UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
ARLENE J. DELGADO,

                Plaintiff,

     -against-

DONALD J. TRUMP FOR PRESIDENT, INC.,
TRUMP FOR AMERICA, INC., SEAN SPICER,
individually, REINCE PRIEBUS, individually, and
STEPHEN BANNON, individually,

                Defendants.
-------------------------------------------------------------------X

No. 19-cv-11764 (AT)

**FIRST AMENDED
COMPLAINT**

**PLAINTIFF DEMANDS
A TRIAL BY JURY**

Plaintiff ARLENE J. DELGADO, by and through her attorneys the DEREK SMITH LAW GROUP, PLLC, hereby complains of Defendants DONALD J. TRUMP FOR PRESIDENT, INC., (hereinafter, the "Campaign"), TRUMP FOR AMERICA, INC., (hereinafter, the "Transition" or "TFA"), SEAN SPICER, individually, REINCE PRIEBUS, individually, and STEPHEN BANNON, individually; and alleges, upon information and belief, as follows:

## NATURE OF CASE

1. Plaintiff complains pursuant to Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978, and by the Civil Rights Act of 1991, Pub. L. No. 102-166) ("Title VII"), the Pregnancy Discrimination Act, the Administrative Code of the City of New York, and the laws of the State of New York, including common law, based upon this Court's supplemental jurisdiction under *United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966) and 28 U.S.C. §1367.

2. Plaintiff seeks declaratory relief and damages to redress injuries she has suffered as a result of *inter alia*, Defendants' breach of contract, tortious interference with economic advantage,

pregnancy discrimination, sex and gender discrimination, hostile work environment, and retaliation.

## JURISDICTION AND VENUE

3. Jurisdiction of this action is conferred upon this Court as this case involves a Federal Question under Title VII.  The Court also has diversity jurisdiction, and jurisdiction pursuant to 29 U.S.C. §2617; 28 U.S.C. §§ 1331 & 1343, and pendent jurisdiction thereto.

4. Additionally, the Court has supplemental jurisdiction under New York State and City laws.

5. Venue is proper in this court, as a substantial part of the events giving rise to this action arose in New York County, within the Southern District of New York.

## PARTIES

6. Plaintiff is an individual woman residing in Miami, Florida.

7. At all times material, the Campaign was and is a foreign not-for-profit corporation incorporated in the State of Virginia, authorized to do business in the State of New York, that operated and operates as a Presidential Campaign Committee, with a principal place of business at Trump Tower, 725 Fifth Avenue, New York, New York, 10022.

8. At all times material, TFA was and is a foreign not-for-profit corporation established pursuant to Section 501(c)(4) of the Internal Revenue Code, incorporated in New Jersey, and authorized to do business is New York.  TFA assisted in the presidential transition and the preparation for Donald Trump's assumption of official duties as President.

9. At all times material, SPICER was a senior official for the Campaign and TFA, and then incoming White House Press Secretary; as such, he held supervisory authority over Plaintiff with regard to her employment, including the ability to hire and fire her.

10. At all times material, PRIEBUS was a senior official for the Campaign and TFA, and then

incoming White House Chief of Staff; as such, he held supervisory authority over Plaintiff with regard to her employment, including the ability to hire and fire her.

11. At all times material, BANNON was a senior official for the Campaign and TFA, and then incoming White House Chief Strategist; as such, he held supervisory authority over Plaintiff with regard to her employment, including the ability to hire and fire her.

## RELEVANT FACTS

### A. PLAINTIFF BEGAN POLITICALLY SUPPORTING DONALD J. TRUMP

12. Ms. Delgado is a nationally known political commentator, writer, and attorney.  A graduate of Harvard Law School, she served as a Senior Advisor and Hispanic Outreach Director for the Campaign and TFA from September 1, 2016 to January 20, 2017.

13. Ms. Delgado is a first-generation Latina-American and a politically conservative writer, thinker, and commentator.  The daughter of Cuban immigrants (her father was a bus driver and her mother worked in a factory), Ms. Delgado only spoke Spanish until she started kindergarten.

14. Ms. Delgado went on to graduate from the University of Florida with 4.0 GPA, then attended and graduated from Harvard Law School, and then joined a top New York City law firm, before returning to Miami to begin building her profile as a political commentator.

15. Ms. Delgado has regularly published commentary in a variety of publications that include the American Conservative, the National Review, the Miami Herald, Breitbart, the Daily Caller, and the Washington Post.  She has appeared hundreds of times as a conservative political commentator on radio, online, and cable news programs, including on Fox News, MSNBC, CNN, CNN en Espanol, Yahoo!, BBC, Al Jazeera, Univision, Telemundo, and NPR.

