UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
ARLENE J. DELGADO,

No. 19-cv-11764 (AT)

Plaintiff,

-against-

DONALD J. TRUMP FOR PRESIDENT, INC.,
TRUMP FOR AMERICA, INC., SEAN SPICER,
individually, REINCE PRIEBUS, individually, and
STEPHEN BANNON, individually,

Defendants.
-------------------------------------------------------------------X


**PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF HER MOTION FOR A PERMANENT INJUNCTION**


DEREK SMITH LAW GROUP, PLLC
One Penn Plaza, Suite 4905
New York, New York 10119
(212) 587-0760

*Attorneys for Plaintiff Arlene Delgado*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT……………………………………………………..1

MATERIAL FACTS……………………………………………………………....2

a)    The Purported "Confidentiality Agreement" That Defendants Seek To Enforce………2

b)    The Campaign's Multiple Attempts To Enforce the Confidentiality Agreement………..4

c)    The AAA Arbitrator Held That the Confidentiality Agreement's Non-Disparagement
      and Non-Disclosure Clauses Could Only Relate To Donald Trump's Political
      Affairs, and That Its Definition Of Confidentiality Is Overly Broad, Vague, and
      Unenforceable…..…………………………………………………………….5

d)    Judge Gardephe Held, in a Case Involving the Same Defendants and Another
      Former Campaign Staffer, That Identical Non-Disparagement and Non-Disclosure
      Clauses in an Identical Agreement Are Invalid and Unenforceable……........................6

ARGUMENT…………………………………………………….……………….....10

I.    THIS COURT SHOULD FIND AS A MATTER OF LAW THAT THE
      PURPORTED "AGREEMENT" IS INVALID AND UNENFORCEABLE……….11

      A.    The Decisions of Arbitrator Ruffino and Judge Gardephe Should
            Collaterally Estop Defendants From Seeking To Enforce the Purported
            Agreement………………………………………………………………11

      B.    The Purported Agreement's Non-Disparagement and Non-Disclosure
            Provisions Are Vague and Over-Broad On Their Face And Thus
            Unenforceable…………………………………………………………...17

II.   THE COURT SHOULD PERMANENTLY ENJOIN DEFENDANTS FROM
      SEEKING TO ENFORCE THE CONFIDENTIALITY AGREEMENT
      AGAINST PLAINTIFF IN THIS ACTION OR ANY FUTURE ACTION………...22

      A.    Forcing Plaintiff To Defend Endless Actions, And In Particular To Arbitrate
            Claims, Pursuant To An Invalid Contractual Provision To Which She Never
            Assented, Constitutes Irreparable Injury Which Legal Remedies Like
            Monetary Damages Cannot Adequately Compensate………………..……..22

      B.    The Balance of Hardships Clearly Weighs In Plaintiff's Favor…………….23

      C.    A Permanent Injunction Would Only Serve the Public's Interest………….23

CONCLUSION………………………………………………………….…..………25

## **TABLE OF AUTHORITIES**

<u>**Cases**</u>

*Ashland Mgmt. Inc. v. Altair Invs. NA, LLC*,
    59 A.D.3d 97 (1st Dept. 2008), *aff'd as modified*, 14 N.Y.3d 774 (2010) ..........6, 18

*BDO Seidman v. Hirshberg*,
    93 N.Y.2d 382 (1999) ...................................................................................18

*Bifolck v. Philip Morris USA Inc.*,
    936 F.3d 74 (2d Cir. 2019) ....................................................................11, 12

*China Shipping Container Lines Co. v. Big Port Serv. DMCC*,
    No. 15 CIV. 2006 (AT), 2019 WL 9362547 (S.D.N.Y. Jan. 15, 2019) .....................11

*Denson v. Donald J. Trump For President, Inc.*,
    No. 20 Civ. 4737 (PGG), 2021 WL 1198666, (S.D.N.Y. 2020) .......................*passim*

*Denson v. Donald J. Trump For President, Inc.*,
    180 A.D.3d 446 (1st Dep't 2020).................................................................24

*Deutsche Bank Sec., Inc. v. Borjas*,
    No. 18 Civ. 10191 (DLC), 2018 WL 6200045 (S.D.N.Y. Nov. 28, 2018).................24

*eBay Inc. v. Merc Exchange, L.L.C.*,
    547 U.S. 388 (2006) ...............................................................................10-11, 22

*EMA Fin. LLC v. Aim Exploration, Inc.*,
    No. 18 Civ. 145, 2019 WL 689237 (S.D.N.Y. 2019)......................................10, 22

*In re Express Indus. & Terminal Com. v. N.Y. State Dep't of Transp.*
    93 N.Y.2d 584 (1999) .................................................................................*passim*

*Interoceanica Corp. v. Sound Pilots, Inc.*,
    107 F.3d 86 (2d Cir. 1997) .........................................................................11

*Joseph Martin, Jr. Delicatessen, Inc. v. Schumacher*,
    52 N.Y.2d 105 (1981)..............................................................................7, 18

*Merrill Lynch Inv. Managers v. Optibase, Ltd.*,
    337 F.3d 125 (2d Cir. 2003)......................................................................22

*Morgan Stanley & Co. v. Seghers*,
    No. 10 Civ. 5378 (DLC), 2010 WL 3952851(S.D.N.Y. 2010) .............................24

*Parklane Hosiery Co. v. Shore*,
    439 U.S. 322 (1979)..................................................................................12

*Reed, Roberts Assocs. v. Strauman*,
    40 N.Y.2d 303 (1976) …………………………………………………………...18

*Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*,
    68 F.3d 1478 (2d Cir. 1995)……………………………………………………...12

*Safra Secs. LLC v. BS Palladium Ltd.*,
    No. 19 Civ. 3213 (NRB), 2019 WL 4198680 (S.D.N.Y. 2019) …………………..……….24

*Smith Barney, Harris Upham & Co. v. St. Pierre*,
    No. 92 Civ. 5735, 1994 WL 11600 (N.D. Ill. Jan. 4, 1994) ……………………………24

*UBS Sec. LLC v. Voegeli*,
    684 F. Supp. 2d 351 (S.D.N.Y. 2010), *aff'd*, 405 F. App'x 550 (2d Cir. 2011) …….23, 24

Plaintiff, Arlene J. Delgado, by and through her attorneys Derek Smith Law Group, PLLC, respectfully submits this Memorandum of Law in support of her Motion for a Permanent Injunction against Defendants.

