UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK


DELGADO,                                  : Docket #19cv11764

                         Plaintiff,       :

  - against -                             :

DONALD J. TRUMP FOR PRESIDENT,            : New York, New York
INC., et al.,                               January 11, 2023
                                          :
                         Defendants.        CASE MANAGEMENT
----------------------------------- :       CONFERENCE

PROCEEDINGS BEFORE
THE HONORABLE KATHARINE H. PARKER,
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For Plaintiff:        DEREK SMITH LAW GROUP
                      BY:  DANIEL KIRSCHBAUM, ESQ.
                      1 Penn Plaza, #4905
                      New York, New York 10119


For Defendants:       LAROCCA HORNIK ROSEN & GREENBERG LLP
                      BY:  JARED BLUMETTI, ESQ.
                      40 Wall Street, 32nd Floor
                      New York, New York 10005




Transcription Service: Carole Ludwig, *Transcription Services*
                       155 East Fourth Street #3C
                       New York, New York 10009
                       Phone:  (212) 420-0771
                       Email:  Transcription420@aol.com

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

## INDEX

### E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---|---|---|---|---|
| None | | | | |

### E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|---|---|---|---|---|
| None | | | | |

```
 1                                                    3
 2              THE CLERK:  Calling case 19cv11764, Delgado
 3  versus Trump for President.  Beginning with counsel for
 4  plaintiff, please make your appearance for the record.
 5              MR. DANIEL KIRSCHBAUM:  Daniel Kirschbaum from
 6  the Derek Smith Law Group for plaintiff, good
 7  afternoon.
 8              HONORABLE KATHARINE H. PARKER (THE COURT):
 9  Good afternoon.
10              THE CLERK:  And counsel for the defendants,
11  please make your appearance for the record.
12              MR. JARED BLUMETTI:  Jared Blumetti of LaRocca
13  Hornik Rosen & Greenberg on behalf of the defendants,
14  good afternoon, Judge.
15              THE COURT:  Good afternoon.  Okay, so we are
16  here for a case management conference, discovery is set
17  to end, fact discovery is set to end the end of this
18  month and expert discovery is scheduled to end by March
19  31st.  And as I understand it, plaintiff's only
20  potential expert is a mental health professional?
21              MR. KIRSCHBAUM:  Currently, Your Honor, I'll
22  officially reserve the right to change my mind and say
23  a damages expert is needed but I don't think it likely.
24              THE COURT:  Okay. And in terms of experts, are
25  there any experts that defendant is currently
```

```
 1                                                      4

 2  contemplating or would it just be potentially a

 3  rebuttal expert?

 4          MR. BLUMETTI:  Potentially rebuttal, Judge.

 5          THE COURT:  Okay.  Now as I understand it,

 6  neither side has taken any depositions even though I

 7  had ordered that depositions be scheduled to take place

 8  in December and January, do you have dates set aside

 9  for depositions?

10          MR. BLUMETTI:  That's correct, Judge.  We had,

11  Mr. Kirschbaum and I had circulated potential dates for

12  depositions, we were scheduled or tentatively scheduled

13  to take Ms. Delgado's deposition in the third week of

14  December, Mr. Kirschbaum expressed a concern about

15  coming into today's settlement conference with only

16  having taken the plaintiff's deposition as opposed to

17  all the party depositions. That kind of stalled things,

18  we had some discovery issues which we have a motion to

19  compel prepared, if Your Honor would like to hear it,

20  on some discovery issues.  After that we do believe

21  there would be a brief extension of the fact discovery

22  deadline to be necessary after which we will get firm

23  deposition dates on the calendar immediately. We

24  understand that, you know, it needs to move forward and

25  we are prepared to move forward quickly.
```

```
 1                                                  5
 2          THE COURT:  Okay, so what I want to have a
 3   complete understanding of is what has been produced
 4   document wise by each side first.  So what has
 5   plaintiff produced?
 6          MR. KIRSCHBAUM:  Your Honor, everything that
 7   plaintiff reasonably believed was in her possession, I
 8   pushed her to search thoroughly for electronica and
 9   papers and I submitted everything I had to the other
10   side.
11          THE COURT:  What did that include, can you
12   just give a general description?
13          MR. KIRSCHBAUM:  Sure, text messages, emails
14   about her job attempts with campaigning in the White
15   House and the pack of messages with the various, with
16   defendants and the various other members of the Trump -
17   -
18          THE COURT:  Including through messaging apps?
19          MR. KIRSCHBAUM:  Several, yes.
20          THE COURT:  Okay.
21          MR. KIRSCHBAUM:  And then random other
22   documents including her job application materials and
23   the settlement materials, the settlement that was --
24          THE COURT:  The various drafts and exchanges
25   concerning the settlement agreement that's at issue in
```

```
 1                                                    6
 2  the case.
 3          MR. KIRSCHBAUM:  Correct, Your Honor.
 4          THE COURT:  Okay, any other categories?
 5          MR. KIRSCHBAUM:  I'm maybe forgetting
 6  something, I don't think so, it was mostly emails, a
 7  few news articles that plaintiff had been collecting in
 8  her file.  I think that's basically it.
 9          THE COURT:  Okay.  And from plaintiff's -- let
10  me actually hear next what defendant, just the
11  categories that defendant has produced.
12          MR. BLUMETTI:  A very fulsome production,
13  Judge, thousands and thousands of pages of ESI based on
14  an ESI search that was premised on the plaintiff's own
15  terms and connectors, an amalgamation of the
16  plaintiff's and the campaign's, so a lot of ESI text
17  messages. Also the, a lot of the ESI and Word docs
18  pertaining to the purported prior settlement, and that
19  is the main categories as well. Some text messages from
20  the individual defendants but very minor in terms of
21  the scope. The vast majority was the ESI emails.
22          THE COURT:  Emails?
23          MR. BLUMETTI:  From the campaign server
24  emailing plaintiff, between plaintiff and workers on
25  the campaign and the transition team, plaintiff and
```

1                                                                7

2   Jason Miller, plaintiff and the individual defendants,

3   et cetera.

4           THE COURT:  Okay.  And there has been some

5   discussion of lists, lists for possible candidates for

6   White House jobs?

7           MR. BLUMETTI:  Yes, that was produced as well.

8           THE COURT:  Who, did both sides produce those?

9           MR. BLUMETTI:  It was produced from defendants

10  to the plaintiff, it was located on the campaign server

11  so we produced it to the plaintiff.

12          THE COURT:  Okay.  And so it's on the campaign

13  server so do you, who are the custodians of those

14  lists, who are the authors of the lists, if you know?

15          MR. BLUMETTI:  Campaign workers, you know,

16  they were just a lot of, attached to emails with

17  donaldjtrump.com domain finishes, some personal email

18  addresses because some of the individual defendants,

19  for example, used their personal email addresses at the

20  time, so it's hard to track down a specific custodian.

21  It certainly came off the campaign server would be the

22  root custodian.

23          THE COURT:  Okay, so the campaign does not

24  have access to White House documents, I assume?

