February 27, 2024
Hon. Magistrate Parker
United State District Court, S.D.N.Y.
500 Pearl Street
Courtroom 17D
New York, NY 10007
RE: *Delgado v. Donald J. Trump for President, et. al.*, 19-cv-11764 (AT) (KHP) – third-party depositions descriptions/request

Your Honor,

I am in the Plaintiff in the above-captioned matter.

Per Your Honor's January 31, 2024 Order, I am to submit a letter[1] to the Court, prior to the February 28th conference, in which I list the third-party depositions I seek; explain why each is relevant; and note that such can be completed by April 15th.

I thank your Honor for the Court's time and consideration to this matter.

First, as to completion by April 15th, the depositions are all brief depositions, which I estimate will each last an average of 90 minutes. Additionally, I will take all by ZOOM, for the convenience of the deponent and judicial efficiency's sake. I would, however, most respectfully request that ***the Court consider extending that deadline by 45 days (i.e., until May 30th)*** given:

---

[1] Plaintiff is cognizant and respectful of Your Honor's rule limiting letters to **three pages** but respectively gathers, as Your Honor requested a letter regarding the depositions required and a description of each, that, given the nature of the letter, there is an exemption from the three-page limit.
To the extent that a formal motion is requested, the Plaintiff hereby moves this Court for permission to please consider this letter required greater length, please grant such, and proceed to consider the letter.

Regarding sealing: On January 24, 2024, I filed a letter with the Court, in part asking if I may submit this letter to chambers, rather than into the docket, to avoid placing into the public docket what would otherwise be work-product *and* to avoid embarrassment to third parties. On February 26, 2024, this Court granted the request in part, giving me the option to redact any information embarrassing to third parties and providing a copy of the procedure for sealing. As the Order gives me the option, I nonetheless must file the entire letter into the docket as (a) while I attempted to redact portions, it became difficult and confusing-for-the-reader for only some portions to be redacted; and (b) I did not have time to familiarize myself, in 24 hours, with the procedure for filing under seal. **I have therefore, to my own detriment, excluded the most embarrassing information to third parties, including foregoing requesting two key depositions, as I do not wish to place into the public docket information that I would naturally have to include, in order to explain why the deposition is necessary.**

1

(a) the recent 13,000 page production that was discovered, which needs to be reviewed;
(b) 'all depositions by April 15th' places a severe **financial burden** on me in terms of funding *all* the depositions within in a very tight window, whereas broadening that window allows me more time to obtain the funds for each deposition;[2] and
(c) Plaintiff observes the period of Lent and, while it does not bar taking depositions or engaging in work, Plaintiff would prefer not to fit nearly *every* deposition into the Lenten period (which does not conclude until March 31st), as it would not allow for the spiritual and religious quiet nature of the period to be observed.

The following are the necessary third party depositions, **all of which are necessary to put on my case and to defend against Defendants' claims**. Please note that, as I have to retain the funds for the court reporter and for the transcript, all of these come at a direct*, upfront cost to me* (normally these costs are fronted by an attorney on the case).

As such, I genuinely only request those that are relevant, *necessary*, and directly proportional to the case. I have eliminated all individuals/entities but for those who are necessary.

## DEPOSITIONS REQUESTED

[I once again, respectfully, note the reservations I hold regarding this required letter, given that I must herein place into the public record, in advance of these individuals' depositions, some of the topics about which they will be asked, which adversely prejudices me in these depositions. Absent including enough information, however, I run the risk of the Court finding the deposition is not relevant. I therefore balance these competing interests as best as possible and again thank the Court for its time.]