16. Shortly after Donald J. Trump announced his candidacy for President in 2015, Ms. Delgado became one of his earliest, most loyal, and most vocal supporters, at a time when almost no

political writers or pundits were willing to publicly support him.

17. For example, on October 2015, at a time when nearly all known conservative writers and pundits were supporting other candidates, Ms. Delgado wrote a viral article in Breitbart entitled, "20 Reasons Why It Should be Donald Trump in 2016," at great professional and personal risk.

18. Even before she was formally hired by the Campaign in August 2016, Ms. Delgado made dozens of unpaid television and radio appearances supporting Donald Trump and the Campaign throughout the October 2015 – August 2016 period.  Notably, on November 4, 2015, Ms. Delgado appeared on Sean Hannity's Fox News show and, when asked to predict the election results, correctly predicted that Donald Trump would win the primaries and the general election.

19. MSNBC's Chris Hayes called Ms. Delgado "by far, the most cogent, formidable surrogate for Trump of anyone who's been doing TV appearances," and Fox News' Hannity said Ms. Delgado has "incredible communications skills.  She is not only a Harvard grad who is brilliant, but she has incredible insight and knowledge on every important issue of the day."

20. Even prior to meeting Ms. Delgado in August of 2016, Trump was so impressed with her advocacy that he sent her messages of praise.

### B. PLAINTIFF ENTERED INTO AN EMPLOYMENT AGREEMENT WITH DEFENDANTS

21. Ms. Delgado formally joined the Campaign in August 2016.  Prior to starting her position, she signed a "Consulting Agreement" that, by its own terms, governed all of her work for the Campaign.

22. Paragraph 8 of the Consulting Agreement, titled "Independent Contractor," states plainly:  "You are an independent contractor, not our employee."

23. Paragraph 9 of the Consulting Agreement, titled "Disputes," states (with emphasis added) that all disputes "relating to this agreement" must be brought *before a court* of competent jurisdiction in

New York."  The Consulting Agreement does not contain an arbitration clause.

24.   Finally, Paragraph 11 of the Consulting Agreement, titled "Modification," states in full: "This agreement may only be changed by a writing signed by both you and us."  There has never been any such signed writing.

25.   Nevertheless, a few days after Ms. Delgado began her work, once she was already at the Campaign's headquarters in New York City, the Campaign presented her with another document, titled simply "Agreement," and instructed her to sign it.  Ms. Delgado was not provided any form of consideration for this new purported agreement.  Moreover, this document was never signed by the Campaign, and the Campaign has in the past presented as evidence a copy of the Agreement that does not contain any counter-signature.

26.   Conveniently, in the present litigation, the Campaign unveiled a version of the document with an undated and self-evidently digitally superimposed signature of a low-level clerical assistant.

27.   The purported "Agreement" contains five substantive provisions, titled: (1) "No Disclosure of Confidential Information"; (2) "No Disparagement"; (3) "No Competitive Services"; (4) "No Competitive Solicitation"; and (5) "No Competitive Intellectual Property Claims."   A sixth numbered provision defines various terms used in the "Agreement," a seventh lists various remedies open to the Campaign for violations of the "Agreement," and an eighth states (with emphasis added) that any dispute "*arising under or related to this agreement* may, at the sole discretion of [the Campaign or Donald Trump] be submitted to binding arbitration."

28.   Publicly filed court documents demonstrate that Ms. Delgado's case is not is not the first in which the Campaign and its counsel have played a bait-and-switch game with signed and unsigned versions of the "Agreement," seeking to enforce or evade its provisions as suits the Campaign.  For example, in a March 2019 letter opposing a Campaign's staffer's attempt to

compel arbitration of a dispute, the Campaign noted indignantly: "The agreement attached to Mr. Lewis' purported Amended Statement of Claim (courtesy copy annexed) is not signed by the Campaign." (*See Emmanuel Lewis v. Donald J. Trump for President, Inc.*, AAA Case No. 01-19-0000-5505, March 25, 2019 Letter from Lawrence B. Rosen, Esq. to AAA Director of ADR Services Jonathan Weed., *available at* New York County Supreme Court Index No. 101616/2017, Docket 58.)  The following month, by contrast, the Campaign sought to compel a different former staffer to arbitrate instead of litigating in court.  As that litigant later noted: "the Campaign itself does not appear to have considered the NDA lawful or enforceable until after Ms. Denson filed this action" and "Ms. Denson's only copy of the NDA, is unsigned," so "[s]ince even the Campaign considers an unsigned NDA unenforceable, it is mysterious, albeit unsurprising that the Campaign only produced a copy of the NDA that it had signed after Ms. Denson sued."  *Jessica Denson v. Donald J. Trump for President, Inc.*, N.Y. Cty. Supreme Court, Index No. 101616/2017, Docket 43 at 8, n.8 (citing Docket 12, 57, 58).