## PRELIMINARY STATEMENT

Defendants seek in the present action, as they sought in a separate arbitration before the AAA, to enforce the confidentiality and non-disparagement provisions of a purported agreement ("the Confidentiality Agreement") against Plaintiff Delgado.  However, the arbitrator in that related AAA proceeding (involving the same parties), as well as Judge Gardephe in a separate action, *Jessica Denson v. Donald J. Trump For President, Inc.*, 1:20-cv-04737-PGG (S.D.N.Y.) (involving the same main Defendant), have both now held, with binding and preclusive effect, that the purported Confidentiality Agreement is so vague and overbroad that it is unenforceable. *Id*.  In essence, these decisions hold that there could have been no mutual assent between the parties to form a contract, and thus the Confidentiality Agreement is null and void.

Defendants' present threat of arbitration, as a matter of well-settled law, would cause irreparable injury to Ms. Delgado that cannot be adequately compensated by monetary damages or other legal remedies.  Moreover, the balance of hardships between the parties warrants an equitable remedy, as Plaintiff (an indigent single mother) is at a significant disadvantage to Defendants, a group of well-funded and high-powered political operatives and organizations. Further, the public interest supports allowing Ms. Delgado (like other former Campaign workers) to speak freely about matters of public interest.

As such, and as more fully set forth below, Plaintiff respectfully requests that the Court issue an order permanently enjoining Defendants from seeking to enforce the terms of the purported Confidentiality Agreement, in this Action, or any other action in the future.

## MATERIAL FACTS

*a)*  ***The Purported "Confidentiality Agreement" That Defendants Seek To Enforce***

As described in the Amended Complaint, Ms. Delgado began working for Defendants in about August 2016, after signing a "Consulting Agreement" stating that all disputes relating to her employment should be brought before a court of competent jurisdiction in New York.  (*See* the accompanying Affirmation of Abraham Z. Melamed ("Melamed Aff."), Ex. A.)   The Consulting Agreement lacked any arbitration provision.  *Id*.  Days after Ms. Delgado began working for Defendants, they presented her with another document titled only "Agreement" (i.e., the Confidentiality Agreement), and instructed her to sign it.  (*Id.* Ex. B).

The purported Confidentiality Agreement contains five substantive provisions, titled: (1) "No Disclosure of Confidential Information"; (2) "No Disparagement"; (3) "No Competitive Services"; (4) "No Competitive Solicitation"; and (5) "No Competitive Intellectual Property Claims."   A sixth numbered provision defines various terms used in the document, a seventh lists various remedies open to the Campaign for violations of the other provisions, and an eighth states (with emphasis added) that any dispute "*arising under or related to this agreement* may, at the sole discretion of [the Campaign or Donald Trump] be submitted to binding arbitration."  *Id*.

Section 1 provides in relevant part:  "During the term of your service and at all times thereafter you hereby promise and agree: …"

a. not to disclose, disseminate or publish, or cause to be disclosed, disseminated or published, any Confidential Information;

b. not to assist others in obtaining, disclosing, disseminating, or publishing Confidential Information;

c. not to use any Confidential Information in any way detrimental to the Company, Mr. Trump, any Family Member, any Trump Company or any Family Member Company;

d.  not to save, store or memorialize any Confidential Information (including, without limitation, incorporating it into any storage device, server, Internet site or retrieval system, whether electronic, cloud based, mechanical or otherwise) except as may be expressly required in connection with the performance of services to the Company;

e.  to (i) provide the Company with written notice of any legal obligation to disclose any Confidential Information as soon as you become aware of such obligation, (ii) not make any disclosure notwithstanding such obligation until the Company (or the appropriate Trump Person) has had a reasonable opportunity to seek an appropriate protective order or similar relief, (iii) fully cooperate and join with the Company (and the appropriate Trump Person) in any request for a protective order or similar relief, (iv) exercise all reasonable efforts to obtain reliable assurance that confidential treatment will be accorded such Confidential Information in the event no such protective order or similar relief is obtained, whether because it has been denied or because the Company (or the appropriate Trump Person) has elected not to seek it, and [(v)] under all circumstances, not furnish any greater portion of the Confidential Information than you are advised by counsel is absolutely legally required to be disclosed by you or furnish any Confidential Information to any individual, company or governmental entity other than the one to whom or to which you are absolutely legally required to disclose it;

…

The foregoing provisions each apply to Confidential Information and disclosure, dissemination, publication, use and effort to help others obtain, saving, storing and memorializing of Confidential Information, as applicable, (i) by any means of expression, including but not limited to verbal, written, or visual, (ii) whether or not preserved in any medium now known or hereafter discovered or invented, including but not limited to audio recording of any type, written text, drawing, photograph, film, video, or electronic device, (iii) in any manner or form, including but not limited to any book, article, memoir, diary, letter, essay, speech, interview, panel or roundtable discussion, image, drawing, cartoon, radio broadcast, television broadcast, video, movie, theatrical production, Internet website, e-mail, Twitter tweet, Facebook page, or otherwise, even if fictionalized, (iv) in any language, or (v)in any country or other jurisdiction (collectively, the "Restricted Means and Contexts").

"Confidential Information" is defined elsewhere in the "Agreement" as:

all information (whether or not embodied in any media) of a private, proprietary or confidential nature or that Mr. Trump insists remain private or confidential, including, but not limited to, any information with respect to the personal life, political affairs, and/or business affairs of Mr. Trump or of any Family Member, including but not limited to, the assets, investments, revenue, expenses, taxes, financial statements, actual or prospective business ventures, contracts, alliances,

affiliations, relationships, affiliated entities, bids, letters of intent, term sheets, decisions, strategies, techniques, methods, projections, forecasts, customers, clients, contacts, customer lists, contact lists, schedules, appointments, meetings, conversations, notes, and other communications of Mr. Trump, any Family Member, any Trump Company or any Family Member Company.

(*Id.* ¶ 6(a)).  Section 2 of the Confidentiality Agreement, titled "no-disparagement," states:

During the term of your service and at all times thereafter you hereby promise and agree not to demean or disparage publicly the Company, Mr. Trump, any Trump Company, any Family Member, or any Family Member Company or any asset any of the foregoing own, or product or service any of the foregoing offer, in each case by or in any of the Restricted Means and Contexts and to prevent your employees from doing so.