25          MR. BLUMETTI:  Not at all.

```
 1                                                      8
 2            THE COURT:  Okay.
 3            MR. BLUMETTI:  Nor the transition team
 4   documents, other than transition team documents that
 5   flowed through the campaign server.
 6            THE COURT:  Okay.  Okay, so from plaintiff's
 7   perspective are there any missing documents or
 8   outstanding documents?
 9            MR. KIRSCHBAUM:  Again, Judge, as we've
10   discussed, there was a, seems to be a missing link
11   here. We have plenty of documents where there were
12   there were reassurances, I realize they are not legally
13   binding, they're not a full contract, whatever, but
14   there were written assurances that A.J. Delgado was
15   going to have a significant position in the White
16   House, a communications position, and outreach
17   position, whatever, and then all of a sudden she does
18   not. And there is no document wherein any defendant or
19   any person among the custodians says to any other
20   person take A.J. off the list, here's why, or in light
21   of her tweets she's off the --
22            THE COURT:  So you would expect there to be
23   some emails at the campaign or among the defendants
24   about whether to offer her a job formally, or to
25   withdraw an offer, or to decide not to extend an offer,
```

```
 1                                                 9
 2   one of the, something in that area?
 3           MR. KIRSCHBAUM:  Yes, Your Honor.
 4           THE COURT:  Okay.
 5           MR. KIRSCHBAUM:  I wouldn't limit it strictly
 6   to emails, there might be a Word document in a memo,
 7   there might be a text message --
 8           THE COURT:  Or a text message or what have
 9   you.  So let me ask defense counsel, did you search for
10   any kind of communication or other document that would
11   concern offering, not offering or withdrawing an offer
12   to Ms. Delgado?
13           MR. BLUMETTI:  Putting aside the word offer,
14   you know, we had the position that our client could not
15   have offered or, you know, accepted any offer but, yes,
16   search terms were performed, it was some of the
17   plaintiff's own search terms along those likes and, you
18   know, we searched through the server, we produced
19   thousands of pages, those documents don't exist.
20           THE COURT:  Was the word offer used in a
21   search?
22           MR. BLUMETTI:  Yes.  I don't know if the word
23   offer, specifically, but certainly her anticipated
24   position that she wanted with the White House, her
25   name, the same date parameters, the same custodians.
```

```
 1                                        10
 2          THE COURT:  Okay, so you were looking for
 3   communications that would explain whether she would go,
 4   wouldn't go and why.
 5          MR. BLUMETTI:  Right.  And --
 6          THE COURT:  Is that fair to say?
 7          MR. BLUMETTI:  Right but, you know, those
 8   documents don't exist on the server, you know, we
 9   performed a good faith search. We can show the hit
10   report, we can show everything, but we just don't have
11   it, I mean the documents don't exist.
12          THE COURT:  Okay.
13          MR. KIRSCHBAUM:  Judge, I'm being sincere, I
14   credit Mr. Blumetti's representations that they did, in
15   fact, produced plenty of documents, it was a reasonably
16   -- reasonably fulsome production. But I just want to be
17   clear, like my impression in communicating with Mr.
18   Blumetti, and he can clarify, is that they religiously
19   mechanically applied my search terms and my custodians
20   and that's great. But they had an obligation, I mean I
21   had more document requests beyond just applying search
22   terms, I had requests for those forms of documents, I'm
23   not sure they independently came up with their own
24   terms or came up with their own search ideas or
25   performed anything beyond just mechanically --
```

11

THE COURT:  So when a defendant is searching
for documents, including ESI, the defendant has the
obligation not just to apply the search terms, but to
conduct a reasonable search for documents responsive to
the plaintiff's document requests, separate and apart,
did you do that?

MR. BLUMETTI:  Of course, yes, and I believe I
indicated before, we had our own search terms in
addition to the search terms that were proposed by
counsel which were also applied. There was certainly a
good faith search done here. I don't know what
particular document they're looking for. I can't prove
a negative. I don't know of Ms. Delgado has a copy of
any document that she says was not in our production
that she finds suspicious. There's been no indication
of that so I'm essentially searching for a negative. I
don't know what else to do other than say that we
believe we complied with our Rule 26 obligation.

THE COURT:  I mean this is all within a
relatively short period of time, right?

MR. BLUMETTI:  Correct.

THE COURT:  I mean basically November into
January, right?  So, okay, and so what you're looking
at is the campaign servers and the personal emails or

12

1
2   social media or apps that any of the relevant people
3   might have used, is that correct, Mr. Blumetti?
4          MR. BLUMETTI:  Correct, that is what was
5   searched.
6          THE COURT:  Okay.  So it may not exist, that
7   may not exist.
8          MR. KIRSCHBAUM:  I find that hard to believe,
9   Judge, but I concede that it's possible that they with
10  a wink and a nod to said to each other let's not put
11  this in writing, let's talk offline about why we're not
12  going to hire her.  That's quite plausible, possible.
13         THE COURT:  That certainly could have
14  happened. That certainly could have happened,
15  especially it was a very quick transition and there
16  were a lot of jobs being discussed and people coming
17  over so it's possible that it was verbal and I guess
18  you can explore that in depositions, right?
19         MR. KIRSCHBAUM:  Yes, Your Honor, correct.
20         THE COURT:  Okay.  Are there, besides that,
21  are there any other categories of documents that you
22  believe are missing or outstanding?
23         MR. KIRSCHBAUM:  Well, judge, just in terms of
24  categories of documents, we had requested the personnel
25  files of the named defendants minus, minus any highly

13

1

2 personal, highly confidential financial or health

3 related documents. So --

4          THE COURT:  Why do you need the personnel

5 files of the individual defendants?

6          MR. KIRSCHBAUM:  Because presumably there

7 would be something in there regarding interpersonal

8 conflicts with other, or complaints against them from

9 other people on the campaign.

10          THE COURT:  Well that's a different thing, a

11 complaint against them versus a personnel file, right?

12 A personnel file by the campaign, they won't have White

13 House personnel files obviously, the campaign doesn't

14 have.

15          MR. KIRSCHBAUM:  I sought the latter, too,

16 Your Honor, but the point is like I think HR files are

17 not always synonymous with complaints, there's

18 sometimes other stuff in there that can bear on a

19 person's credibility, on a person's biases, on, you

20 know, whatever that is.  It's a standard request, I

21 don't think it's unreasonable to ask for it.

22          THE COURT:  What is the, what is defendant's

23 position?

24          MR. BLUMETTI:  The response was is that, and

25 they put in their interrogatory responses, the

1

2  individual defendants, Mr. Priebus and Mr. Spicer, my

3  client, they never worked for the campaign, they only

4  worked for the transition team and the RNC, we don't

5  have a personnel file for them.

6            THE COURT:  Okay.

7            MR. BLUMETTI:  Which was what we represented

8  in their sworn interrogatory responses.

9            THE COURT:  Okay.  And what about Bannon?

10           MR. BLUMETTI:  Bannon was limited to his

11 written NDA.

12           THE COURT:  Oh, he only had a written NDA,

13 there was no file?

14           MR. BLUMETTI:  Yeah, exactly right.

15           THE COURT:  Are you aware of any complaints,

16 does the campaign have any personnel related

17 complaints? I mean in general in these kinds of cases

18 what Courts allow is discovery of any performance

19 evaluation or similar kinds of complaints. For example,

20 gender discrimination, pregnancy discrimination,

21 harassment, retaliation, those are the kinds of claims

22 that have been asserted in this matter and are there

23 any such claims that were or complaints that were made

24 about any of the individual defendants to the campaign?

25           MR. BLUMETTI:  Not regarding these individual

1

2   defendants. The only other claim that I believe this

3   Court is even aware of, one of the cases in this Court

4   was pertaining to an individual named Jessica Denson,

5   her entire file is public record, she had also made a

6   gender discrimination claim against the campaign. And

7   the irony there is, Judge, one of the alleged harassers

8   on the part of Ms. Denson is a A.J. Delgado, counsel is

9   well aware of that, that's the only thing we have,

10  certainly that pertained to that time period.