THE DEFENDANTS' THREE TRIAL WITNESSES
I respectfully request that the three witnesses listed by the Defendants as witnesses they intend to call at trial not be 'counted against me' in terms of the number of depositions I request, as these are nearly 'automatic' depositions I must take, by virtue of Defendants' declaration that these individuals will be called at trial. They

---

[2] Each deposition entails a cost of $510 simply for the court reporter appearance. ($125/hour with a four-hour minimum) (a 2% credit card fee is added) This does not even include the cost of the transcripts.

are also, to be sure, relevant on their own merits, including but not limited to the following grounds:

- KELLYANNE CONWAY (Trump Campaign Manager in 2016). Conway witnessed my work on the Campaign and was one of the two individuals I informed about the pregnancy (the other being Steve Bannon). (Plaintiff cannot say more about relevance for fear of giving too much away.)

- LUCIA CASTELLANO (Trump Campaign HR). Castellano was the head of HR for the Trump Campaign and is clearly relevant by virtue of that alone.

- MICHAEL GLASSNER (Trump Campaign CEO in 2016 and represented the Campaign at the 2017 mediation). Glassner was part of the discussions of the 2017 settlement and is relevant to the breach-of-contract issue. Additionally, as CEO of the 2016 Campaign, he is relevant in terms of documents he possesses.

Therefore, I request those three but, again, humbly request that the three not be tallied against my total request.

A. DONALD J. TRUMP: Per the Complaint, Mr. Trump told Plaintiff, on at least three occasions, that Plaintiff would have a White House role, was 'coming with' him to D.C., and that he "would not forget what you [Plaintiff] have done for me." Mr. Trump is also on video lavishing praising Plaintiff's work on the Campaign as his "star." And, of course, the hiring decisions are for his own administration. It is extremely likely, given the attention that the Plaintiff/Miller's news received in the press in late December 2016, that Mr. Trump expressed an opinion or directive. Additionally, Mr. Priebus made references to Mr. Trump during this deposition, which also augment Mr. Trump's relevance. Though I realize Mr. Trump has a busy court and Campaign schedule, a 90-minute ZOOM deposition, where he can even appear from his phone, can certainly be fit into his schedule. Mr. Trump is aware of this lawsuit and clearly aware he would be deposed at some point. I have waited for this deposition since 2017.

B. JARED KUSHNER: Mr. Kushner was identified by both Defendant Priebus and by Defendant Spicer, in their depositions, as someone who was involved in White House hiring decisions. Second, Jason Miller claimed in 2018 that Mr. Kushner personally called him in late December 2016, and was involved in Delgado/Miller White House jobs matter. Third, a 2016-Campaign-senior advisor informed Plaintiff that it was Mr. Kushner who made many decisions.

3

C. DONALD ("DON") MCGAHN: Mr. Priebus stated during his deposition that, following my 'tweets' in 2016, he reached out to Don McGahn, forwarded all emails and documents concerning such to Don McGahn, and "got Don McGahn involved." (Per online reports, it appears Mr. McGahn was Campaign counsel at the time.) ***Given that Mr. Priebus has produced no documents in this matter, despite extensive requests, Mr. McGahn should be subpoenaed for deposition***, as to those documents forwarded to him by Defendant Priebus and what steps were taken, outside of attorney-client privileged conversations, of course. [A document, simply by virtue of being forwarded to an attorney, does not become privileged. The underlying document is still relevant, discoverable, and should be produced. But it seems Defendants have hidden under, 'We forwarded incriminating documents to an attorney, therefore we do not have to produce any.' Notice, moreover, Defendants have produced no privilege log.]

Additionally, Mr. McGahn was involved in White House employees' security clearance, making him relevant also in terms of "Part 2" of this letter.

Plaintiff holds Mr. McGahn in high esteem and understands him to be a man of great ethics. His wife, coincidentally, was a professed 'big fan' of the Plaintiff, approaching Plaintiff at the RNC Convention in 2016 to express her admiration for Plaintiff's work and advocacy. Plaintiff does not seek to inconvenience Mr. McGahn but the facts are that he is a clearly relevant party for purposes of discovery.

***What materials Defendant Priebus had, which were forwarded to McGahn, is key, now more than ever, given that yesterday (February 26th), Defendants' counsel suddenly located an important document, at the specific urging of the Plaintiff (including a date), that had previously not been produced. It appears there are documents, enormously relevant to this matter, that have yet to be produced and have been withheld***.