29.   The purported Agreement's non-disparagement and confidentiality provisions were not reasonable in time because they had no time limitations whatsoever.  The scope of the definition of confidential and of disparaging information, as well as the entities to which those clauses apply are undefined, unlimited, and exceedingly vague and overbroad, and do not relate to any legitimate interests of the Defendants.

30.   As a result of the vagueness and overbreadth of these clauses, Ms. Delgado has been chilled and effectively restrained from making speech about matters of public interest.

31.   Because of the vagueness and overbreadth of these clauses, it was and is impossible for Ms. Delgado to know what speech she has agreed to forego, and thus she did not assent or agree to these material terms of the purported "Agreement."

### C. Plaintiff Began Working For Defendants

32. When Ms. Delgado began working for Defendants, her counterparts on the Campaign were Sarah Huckabee Sanders (later hired by the White House as Deputy Press Secretary and then promoted to White House Press Secretary); Boris Epshteyn (who was hired by the White House); and Omarosa Manigualt Newman (who was also subsequently hired by the White House).

33. After joining the Campaign, Ms. Delgado appeared on television on behalf of Donald Trump nearly 100 times and defended him against every attack. The Washington Post referred to Ms. Delgado as "one of Trump's most steadfast defenders."

34. Ms. Delgado performed for the campaign so well that Trump consistently complimented her and referred to her as his "star" and routinely called Ms. Delgado up on stage at public events and singled her out for praise.

35. Indeed, on at least three separate occasions, Donald Trump personally promised Ms. Delgado that if he won the election, she would be "set" in the White House in a prime role. This occurred backstage at an Austin, Texas "Hannity" town hall in late August 2016; on a plane ride to Miami in late September 2016; and during a Campaign event at the Bay of Pigs Museum in Miami in late October 2016. At the latter, Trump reiterated that promise and added, "I won't forget what you've done for me."

36. Ms. Delgado's supervisor, Campaign Spokesperson Jason Miller, also assured Ms. Delgado many times that she was "going in" to the Trump Administration with a White House job. For example, Miller sent Ms. Delgado a text message on December 16, 2016: "You're on the list going in!!! I've told you that repeatedly." On one occasion in December 2016, Miller sketched out Ms. Delgado's career options within the White House on a white board in his office, and listed her as part of the top White House communications staff.

**D. DEFENDANTS DISCRIMINATED AGAINST PLAINTIFF AFTER SHE GOT PREGNANT, THEN RETALIATED AGAINST PLAINTIFF FOR COMPLAINING ABOUT DISCRIMINATION**

37. In mid-November 2016, Ms. Delgado learned that she had become pregnant by Miller.

38. Ms. Delgado informed Miller, his initial response was to ask her to terminate her pregnancy. When she refused, he told her that she could not be seen "waddling around the White House pregnant."

39. Around December 21, 2016, Ms. Delgado e-mailed BANNON and senior Campaign and TFA Advisor Kellyanne Conway to inform them of her pregnancy.

40. The following day, around December 22, 2016, Miller raised Ms. Delgado's pregnancy during a morning conference call with PRIEBUS and BANNON, which had been scheduled to discuss Miller's appointment as White House Communications Director – announced later that day.

41. Upon learning of Miller's appointment, Ms. Delgado called BANNON directly to confirm that he was aware of her pregnancy. BANNON reassured Ms. Delgado that "everything would be okay" but refused to discuss her request for a job in the White House, promising instead that someone would reach out to her later that day to discuss the issue. Despite this promise, nobody reached out to Plaintiff.

42. In late December 2016, Ms. Delgado sent BANNON and PRIEBUS an e-mail with the subject line: "IMPORTANT – pls read." Her e-mail noted how "Mr. Trump, on two separate occasions in person, promised me I'd be part of the inner circle if we won the election and would head with him to the White House," as did Miller, who "on countless occasions emphasized I would absolutely be in the West Wing." However, "as punishment for … a pregnancy," she had been "*REMOVED from the org chart and have been removed from any job possibility*." Ms. Delgado concluded: "*I am a woman being penalized for a male supervisor's actions, as I am pregnant no less, while said supervisor is elevated to one of the most senior WH roles.*"

43. On December 22, 2016 and December 24, 2016, Ms. Delgado posted several "tweets" relating to being pregnant by Miller.  Notably, at that time and for several months thereafter, the Campaign took no legal action against Ms. Delgado or her Twitter account.