The Confidentiality Agreement defines "Family Member" to include Donald Trump, any of his children, and any of their grandchildren or their spouses; it defines "Family Member Company" as "any entity partnership, trust or organization that, in whole or in part, was created by or for the benefit of any Family Member or is controlled or owned by any Family Member"; "Trump Company" as "any entity, partnership, trust or organization that, in whole or in part, was created by or for the benefit of Mr. Trump or is controlled or owned by Mr. Trump"; and "Trump Person" as "each of Mr. Trump, each Family Member, each Trump Company (including but not limited to the Company), and each Family Member Company."  (*Id.* ¶ 6(c)-(g).)

b)      ***The Campaign's Multiple Attempts To Enforce the Confidentiality Agreement***

Around July 28, 2017, the Campaign filed a baseless AAA arbitration against Ms. Delgado, *Donald J. Trump for President, Inc. v. Arlene Delgado*, AAA reference 01-17-0004-4706 ("Arbitration"), claiming she had violated the Confidentiality Agreement's non-disclosure provision with certain unnamed tweets as well as by "threaten[ing] to file a public complaint containing similar and further confidential information and disparaging statements with the New York City Commission on Human Rights."  (Melamed Aff. Ex. C.)  Additionally, on April 22, 2020, Defendants cited the purported Agreement in moving this Court to compel arbitration of

Plaintiff's breach of contract and promissory estoppel claims – which arose out of Defendants' failure to honor the Parties' settlement agreement.  (Docket 35-37, renewed at Dkt. 67-68.)

c)      ***The AAA Arbitrator Held That the Confidentiality Agreement's Non-Disparagement and Non-Disclosure Clauses Could Only Relate to Donald Trump's Political Affairs, and That Its Definition of Confidentiality Is Overly Broad, Vague, and Unenforceable***

On March 8, 2021, Arbitrator Stephen F. Ruffino issued an Award in the AAA Arbitration.  (Melamed Aff., Ex. D.)  The Arbitrator first noted that the Agreement's non-disclosure provisions prohibit disclosing "Confidential Information," is defined to include "all information of a private … nature or that Mr. Trump insists remain private or confidential, including … any information with respect to … the political affairs of Mr. Trump …."  *Id.*  The Arbitrator held that reading the Confidentiality Agreement to "prohibit the disclosure of all private information, even [Ms. Delgado's] own, without the qualifying reference to Mr. Trump's political affairs, would result in an overly broad, vague and unenforceable restriction, and so is unenforceable," particularly in the context of a restrictive covenant.  *Id.*

The Arbitrator concluded that Ms. Delgado's tweets "contained opinions (as distinct from confidential facts) and/or information regarding her personal life," that were "strictly personal in nature and did not violate the prohibition on disclosing information regarding Mr. Trump's political affairs," so "[r]egardless of their alleged public impact, the essential nature of those communications does not fall within the enforceable definition of Confidential Information in the Agreement."  (*Id.*)  As to Ms. Delgado's alleged violation of the non-disclosure provision, the Arbitrator found it "questionable" whether the tweets were disparaging, but "even if they were, I agree with Respondent's argument that her comments were directed only at an individual colleague, not [the Campaign]," so could not have violated the non-disparagement clause.  *Id.*  Moreover, Arbitrator Ruffino held that the purported Agreement's definition of "Confidential

Information," which included any information "that Mr. Trump insists remain private or confidential" is "overly broad and vague, and so is unenforceable."

### d)   *Judge Gardephe Held, in a Case Involving the Same Defendants and Another Former Campaign Staffer, That Identical Non-Disparagement and Non-Disclosure Clauses in an Identical Agreement Are Invalid and Unenforceable*

On March 30, 2021, four days after this Court Order requesting supplemental briefing (Docket 63), the Honorable Paul G. Gardephe of this District issued a decision in *Jessica Denson v. Donald J. Trump*, No. 1:20-cv-04737-PGG, which granted the plaintiff's summary judgment motion and declared that the non-disclosure and non-disparagement provisions of an identical agreement to the one at issue in the present case (*see* Melamed Aff, Ex. E.) were "invalid and unenforceable..." *Id.*, Docket 48, *available at* 2021 WL 1198666, at 1-4.

In *Denson*, the plaintiff sued the Campaign for sex discrimination in New York Supreme Court. *Id.* at 4. The next month, the Campaign filed an arbitration demand claiming she breached the same non-disclosure and non-disparagement provisions at issue in our case "by publishing certain confidential information and disparaging statements" in her lawsuit. *Id.* Denson sought a declaratory judgment that her agreement is void, as well as an injunction prohibiting enforcement of its non-disclosure and non-disparagement clauses. *Id.* at 1. Judge Gardephe granted Denson's motion, holding the confidentiality and non-disparagement provisions were so vague and overbroad on their face as to be invalid and unenforceable for lack of mutual assent, and not salvageable through "blue penciling." *Id generally*.

Judge Gardephe's decision first quotes *Ashland Mgmt. Inc. v. Altair Invs. NA, LLC*, 59 A.D.3d 97, 102 (1st Dept. 2008), *aff'd as modified*, 14 N.Y.3d 774 (2010) for the proposition that "[r]estrictive covenants, such as … confidentiality agreements [], are subject to specific enforcement to the extent that they are 'reasonable in time and area, necessary to protect the

employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee.' " 2021 WL 1198666 at 14. The Court also quoted *Joseph Martin, Jr. Delicatessen, Inc. v. Schumacher,* 52 N.Y.2d at 109 (1981): "Under New York contract law, however, '[i]mpenetrable vagueness and uncertainty will not do[,]' because 'definiteness as to material matters is of the very essence in contract law.'" *Id*. Finally, the Court cited *In re Express Indus. & Terminal Com. v. N. Y. State Dep't of Transp.* 93 N.Y.2d at 589 (1999): "Enforceability requires 'a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms.'" *Id*.

Judge Gardephe concluded that the agreement's "non-disclosure provision does not meet any of the elements of the *Ashland* test." 2021 WL 1198666 at 14. First, "as to whether the provision is "reasonable in time," the provision has no time limitation. It applies '[d]uring the term of your service and at all times thereafter.' " *Id*. Second, the scope of the provision is, as a practical matter, "unlimited." *Id*. Third, the agreement's definition of "Confidential Information" includes "thirty-five categories of 'private, proprietary or confidential' information, many of which include 'personal life,' 'relationships,' and 'political and business affairs,' " which are vague, "and none of the categories are further defined or limited. *Id*. Similar to Arbitrator Ruffino, Judge Gardephe noted that "Confidential Information" also included "any information that President Trump insists remain private or confidential." *Id*. Thus, the categories of "Confidential Information" are "sufficiently broad and vague to cover any information about President Trump and his family members." *Id*.