11          THE COURT:  Okay.  All right, so are there any

12  other categories of outstanding documents?

13          MR. KIRSCHBAUM:  Of outstanding documents?

14          THE COURT:  That's what we're talking about

15  now, just documents.

16          MR. KIRSCHBAUM:  The only other thing I can

17  think of which Mr. Blumetti has indicated there

18  shouldn't be, but I'm not -- there are communications

19  between Donald Trump's PAC and his campaign. In other

20  words, why Ms. Delgado was denied work for one or the

21  other because of, in other words, were they

22  coordinating that she would not get a job with the PAC

23  because of her conflict with the campaign.

24          THE COURT:  Is there a document request about

25  that?

16

1

2          MR. KIRSCHBAUM:  There was, yes.

3          THE COURT:  Okay, so if there was a document

4    request, I don't know, what was the response to that

5    request?

6          MR. KIRSCHBAUM:  Just to clarify, I phrased it

7    inelegantly, I said any communications between the PAC

8    and the campaign, and Mr. Blumetti, you reasonably said

9    that's way too overbroad --

10          THE COURT:  So what you're looking for is any

11    communications between the PAC and the campaign about

12    Ms. Delgado?

13          MR. KIRSCHBAUM:  Yes, Your Honor.

14          THE COURT:  Is that something that you've

15    looked at, looked for?

16          MR. BLUMETTI:  That was something that would

17    have been caught within the web of our search I

18    believe, you know, I would also say even though we did

19    perform a search on those lines and we didn't find

20    anything, which is not surprising, that's outside the

21    scope of the pleadings. I mean it's not even an

22    allegation about the PAC and not having a job at the

23    PAC, all of this, you know, goes years past the

24    allegations in the complaint anyway. So we don't

25    believe it's relevant in any way.  She's not, she

17

1
2   doesn't have any claims against, you know, a wrongful

3   termination with respect to the PAC or any

4   communications with the PAC, so I'm not sure how it's

5   relevant. But I would say that we did search, I know we

6   searched and there was nothing.  Certainly no

7   communications with the campaign entity from 2016

8   pertaining to any purported employment with Ms. Delgado

9   with the PAC in 2017.

10          THE COURT:  Okay, what is the theory with the

11  PAC, I mean it sounds like the search would have turned

12  up this --

13          MR. KIRSCHBAUM:  I take them at their word

14  that they found nothing, Your Honor, and if you want to

15  know, I mean just as much as the defendants torpedoed

16  Ms. Delgado getting a White House position, our take as

17  they generally also torpedoed her ability to work

18  anywhere in the Trump world including for PAC, which is

19  another, you know --

20          THE COURT:  What are the acts of retaliation

21  that you've alleged?

22          MR. KIRSCHBAUM:  We've alleged that they

23  tortuously interfered with and retaliated against her

24  trying to get, getting a job at the White House, a

25  communications job from Donald Trump after the

18

1  election.

2          THE COURT:  I'm just looking at the first

3  amended complaint for a second.

4          MR. KIRSCHBAUM:  The first amended complaint

5  may not say the PAC in there, in which case, you know,

6  I'll take Mr. Blumetti's point and consider potentially

7  amending, but given that there's no evidence --

8          THE COURT:  We have a first cause of action

9  breach of contract relates to the settlement agreement,

10 promissory estoppel relates to the settlement

11 agreement, we have the New York Human Rights Law

12 discrimination, New York --

13         MR. KIRSCHBAUM:  Judge, I will say it seems --

14         THE COURT:  (continuing) -- Human Rights Law

15 retaliation and New York City Law discrimination and

16 retaliation.  The ninth cause of action is New York

17 City Law interference with protected rights.  Okay.

18 And then eleventh cause of action is tortuous

19 interference with prospective economic advantage, and

20 you're saying that pertains to more than just

21 employment at the White House?

22         MR. KIRSCHBAUM:  It could, sure.  But, again,

23 I'm not, you know, going to fight on this if Mr.

24 Blumetti represents that they searched for these

19

1

2    documents and found them, I take him at his word.

3           THE COURT:  Okay.  Okay, so let me hear from

4    defendants then, unless there is any other category of

5    document that plaintiff believes is outstanding?

6           MR. KIRSCHBAUM:  Not categories of documents,

7    Your Honor, we have other disputes about categories of

8    information but I'll --

9           THE COURT:  What are, if you can just

10   highlight what those disputes are, these are things

11   that you want that defendants have opposed?

12          MR. KIRSCHBAUM:  Yeah.

13          THE COURT:  So what's that?

14          MR. KIRSCHBAUM:  Well first, there's an issue

15   of Ms. Delgado is afraid that confidential documents

16   are being shared with Boris Epshteyn who is a, I'm not

17   sure what his current position is. And I'm, I've asked

18   defense counsel to represent in writing that they're

19   not sharing those in compliance with the

20   confidentiality order that Your Honor entered.

21          THE COURT:  She thinks that there's been a

22   violation of the protective order?

23          MR. KIRSCHBAUM:  Yes.

24          THE COURT:  Okay, and on what basis?

25          MR. KIRSCHBAUM:  That she's just, she feels

```
 1                                          20
 2   that way based on her (indiscernible) conversations
 3   with other people who --
 4          THE COURT:  Has somebody said that to her?
 5          MR. KIRSCHBAUM:  No, but she's, she's been
 6   told that Boris Epshteyn has been privy to all sorts of
 7   Trump legal affairs and even though he's, I think he's
 8   trained as a lawyer so he often comes in as an informal
 9   legal advisor to Trump related disputes, so that's her
10   understanding is that he's been doing that here, too.
11          THE COURT:  Okay, go ahead, any other issues?
12          MR. KIRSCHBAUM:  Mr. Blumetti has again said
13   that that's not so and they've not been sharing with
14   him.
15          THE COURT:  Okay.
16          MR. KIRSCHBAUM:  I would feel better if that
17   was written but --
18          THE COURT:  Okay.
19          MR. KIRSCHBAUM:  I'm -- oh, actually there was
20   one other category of documents I forgot, Your Honor,
21   which is we asked about other people applying for White
22   House jobs from the campaign and documentation of that.
23   And that was also objected to.
24          THE COURT:  Okay.
25          MR. KIRSCHBAUM:  And that's it.
```

1

2          THE COURT:  Okay, what's the basis for

3  objecting to that request?

4          MR. BLUMETTI:  I think it was the way in which

5  it was phrased, Judge, and also what we discussed

6  earlier in the day, the campaign entity didn't handle

7  applications for positions in the White House, that was

8  handled by the federal government. And there was a

9  whole, another entity against which Ms. Delgado's

10 released all claims, the transition team, which was

11 charged with identifying potential candidates for the

12 White House and we don't have access to any of their

13 documents either. As far as the campaign is concerned

14 certain campaign employees may have gone on to work in

15 the White House but there was no application process

16 that flowed through the campaign.

17         THE COURT:  So what was the application

18 process, if you can describe that?

19         MR. BLUMETTI:  As far as I understand, Judge,

20 and as we discussed earlier, it pertained to, you know,

21 the transition team identifying potential White House

22 employee candidates and those candidates being

23 proffered to the federal government and then the

24 federal government issuing a standard Form 86

25 Questionnaire Clearance paperwork and to the extent

22

1

2    that they passed that vetting process, they were then

3    offered more of a verbal handshake sort of deal as

4    opposed to a written deal, a job in the White House.