D. THOMAS BOWMAN: Mr. Bowman was, in 2016, a chief programming director at Fox News who, per a November 2016 email, emailed Plaintiff, "You'll have your own show soon!" Subsequent to the Defendants actions, Fox 'went cold' on the Plaintiff. For purposes of the issue of damages and for purposes of potential Campaign actors' interference, Plaintiff needs to depose Mr. Bowman. (This Court itself, in January 2023, questioned the claim that I would have had a role in television, absent the Defendants' sabotage of my career and image. This goes to the heart of that.)

E. STEVE BANNON (NAMED DEFENDANT): Mr. Bannon was served the summons in this case but never answered. In August 2023, he was also served a

subpoena to appear for deposition in this case on August 1, 2023.[3] Mr. Bannon was one of the two individuals that Plaintiff notified, along with Ms. Conway, of her pregnancy in December 2016. Mr. Bannon took part in key conversations about Delgado's pregnancy, and, as the document production shows, about jobs, including about Plaintiff's job/s and, in one email, noted Delgado was "close" (unlike the vast majority obtaining White House jobs) with president-elect Trump.

F. BORIS EPSHTEYN: During the January 2023 conference, this Court informed Plaintiff's then-counsel that parties (i.e., Plaintiff) had approximately two weeks to finalize any expert/provide expert reports. No expert had been retained at the time by Plaintiff's counsel, as the depositions had not yet occurred. Thus, the Plaintiff was unable to obtain an expert, as such could not be completed in such a short time period.[4] Faced with the current circumstances, Plaintiff, for purposes of establishing the harm to her career and damages (including what her career and earnings potential post Campaign and post White House would have been), at least needs to depose a 'comparable.' The clear 'comparable' is Boris Epshteyn who, same as Plaintiff, was a NY-licensed lawyer in his 30's, working on the 2016 Campaign as a Senior Advisor in Communications, advocating for candidate-Trump on television and at events. (***Four individuals all had the same essential role as Senior Advisors: Plaintiff; Sarah Huckabee Sanders; Omarosa Manigault; and Boris Epshteyn. But, given Mr. Epshteyn's legal background, he is the most suitable comparable***.)
Same as Ms. Sanders and Ms. Manigault, Mr. Epshteyn was given a high-ranking role in the White House. Only Plaintiff was excluded. And, although he was only in the White House three months before being asked to leave,[5] he was nonetheless able to parlay that into a lucrative media company role at Sinclair Broadcasting, earning a reported $500,000/year. i.e., Even a brief White House tenure opens doors, with Mr. Epshteyn earning over $1 million last year, as reported by the *NY Times* last year, consulting for 'MAGA' candidates. There are additional reasons why Mr. Epshteyn is relevant to the allegations in this matter, including allegations made against Mr. Epshteyn, regarding alleged misconduct conduct *prior* to Mr. Trump's inauguration, but the Plaintiff omits details herein, both for Mr. Epshteyn's sake and that of the alleging individual, as the above is, the Plaintiff believes, sufficient to establish his relevance.

---

[3] However, that was not followed up on as the attorney on this case withdrew a few days later, in part given the Plaintiff's criticism online of Judge Aileen Cannon, before whom he has a pending case.

[4] The Plaintiff will file a separate motion to revisit this issue.

[5] Defendant Priebus confirmed such during his deposition but stated he was unable to share the reasons for Mr. Epshteyn's departure because he had learned of allegations in the course of attorney-client communications. A motion on such will follow.

G. ASHLEY MOCARSKI and MONICA BLOCK:
Both were in administrative roles during transition, who exchanged emails in early January 2017 reflecting that Plaintiff was no longer on the White House list and no longer going in "at all." It is imperative to ask from where this idea stemmed and who gave that directive.