44. On December 26, 2016, Ms. Delgado spoke with SPICER on the phone.  He discouraged Ms. Delgado from pursuing White House employment due to her status as a pregnant woman and a first-time mother.

45. SPICER told Ms. Delgado that the White House is "no place for a new mom," citing the long hours and serious commitment required of a White House job; he said that that it would be difficult, if not impossible, for Ms. Delgado to work in the White House as a first-time mother with a newborn baby.  SPICER noted that the White House press team holds daily meetings at 7:00 a.m., including on weekends, and emphasized that having children and working was difficult even for him, and it would not be possible without assistance from his wife and their nannies.  SPICER tried persuading Ms. Delgado to focus on options outside the White House.

46. Despite this, Ms. Delgado insisted that she receive equal treatment to other Campaign employees and that she was seeking a position in the White House despite being pregnant.

47. Shortly thereafter, the Campaign and TFA, including SPICER, BANNON and PRIEBUS, stripped Ms. Delgado of her job responsibilities and duties for for the remainder of her employment with them, from late December 2016 through the Inauguration in late January 2017.

48. By way of example only, Ms. Delgado immediately and inexplicably stopped receiving e-mails and other communications from the Campaign and TFA, including about projects on which she was working.

49. Ms. Delgado was excluded from participating in the communications work of the Inauguration in any capacity, even though she was still formally part of the Communications Transition team.

50. Ms. Delgado was even prohibited from making previously scheduled television appearances around the time of the Inauguration. Despite the fact that Ms. Delgado was still officially the Campaign's Hispanic Outreach Director, she was even excluded from a transition event where her team met with Hispanic leaders.

51. On January 20, 20217, Ms. Delgado texted SPICER, reminding him that she was still waiting to hear about her new position at the White House. SPICER did not respond. Ms. Delgado followed up by e-mail on multiple occasions over a period of weeks, strongly reiterating her interest in a White House position and asking about her status. She never received a substantive response.

52. Whereas even Republican National Campaign (RNC) employees who had previously criticized Donald Trump, and had far less experience and fewer accolades than Plaintiff, were given high-ranking and well-paying White House jobs, Ms. Delgado was completely ignored. She even watched as administrative, junior staffers from the Campaign received top jobs in the administration.

53. Ultimately, Defendants actually terminated and/or constructively terminated Ms. Delgado from the Campaign because of her sex, gender, and pregnancy, as well as in retaliation for her complaining of discrimination.

54. Defendants also prevented Ms. Delgado from obtaining employment with the White House and Federal Government – interfering with her relationship with governmental third parties including the United States of America, the White House, the General Services Administration, the Executive Office of the President, and/or the Office of Management and Budget – who would otherwise have hired Ms. Delgado – because of her sex, gender, and pregnancy, and because she complained of discrimination.

55.   In particular, upon information and belief, in late December 2016 or early January 2017, Defendants communicated with the Federal Government, including but not limited to the United States of America, the General Services Administration, the Executive Office of the President, and/or the Office of Management and Budget, and advised the Trump Administration or the Federal Government to remove Ms. Delgado from the list of incoming White House personnel and to not hire her.

56.   As a result of these communications, the United States of America, the General Services Administration, the Executive Office of the President, and/or the Office of Management and Budget did not hire Ms. Delgado.

57.   But for Defendants' intentional interference with Ms. Delgado's attempts to obtain a White House position, she would have almost certainly been named Deputy Press Secretary, and as such, would have earned $165,000 in 2017 and $179,700 in each of the following three years

58.   The only possible motive for Defendants' acts and omissions was Ms. Delgado's sex and gender, pregnancy, and complaints of discrimination – or else pure malevolence.

59.   Defendants thus discriminated against Ms. Delgado because of her gender and pregnancy, retaliated against her because she complained of such discrimination, and tortiously interfered with her business and career opportunities, and her prospects with the third-party White House and Federal Government.

### E.   DEFENDANTS ENTERED INTO A SETTLEMENT AGREEMENT WITH PLAINTIFF, BUT THEN RENEGED ON THE AGREEMENT AND FAILED TO PERFORM THEIR OBLIGATIONS UNDER THE AGREEMENT

60.   On March 29, 2017, Ms. Delgado's counsel informed the TFA's counsel that she intended to file a complaint with the New York City Commission on Human Rights ("NYCCHR") regarding the discrimination she had suffered while working for the Campaign and TFA.

61. On May 10, 2017, the Parties had a full-day mediation before former First Department Justice Betty Weinberg-Ellerin, in an to attempt to resolve Ms. Delgado's claims.