Finally, Judge Gardephe found that the scope of the individuals and entities covered by the non-disclosure provision is also quite broad. *Id*. at 15. Specifically, "[t]he provision applies not only to President Trump and his family members - including unnamed spouses,

children, and grandchildren -  but also to any legal entity' that, 'in whole or in part, was created by or for the benefit of ... or is controlled or owned by' President Trump or any of his family members."  Judge Gardephe noted that Donald Turmp is "affiliated with more than 500 companies, and his family members may be affiliated with yet more, and "terms such as 'political affairs,' 'decisions,' 'communications,' and 'strategies' are broad enough to encompass any matter that relates to the Campaign whatsoever." *Id.*

Judge Gardephe concluded, "the vagueness and breadth of the provision is such that a Campaign employee would have no way of what may be disclosed, and accordingly Campaign employees are not free to speak about anything concerning the Campaign." *Id*. He also held that the non-disclosure provision's "vague, overbroad, and undefined terms also render it unduly burdensome." *Id*.  In particular, Judge Court noted it, "is difficult if not impossible for Denson **or another Campaign employee** to know whether any speech might be covered by one of the broad categories of restricted information; whether that speech might relate to one of the several  hundred  potential  subjects  of the non-disclosure provision; or whether that speech may relate to a matter that President Trump will determine is confidential." *Id*. (emphasis added).  Thus, "because the effect of these burdens is to chill the speech of Denson **and other former Campaign workers** about **matters of public interest, the non-disclosure provision is harmful not only to them but also to the general public**." *Id*. (emphasis added).

The *Denson* Court *further* held that the non-disclosure provision  is unenforceable even under basic principles of contract law, because its vague and indefinite nature means that there could not be a "manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms."  *Id*. at 16 (citing

*Express Indus. & Terminal Corp.*, 93 N.Y.2d at 589).   Thus, the broad categories of information covered by the non-disclosure provision, themselves not exhaustive, "could conceivably cover any information related to the Campaign" making it "impossible for Denson to know what speech she has agreed to forego," so "there is no possibility of mutual assent."   *Id*.   Indeed, "[t]he breadth of the non-disclosure provision is such that Denson would have no way of knowing *ex ante* what speech will result in enforcement. Accordingly, the mutual assent that is required for an enforceable contract under New York law is not present."   *Id*.

With respect to the non-disparagement provision of Denson's agreement, Judge Gardephe held that "[a]s with the non-disclosure provision," it is "defined to cover President Trump, his family members, many of whom are unnamed, and any legal entity 'that, in whole or in part, was created by or for the benefit of … or is controlled or owned by' President Trump or any of his family members."   *Id*.   But again, "President Trump alone is affiliated with more than 500 companies."   *Id*.   Thus, the *Denson* Court concluded, there is no "manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement" with respect to the scope of the non-disparagement provision.   *Id*. (citing *Express Indus. & Terminal Corp.*, 93 N.Y.2d at 589).

Finally, the *Denson* Court held that "blue penciling" was not appropriate to preserve any part of either the non-disclosure or non-disparagement provisions, because it would "involve much more than a paring down of duration and geographical scope," and "to render the non-disclosure and non-disparagement provisions enforceable, the court would have to engage in a wholesale re-drafting of these provisions."   *Id*. at 17.   The Court also noted that the Campaign's past efforts to enforce these provisions demonstrated it was not operating in

good faith to protect legitimate interests, rather, "[t]he evidence before the Court instead demonstrates that the Campaign has repeatedly sought to enforce the non-disclosure and non-disparagement provisions to suppress speech that it finds detrimental to its interests." *Id*.

Thus, the *Denson* Court held that the non-disclosure and non-disparagement provisions of the same purported "agreement" at issue in the present case are invalid and unenforceable. Following this decision, the *Denson* parties submitted a joint letter stating their respective positions on "how the parties wish to proceed in light of the Court's decision." (No. 20 Civ. 4737 (PGG), Docket 49.) The Campaign's position was that Denson "has already obtained all of the relief to which she is entitled, to wit, Your Honor's order declaring the Agreement's confidentiality and non-disparagement provisions invalid and unenforceable as to her"; so the Campaign "requests that the Court enter a final judgment closing this lawsuit." (*Id.*)

## ARGUMENT

In the present case, the decisions of both Arbitrator Ruffino and Judge Gardephe collaterally estop Defendants from enforcing the purported "Agreement's" non-disparagement and non-disclosure clauses against Ms. Delgado. Moreover, even if this Court was not inclined to find that these decisions have preclusive effect, they offer strong persuasive support for why the Court should hold that the non-disparagement and non-disclosure clauses, and indeed the entire Confidentiality Agreement, are invalid and unenforceable. Because Defendants have sought to enforce this purported agreement in the present action and in the AAA arbitration, Ms. Delgado stands to suffer irreparable injury for which legal remedies such as monetary damages are inadequate. Additionally, the balance of hardships between the parties warrants an equitable remedy and the public interest will not be disserved by the injunction sought. *See EMA Fin. LLC v. Aim Exploration, Inc.*, No. 18 Civ. 145, 2019 WL 689237, at 12 (S.D.N.Y. 2019) (citing *eBay*

*Inc. v. Merc Exchange, L.L.C.*, 547 U.S. 388, 391 (2006)).   As such, Plaintiff respectfully requests that this Court grant her motion for a permanent injunction.

## I.      THIS COURT SHOULD FIND AS A MATTER OF LAW THAT THE PURPORTED "AGREEMENT" IS INVALID AND UNENFORCEABLE

### A.      The Decisions of Arbitrator Ruffino and Judge Gardephe Should Collaterally Estop Defendants From Enforcing the Purported Agreement

Defendants have repeatedly sought to enforce the non-disparagement and non-disclosure provisions of the Confidentiality Agreement.   They have done so against Ms. Delgado in the present action and in the separate AAA Arbitration, as well as against Jessica Denson in her action.   In both the AAA arbitration and the *Denson* case, Defendants lost on the merits, and the provisions of the Confidentiality Agreement at issue in the present action were deemed vague, overbroad, and unenforceable.   The law does not allow Defendants a third bite at the apple.

As Your Honor has noted, "[c]ollateral estoppel applies to prevent relitigation of an issue when:  (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits."  *China Shipping Container Lines Co. v. Big Port Serv. DMCC*, No. 15 CIV. 2006 (AT), 2019 WL 9362547, at 6 (S.D.N.Y. Jan. 15, 2019) (quoting *Interoceanica Corp. v. Sound Pilots, Inc*., 107 F.3d 86, 91 (2d Cir. 1997) (internal quotations omitted).