5    This wasn't handled by the campaign in any way.

6            THE COURT:  Was there any kind of confirmatory

7    document issued by the White House, the executive

8    branch of government, that somebody now is in fact

9    working at the White House, what is the closest proxy

10   that someone was offered and received the job?

11           MR. BLUMETTI:  Nothing that I have seen,

12   Judge, and I believe this also would have been

13   captured. For example, we had when we ran our search we

14   caught within that web was the list that we discussed

15   where it had, you know, certain names on there about

16   who could potentially be identified as a candidate.  We

17   found that but we didn't find anything beyond that --

18           THE COURT:  So the list, the lists that both

19   sides have referred to are lists are candidates?

20           MR. BLUMETTI:  Correct.

21           THE COURT:  Okay.  And is there a way of

22   ascertaining within the defendants' documents which of

23   those, which candidates on the list got a job? I mean

24   is there, is it public who worked at the White House?

25           MR. BLUMETTI:  As far as I know that would be

23

limited to testimonial discovery, you know, who of
which of those names actually worked in the White
House.  I don't have any documents in the campaign
server certainly, I don't have access or any documents
from the federal government.  Counsel, myself, knows
what the general public knows, you know, what's in the
media in names and reading in that manner --

THE COURT:  Okay.

MR. BLUMETTI:  But nothing formal by way of
discovery.

THE COURT:  Okay.

MR. KIRSCHBAUM:  So to be clear, my request
was worded suitably broadly, distinctly informal
communications about White House jobs or what have you,
not just limited to formal standard form --

THE COURT:  Sure, I understand, that's what
I'm sort of trying to understand, is there anything
that would be any kind of document that would reflect
that somebody was going to be employed or had been
offered a job or given a job at the White House that
would be within the campaign's possession?

MR. BLUMETTI:  Beyond that list, no, Judge.

MR. KIRSCHBAUM:  What I've seen in the
production, Judge, has been, as Mr. Blumetti alluded to

24

1

2  before, there have been emails back and forth among

3  various people in high places including Mr. Miller

4  about here's our roster. It wasn't a list of here are

5  potential candidates, let's pick one of the following

6  five, it was a roster, here is who we've slated for the

7  following jobs and --

8          THE COURT:  Right, but Miller wasn't the

9  decision maker, he's not even a defendant in this case.

10         MR. KIRSCHBAUM:  No, there were other people

11  involved in this communication.

12         THE COURT:  Okay.

13         MR. KIRSCHBAUM:  But it was just an FYI or

14  here's, this is my list, what do you think. And there

15  were slots and Ms. Delgado was allocated a position

16  like at some point it was Hispanic Outreach

17  Coordinator, at one point it was a Senior Advisor,

18  other people were allotted other positions, it was not

19  a list, a roster, a slate of potentials, it was a, you

20  know, a planned staffing tree.

21         THE COURT:  And did everybody on those lists

22  get hired?

23         MR. KIRSCHBAUM:  I don't know, that's --

24         THE COURT:  Does the campaign have any way of

25  ascertaining that?

25

1

2          MR. BLUMETTI:  Not in formal documents, I'm

3    sure that certain witnesses can testify to who actually

4    worked in the White House from that list, but not an

5    actual roster of who ultimately became formally

6    employed, no.

7          THE COURT:  Okay, so let me ask defendant, are

8    there outstanding documents that defendant believes

9    still need to be produced by plaintiff?

10          MR. BLUMETTI:  Yes, the motion to compel that

11    I referenced earlier, Judge, it breaks down into just

12    issues with respect to limited interrogatory and

13    document responses. They kind of cover the same topics.

14    It's, the first named topic would be the settlement

15    agreement that plaintiff entered with TFA.

16          THE COURT:  The co-defendant.

17          MR. BLUMETTI:  With the co-defendant.

18          THE COURT:  Former co-defendant.

19          MR. BLUMETTI:  Against whom plaintiff has now

20    released all claims. So we made an interrogatory number

21    18 to that, to that -- to that point or that issue and

22    we also made document demands. The plaintiff objected

23    outright to providing any of that discovery. We've met

24    and conferred on this issue and this was the subject of

25    our impending motion to compel.  We believe this

26

discovery is highly relevant, for one thing it is

potential grounds for summary judgment on most, if not

all her employment claims, as these claims arose during

her employment with TFA against whom she's released all

claims.  You know, Mr. Spicer, Mr. Priebus, the

individual defendants in this case, both worked for the

TFA during this relevant time period of allegations.

So we certainly believe that we're entitled to discover

the scope of any release contained --

THE COURT:  This is the transition team?

MR. BLUMETTI:  The transition team, right.

THE COURT:  So people were on a separate

payroll for the transition team --

MR. BLUMETTI:  Right.

THE COURT:  And the plaintiff was on that

payroll.

MR. BLUMETTI:  Correct.

THE COURT:  So she was on the campaign payroll

and then she was on the transition payroll.

MR. BLUMETTI:  Correct, and her allegations

with respect to discrimination and retaliation, you

know, pertain to December of '16 which was necessarily

after the election, after the campaign was already

winding down --

27

1

2        THE COURT:  I'm sorry, say that date again?

3        MR. BLUMETTI:  December of 2016, if you --

4        THE COURT:  That's when she was employed by

5   the transition team.

6        MR. BLUMETTI:  The transition team, and if you

7   peruse the allegations in the first amended complaint,

8   all the allegations of discrimination and retaliation

9   and hostile work environment find their genesis in that

10  month, which was after the election, after the campaign

11  entity was kind of, you know, served its purpose. So

12  this is the time when the individuals were working for

13  the transition to fill spots in the incoming

14  administration for the federal government.

15       THE COURT:  Were any of the individual

16  defendants, if you know, on the payroll of the

17  transition team?

18       MR. BLUMETTI:  I understand that Mr. Priebus

19  and Mr. Spicer were.

20       THE COURT:  Okay.

21       MR. BLUMETTI:  As was the plaintiff. So

22  plaintiff entered into a settlement agreement with TFA

23  in exchange for a monetary payment and we believe

24  mutual releases. You know, the scope of those releases

25  might very well cover plaintiff's claims against Mr.

1                                                      28

2   Spicer and Mr. Priebus by virtue of their status as an

3   agent or employee of the TFA.  So we could have a

4   summary judgment motion on that alone. I believe we

5   indicated earlier that also if there was a monetary

6   payment which we're almost positive there was, that

7   could serve to offset the plaintiff's damages as well.

8   So we believe we're certainly entitled to these

9   settlement agreement docs with the TFA.

10           THE COURT:  Okay, and what is the plaintiff's

11  view on why this is not relevant or producible?

12           MR. KIRSCHBAUM:  Your Honor, it's, I actually

13  touched on this in my letter, my pre-conference letter,

14  like there are strict confidentiality measures in place

15  in that agreement because, for this reason, that Ms.

16  Delgado is afraid of sharing too much with the other

17  defendants.  They, I've mentioned, I've discussed Mr.

18  Blumetti that we will stipulate to, when it comes to

19  it, to the amount, and any jury verdict could be offset

20  by that, and he admitted that was an intriguing idea.

21           But in terms of the other issues, the release

22  issue, as I mentioned in my letter, I believe it

23  specifically excludes Mr. Priebus, Mr. Spicer, Mr.

24  Bannon, and anyone else who could be of issue here. So

25  it is, it's written in black and white that they are

29

1
2  not released by that agreement.