H. STEPHANIE GRISHAM: Ms. Grisham worked in the press group in the 2016 Campaign as a 'press wrangler' and then for four years in the White House, including as White House Press Secretary and White House Communications Director. She directly contradicts key statements Defendant Spicer made about her during his deposition, regarding what she told Spicer. (Ms. Grisham can also speak to Plaintiff's senior role in the Campaign and the expectation that Plaintiff would be in the White House.)

I. KATRINA PIERSON: Ms. Pierson was an advisor on the 2016 Campaign and the first Campaign press secretary. Ms. Pierson is familiar with facts regarding potential retaliation efforts against Plaintiff. Ms. Pierson remains a supporter of the president and, absent a subpoena for deposition, would likely be unavailable. (Additionally, Ms. Pierson is very familiar with Plaintiff's work on the Campaign and can speak to Plaintiff's senior role in the Campaign, the expectation that Plaintiff would be in the White House alongside her counterparts, and to Plaintiff's job seeking efforts.)

J. BRIAN WALSH: Mr. Walsh ran the America First PAC, from which the Plaintiff was mysteriously terminated on April 2018, with no reason or justification given. Plaintiff strongly believes this was in retaliation for not signing a release of claims against the Campaign, which the Campaign had asked Plaintiff to sign a few weeks earlier and she did not. This is highly relevant to the issue of the Campaign's retaliation against Plaintiff and tortious interference. [This was addressed during the January 2023 conference with Your Honor, with the Campaign stating they have no written communications to produce on this. As my then-counsel stated, we do not dispute such is true and that Defendants probably do not possess written communications on this. But I thus seek to depose the individual who would have knowledge, whether written or otherwise.]

K. CAROLINE WILES: Ms. Wiles was a junior employee in her 20's, who joined in the Campaign in its last few months, in a strictly administrative role. She joined because her mother, Susie Wiles, was assigned to run the FL state-operation for the Campaign, taking over for FL state-director Karen DiGiorno, whom Steve Bannon

had removed for alleged incompetence. Caroline Wiles was in charge of typical secretarial duties, e.g., the flight manifest and compiling the list of those riding with Trump on his plane. Despite her lack of a college degree, lack of direct experience in national politics, administrative role in the Campaign, and little time on the Campaign, Ms. Wiles was somehow nevertheless then appointed to Deputy Assistant Press Secretary by Defendant Spicer, for his press group.

Deposing Ms. Wiles is critical as it speaks to the nature of the clear pregnancy discrimination against Plaintiff, and demolishes Defendant Spicer's 'not everyone gets to have a White House job!', in that even the most junior, unqualified, and late-comer employees in the Campaign… received White House jobs (and jobs senior to that which the plaintiff was offered). As one article noted:

> *The younger Wiles has an unusual background for a senior White House official. On a résumé she submitted to the state of Florida she said she had completed course work at Flagler College. On her LinkedIn page, she says she simply lists Flagler under education. A Flagler spokesman said she never finished her degree. "She did not continue her enrollment or graduate from here," said spokesman Brian Thompson…. Over the years, she has had multiple encounters with police. In 2005, she had her driver's license suspended for driving while intoxicated, police records show. In 2007, she was arrested for driving while intoxicated and arrested for passing a "worthless check." She was found guilty of a misdemeanor for driving under the influence. The charge related to the bad check was dropped in a plea agreement.*[6]

Absent this deposition, Defendant Spicer will try to claim to a jury that only the most seasoned D.C. insiders obtained White House jobs. This deposition glaringly speaks to the pregnancy discrimination against Plaintiff.

L. JASON MILLER: As Plaintiff's direct supervisor/boss[7], who impregnated Plaintiff, the Plaintiff naturally seeks his deposition (Miller was involved in job placement and discussions) but caveats that she is **awaiting response from Defendants' counsel, as to** *whether Mr. Miller's deposition can be avoided (one less deposition needed) by stipulating to certain matters*. [Given Plaintiff's experience with Mr. Miller, and given that the Plaintiff is pro-se and would have to question Mr. Miller herself, the Plaintiff, for her well-being, prefers not to depose

---

[6] https://www.staugustine.com/story/entertainment/local/2018/03/31/behind-chaos-office-that-vets-trump-appointees-plagued-by-inexperience/12856401007/

[7] Despite Mr. Miller's claims that he was not Plaintiff's supervisor, this is explicitly contradicted by a multitude of documents in this case.