62. The mediation resulted in a settlement proposal from Justice Weinberg-Ellerin.

63. Defendants and Ms. Delgado both orally accepted the settlement proposal, reaching a binding settlement agreement for the amount proposed by Judge Weinberg-Ellerin, in exchange for a release of all claims.

64. The Parties then confirmed the settlement agreement in writing via e-mails between counsel for all Parties.

65. Plaintiff began performing her obligations under the agreement, including by drafting a long-form written agreement and refraining from pursing further legal action in accordance with the agreement's release clause.

66. Subsequently, however, Defendants reneged on their part of the agreement and refused to perform their obligations under it.

## F. DEFENDANTS FILED A MERITLESS ARBITRATION DEMAND THAT HAS SINCE BEEN DISMISSED ON SUMMARY JUDGMENT

67. Immediately after reneging on their settlement agreement, and in further retaliation for Ms. Delgado's prior complaints of discrimination and stated intent to file a NYCCHR complaint, on on about July 31, 2017 Defendants filed a baseless arbitration action against Ms. Delgado while she was caring for a three-week-old newborn.  Defendants claimed $1.5 million in damages and alleged that Ms. Delgado had breached the confidentiality and non-disparagement clauses of the purported "Agreement" from mid-2016.

68. Defendants' baseless arbitration demand claimed that Ms. Delgado breached the "Agreement," "by publishing confidential information in a series of Twitter posts on December 22 and 24, 2016," and because she "has also threatened to file a public complaint containing similar and

further confidential information and disparaging statements with the New York City Commission on Human Rights." Defendants later withdrew the portion of their arbitration demand which claimed Ms. Delgado's intent to file a complaint with the NYCCHR was a violation of the "Agreement," further demonstrating the baselessness of the arbitration.

69.   Once they had filed the Arbitration Demand against Ms. Delgado in order to silence her, Defendants ceased prosecuting their claims. Ms. Delgado requested that the Arbitration continue so she could be vindicated and not have the matter pending eternally, but Defendants refused, and the Arbitration proceeding was held in abeyance.

70.   More than a year later, in about September 2018, the arbitration tribunal requested a status update from the Parties, because its practice is to close a case after one year without activity. Defendants e-mailed the arbitration tribunal: "At this time, the Claimant has no intention of prosecuting its claims against Ms. Delgado. We request, however, that the AAA continue to hold this matter in abeyance pending final disposition." This further demonstrated that the Arbitration demand was unfounded and merely intended to intimidate Ms. Delgado from pursing her discrimination claims. Despite Ms. Delgado's insistence that the Arbitration continue so she could be vindicated and not simply have it hanging over her head, Ms. Delgado was ignored and the Arbitration remained in abeyance.

71.   For yet another year, Defendants refused to prosecute the Arbitration against Ms. Delgado, until her counsel in the present action reached out to Defendants' Counsel in late December 2019 and informed them that the instant Complaint would be filed; at that point Defendants immediately re-initiated the Arbitration against Ms. Delgado, in retaliation for the instant action.

72.   Indeed, tellingly, Defendants could not claim that they re-initiated the Arbitration to seek relief relating to Ms. Delgado's claims. The only claim Defendants sought to prosecute was for the

alleged breach caused by her tweets in December of 2016, three years earlier.  Given the fact that Defendants only initiated and then revived their Arbitration claims at times when Ms. Delgado indicated an intent file a Complaint or lawsuit, Defendants clearly did not care to pursue these claims out of merit, but merely to intimidate Ms. Delgado and deter her from filing the present action.

73.   Defendants retaliated against Ms. Delgado for complaining about discrimination and retaliation, as well as for indicating her intent to file the present action.

74.   Ultimately, on October 8, 2020, the Arbitrator issued an opinion and award vindicating Ms. Delgado, rejecting all of Defendants' arguments, dismissing all of their Arbitration claims, and awarding Ms. Delgado attorney's fees and costs.

75.   The Arbitrator concluded that the purported Agreement's "Confidential Information" provision could only pertain to "Mr. Trump's political affairs," and "[a]ny attempt to read that text so as to prohibit the disclosure of all private information, even Respondent's own, without the qualifying reference to Mr. Trump's political affairs, would result in an overly broad, vague and unenforceable restriction."   The Arbitrator further concluded that the purported Agreement's definition of "Confidential Information" to include any information "that Mr. Trump insists remain private or confidential" is "overly broad and vague, and so is unenforceable."

76.   The Arbitrator concluded that Plaintiff's December 22 and 24, 2016 tweets "contained opinions (as distinct from confidential facts) and/or information regarding her personal life," and "were strictly personal in nature and did not violate the prohibition on disclosing information regarding Mr. Trump's political affairs," so "[r]egardless of their alleged public impact, the essential nature of those communications does not fall within the enforceable definition of Confidential Information in the Agreement."