Additionally, the doctrine of "non-mutual offensive collateral estoppel" precludes a defendant from "relitigating an issue the defendant has previously litigated and lost to another plaintiff."  *Bifolck v. Philip Morris USA Inc.*, 936 F.3d 74, 79 (2d Cir. 2019) (internal quotations omitted).  To invoke this doctrine, a plaintiff must satisfy the same four conditions noted above, and the district court "must ensure that application of the doctrine is not unfair."  *Id.* (citing

*Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979)).

With regard to the final element of offensive collateral estoppel, the Second Circuit has declined to "exhaustively catalogue[] the factors a district court should consider when reviewing for fairness," but among other factors, courts have looked to whether "the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result," whether "the defendant had little to no incentive to raise the issue in the earlier action," and the "relative scope or complexity of the two actions and whether they involve different causes of action." *Bifolck*, 936 F.3d at 84. Additionally, a district court "is generally accorded wide discretion to determine when offensive collateral estoppel should be applied." *Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1486 (2d Cir. 1995) (citing *Parklane Hosiery*, 439 U.S. at 331).

In the present case, Defendants cannot plausibly dispute that the identical issues to those at stake here were raised in Ms. Delgado's prior arbitration, as well as in the *Denson* litigation. Specifically, whether or not the Confidentiality Agreement's non-disparagement and non-disclosure provisions are invalid and thus enforceable through arbitration, or otherwise, as well as whether they would apply to the facts of the present action even if enforceable.

Before Arbitrator Ruffino, Defendants argued that Ms. Delgado had violated those provisions by sending undisclosed tweets. (*See* Melamed Aff., Exs. C & D.) In *Denson*, the Campaign commenced an arbitration action claiming that Ms. Denson breached the confidentiality and non-disparagement provisions of an identical agreement by publishing confidential information and disparaging statements in connection with a lawsuit she filed in New York Supreme Court. *See* 2021 WL 1198666, at 4. (*See also* 20 Civ. 4737 (PGG), Docket No. 22-1.) In the present case as well, Defendants demand that Ms. Delgado arbitrate her claims

seeking to enforce their settlement agreement, claiming that that settlement was inherently confidential because the Campaign deems it so.

There can be no possible dispute that Defendants had a full and fair opportunity to, and did, litigate these issues in the prior proceedings.  Via the very same attorneys who represent them here, Defendants filed the arbitration demand that led to Arbitrator Ruffino's award in the Arbitration.  (*See* Melamed Aff. Ex. C.)  As the Arbitrator's Award notes, "[p]er the procedure agreed upon and ordered April 14, 2020, Claimant [the Campaign] made a dispositive motion and Respondent [Delgado] filed a dispositive cross-motion, … [and] [b]ecause the parties agree there are no material factual issues in dispute, the case may be disposed of by summary judgment."  (*Id.*, Ex. D.)  Ultimately, Arbitrator Ruffino held that reading the Agreement to "prohibit the disclosure of all private information, even Respondent's own, without the qualifying reference to Mr. Trump's political affairs, would result in an overly broad, vague and unenforceable restriction, and so is unenforceable," especially in the context of a restrictive covenant.  *Id.*  Moreover, Arbitrator Ruffino held that the purported Agreement's definition of "Confidential Information," which included any information "that Mr. Trump insists remain private or confidential" is "overly broad and vague, and so is unenforceable."  *Id.*

Likewise in *Denson*, the same attorneys, representing the same Campaign, had a full and fair opportunity to litigate the same issue, and indeed did so.  The *Denson* docket reveals that Defendants:  a) removed the case from New York Supreme Court (*see* No. 20 Civ. 4737 (PGG), Docket 1); b) successfully opposed Denson's letter motion seeking to expedite a Rule 16 conference and serve early discovery (*id.*, Docket 10-12); c) cooperated with Denson's counsel to submit a joint proposed case management plan and scheduling order (*id.*, Docket 14); d) submitted a pre-motion letter and participated in a pre-motion conference (*id.*, Docket 15 & 17);

e) submitted a fourteen-page brief, ten-page reply brief, and attorney declaration with exhibits in support of a motion to dismiss the complaint (*id.*, Docket 23-25, 39); and f) submitted an opposition brief, declaration, and counter-statement pursuant to Local Rule 56.1 in opposition to Denson's summary judgment motion (*id.*, Docket 33-35).   Defendants' twenty-two-page summary judgment opposition brief spent approximately eleven pages arguing that the very same "agreement" at issue in the present action "cannot be declared void and unenforceable," *inter alia*, because:   "The Campaign Has Unique and Compelling Confidentiality and Privacy Interests," "The Agreement Does Not Impermissibly Restrict Plaintiff's Speech," "The Agreement Provisions Are Not Vague and Indefinite," and "The Agreement is Not per se 'Unconscionable.' "  (*See id.*, Docket 34 at 6-17.)

Despite this, again, the *Denson* Court held that "the vagueness and breadth of the [agreement's non-disclosure] provision is such that a Campaign employee would have no way of what may be disclosed, and accordingly Campaign employees are not free to speak about anything concerning the Campaign."  2021 WL 1198666, at 15.  Judge Gardephe also held that the non-disclosure provision's "vague, overbroad, and undefined terms also render it unduly burdensome." *Id*.  In particular, the Court noted that it "is difficult if not impossible for Denson **or another Campaign employee** to know whether any speech might be covered by one of the broad categories of restricted information; whether that speech might relate to one of the several hundred potential subjects of the non-disclosure provision; or whether that speech may relate to a matter that President Trump will determine is confidential." *Id*. (emphasis added).  Thus, "because the effect of these burdens is to chill the speech of Denson **and other former Campaign workers about matters of public interest**, **the non-disclosure**

*provision is harmful not only to them but also to the general public*." *Id*. (emphasis added).

Moreover, the *Denson* Court held that the non-disclosure provision is unenforceable under basic principles of contract law because its vague and indefinite nature means that there could not be a "manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms[.]' " *Id*., citing *Express Indus. & Terminal Corp.*, 93 N.Y.2d at 589.   Thus, the broad categories of information covered by the non-disclosure provision, which in themselves are not exhaustive, "could conceivably cover any information related to the Campaign" and it is therefore "impossible for Denson to know what speech she has agreed to forego, and there is no possibility of mutual assent. *Id*.   Indeed, "[t]he breadth of the non-disclosure provision is such that Denson would have no way of knowing ex ante what speech will result in enforcement. Accordingly, the mutual assent that is required for an enforceable contract under New York law is not present." *Id*.[1]   Similarly, with respect to the non-disparagement provision of the Agreement, the *Denson* Court concluded that there is no 'manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to [the scope of the non-disparagement provision].' " *Id*. citing *Express Indus.,* 93 N.Y.2d at 589. Thus, the Court held that the non-disclosure and non-disparagement provisions of the Agreement, which are identical to those in the present case, were invalid and unenforceable. *Id*.