3          THE COURT:  So why couldn't you produce a

4  redacted version that showed the release language?

5          MR. KIRSCHBAUM:  I can certainly --

6          THE COURT:  I mean I have had other cases

7  where part of the defendants settled and other

8  defendants wanted the agreement and I have ordered them

9  to be produced or produced in redacted form because it

10 is relevant, or at least portions are relevant, maybe

11 not all the provisions are relevant. But my view is

12 that there doesn't need to be motion practice on this.

13 I think that it is, the release language, in

14 particular, is relevant now to the issue of liability

15 and that that, there is nothing unusual about release

16 language, everybody pretty much knows what release

17 language looks like and there is nothing particularly

18 secret about it.  And it certainly is, is relevant.

19          In terms of the amount, that is something that

20 could be produced on an attorneys' eyes only basis

21 until after trial.  But what I, what I'm hearing is

22 that that amount defendants say would be an offset, is

23 that what I'm understanding you to day?

24          MR. BLUMETTI:  Correct, Judge. And just for

25 illustration purposes it makes more logical sense to me

30

at least in the context of the breach of settlement

agreement claims, the TFA was a party to that original

purported settlement.

THE COURT:  Um-hmm.

MR. BLUMETTI:  So to the extent that the

number was 1.2 and the TFA paid $200,000 in settlement

in a breach of contract action, that --

THE COURT:  But why does it matter now, I mean

it doesn't really go to liability.  So I'm wondering,

you know, I don't think it's particularly secret really

and to the extent it's an offset I think if defendant

is evaluating damages, evaluating any potential

offsets, the number, of course, is relevant to that.

So I think under Rule 26 which has a very broad

definition of relevance for purposes of discovery, that

these provisions are things that should be produced to

the defendants.

Now, I don't think the other provisions of the

settlement agreement are particularly relevant, I

haven't heard any reason why any other provision should

be -- should not be redacted.  And I don't, at least

for now what I'm going to do is I'm going to order

production of the redacted version on an attorneys'

eyes only basis.  Because what I've, the representation

31

1

2 that has been made is that the release does not release

3 the defendants that remain and as soon as you see that

4 you'll know that you don't have the argument, you know,

5 have that argument and there is no reason that you need

6 to, the campaign or the individual defendants need to,

7 to see that language.  But I think it is relevant and

8 then the parties can argue later whether or not it

9 would be admissible for any purpose.

10          MR. BLUMETTI:  Understood, Judge.

11          MR. KIRSCHBAUM:  So for right now we redact

12 everything but the release provision?

13          THE COURT:  The release provision and the

14 number. And it will be attorneys' eyes only.

15          MR. KIRSCHBAUM:  Okay, because the reason I

16 ask is my client is fearful that the number will be

17 released to the defendants if it's shared.

18          THE COURT:  I'm ordering it to be attorneys'

19 eyes only and I will put that in an order after this

20 conference, and if that is violated that's a violation

21 of a Court Order, okay? So it should not be shared, it

22 should just be attorneys' eyes only basis, everything

23 redacted except those two provisions.

24          MR. KIRSCHBAUM:  Okay.

25          THE COURT:  So there is not a need for motion

                                                        32

1
2   practice on that.

3          MR. KIRSCHBAUM:  Okay.

4          THE COURT:  What is the other issue?

5          MR. BLUMETTI:  Another main category would be

6   the documents concerning the matter entitled *John*

7   *Denoffville* (phonetic) *versus Arlene Delgado*.  This was

8   the Florida court case, the plaintiff refuses to

9   provide any documents which we understand are in her

10  possession regarding this proceeding.  We believe that

11  this, these documents and discovery is highly relevant

12  and will be explored at the plaintiff's deposition. We

13  understand that the plaintiff engaged in a campaign,

14  pun intended, of, quote, "malicious harassment" against

15  Mr. Denoffville in and around 2012 which included her

16  sending dozens and dozens of emails to him in which she

17  made countless sexist and racist statements, very

18  colorful and inappropriate statements. The reason that

19  this is relevant, Judge, is not because we're making

20  any argument that plaintiff somehow welcomed any

21  alleged conduct towards her or during her time period

22  with the campaign, but rather that the, the words and

23  her conduct in that proceeding and its final

24  disposition, including the permanent injunction that

25  was assessed against her by a Florida Court in 2012

33

necessarily means that she could not have passed the

strict vetting process to receive White House

employment.

As Your Honor is aware, the vast majority of

the plaintiff's damages in this case pertain to lost

employment with the White House and speculative future

employment had she obtained an employment with the

White House.  All this discovery will show that she

could have never obtained any position the White House

because of the final disposition of this proceeding and

her conduct in connection with that proceeding. So we

believe we are certainly entitled to view this docket,

view the documents that Ms. Delgado has in her

possession, including, not limited to, discovery,

affidavits, Court opinions to the extent that they're

not publicly available, all of which will be explored

at Ms. Delgado's deposition and assessed against

Standard Form 86 which is the security clearance

required for any person to work in the White house, and

to use those documents to show and argue that she could

not obtain any position.

THE COURT:  Why are, why is the scope of what

you're asking all relevant? Because as I understand it,

what would happen in a background check is that there

34

1  would be a criminal record search --

2          MR. BLUMETTI:  Right.

3          THE COURT:  And a search for judgments against

4  a person. And so what would come up would be the

5  permanent injunction.  I take it that you actually have

6  a copy of that, that's a public record?

7          MR. BLUMETTI:  We don't have a copy of it, we

8  have certain records from predecessor counsel, Kasowitz

9  Benson Torres, but we don't have a copy of the actual

10 final disposition. I believe --

11         THE COURT:  Is that not knowable?

12         MR. BLUMETTI:  I believe it's sealed, I tried

13 to go and get it myself and I've been unable to.  I

14 understand that Ms. Delgado has it and, you know, we

15 wouldn't be looking for any privileged documents

16 obviously, we would be looking for --

17         THE COURT:  But why do you need the rest of

18 the scope of stuff, why, isn't -- in terms of an

19 employment decision, right, if, isn't that made based

20 on the nature of the conviction or the charge, if the

21 charge is there was a finding of harassment and,

22 therefore, there's a permanent injunction, isn't, what

23 more is needed or are you saying that as part of the

24 process they don't just look at the actual conviction

35

2  but they look behind it in some way?

3           MR. BLUMETTI:  They would look behind it and

4  also, you know, I think that the lead argument that I

5  would make on relevance is what I have already

6  articulated.  But part and parcel of this case, Ms.

7  Delgado is alleging that certain comments that were

8  made to her by, among others, Jason Miller, you know,

9  Sean Spicer, you know, were so offensive to her as part

10 and parcel of her hostile work environment claim, and

11 we are entitled to use the plaintiff's own words

12 against here that she used --

13          THE COURT:  Have you talked -- have you talked

14 to the individual who obtained the injunction against

15 her?

16          MR. BLUMETTI:  I have not, no.

17          THE COURT:  Have you tried to subpoena him?

18          MR. BLUMETTI:  I have not, I thought it would

19 be more prudent to go through the plaintiff in this

20 action.

21          THE COURT:  I mean because you are entitled

22 to, of course, seek any information you want from that

23 individual. I don't know if he's within the

24 jurisdiction of this Court's subpoena power.

25          MR. BLUMETTI:  I believe he lives in Florida,

36

1    and also I just thought, you know, for --

2            THE COURT:  Well normally you first go through

3    the parties --

4            MR. BLUMETTI:  That's exactly why I'm going

5    through the parties first.