7

Mr. Miller herself, given ongoing trauma. For similar reasons, the Plaintiff did not depose Mr. Miller in the family law case last year in Miami Dade. The one time the pro-se Plaintiff bravely attempted to depose Miller, in her family law case, back in January 2020, Miller: wore sunglasses throughout, laughed sporadically, and almost immediately launched into a verbal assault on the Plaintiff (in response to a benign question as to why a bank statement contained redactions), causing her to have to terminate the deposition only minutes in. She prefers to avoid taking Mr. Miller's deposition, if stipulations can avoid the need for same and, naturally, it would also save time and costs.

PART 2

The depositions found in Part 2 herein are necessary ***purely due to a frivolous 'defense' claim that the Defendants appear intent on pursuing. If Defendants' counsel can stipulate that the Defendants abandon this frivolous claim, then none of the depositions below are necessary.***

That 'defense' claim is that the 'Plaintiff would not have obtained a White House role because she would not have received White House security clearance.' The reason being that, in a 2011 hearing, a county court in Miami issued a no-contact order against the Plaintiff, based solely on a threatening, anonymous letter a former paramour of the Plaintiff in NY, from whom Plaintiff had suffered a miscarriage[8] some months earlier, received. The letter was anonymous and mailed from Kansas City, MO (a place the Plaintiff had only visited once, in 2004, for a wedding) and to which she has no connections. The Plaintiff did not attend the hearing because she did not receive notice of the hearing (the notice being sent to her via U.S. mail), and the five-year no-contact order was thus entered. It was, moreover, a civil matter, not a criminal one, in 'family court.'

To be sure, Defendants admit they were not aware of this at the time the Plaintiff's White House job was revoked (only learning of it later) and it played no role in White House job placement but nonetheless put forth this defense as relevant to ***damages***: i.e., Defendants' counsel opines that the Plaintiff would *ultimately* have never qualified for a White House job because she would not have been able to obtain security clearance and, because of that, she only has few damages.

Defendants' argument is patently frivolous, and contrary to conducting this case in a judicially efficient and somber manner, given that:

---

[8] This is the only other pregnancy in the Plaintiff's lifetime, besides that with Mr. Miller.

a) The SF-86 security-clearance form does *not* indicate that *any* background issue (much less one as benign as Plaintiff's) is automatically disqualifying. (Quite the contrary, on the page asking if the applicant has ever had any protective orders entered, it provides an area in which the applicant can "explain");

b) The SF-86 form is used for the FBI to conduct its research on a person. The FBI, as it has testified before Congress, does not make any determination nor recommendation as to security clearances. It simply passes the information found onto the Executive Office of the President (EOP) Personnel Office, which then makes the determination to grant or deny White House security clearance. The personnel office mostly looks for incidents in a person's past that might lead to stealing state-secrets and/or would make the person susceptible to blackmail: things such as drug use; patronage of sex workers; married individuals who have had affairs -- e.g., information a Kremlin agent can use to blackmail a person; gambling debt; foreign investments; and the like. But even if the EOP opts to deny clearance, even *that* is subject to overruling by various White House officials.