77. Thus, the Arbitrator further concluded, while it is "questionable whether the tweets were disparaging," even if they were, they were "directed only at an individual colleague," not the Campaign – so could not have violated the purported Agreement's non-disparagement provision.

### G. A JUDGE DECLARED IDENTICAL NON-DISPARAGEMENT AND NON-DISCLOSURE PROVISIONS, CITED BY DEFENDANTS IN ANOTHER ACTION, VOID AND UNENFORCEABLE, THUS COLLATERALLY ESTOPPING DEFENDANTS FROM ENFORCING THE PURPORTED "AGREEMENT" IN THE PRESENT CASE

78. On March 30, 2021, in another former Trump Campaign staffer's sexual harassment and gender discrimination lawsuit (in which Defendants' present counsel represented the Campaign), District Judge Paul G. Gardephe reviewed a purported confidentiality and non-disparagement "Agreement" identical to the one at issue in this case.

79. Judge Gardephe's March 30, 2021 Opinion and Order declares the entire confidentiality and non-disparagement provisions so vague and overbroad as to be entirely invalid and unenforceable for lack of mutual assent – not even salvageable through "blue penciling." *See generally Jessica Denson v. Donald J. Trump For President, Inc.*, 1:20-cv-04737-PGG (S.D.N.Y.), Docket No. 48.

80. Judge Gardephe's opinion notes that "[t]he Campaign has brought claims for arbitration against other former Campaign workers for alleged breaches of the Employment Agreement (or similar non-disclosure agreements)," offering several high-profile examples. *Id.* at 9.

*****

81. As demonstrated above, Defendants breached their settlement agreement with Ms. Delgado, and repeatedly discriminated against her because of her sex, gender, and pregnancy, as well as in retaliation for her complaining of discrimination.

82. Defendants also wrongfully terminated Ms. Delgado because of her sex, gender, and pregnancy, as well as in retaliation for her complaining of discrimination.

83. Defendants also tortiously interfered with Ms. Delgado's prospective business opportunities with

third parties, including in the Federal Government, the White House, and other media positions.

84. As a result of Defendants' actions, Ms. Delgado feels extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

85. As a result of the acts and conduct complained of herein, Ms. Delgado has suffered and will continue to suffer loss of income, including the loss of salary, bonuses, benefits, and other compensation.

86. In particular, Defendants' conduct has not only caused Ms. Delgado reputational harm and the loss of a White House position with a significant salary, but also other jobs on political campaigns and in journalism and commentary, including publishing deals, that are likely worth millions of dollars in income.

87. As a result of Defendant's actions, Ms. Delgado feels extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

88. As a result of the acts and conduct complained of herein, Ms. Delgado has suffered and will continue to suffer future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.  Ms. Delgado has further experienced severe emotional and physical distress.

89. As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Ms. Delgado demands punitive damages against all Defendants, jointly and severally.

90. The above are just some examples of some of the unlawful discrimination and retaliation to which Defendants subjected Ms. Delgado.

91. Defendants' actions constituted a continuing violation of the applicable federal, state, and local laws.

## FIRST CAUSE OF ACTION
### BREACH OF CONTRACT
#### (Against All Defendants)

92.   Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this
Complaint as if fully set forth at length herein.

93.   Ms. Delgado entered into a valid, binding, and enforceable contract with Defendants to settle her
discrimination claims.

94.   Ms. Delgado has performed and has been ready, willing, and able to continue performing, all of
her material obligations in connection with this settlement agreement.

95.   Defendants have willfully and intentionally breached their settlement agreement with Ms.
Delgado and failed to perform their obligations in connection with that agreement, including but
not limited to failing to pay her the settlement amount owed under the agreement.

96.   Defendants have further breached the covenants of good faith and fair dealing inherently
contained in the settlement agreement, as in every contract, in their dealings with Ms. Delgado.

97.   As a result of these breaches, Plaintiff has been damaged in an amount to be determined at trial,
but not less than the amount of the settlement agreement with Defendants, plus costs and interest.

## SECOND CAUSE OF ACTION
### PROMISSORY ESTOPPEL
#### (Against All Defendants)

98.   Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this
Complaint as if fully set forth at length herein.

99.   Defendants made a clear and unambiguous promise to Ms. Delgado to settle her NYCCHR
claims, and she reasonably and foreseeably relied upon their promise to her detriment by ceasing
to pursue those claims.