---

[1]     Additionally, although "[p]arties may delegate threshold arbitrability questions to the arbitrator, … [t]o be sure, before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists." *Pierre v. Rochdale Vill. Inc.*, No. 18 Civ. 6383 (MKB) (ST), 2020 WL 6799635, at 4 (E.D.N.Y. Nov. 19, 2020) (quoting *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019)).  Thus, "[i]n the absence of clear and unmistakable evidence that the parties intended to submit the question of arbitrability to the arbitrator, courts assume they, not arbitrators, were intended to decide 'certain gateway matters, such as whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy.' " *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Wynn Las Vegas, LLC*, No. 20 CIV. 3139 (ER), 2020 WL 7647177, at 3 (S.D.N.Y. Dec. 23, 2020) (quoting *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452 (2003)).  As such, this issue is properly before this Court.

What is more, there can be no doubt – indeed it is self-evident – that the validity of the "Agreement's" non-disparagement and non-disclosure provisions *was* in fact decided in both Ms. Delgado's AAA arbitration and the *Denson* summary judgment motion, and that resolution of this issue was necessary to support both the decisions of Arbitrator Ruffino and Judge Gardephe. The Arbitrator noted that "[b]oth parties provided extensive recitations of events," and "[e]ssentially, those facts are not in dispute," but "for purposes of this decision and Award, most of the factual events are largely immaterial because the claims can be addressed and decided on (1) the text of the Agreement and (2) the texts of the statements admittedly made by Respondent." The Award then devotes five of its remaining eight paragraphs to analyzing the "Agreement" and in particular why reading its non-disclosure language "so as to prohibit the disclosure of all private information, even Respondent's own, without the qualifying reference to Mr. Trump's political affairs, would result in an overly broad, vague and unenforceable restriction" and that the purported Agreement's definition of "Confidential Information," which included any information "that Mr. Trump insists remain private or confidential" is "overly broad and vague, and so is unenforceable." *Id*.

Likewise in *Denson*, Judge Gardephe's decision devotes many pages to analyzing why the "Agreement's" non-disclosure and non-disparagement provisions are too vague and overbroad to be enforceable – indeed, too vague and overbroad for Denson to have even manifested her mutual assent to them." *Denson*, 2021 WL 1198666, at 14-18. This summary judgment decision, based upon evidence cited in the parties' respective Rule 56.1 statements, was a "final judgment on the merits." Indeed in the joint letter submitted by the *Denson* parties, the Campaign stated that Denson "has already obtained all of the relief to which she is entitled, to wit, Your Honor's order declaring the Agreement's confidentiality and non-disparagement

provisions invalid and unenforceable as to her." (No. 20 Civ. 4737 (PGG), Docket 49.)

Finally, with regard to the "fairness" element of offensive collateral estoppel, there is simply no reason why applying the doctrine here would be unfair to Defendants. There are no apparent procedural opportunities that they will likely have in this case that they lacked in the Arbitration or the *Denson* case. In both of these actions, the invalidity of the Campaign's "Agreement" was decidable as a matter of law based on the face of the document. Certainly Defendants had every incentive to raise that issue in the prior two proceedings – particularly in *Denson* where the plaintiff sought to certify an entire *class* of Trump Campaign "Agreement" signatories, and the Campaign indeed did in fact argue that the agreements are not invalid or unenforceable in both actions. Indeed, *Denson's* "scope or complexity" can only be broader and greater than this case, which also weighs in favor of the *Denson* decision having preclusive effect in the present case.

For all these reasons, Defendants are collaterally estopped from enforcing the "Agreement's" non-disclosure or non-disparagement clauses against Plaintiff in the present action, or any future action.

### B.  The Purported Agreement's Non-Disparagement and Non-Disclosure Provisions Are Vague and Over-Broad On Their Face, So Unenforceable

Even if this Court were to conclude – and Plaintiff maintains that it should not – that Defendants are not collaterally estopped from seeking to enforce the purported Confidentiality Agreement's non-disparagement or non-disclosure provisions, Plaintiff respectfully submits that the Court should still conclude that those provisions are void, invalid, and otherwise unenforceable for all the same reasons that Arbitrator Ruffino and Judge Gardephe did, and thus that this Court should afford those decisions significant persuasive effect.

As both the Ruffino Award and Judge Gardephe's opinion note, non-disparagement and

non-disclosure provisions are restrictive covenants.  As such, they are enforceable only if " 'reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee.' "  *Ashland Mgmt. Inc. v. Altair Invs. NA, LLC*, 59 A.D.3d 97, 102 (1st Dept. 2008), *aff'd as modified*, 14 N.Y.3d 774 (2010) (quoting *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 389 (1999) (quoting *Reed, Roberts Assocs. v. Strauman*, 40 N.Y.2d 303, 307 (1976))).  Enforceability requires "manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms."  *In re Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*, 93 N.Y.2d 584, 589 (1999).  "Impenetrable vagueness and uncertainty will not do," because "definiteness as to material matters is of the very essence in contract law." *Joseph Martin, Jr. Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109 (1981).

The "Agreement's" non-disclosure provision clearly fails the *Ashland* test.  As Judge Gardephe noted, the scope of the provision is, as a practical matter, unlimited, listing thirty-five categories of "private, proprietary, or confidential" information that it purports to shield from disclosure.  *Denson*, 2021 WL 1198666, at 14.  Many of the categories – like "personal life," "relationships," and "political and business affairs" – are vague, and none are further defined or limited.  (*See* Melemed Aff., Ex. B ¶ 6(a).)  "Confidential Information" also includes anything that Donald Trump "insists remain private or confidential."  (*Id.*)  In essence, "any information about President Trump and his family members" is undisclosable.  And this provision covers not only Donald Trump, but any of his family members – including their spouses, children, and grandchildren – as well as any entity "that, in whole or in part, was created by or for the benefit of … or is controlled or owned by" President Trump or any of his family members."  (*Id.* ¶¶ 6(a)-(c), (f).)  As Judge Gardephe notes, Donald Trump "himself is affiliated with more than 500

companies." The non-disclosure provision's "vague, overbroad, and undefined terms also," as Judge Gardephe further reasoned, "render it unduly burdensome," in that it is "difficult if not impossible for [a] Campaign employee to know whether any speech might be covered by one of the broad categories of restricted information; whether that speech might relate to one of the several hundred potential subjects of the non-disclosure provision; or whether that speech may relate to a matter that President Trump will determine is confidential." *Denson*, 2021 WL 1198666, at 15. Further, "the effect of these burdens is to chill the speech" of Campaign workers about matters of public interest, and so "the non-disclosure provision is harmful not only to them but also to the general public." *Id.*