6            THE COURT:  Normally you first go through the

7    parties. But on what basis are you saying that the

8    White House would look beyond the actual finding of a

9    Court because there's a lot of allegations but, you

10   know, allegations are allegations, what, the finding is

11   a more dispositive kind of thing that would, I would

12   think, be most impactful in a decision making process.

13           MR. BLUMETTI:  Well here, Judge, we have an

14   individual who is seeking a position in the

15   Communications Department and part of her job would be

16   communications and messaging.  So, you know, discovery

17   where there's emails where the plaintiff is using this

18   language towards numerous third parties, you know, goes

19   part and parcel to a decision. I'm not in the position

20   to say that the federal government would just see

21   injunction, you're in or you're out, I would like to

22   imagine it's more gray than that and, you know, pull

23   back the lens a little bit and see what happens.  And

24   once you do pull back that lens and you see the

37

1
2  language and you see the conduct in issue in this case,
3  it would have made it a no brainer.
4        THE COURT:  But that was ten years before,
5  right, it was --
6        MR. BLUMETTI:  It was, it would have been only
7  four years before --
8        THE COURT:  When did this happen?
9        MR. BLUMETTI:  2012, so it would have been
10  four years before her employment with the campaign
11  which would, and the Standard Form 86 pertains to any
12  conduct that goes back seven years prior to employment.
13        THE COURT:  Right.
14        MR. BLUMETTI:  So it's certainly relevant from
15  a temporal standpoint as well.
16        THE COURT:  It's within the seven year period.
17  What does plaintiff say about this?
18        MR. KIRSCHBAUM:  Your Honor, this is a
19  complete and total fishing trip, a trawl, scraping the
20  bottom of the ocean, designed to embarrass the
21  plaintiff. I mean there's no legitimate reason to go
22  through, as Mr. Blumetti, himself, said, every piece of
23  paper from the entire file of anything having to do
24  with this case.  If, as a compromise we could stipulate
25  to the fact that there was an injunction entered, I see

38

his point about that. I reiterate what I said to you
back there which is that the Trump White House was a
motley crew of people with all kinds of questionable
backgrounds, with arrest records, with domestic abuse
records, with all kinds of records and somehow they got
past the vetting at the White House.  So it's not a
clear --

THE COURT:  Disqualifier.

MR. KIRSCHBAUM:  Yes.

THE COURT:  I understand.  I understand that.
I think, again, Rule 26 has a broad relevance scope and
the background checks are supposed to turn up things
like these kind of judgments. So I do think it is the
final decision or injunction, that document or
documents, I don't know if there is a, you know, a
judgment and then an injunction, but if there was a
final finding and final disposition that I believe
should be produced. I think that is relevant because it
is relevant to the defense that the defendant is making
and both parties will have an opportunity to make an
argument that it would not be disqualifying.  But it
certainly would be something that would be discovered
in the course of a standard background check and
considered in the course of a background check. And I

1                                                      39

2   haven't heard enough from the campaign to convince me

3   that all of the other details need to be produced at

4   this time.

5          So what I'm going to order is production of

6   the final disposition and injunction.  And if it is, in

7   fact, currently sealed, that can be produced pursuant

8   to the protective order in this case.

9          MR. BLUMETTI:  I appreciate your ruling,

10  Judge, I just want to clarify that on the final

11  disposition, does that include any written opinions by

12  the Court?

13         THE COURT:  Yes.

14         MR. BLUMETTI:  You know, explaining the

15  decision?

16         THE COURT:  Yes.

17         MR. BLUMETTI:  Okay.

18         MR. KIRSCHBAUM:  Judge, my understanding I

19  that this was an injunction issued as a standalone

20  thing --

21         THE COURT:  Okay, so there's no, there's no

22  written decision?

23         MR. KIRSCHBAUM:  Yeah, the plaintiff was

24  apparently not aware it was even going on, it was done

25  ex parte and then all of a sudden she was served with

                                                    40

 1
 2  an injunction.

 3          THE COURT:  Okay, so then there is just the

 4  one court document.

 5          MR. KIRSCHBAUM:  I assume so, Your Honor.

 6          THE COURT:  Okay.

 7          MR. KIRSCHBAUM:  But can I, Mr. Blumetti

 8  mentioned something else before that has now intrigued

 9  me which is he said we have some documents that we got

10  from Kasowitz, from the former counsel for the Trump

11  campaign, I don't believe those were produced in

12  discovery and I think they're squarely relevant. If

13  he's claiming that those were part of the reason why

14  her damages should be limited, or why she wouldn't have

15  gotten a job or what have you, I think we're entitled

16  to see whatever documents that Kasowitz disclosed to --

17          THE COURT:  Well certainly any documents that

18  you're intending to rely on or that are within the

19  scope of the document requests need to be produced or

20  alternatively put on a privilege log.

21          MR. BLUMETTI:  To the extent that those were

22  not produced they will be.

23          THE COURT:  Okay.

24          MR. BLUMETTI:  And I just wanted to clarify

25  also that, you know, this issue about the final

41

1   disposition of the proceeding, when I go on the

2   website, Federal Court, and admittedly I'm not as

3   familiar with their dockets as I am the New York

4   Courts, there seems to be a litany, like I'm talking

5   hundreds of pages of documents where there is written

6   opinions and whatnot.  And, you know, if the plaintiff

7   has any of that in her possession --

8           THE COURT:  The written opinion --

9           MR. BLUMETTI:  The written opinions underlying

10  the decision on the injunction. It wasn't just a final

11  piece of paper that says --

12          THE COURT:  Well if there is a written

13  decision, because normally on an order to show cause

14  there will be a preliminary, a temporary --

15          MR. BLUMETTI:  Yes.

16          THE COURT:  And the briefing and then a

17  preliminary leading to a permanent injunction.

18          MR. BLUMETTI:  And that's what I understand

19  happened here.

20          THE COURT:  If there was a permanent

21  injunction and there was a decision on that, that is

22  what I'm ordering to be produced.

23          MR. BLUMETTI:  Understood.

24          THE COURT:  I don't think that it's necessary

42

1

2 to produce all of the preliminary stuff or the

3 briefing, I don't think that that's necessary. Of

4 course, plaintiff can if you want to do that, but all

5 I'm ordering is the final disposition which would be

6 whatever is the final injunction.

7          MR. KIRSCHBAUM:  Your Honor, I just want to

8 clarify, Mr. Blumetti indicates he looked at the

9 Court's electronic docket and I, as far as I know from

10 talking to the plaintiff, she has not seen any of these

11 documents, she's seen the final order.

12          THE COURT:  Um-hmm.

13          MR. KIRSCHBAUM:  So to the extent, similar to

14 Mr. Blumetti, I'm not familiar with how their

15 electronic dockets work, if those --

16          THE COURT:  This is a Florida court.

17          MR. KIRSCHBAUM:  If the documents are

18 available on the docket I don't, it seems like

19 redundant and overkill to make us produce them a second

20 time.

21          THE COURT:  So what I'm hearing is they're

22 not.

23          MR. BLUMETTI:  They're not available.

24          MR. KIRSCHBAUM:  Okay, I mean I will produce

25 whatever is in plaintiff's possession, that's all I can

43

1    really do.

3         THE COURT:  Well she can obtain her own

4    records from the Court, she can obtain the final

5    disposition and any written rationale for any

6    injunction, permanent, temporary or preliminary.  And

7    defendant should produce any documents that they're,

8    that they referenced related to this.  My order does

9    not preclude defendants from reaching out to the

10   counterparty to that action.