c) Even if the White House personnel office had opted to deny the Plaintiff the White House security clearance (unlikely, given that the incident is not the kind that invokes concerns of blackmail), the Trump White House overruled *dozens* of security-clearance denials, as testified to in a Congressional hearing, by a White House personnel office career employee, Trisha Newbold, who was shocked by the Trump White House's constant overruling of security-clearance denials.[9]

d) Even those whose security clearance was denied, and whose denial was not explicitly overruled by the White House, nonetheless were able to work in the White House for months, often even over a year, because, as Defendant Priebus testified in his deposition and as reports confirm, the process was extremely slow and cumbersome, with many employees working under 'temporary' clearance. (And, as Mr. Epshteyn's trajectory, and others' trajectory, shows, a few months in the White House, on one's resume, is all that is needed to parlay such into prestigious and lucrative opportunities.) For instance, Mr. Rob Porter (who had a protective order against him for allegedly beating an ex-wife, and about whom *two* ex-wives went to the FBI with reports of abuse, to warn against Mr. Porter working in the administration) nonetheless was working in the White House (moreover, in the West Wing, handling top secret documents) for over a *year*. And, Mr.

---

[9] https://s3.documentcloud.org/documents/5785133/Newbold-Security-Clearances.pdf

Porter was only pushed out because media reports about the domestic battery in 2018, including prime news shows splashing photos of his ex-wife's black eye, circulated throughout network news. The White House could not withstand the negative publicity of employing a 'wife beater' in the West Wing, handing the president papers to sign, and, only then, most reluctantly, had Mr. Porter resign. Even then, Mr. Trump still praised him.

e)  As aforementioned, the SF-86 looks for background issues that would make a person susceptible to *blackmail* and thus a danger to national security if permitted to obtain security clearance. Drug use, which often leads to debt and owed favors, is one red flag; gambling; married men who have affairs and could be blackmailed; foreign entanglements… are what set off alarms. The Plaintiff's past (a bad experience and a fake letter) have no relevance to blackmail concerns, particularly as all of it was public knowledge.
    ***The idea that the Plaintiff would have been denied security clearance is not only purely speculative and opinion but contradicted by all facts.***

f)  In fact, so flexible was the Trump White House on this issue that only a few individuals were prevented from working in the White House due to issues in their background: Caroline Wiles, who worked as a scheduler during the Campaign and was appointed a deputy press secretary, was removed (for reasons the Plaintiff does not list here) and another individual was removed due to a secret profile on Grindr (the rationale there being that such could purportedly lead to blackmail).

g)  Lastly, the "this is at least relevant to damages" argument is utterly debunked, by publicly available facts. Why? Because those who did not receive security clearance for the White House were then nonetheless shuffled over into other similarly (usually even higher paying) jobs elsewhere in the administration or at a PAC, etc. *See e.g.*, when Caroline Wiles failed to pass screening, due to admitted past drug use, she was nonetheless immediately given an alternate job, at the Treasury Department.[10] And, even then denial was somehow then retracted, as Ms. Wiles ultimately indeed stayed in the White House (!), working in the White House Presidential Personnel Office (PPO).[11]

Defendants are obviously aware of all this. This line of query is legally unsound and meritless: the point is to harass the Plaintiff (the information being provided to

---

[10] https://www.jacksonville.com/story/news/2017/02/16/daughter-political-consultant-susie-wiles-resigns-white-house-post/15742956007/

[11] https://www.staugustine.com/story/entertainment/local/2018/03/31/behind-chaos-office-that-vets-trump-appointees-plagued-by-inexperience/12856401007/

Defendants by Jason Miller) and humiliate her for bringing forth this litigation. ***This is not even a phishing expedition, as even a phishing expedition could perhaps lead to something admissible – it is a harassment expedition.***

The Defendants' putting forth this claim is a waste of time in this case, ***and will swallow up more discovery and time than even the main aspects of the case itself (pregnancy discrimination and breach of contract). However, unless and until the Defendants admit this is a dead end that would likely not survive a motion in limine, the Plaintiff has no choice but to forge ahead and defend against this claim. To that end, Plaintiff must be provided the right to engage in discovery to defend against this frivolous position, or Defendants should not be permitted to put forth this claim.***

Questions to be asked include but are not limited to:
- Did you have any conversations with any of the Defendants regarding security clearance?
- Did Defendant Spicer or another decisionmaker inform you that an incident in your past was not a problem, so long as you were truthful on your application?
- How long did you have interim security clearance, before a permanent security clearance?
- Why/how were you able to work in the White House despite (XYZ) in your past? Did anyone, including Defendants, shed light on such?
- Are you aware of others who were denied White House clearance? Was the denial overridden? If not, where was the person placed? (agency, etc.)