100.   Defendants breached their promise by refusing to fulfill their agreed-upon settlement, including

by, but not limited to, failing to pay Ms. Delgado the settlement amount owed under the agreement.

101. As a direct result of the Defendants' actions, Plaintiff has suffered damages in an amount to be determined at trial, but not less than the amount of the settlement agreement with Defendants plus costs and interest.

### THIRD CAUSE OF ACTION
### NEW YORK STATE EXECUTIVE LAW – DISCRIMINATION
### (Against All Defendants)

102. Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this Complaint as if fully set forth at length herein.

103. New York Executive Law Section 296 provides: "1. It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

104. Defendants engaged in an unlawful discriminatory practice under this provision by discriminating against Ms. Delgado because of her sex, gender, and pregnancy.

105. Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of New York State Executive Law Section 296.

### FOURTH CAUSE OF ACTION
### NEW YORK STATE EXECUTIVE  LAW – AIDING AND ABETTING
### (Against All Defendants)

106. Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this Complaint as if fully set forth at length herein.

107.   New York State Executive Law Section 296(6) further provides: "It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."

108.   Defendants engaged in an unlawful discriminatory practice under this provision by aiding, abetting, compelling, and/or coercing the other Defendants' discriminatory behavior as stated herein.

## FIFTH CAUSE OF ACTION
## NEW YORK STATE EXECUTIVE LAW – RETALIATION
### (Against All Defendants)

109.   Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this Complaint as if fully set forth at length herein.

110.   New York State Executive Law Section 296(7) provides that it shall be an unlawful discriminatory practice:  "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because [s]he has opposed any practices forbidden under this article."

111.   Defendants engaged in an unlawful discriminatory practice under this provision by retaliating against Plaintiff because she complained of discrimination and indicated her intention to file a NYCCHR complaint and pursue legal action against Defendants for their unlawful practices.

## SIXTH CAUSE OF ACTION
## NEW YORK CITY ADMINISTRATIVE CODE – DISCRIMINATION
### (Against All Defendants)

112.   Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this Complaint as if fully set forth at length herein.

113.   Section 8-107(1) of the Administrative Code of City of New York provides that it shall be an unlawful discriminatory practice: "(a) For an employer or an employee or agent thereof, because

of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienate or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

114. Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8 by creating and maintaining discriminatory working conditions and a hostile work environment, and otherwise discriminating against Plaintiff, because of her sex, gender, or pregnancy.

115. Plaintiff hereby makes a claim against Defendants under all applicable paragraphs of New York City Administrative Code Title 8.

## SEVENTH CAUSE OF ACTION
## NEW YORK CITY ADMINISTRATIVE CODE – RETALIATION
### (Against All Defendants)

116. Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this Complaint as if fully set forth at length herein.

117. Section 8-107(7) of the New York City Administrative Code provides that it shall be an unlawful discriminatory practice: "For an employer . . , to discharge . . . or otherwise discriminate against any person because such person has opposed any practices forbidden under this chapter . . . ."

118. Defendants engaged in an unlawful discriminatory practice under this provision by wrongfully retaliating against Plaintiff because she complained of discrimination and indicated her intention to file a NYCCHR complaint and pursue legal action against Defendants for their unlawful practices.

## EIGHTH CAUSE OF ACTION
## NEW YORK CITY ADMINISTRATIVE CODE – AIDING AND ABETTING
### (Against All Defendants)

119.    Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this

Complaint as if fully set forth at length herein.

120.    Section 8-107(6) of the New York City Administrative Code provides that it shall be an unlawful

discriminatory practice: "For any person to aid, abet, incite, compel; or coerce the doing of any

of the acts forbidden under this chapter, or attempt to do so."

121.    Defendants engaged in an unlawful discriminatory practice under this provision by aiding,

abetting, inciting, compelling, and coercing the above discriminatory, unlawful, and retaliatory

conduct of the other Defendants.

## NINTH CAUSE OF ACTION
## NEW YORK CITY ADMINISTRATIVE CODE – INTERFERENCE
### (Against All Defendants)

122.    Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this

Complaint as if fully set forth at length herein.

123.    Section 8-107(19) of the New York City Administrative Code, titled "Interference With

Protected Rights," provides:  "It shall be an unlawful discriminatory practice for any person to

coerce, intimidate, threaten or interfere with, or attempt to coerce, intimidate, threaten or

interfere with, any person in the exercise or enjoyment of, or on account of his or her having

aided or encouraged any other person in the exercise or enjoyment of, any right granted or

protected pursuant to this section."

124.    Defendants engaged in an unlawful discriminatory practice under this provision as set forth

herein.