Indeed, that is precisely the effect that this Agreement has had on Ms. Delgado. For example, in the AAA Arbitration, the Campaign initially sought to enforce the agreement as it related to tweets of a personal nature, as well as to prevent Ms. Delgado from filing her discrimination claims before a state agency or court. (*See* Melamed Aff., Ex. C.) The Campaign then withdrew the second portion of the demand, but maintained its action against Plaintiff relating to her personal tweets. (*Id.*) Arbitrator Ruffino's decision concluded that Ms. Delgado's tweets "contained opinions (as distinct from confidential facts) and/or information regarding her personal life," that were "strictly personal in nature and did not violate the prohibition on disclosing information regarding Mr. Trump's political affairs," so "[r]egardless of their alleged public impact, the essential nature of those communications does not fall within the enforceable definition of Confidential Information in the Agreement." (Melamed Aff., Ex. C.)

As to Ms. Delgado's alleged violation of the non-disclosure provision, the Arbitrator found it "questionable" whether the tweets were disparaging, but "even if they were, I agree with Respondent's argument that her comments were directed only at an individual colleague, not [the

Campaign],'' so could not have violated the non-disparagement clause.  *Id.*  This action is a perfect demonstration of just how vague, overbroad, and undefined the terms are, rendering it unduly burdensome.  It is "difficult if not impossible for [a] Campaign employee to know whether any speech might be covered by one of the broad categories of restricted information; whether that speech might relate to one of the several hundred potential subjects of the non-disclosure provision; or whether that speech may relate to a matter that President Trump will determine is confidential."  *Denson*, 2021 WL 1198666, at 15.  Indeed, even the Campaign wrongly presumed that the tweets that were strictly personal in nature, and not about Donald Trump's political affairs, violated the agreement.  If even the Campaign cannot figure out what the purported Agreement protects, Ms. Delgado surely cannot ever speak about any topic again, personal or otherwise, without fearing that Defendants will sue her for an alleged breach of the "Agreement."  Thus, as Judge Gardephe noted, "because the effect of these burdens is to chill the speech of Denson ***and other former Campaign workers*** about ***matters of public interest***, ***the non-disclosure provision is harmful not only to them but also to the general public***."  *Id.* (emphasis added).    Indeed, this has chilled Ms. Delgado from speaking about matters of public interest, effectively precluding her from working in her field of expertise, and from publishing opportunities.

Moreover, as Judge Gardephe further concluded, the "Agreement's non-disclosure provision is also unenforceable under basic contract law principles."  *Id.* at 16.  In particular, it is too vague and indefinite to constitute a " 'manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms.' "  *Id.* (quoting *Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*, 93 N.Y.2d 584, 589 (1999)). The "broad categories of information covered by the non-disclosure provision – which in

themselves are not exhaustive – could conceivably cover any information related to the Campaign," make it impossible for a person signing it "to know what speech she has agreed to forego," so "there is no possibility of mutual assent." *Denson*, 2021 WL 1198666, at 16.

The Confidentiality Agreement's non-disparagement provision is also vague and unenforceable because it applies to an group of entities, products, and services that simply cannot be ascertained, including Donald Trump and his family members, many unnamed, and any legal entity " 'that, in whole or in part, was created by or for the benefit of … or is controlled or owned by' President Trump or any of his family members." *Id.* Indeed, as Judge Gardephe noted, the Campaign could not cite " any case that finds enforceable a non-disparagement provision comparable to that at issue here." *Id.* at 17. Thus, as with the non-disclosure provision, the non-disparagement provision at issue lacks mutual assent sufficiently definite to assure that the Parties are truly in agreement, and therefore no valid contract was formed.[2]

Finally, as Judge Gardephe noted, the non-disclosure and non-disparagement provisions cannot simply be salvaged through judicial narrowing or "blue penciling" because the court would have to impermissibly engage in a complete re-drafting of the provisions. Thus, the non-

---

[2]     As to the remainder of the Confidentiality Agreement, its Sections 3 and 4, which prohibit competition and solicitation respectively, have expired. They are defined as "the date the current U.S. Presidential election cycle is over or, if earlier, the date Mr. Trump announces that he will not run or will no longer run for the Presidency of the United State of America in the current U.S. presidential election cycle. (Melamed Aff., Ex. B ¶ 6(d).) Moreover, although not addressed by Judge Gardephe, and not at issue in the present case, Section 5, titled "No Competitive Intellectual Property Claims" suffers from the same defects as the confidentiality and non-disparagement provisions. That provision states:  "During the term of your service and at all times thereafter you promise and agree never to assert any rights to any intellectual property that (a) includes the name 'Trump,' (b) is owned by or associated with the Company, Mr. Trump, and Trump Company, any Family Member, or any Family Member Company, for example, without limitation, any name, likeness, voice, or image of Mr. Trump or any Family Member, or any logo, motto or phrase created, developed or commonly associated with any of them, or (c) is developed in connection with the project of objective for which your services are being engaged (all of which will be deemed "work made for hire" or will be assigned by you to us). (*Id.* at pp. 2-3.) This clause is vague, overbroad, indeterminate in scope and time, and suffers from the same defects. Indeed, for example, under this clause, if Plaintiff were to publish an article or book and mention the name Donald Trump, or the names of any of his 500 plus companies, or his undefined family members, this clause would purport to prevent her from maintaining the intellectual property rights to her own book. As such, the entire Confidentiality Agreement should be declared null, void, and unenforceable, and the Court should permanently enjoin Defendants from seeking to enforce any part of it.

disclosure and non-disparagement provisions in the "Agreement" are unenforceable.

## II.    THE COURT SHOULD PERMANENTLY ENJOIN DEFENDANTS FROM SEEKING TO ENFORCE THEIR CONFIDENTIALITY AGREEMENT AGAINST PLAINTIFF IN THIS ACTION OR ANY FUTURE ACTION

Because the purported Confidentiality Agreement, particularly its non-disclosure and non-disparagement provisions, are invalid and unenforceable, the Court should permanently enjoin Defendants from seeking to enforce them, in this action or otherwise.