11        MR. BLUMETTI:  Understood.

12        THE COURT:  Okay, any other items that the

13   defendant is seeking?

14        MR. BLUMETTI:  The last item pertains to

15   damages, Judge, that would be the scope of the

16   documents we were seeking.  The demand for

17   authorizations asked plaintiff to provide a HIPAA

18   complaint authorization to obtain her medical records

19   from any health care providers with whom she treated

20   for any alleged physical, mental or emotional injuries

21   related to this action.

22        Plaintiff responded that she has not sought or

23   received any form of mental health care or treatment

24   since 2016, nor has she sought or received any form of

25   physical, mental or emotional injuries related to this

1                                                           44

2   action. The only problem with that is, Judge, it's

3   directly contrary to what her predecessor counsel's

4   representations to our firm were, that she did, in

5   fact, receive extensive mental health treatment because

6   of the defendants' alleged conduct and that her damages

7   in this case are not limited to garden variety

8   emotional distress.  You know, these assertions are

9   also inconsistent with plaintiff's representation in

10  her interrogatories that she's seeking at least $20

11  million for alleged emotional distress which is

12  obviously at odds with Second Circuit law as well as

13  garden variety damage reports go.

14          So we have asked plaintiff to stipulate or

15  confirm in writing that she is not seeking damages for

16  anything more than garden variety emotional distress or

17  we should get her records, she can't have it both ways.

18  So if she didn't, in fact, treat, then she should

19  stipulate to garden variety emotional distress. If she

20  did, in fact, treat, we're entitled to all those

21  records.

22          THE COURT:  What is plaintiff's position on

23  this?

24          MR. KIRSCHBAUM:  Your Honor, as discussed

25  briefly back in your room, we are, I don't know who

1                                               45

2  said that plaintiff had treated. She has assured me she

3  did not.

4           THE COURT:  Okay.

5           MR. KIRSCHBAUM:  And I think we discussed

6  that.

7           THE COURT:  Um-hmm.

8           MR. KIRSCHBAUM:  So I, and again, I realize

9  that technically limits us to what's called garden

10  variety emotional distress, I don't agree that it's the

11  de minimis --

12           THE COURT:  Sure, the jury decides, what the

13  stipulation normally the parties enter into when

14  plaintiffs sometimes decide to do this because they

15  don't want to produce mental health records if they

16  were treated and that's, that is, that can be done. And

17  so normally the stipulation is simply in this action

18  the plaintiff is seeking so-called garden variety

19  emotional distress damages and then the jury will

20  ultimately decide that amount and the range varies and

21  the jury will ultimately decide that typically based on

22  the plaintiff's own testimony.

23           MR. BLUMETTI:  And given the massive

24  discordance in this case thus far about this large

25  damages issue, we would ask that the Court order the

46

1

2 parties to stipulate that plaintiff is seeking garden

3 variety emotional distress.

4         THE COURT:  Well it sounds like, it sounds

5 like plaintiff's counsel is willing to do that, is that

6 correct?

7         MR. KIRSCHBAUM:  Correct.

8         THE COURT:  All right --

9         MR. BLUMETTI:  Okay, that was, that was

10 something more than I had heard.

11         THE COURT:  So I think that, why don't you

12 just enter into that stipulation or if you want to do

13 that on the record you can order a transcript, what

14 I've heard is you're willing to stipulate that she is

15 seeking garden variety damages and, therefore, there

16 will not be any psychological records and, in fact, she

17 did not seek any psychological treatment is what is

18 what I've heard. Is that correct?

19         MR. KIRSCHBAUM:  That is correct.

20         MR. BLUMETTI:  Defendants would prefer to put

21 that on the record now, Judge --

22         THE COURT:  I've just done that.

23         MR. BLUMETTI:  Oh, okay.

24         THE COURT:  I've just confirmed it with

25 plaintiff's counsel.

1

2          MR. BLUMETTI:  Understood.

3          THE COURT:  Okay, so we're talking about

4    garden variety and you can argue what that means. Okay,

5    anything else that defendant is seeking?

6          MR. BLUMETTI:  That is all, Judge.

7          THE COURT:  Okay, so I think that the

8    remaining issue from plaintiff was this protective

9    order, hang on here.  Is there anything more that you

10   want, is there an application that you're making with

11   respect to that protective order right now?

12         MR. KIRSCHBAUM:  I would, you know, this is a

13   new situation for me, I'm not quite sure how to

14   proceed. I would say ideally, yes, I would ask that --

15         THE COURT:  I mean if there's, if there is

16   going to be a motion for sanctions for violation of a

17   protective order, that's normally what happens. It's

18   unusual to have those motions but I have had them in

19   the past, there has to be an evidentiary basis for

20   that.  But I haven't heard what the evidentiary basis

21   is for that motion.

22         MR. KIRSCHBAUM:  Your Honor, I have no solid

23   evidence which is why I would prefer to have Mr.

24   Blumetti simply sign off that in writing that nothing

25   will be shown to Boris Epshteyn and that would resolve

```
 1                                              48

 2   this.

 3           THE COURT:  Can the defendant make that

 4   representation?

 5           MR. BLUMETTI:  I can say that I, personally,

 6   and my firm, have not shared any documents with Boris

 7   Epshteyn, nor have we spoken to him in any capacity in

 8   connection with this case.  I have informed Mr.

 9   Kirschbaum that should any documents be shared with

10   him, which I have no inclination to do anyway, we would

11   comply with the Judge's Exhibit A that's attached to

12   the confidentiality stip that would make him also

13   subject to the confidentiality stipulation.

14           THE COURT:  Is he somebody who would fall

15   within the category of persons who could be shown

16   documents?

17           MR. BLUMETTI:  I understand that he's an

18   attorney that does some work for the campaign as it

19   currently exists now.  So I can't see why we would be

20   prohibited just by nature of, you know, plaintiff's

21   animosity towards him from every sharing anything. But,

22   again, I have, I have not shared anything, I have no

23   inclination to share anything, and if I were to share

24   anything it would be subject to the rules of the

25   confidentiality stip as they currently exist.
```

```
 1                                              49
 2            THE COURT:  Are you aware of any of the
 3   individual parties sharing any confidential information
 4   with Mr. Epshteyn without him having signed off on the
 5   required confidentiality form?
 6            MR. BLUMETTI:  Absolutely.  I, in fact, I have
 7   not even shown an of the individual defendants any
 8   documents that have been produced by either side in
 9   this case, so they wouldn't even have any documents to
10   show him.
11            THE COURT:  Okay, well what I'd like you to do
12   is just do a follow-up conversation after this
13   conversation --
14            MR. BLUMETTI:  Okay.
15            THE COURT:  Just to confirm that is the case.
16            MR. BLUMETTI:  Okay.
17            THE COURT:  And if there's some reason that
18   Mr. Epshteyn needs to be shown documents it has to be
19   in compliance with the protective order in this case.
20            MR. BLUMETTI:  Which we would always comply
21   with, Judge.
22            MR. KIRSCHBAUM:  Judge, just to confirm, the
23   follow-up conversation is between Mr. Blumetti and the
24   individual defendants?
25            THE COURT:  Yes.  Yes.
```

1

2        MR. KIRSCHBAUM:  Just making sure I

3  understood.

4        THE COURT:  Yes.  Okay, so I think that, I've

5  now addressed the parties' outstanding document issues,

6  let's talk about the depositions that are happening.

7  What are the depositions that plaintiff is going to

8  take, the individual defendants?