Thus, to wit, Plaintiff requires the following depositions:

TRISHA NEWBOLD: Ms. Newbold is longtime Executive Office of the President (EOP) Personnel Office employee, who gave Congressional testimony regarding the dozens of individuals for whom the Trump White House 'overruled' her office's decision to decline security clearance.

JOHN KELLY: Mr. Kelly was Chief of Staff immediately following Reince Priebus, and would know about security clearance issuance, including that of Rob Porter and why Plaintiff would have been treated any differently than Porter, as Defendants implicitly posit. (Mr. Kelly was interviewed by the press as to how Mr. Porter was able to work in the White House well into 2018, given that the White House was made aware of the domestic violence allegations in March 2017). Mr. Kelly has already agreed to be deposed in this matter.

STEPHANIE GRISHAM (also mentioned in previous section): Given the Defendants' frivolous claims that Plaintiff's no-contact, civil order from 2012 would have barred her White House employment, Plaintiff must be permitted to depose Stephanie Grisham (which, to be sure, Plaintiff holds in high esteem), who had two DUI arrests, one later reduced to reckless driving, in 2013 and 2015 (the latter one incurred while working for the Campaign). Her past incidents did not stop Ms. Grisham from being offered a *top* White House post by Defendant Spicer, later serving as Communications Director for the First Lady, then being named White House Press Secretary (one of the most prestigious roles in the nation), and then also named White House Communications Director, serving in the White House for four years at the very highest posts.

Moreover, Ms. Grisham has provided an affidavit to Plaintiff, noting that, contrary to Defendant Spicer's claims during his deposition, that she only informed him of "one" DUI, she informed Mr. Spicer of *both*. This also goes to Mr. Spicer's credibility and apparently willingness to, perhaps, perjure himself in this case to further substantiate his 'defense'.

Moreover, Ms. Grisham has explained that Defendant Spicer informed her that, so long as she listed everything and did not lie on her SF-86, it would be fine. Yet, the same Mr. Spicer has claimed differently in his testimony in this case.

Ms. Grisham was hired specifically by Mr. Spicer, who somehow claims *Plaintiff's* past, in contrast, would be an impediment.

ROB PORTER: Given the Defendants' frivolous claims that Plaintiff's no-contact, civil order from 2012 would have barred her White House employment, Plaintiff must be permitted to depose Rob Porter and ascertain *how/why* he was employed by the White House despite a **protective order for domestic battery** on his (second) wife, Jennifer Willoughby, as well as both ex-wives (Ms. Willoughby and Ms. Holderness) reportedly approaching the FBI in late 2016 to warn the FBI about Mr. Porter's abuse of both of them.[12] A letter to a Congressional oversight committee (April 13, 2018) details the extensive amount of information White House received about Mr. Porter,[13] yet the White House took no action.

---

[12] https://theintercept.com/2018/02/07/rob-porter-wives-abuse-trump-aide/

[13] https://oversightdemocrats.house.gov/sites/democrats.oversight.house.gov/files/documents/FBI.041318.Response%20to%20Gowdy%20re%20Clearances%20&%20Porter.pdf
See also: https://www.cbsnews.com/news/fbi-gave-derogatory-information-on-rob-porter-to-white-house-in-march-2017/

JURISPRUDENCE

# Rob Porter's History of Domestic Abuse Wasn't a Secret. It's Just That No One Cared.

The cops, the FBI, and the White House chief of staff all knew, and he still continued to rise through the ranks of our government's highest office.