**TENTH CAUSE OF ACTION**
**NEW YORK CITY ADMINISTRATIVE CODE – VICARIOUS LIABILITY**
**(Against All Defendants)**

125.   Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this

Complaint as if fully set forth at length herein.

126.   Section 8-107(13) of the New York City Administrative Code, titled "Employer Liability for

Discriminatory Conduct by Employee, Agent or Independent Contractor," provides:   "An

employer shall be liable for an unlawful discriminatory practice based upon the conduct of an

employee or agent which is in violation of any provision of this section other than subdivisions

one and two of this section"   And it further states that an employer "shall be liable for an

unlawful discriminatory practice based upon the conduct of an employee or agent which is in

violation of subdivision one or two of this section" where:   "(1) the employee or agent exercised

managerial or supervisory responsibility"; or "(2) the employer knew of the employee's or

agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and

appropriate corrective action; an employer shall be deemed to have knowledge of an employee's

or agent's discriminatory conduct where that conduct was known by another employee or agent

who exercised managerial or supervisory responsibility"; or "(3) the employer should have

known of the employee's or agent's discriminatory conduct and failed to exercise reasonable

diligence to prevent such discriminatory conduct."

127.   Defendants are vicariously liable for the unlawful discriminatory practices of their employees, as

set forth herein.

**ELEVENTH CAUSE OF ACTION**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
**(Against All Defendants)**

128.   Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this

Complaint as if fully set forth at length herein.

129. Defendants tortiously interfered with Ms. Delgado's ability to obtain employment with the White House because of her sex, gender, and pregnancy, and because she had complained of discrimination and retaliation.

130. Through the foregoing, Defendants harmed Plaintiff, who has been injured as a result thereof.

**TWELFTH CAUSE OF ACTION**
**PRIMA FACIE TORT**
**(Against All Defendants)**

131. Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this Complaint as if fully set forth at length herein.

132. By the acts and omissions described herein, Defendants intentionally inflicted harm upon Ms. Delgado.

133. Given Ms. Delgado's highly successful work for the Trump Campaign, Donald Trump's repeated praise of her abilities, and their own promises to her, Defendants had no justification for interfering with Ms. Delgado's ability to obtain a role in the Trump Administration.

134. Even if their motives are ultimately deemed to be non-discriminatory and non-retaliatory, then Defendants could only have been motivated by "disinterested malevolence," or the intent to simply harm Ms. Delgado.

135. But for Defendants' intentional interference with Plaintiff's attempts to obtain a White House position, she would have almost certainly been named Deputy Press Secretary, and as such, she would have earned $165,000 in 2017 and then $179,700 in each of the following three years – or a total of $704,100.  Thus, Plaintiff suffered special damages as a direct result of Defendants' tortious acts and omissions.

<u>THIRTEENTH CAUSE OF ACTION</u>
<u>DECLARATORY JUDGMENT</u>
<u>(Against All Defendants)</u>

136.   Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this Complaint as if fully set forth at length herein.

137.   Defendants have moved, and intend to move imminently, for an order compelling Ms. Delgado to arbitrate her contract-related claims against Defendants.

138.   This is despite the fact that the "Consulting Agreement" pursuant to which Ms. Delgado worked for Defendants states that all disputes between them must be brought in a court of law, and the fact that the non-disclosure and non-disparagement provisions of the purported "Agreement" under which Defendants demand arbitration have now been held invalid and unenforceable by both an arbitrator and a judge in this district, in cases where Defendants, zealously represented by their present counsel, had a full and fair opportunity to litigate the validity and enforceability of those provisions.

139.   Plaintiff is accordingly entitled to a declaration, pursuant to 28 U.S.C. § 2201(a), that the purported "Agreement" is null and void, that Defendants cannot compel her to arbitrate any disputes under it, and that the entirety of the current dispute must be heard by a court of law.


   **WHEREFORE**, Plaintiff demands judgment against all Defendants, jointly and severally, in an amount to be determined at the time of trial; plus interest, punitive damages, attorneys' fees, costs, and disbursements of action; a judgment enforcing the settlement agreement that Defendants previously reached with Plaintiff; and a judgment deeming the purported confidentiality and non-disparagement agreement between the parties null and void and permanently enjoining Defendants from bringing claims or attempting to enforce any part of

the purported "Agreement" against Plaintiff; and for such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a jury trial on all issues to be tried.

Dated:  New York, New York
       April 15, 2021

                 DEREK SMITH LAW GROUP, PLLC

         By:    ***/s/Abraham Z. Melamed***
               Abraham Z. Melamed, Esq.
               Daniel S. Kirschbaum, Esq.
               One Penn Plaza, Suite 4905
               New York, New York 10119
               (212) 587-0760

               *Attorneys for Plaintiff*