A party seeking a permanent injunction must demonstrate that:  (1) she has suffered an irreparable injury; (2) legal remedies like monetary damages are inadequate to compensate her injury; (3) the balance of hardships between the parties warrants an equitable remedy; and (4) the public interest would not be disserved by the injunction sought.  *EMA Fin. LLC v. Aim Exploration, Inc.*, No. 18 Civ. 145, 2019 WL 689237, at 12 (S.D.N.Y. Feb. 19, 2019) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).  Additionally, "[t]he decision to grant or deny permanent injunctive relief is within the Court's equitable discretion."  *eBay*, 547 U.S. at 391.  Plaintiff meets each of these elements, thus entitling her to injunctive relief.

### A.    Forcing Plaintiff To Defend Endless Actions, And In Particular To Arbitrate Claims, Pursuant To An Invalid Contractual Provision To Which She Never Assented, Constitutes Irreparable Injury Which Legal Remedies Like Monetary Damages Cannot Adequately Compensate

There can be no dispute that Defendants' invocation of an invalid agreement's arbitration clause, in order to enforce its non-disclosure and non-disparagement provisions, would constitute irreparable harm for which there is no adequate legal remedy.  It is well established that a party suffers irreparable harm if it is "forced to expend time and resources arbitrating an issue that is not arbitrable, and for which any award would not be enforceable."  *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003).  Moreover, if a party would "lose its right to have [] claims adjudicated in a court of law, rather than in an arbitral forum to whose

jurisdiction it has not consented," it would have no adequate remedy at law for being forced to arbitrate such claims.  *UBS Sec. LLC v. Voegeli*, 684 F. Supp. 2d 351, 354 (S.D.N.Y. 2010), *aff'd*, 405 F. App'x 550 (2d Cir. 2011).  In short, the first two permanent injunction factors favors weigh squarely in Plaintiff's favor.

### B.    The Balance of Hardships Clearly Weighs In Plaintiff's Favor

As noted at the outset of this brief, Ms. Delgado is an indigent, single mother.  To require her to expend time and money to defend endless actions or arbitrations, particularly where she never assented to do so, is a significant hardship for her.  Thus, Defendants' stated intention to drag Ms. Delgado into more arbitration, particularly based on their indefensible view of what they deem is confidential under the unenforceable non-disparagement and non-disclosure provisions of an invalid "agreement," represents an undeniable hardship to Ms. Delgado.

On the other hand, Defendants face no cognizable hardship if they are enjoined from enforcing those confidentiality and non-disparagement provisions.  They are perfectly capable of defending themselves in this action, and of litigating the enforceability of their own prior settlement with Ms. Delgado here.  Thus the balance of hardships in this case clearly favors injunctive relief.

### C.    A Permanent Injunction Would Only Serve the Public's Interest

Finally, it is clear that enjoining Defendants from seeking to enforce the Agreement in facts serves the public's interests.

First, as Judge Gardephe noted, "because the effect of these burdens is to chill the speech of Denson ***and other former Campaign workers*** about ***matters of public interest***, ***the non-disclosure provision is harmful not only to them but also to the general public***." *Denson*, 2021 WL 1198666, at 15 (emphasis added).  Second, it is well established that "the

public interest and equities favor enjoining an arbitration that is outside the scope of an arbitration agreement." *Deutsche Bank Sec., Inc. v. Borjas*, No. 18 Civ. 10191 (DLC), 2018 WL 6200045, at 2 (S.D.N.Y. Nov. 28, 2018).

Similarly, "[f]orcing a party to arbitrate a dispute that it did not agree to arbitrate" is not only an irreparable harm to that party for which there is no adequate remedy at law, but also "contravenes the 'significant public interest in conserving judicial and arbitration resources by preventing duplicative proceedings.' " *Safra Secs. LLC v. BS Palladium Ltd.*, No. 19 Civ. 3213 (NRB), 2019 WL 4198680, at 2 (S.D.N.Y. Aug. 15, 2019) (citing *UBS Sec., LLC v. Voegeli*, 405 Fed. App'x 550, 551 (2d Cir. 2011) and quoting *Morgan Stanley & Co. v. Seghers*, No. 10 Civ. 5378 (DLC), 2010 WL 3952851, at 7 (S.D.N.Y. Oct. 8, 2010)). *See also Smith Barney, Harris Upham & Co. v. St. Pierre*, No. 92 Civ. 5735, 1994 WL 11600, at 4 (N.D. Ill. Jan. 4, 1994) (the public interest in avoiding the unnecessary waste of time, money and effort caused by an arbitration proceeding that should not occur in the first place weighs heavily in favor of injunctive relief).

Moreover, Ms. Delgado's ability to litigate statutory discrimination claims before a court, rather then arbitration, is a matter of public interest as well.  Indeed, if Defendants sought to prevent Ms. Delgado from litigating such claims before a court, and argued that she must litigate such claims in arbitration because they related in some way to the purported non-disparagement and confidentiality provisions of the agreement, it would violated public policy.  *See Denson v. Donald J. Trump For President, Inc.*, 180 A.D.3d 446, 454 (1st Dep't 2020) (reversing confirmation of arbitrator decision that plaintiff's negative statements about Campaign in context of her lawsuit was "tantamount to disclosure of confidential information violative of the NDA"; finding such conclusion improperly punished plaintiff for availing herself of judicial forum, in

violation of public policy).  Thus, it is clear that Plaintiff statutory discrimination claims properly belong before this Court, and indeed Defendants do not challenge this.

Yet Defendants now seek to compel Ms. Delgado to arbitrate her settlement of those statutory discrimination claims.  But, if the public interest compels allowing a party to litigate statutory discrimination claims in a public forum, the same public interest supports enabling that party to enforce its settlement of such statutory discrimination claims in court, not arbitration.

Thus, as described above, all of the elements necessary for a permanent injunction weigh in Ms. Delgado's favor, and this Court should grant the permanent injunction.

## CONCLUSION

For all of the above reasons, Plaintiff respectfully requests that this Court issue an order deeming the "Confidentiality Agreement" invalid and unenforceable, and permanently enjoining Defendants from seeking to enforce it against Plaintiff in the present action or any action in the future, together with such other and further relief as the Court may deem just and proper.

Dated:      Los Angeles, California
            April 23, 2021

                                        DEREK SMITH LAW GROUP, PLLC

                            BY:    */s/Abraham Z. Melamed*
                                   Abraham Z. Melamed, Esq.
                                   Daniel S. Kirschbaum, Esq.
                                   One Penn Plaza, Suite 4905
                                   New York, New York 10119
                                   abe@dereksmithlaw.com
                                   dsk@dereksmithlaw.com
                                   (212) 587-0760

                                   *Attorneys for Plaintiff*