9        MR. KIRSCHBAUM:  At least, Your Honor.

10        THE COURT:  Okay.  And who else?

11        MR. KIRSCHBAUM:  I did provide a list at some

12  point, and I would want to confirm with my client, but

13  I think any of the individual custodians listed on our

14  document requests as a starting --

15        THE COURT:  Well there's a limit of ten

16        MR. KIRSCHBAUM:  Then we'll narrow it to ten.

17        THE COURT:  Right?

18        MR. KIRSCHBAUM:  True.

19        THE COURT:  Unless the parties stipulate to

20  more.

21        MR. KIRSCHBAUM:  I can only assume that the

22  defendants will not stipulate thusly.

23        THE COURT:  And in that case there would have

24  to be an application for good cause, but I'm not

25  inclined to extend that number absent a compelling

51

1  reason.  So can you, can you locate that, the list, I

2  just want to --

3

4        MR. KIRSCHBAUM:  Yes, Your Honor. It's not

5  counting the plaintiff, in terms of custodian it's 21

6  people. So I will work with the plaintiff to narrow it

7  to --

8        THE COURT:  Yes, you can't take 21 depositions

9  in this case.

10        MR. KIRSCHBAUM:  I would not imagine I could.

11        THE COURT:  I mean that's class action level.

12        MR. BLUMETTI:  I would note that the campaign

13  entity will be on the individual defendants that I

14  represent, currently has essentially one employee. So

15  to the extent all these nonparties, it's going to have

16  to be subpoenas, I don't have any of these people under

17  my possession, custody or control.

18        THE COURT:  Okay, so who is working for the

19  campaign now, there is only one employee?

20        MR. BLUMETTI:  I understand that the 2016

21  campaign entity is limited to an individual named

22  Bradley Crepe (phonetic) who is the treasurer, he

23  didn't have any involvement with any of the allegations

24  of this case. I certainly have Mr. Priebus and Mr.

25  Spicer under my control and they will be produced

52

1  obviously --

2          THE COURT:  What about Bannon?

3          MR. BLUMETTI:  He is not represented by my

4  firm, he's never appeared in this case, I don't believe

5  plaintiff has ever sought a default against him, I

6  don't know about Mr. Bannon.

7          THE COURT:  Okay.

8          MR. KIRSCHBAUM:  We just can't find him, Your

9  Honor, apparently he hides from the process servers.

10         THE COURT:  Okay.  So are you intending to

11 serve a 30(b)(6) deposition notice?

12         MR. KIRSCHBAUM:  I don't currently intend to,

13 Your Honor, I don't think that's going to be -- I guess

14 I will confirm that once more to be sure but I wasn't

15 planning to do that.

16         THE COURT:  Okay.  So from the defendant's

17 standpoint I'm hearing plaintiff's deposition, any

18 other depositions?

19         MR. BLUMETTI:  That's all I've, you know,

20 identified as of right now. I'm sure that we're

21 probably going to join in on some of the depositions

22 identified by the plaintiff in her Rule 26 disclosures

23 but, you know, that's the first one, we need to get the

24 plaintiff --

1

2          THE COURT:  So nonparty --

3          MR. BLUMETTI:  Right, it would necessarily

4  nonparties, right.  And I'm sure that we're certainly

5  going to be questioning some of the eight nonparties

6  that, you know, plaintiff might be subpoenaing as well.

7          THE COURT:  Okay.  I'm not going to extend the

8  overall deadline for the case, the overall deadline is

9  the March 31st, I'll allow you to take fact depositions

10 through March 31st. If there is going to be an expert,

11 it sounds like if you're stipulating to garden variety

12 there doesn't need to be any medical testimony.

13         MR. KIRSCHBAUM:  Well in our experience, Your

14 Honor, we still need an expert, psychological, to vouch

15 for the plaintiff's, the extent of the garden variety

16 damages to support a high end verdict.

17         THE COURT:  So is she going to submit to a

18 medical examination then because we'll want, I'm --

19         MR. KIRSCHBAUM:  If necessary, or a psych

20 examination.

21         THE COURT:  Okay.  So the report, any expert

22 report by the plaintiff needs to be produced by

23 February 10th, any rebuttal expert report needs to be

24 produced by March 17th. If the defendant might decide

25 you don't want to have a rebuttal expert, sometimes

54

that happens, sometimes the defendant just cross

examines the plaintiff's expert, but any rebuttal

report is due March 17th, any expert depositions have to

be completed by March 31st.  I am going to schedule a

conference for February 7th at 3:00.

          MR. BLUMETTI:  Sorry, Your Honor, what time

was that?

          THE COURT:  3 p.m., Chris, that works?

          THE CLERK:  That works.

          THE COURT:  Yes, okay, 3 p.m. February 7th. By

that date, so any documents that I've asked, directed

to be produced should be produced within a week of

today, by February 7th I expect that plaintiff's

deposition will have been taken and my expectation is

that you will have already served subpoenas on any

nonparties that the campaign doesn't have any control

over for who you, because you've got to schedule them,

it's going to take time. And if they're not located in

the state you may have to implement process, you know,

outside of the state, okay? So that takes some time. So

I'm going to expect that by February 7th you will have

done what you needed to do to serve any nonparty

subpoenas. I also expect that there will be dates on

the calendar for the represented individual defendants.

1

2          MR. BLUMETTI:  Of course.

3          THE COURT:  And my expectation is that the

4  individual defendants will make themselves available

5  for deposition in February.

6          MR. BLUMETTI:  Okay.

7          THE COURT:  And the parties can agree, of

8  course, if they wish to do those by video or in person,

9  it's up to you. I have, if you don't have a video

10  protocol and you expect any of the depositions to be by

11  video, I have a sample video deposition protocol.

12  Everybody's expert by now in this, nobody ever wanted

13  to do it remotely pre-pandemic, now everybody likes to

14  do it remotely.

15          MR. BLUMETTI:  I made a similar comment

16  yesterday, it's funny you should say that.

17          THE COURT:  They were always allowed but it

18  took a pandemic to push people to learn how to do it.

19  Well I guess there was new technology in the platforms.

20          MR. BLUMETTI:  It's much easier now.

21          THE COURT:  Yes.  Yes, so I have a sample

22  protocol, obviously you can change it if you have

23  other, you know, provisions that you want, but I offer

24  it to you just so that you don't have to spend a lot of

25  time on a protocol.

56

Are there any other items that plaintiff's counsel would like to raise today?

MR. KIRSCHBAUM:  I don't believe so, Your Honor.

THE COURT:  Okay.  Any other issues from defense counsel?

MR. BLUMETTI:  No, Judge.

THE COURT:  All right, I want to thank both of you for participating in today's settlement conference, I'm sorry that we didn't get to a resolution, but I'm going to keep close tabs on discovery so that you do complete it, timely complete it because the case has been going on for a long time and all sides need a resolution, okay?

MR. BLUMETTI:  Understood.

THE COURT:  All right, thank you.

MR. BLUMETTI:  Have a wonderful day, Judge.

THE COURT:  You, too, bye-bye.

(Whereupon, the matter is adjourned.)

57

<u>C E R T I F I C A T E</u>

I, Carole Ludwig, certify that the foregoing transcript of proceedings in the case of Delgado versus Donald J. Trump for President, Inc., et al., Docket #19cv11764, was prepared using digital transcription software and is a true and accurate record of the proceedings.

Signature: ____*Carole Ludwig*_____

CAROLE LUDWIG

Date:    January 26, 2023