BY DAHLIA LITHWICK                              FEB 08, 2018 • 2:54 PM

https://slate.com/news-and-politics/2018/02/rob-porters-history-of-domestic-abuse-wasnt-a-secret.html

> *Long before Wednesday, many of the people to whom he reported knew he had physically abused and assaulted both of his wives. Colbie Holderness, Porter's first wife, and Jennifer Willoughby, Porter's second wife, both told the FBI their marriages had ended because of a pattern of physical and emotional abuse. According to their accounts, supported by photos, contemporaneous reporting to others, and a blog post written by Willoughby last April, Porter kicked these women, he punched and choked one of these women, he blackened one of these women's eyes.*



The True Face of the Trump Administration
Colbie Holderness's black eye confronts us with the underside of this White House.
By Rhonda Garelick

13

https://www.thecut.com/2018/02/rob-porter-photos-colbie-holderness.html

RAJ SHAH: Given the Defendants' frivolous claims that Plaintiff's no-contact, civil order from 2012 would have barred her White House employment, Plaintiff must be permitted to depose Raj Shah, who, despite having a criminal past (DUI), involving alcohol or drugs, which resulted in his being fired from a campaign in New Mexico,[14] was nonetheless appointed to a *top* post in the White House in Defendant Spicer's group, and appointed by Defendants Spicer and Priebus, to boot.

BORIS EPSHTEYN: Given the Defendants' frivolous claims that Plaintiff's no-contact, civil order from 2012 would have barred her White House employment, Plaintiff must be permitted to depose the aforementioned Boris Epshteyn, who obtained a White House role despite a criminal past, pleading guilty to assault, shortly prior to the Campaign (in 2014).[15] This was, moreover, *known at the time of Mr. Epshteyn's appointment to the White House* (it was reported on, by the *New York Times*, in October 2016, leaked to the NY Times by, coincidentally, Mr. Miller's assistant, Kaelan Dorr, who bragged to the Plaintiff that he had done so, whilst publicly sympathizing with Epshteyn).



(Mr. Epshteyn's 2014 booking photo)

---

[14] https://www.newschannel10.com/story/12792169/nm-gov-campaign-staffer-fired-after-dwi-arrest/
[15] http://www.thesmokinggun.com/documents/crime/boris-epshteyn-assault-arrest-473920

MAX MILLER: Given the Defendants' frivolous claims that Plaintiff's no-contact, civil order from 2012 would have barred her White House employment, Plaintiff must be permitted to depose the Max Miller, who also worked in the White House despite an *extensive* criminal record (court records show that Miller had a criminal record, including charges of assault, disorderly conduct, and resisting arrest. And, a few years before joining a White House, he also had a DUI.)

The list goes on and on. The reality that one's past was no impediment to White House security clearance in the Trump White House was openly covered by the press. *See e.g.,* this VICE article.'[16]

# Trump Official Charged in Capitol Riots Had a Rap Sheet and Still Got Top-Secret Clearance

Again, none of these depositions (Part 2) are necessary if the Defendants agree to acknowledge that their frivolous position is a waste of time (it is simply 'Hail Mary' pass to try to avoid what is a strong and clear case of discrimination). Defendants should pursue other avenues of defense, of course, but this one is not only clearly frivolous but would result in an enormous waste of time in this case. The Plaintiff requires the aforementioned depositions to defend against this particular claim. Absent such, the Defendants should not be permitted to make the claim.

CONCLUSION
In sum, the aforementioned depositions are all clearly relevant and necessary to both make the Plaintiff's affirmative case and/or to defend against the Defendants' claims. (The depositions requested in Part 2 are only necessary if Defendants' counsel insists on the frivolous argument.) Plaintiff thanks the Court for its consideration and respectfully requests that the depositions be granted, so that she is able to make her case.

Respectfully submitted,

*s/Arlene Delgado*
Arlene Delgado, Plaintiff, Pro-Se

---

[16] https://www.vice.com/en/article/wx8m8q/trump-official-charged-in-capitol-riots-had-a-rap-sheet-and-still-got-top-secret-clearance

15