April 15, 2024

Hon. Magistrate Parker
United State District Court, S.D.N.Y.
500 Pearl Street, Courtroom 17D
New York, NY 10007
<u>RE</u>: ***motion to compel appropriate 30(b)(6) answers and general motion to compel (combined with procedural request for letter-motion longer than three pages)***
<u>VIA</u>: electronic submission through *Pro-Se* Intake Unit

Your Honor,

I am the *pro-se* Plaintiff in the above-mentioned matter, hereinafter referred to in first person or as "Plaintiff."

## REQUEST FOR LETTER-MOTION LONGER THAN THREE PAGES

Plaintiff respectfully incorporates into this motion a separate procedural-motion, requesting that this motion's longer-than-three-pages length be permitted. Given the nature of the letter-motion, and the need for citations and quotes, the longer page limit could not be avoided (nonetheless, Plaintiff has kept the letter-motion as succinct as possible, to five pages).

## MOTION TO COMPEL APPROPRIATE 30(B)(6) ANSWERS
### and
## GENERAL MOTION TO COMPEL

As the Court may recall, on March 21, 2024, Plaintiff took a 30(b)(6) deposition of the Defendant-Campaign. [The witness put forth was Jesse Binnall, Esq., an outside attorney who frequently works for the Trump network, including representing the Campaign itself, Donald Trump, Trump Jr., and various former Trump officials. Mr. Binnall admits to having earned over $4 million just from Trump legal work, in the past 3.5 years alone.]

Your Honor cautioned the Campaign's attorney, Mr. Blumetti, that the witness chosen (who never was a Campaign executive or employee) would need to be fully prepared and able to speak on the topics. Regrettably, this is not what occurred.

Plaintiff herein respectfully requests that the Defendant-Campaign be compelled to provide answers to the following fundamental and reasonable questions, posed to it during the 30(b)(6) deposition.

**I.Discrimination/harassment complaints against the Defendant-Campaign from 2017-2020.** As is routine in employment litigation, Plaintiff naturally requested information regarding any other complaints of improper treatment (discrimination, harassment) against the Campaign. This is customarily granted, as clearly relevant, in most employment cases. <u>See e.g.</u>, *Sunaz v. Despont Studios LLC* 17-CV-1979 (SDNY 2020) (Plaintiff may seek discovery about complaints of discrimination and/or harassment by other of defendant's employees, and defendant's responses). This was Topic 4 of the 30(b)(6) Notice (Notice is **attached**). (This was also requested in the original Request for Production served on Defendants.)

During the 30(b)(6), the witness provided only a *partial* answer: Namely, the witness answered as to complaints made during the 2016-election-cycle (listing four different complaints, which regarded sexual misconduct/"unwanted physical advance"; "gender discrimination"; hostile work environment; and pregnancy discrimination). **The witness, however, neither held, nor provided, any information regarding complaints against the Defendant-Campaign during the 2020 election-cycle (which would be 2017-2020).** The witness's rationale was that it was too burdensome to conduct said search. (See Attachment A-1).

The reason provided is clearly not acceptable:
First, the witness has confirmed that the Campaign's documents are stored in an electronic server with a professional vendor ("2M") and thus, thanks to modern day technology, enormous amounts of documents can be searched within minutes.
Second, the witness could also have easily contacted the Human Resources director or COO of that time. The witness repeatedly admits he did not (See Attachment A-1), nor tried to. When asked why he did not do so, the witness simply shrugged and said he did not feel it was necessary (curiously, while simultaneously claiming an answer required too burdensome a search). This answer is illogical: it is tantamount to saying "I did not have time to locate where you left this object but I also saw no need to call and ask the person, who knows the location and can tell me instantly, where I could find it or what it looks like."

Thus, it is clear the witness failed to answer a critical question, and knowingly failed to prepare for such.

To be clear, the Campaign/witness did not claim that the 2016-election-cycle and 2020-election-cycle were part of different entities (i.e., the Campaign did not refuse to answer on the basis that the 2020-election-cycle was part of a different entity and thus irrelevant). On the contrary, **the 30(b)(6) witness repeatedly stated that the 2016 and 2020 campaign cycles were the same entity**: Donald J. Trump for President, Inc., which, in 2021, reportedly reincorporated and renamed as a PAC. The witness's position is that the 2016 and 2020 Campaign was one and the same entity but the 2024 Campaign is distinct, and is a new/separate entity. (See Attachment A-6 and A-8) The witness even admits that, when possible, his answers include both 2016 and 2020 Campaign cycle. (See Attachment A-3).

Plaintiff attempted to resolve this, subsequent to the deposition, with Mr. Blumetti, Defendant-Campaign's counsel. During the call, Mr. Blumetti took the position that the complaints made during the 2020 election cycle (2017-2020) are not relevant, which was an entirely new position to take and one taken by the witness. But this is inaccurate and improper:

1)      The Campaign has already stated, on the record, during the 30(b)(6) deposition, that the 2016 and 2020 campaign cycles were the very same entity.
2)      The position, even if they had not already acknowledged such, would have been illogical. Consider the following hypothetical: An employee sues FIFA for discrimination experienced during the 2016 World Cup planning. The lawsuit is still ongoing and, during a 2024 deposition, the employee requests information on what other similar complaints, by other staffers, were made against FIFA from 2017-2020. FIFA could not reasonably take the position that *only* those complaints made during the planning of the 2016 World Cup are relevant and not those made during the planning of the 2017-2020 planning for the 2020 World Cup, especially when much of the team

members remain the same! It is the same organization, with many of the same individuals, and the same information is sought, about similarly situated employees, within a reasonably close period of time.

3)      Courts have repeatedly held that a reasonable time period is "five years" before/after the conduct at issue in the instant matter. This suit entails conduct / decisions dated December 2016 – January 2017. Thus, allegations made during the 2020-election cycle (which would have a time frame of 2017-2020) are well-within the 'five year' guideline (indeed, the five year guideline would find that complaints made as late as January 2022 are still relevant and discoverable. [Courts have, admittedly, found 10-years-later to be too far distanced. (*Glenn v. Williams*, 209 F.R.D. 279, 282 (D.D.C. 2002)).]

Though Mr. Blumetti did not take this position on the call, the Campaign also cannot take the position that the information is limited to strictly the exact same legal claim made in the Plaintiff's lawsuit (pregnancy discrimination). First, as this Court has rightly noted in an earlier hearing, pregnancy discrimination is a type of gender discrimination – thus, any and all claims related to gender discrimination are of the 'same kind' of misconduct. Second, even if the Plaintiff were pleading a very specific type of discrimination (e.g., age discrimination), the Campaign has already waived that position by answering, as to 2016, with a *variety* of complaints, ranging from sexual misconduct, to hostile work environment, to gender discrimination. It has thus waived the "We would limit it only to pregnancy discrimination claims" avenue (an avenue that, regardless, would have no reasonable legal basis).

And, even if the Campaign had not already waived relevancy, which it has (both by handing over the 'variety' of complaints in 2016 AND by admitting the 2016 and 2020 cycles were both the same entity), the information sought would easily meet the proportionality factors in Rule 26(b)(1).[1]

**II.Incomplete searches.** Second, despite this Court repeatedly cautioning the Defendant-Campaign's counsel that the Defendant-Campaign *must prepare* the witness to be able to answer appropriately, the witness was incredibly unprepared and repeatedly gave answers that were simply:

(a)  providing what is in the public record (See Attachment A-1);

(b) qualified as "what I was able to find" (See Attachment A-1);

---

[1] (1) the importance of the issues at stake in the action (information sought goes to the very heart of the lawsuit claims); (2) the amount in controversy (significant amount is sought in damages); (3) the parties' relative access to relevant information (there is no way for the Plaintiff to obtain this information otherwise); (4) the parties' resources (the Plaintiff has no resources, whereas the Defendant has the resources to easily conduct an electronic search with its vendor); (5) the importance of the discovery in resolving the issues (discovery is key to the Plaintiff fleshing out her case); and (6) whether the burden or expense of the proposed discovery outweighs its likely benefit (there is very little time and energy involved in contacting an HR professional and in running electronic searches on a vendor's storage).

(b)  qualified as "that I'm aware of" (See Attachment A-2); or

(c)  laid bare that the witness did not conduct a thorough search (See Attachment A-2).

For instance, on the issue of the complaints against the Defendant-Campaign during the 2016 cycle, the witness admitted to essentially only going by those complaints that were already "in the public record" and *then* searching for information based on that. The witness also, astonishingly, admits to not running a keyword search in the HR Director's email files *or* even contacting the HR director – instead, only looking through "a number of" the HR director's emails (See Attachment A-2).

> I researched publicly available sources on this as well, is identified the particular, you know, the particular individuals that people make claims. Those were the only four claims I was able to find….I can tell you I ran a number of keyword searches. And I can't tell you off the top of my head exactly what keyword searches, that of course was not a designated topic here. But I believe these were -- my understanding is that this is all information that was turned over in discovery as well. [Plaintiff's 4/15/24 note: THIS INFORMATION WAS NOT TURNED OVER IN DISCOVERY.] I tried to -- tried to think best I could the best way to come up with information that would be responsive, and I did that for those four individuals…. I went through the document production [Plaintiff's 4/15/24 note: AGAIN, THIS INFORMATION WAS NOT TURNED OVER IN DISCOVERY.] and I looked at publicly available searches in order to come up with that. And that's what I was able to come up with.

-30(b)(6)  witness, March 21, 2024 deposition, Attachment A-2

What is the point of a 30(b)(6) deposition when a 'company'/'entity' is answering with, 'Well, that's the best I can come up with for you'?

The most straightforward manner to prepare on this topic would have been to contact the HR director at the time. The witness inexplicably said he saw no reason to do so, all whilst answering that the best he could do was provide what is already in the public record – i.e., allegations against the Campaign reported on in the press.

> Q. Yet you don't believe that efforts would entail speaking to the HR who is still alive as far as I know and somewhere?....
>
> THE WITNESS: Ma'am, in order to answer your question, I didn't need to do that…. I -- in order to answer the questions that you put in your designated topics, I did not have to do that. And it was -- **it just wasn't necessary for me to be able to answer -- to find the answer to the designated topic.**

-30(b)(6) witness, March 21, 2024 deposition, Attachment A-2 (emphasis added)

To be clear, while claiming the search results were the best he could do, the witness (astonishingly) *also* claims there was 'no need' to consult with the HR director.

The search is so flimsy indeed that the witness would only answer as to complaints of which the Campaign is "currently aware." (See Attachment A-1)

The witness even admits he does not know who the HR director was in the 2020-election cycle and never inquired -- and would not say who it was. (See Attachment A-4).

This is a clear and severe violation of the Defendant-Campaign's duties under the 30(b)(6) obligation. If the Plaintiff wanted to merely obtain what was in the public record, she could obtain that from the public record and Google. The entire point of the 30(b)(6) is to obtain what is not already public record.

As a result of the incomplete searches, the Plaintiff requests that the Defendant-Campaign be compelled to identify the name and location of its storage-vendor ("2M") so that a subpoena may be served on such.

**III. Witness refused to provide an answer as to legal fees paid for this case _and_ as to cash/assets on hand.** Under both Topic 11 and Topic 18, the witness should have been ready to answer how much the Defendant-Campaign has spent on legal fees in this case. Yet the witness instead rattled off numbers which were only what the Defendant-Campaign has paid the Defendant-Campaign's law firm _overall_ (yet, given that the law firm handles numerous cases for the Defendant-Campaign, not just this one, the 'total number of legal fees paid to the firm' does not answer the question, since it is impossible to tell how much is for _this_ case). (See Attachment A-7).

The Plaintiff realized that the numbers the witness had provided were simply those found in public FEC disclosures, available to anyone, if one searches how much money the law firm has received.

Yet this was not the question or topic.

The Plaintiff also tried to resolve this after the deposition, with Defendants' counsel, explaining that this is relevant for purposes of waste and fraud and relevant for purposes whether the Defendant-Campaign is deliberately spending excessive amounts on fees, to then claim it has no funds left to pay on a judgment.

The same problem occurred with the testimony regarding the Campaign's current financial picture - a standard question in any 30(b)(6).  On this, the witness only read off the _months-old, publicly available, FEC-filing numbers_.

It is readily apparent that the witness was not only unprepared but, worse yet, the Defendant-Campaign and the witness did not approach this deposition in a somber and serious manner, likely because the Plaintiff is _pro-se_. This Court should not condone such. For a 30(b)(6) witness to be asked to speak on the current cash/assets of an entity, and to instead rattle off months-old, public-filing information, is nothing short of outrageous.

**IV. Witness refused to provide a clear answer as to whether staff was ever informed that there was an HR Director for the Campaign.** The witness was also repeatedly evasive and refused to clearly answer as to whether staff was ever informed that there was an HR director available to them. (This is relevant, given that Defendants have claimed Plaintiff had avenues available to her to

complain of the discrimination, versus her going public on social media to air her discrimination complaints.)

Plaintiff attempted to resolve this after the deposition, as well, and Defendants' counsel's position was that the witness clearly answered that the Campaign staffers were never informed. The Plaintiff begs to differ that such is clear from the transcript. (See Attachment A-5). A clear answer should be provided, especially given that Defendants' counsel seems to believe this was already admitted in the deposition.

IN SUM, the Plaintiff respectfully and humbly requests that the Defendant-Campaign be compelled to provide all of the answers above. Plaintiff also requests that the Defendant-Campaign be compelled to identify the name and location of its storage-vendor ("2M") so that a subpoena may be served on such.

It is clear Defendant-Campaign did not approach this deposition with the seriousness and preparation required. It is clear Defendant-Campaign did not treat this deposition respectfully, because the Plaintiff is *pro-se*.

Absent such, the appropriate remedy (prohibiting the Defendant-Campaign from putting forth argument and evidence at trial) is requested.

Respectfully and humbly submitted,
*s/ Arlene Delgado*
Plaintiff, *pro-se*

**ATTACHMENT A: RELEVANT EXCERPTS FROM THE DEPOSITION**
**(the following are true and correct excerpts from the March 21, 2024 deposition-transcript of**
**30(b)(6)  Campaign witness, Jesse Binnall, Esq.)**
**(bold emphasis added)**

ATTACHMENT A-1, Deposition, p. 55-61:

Q. The topic also asked for quote, "applicable decision maker" on that issue. Who was the decision maker in terms of -- in terms of policies and procedures regarding my claim?

MR. BLUMMETTI: Objection to form. On behalf of the campaign?

THE WITNESS: Mr. Bannon was I believe the CEO of the campaign. Ms. Conway was the campaign manager. At the end of the day any decision makers, again, of course was the campaign general counsel, and so as far as **decision makers** go probably would rest with those people.

BY MS. DELGADO: Q. I'm sorry, that last that you cut out. Probably what?

A. It would probably rest with those people as far as decision makers go.

Q. Okay. Obviously, we've talked about **Lucia Castellano was the human resources director.** She certainly has decision making authority in a number of matters as well as the human resources director.

**Q. Did you reach out to her?**

**A. No, ma'am.**

Q. Okay. Topic Number 4 is quote "any and all claims of sexual harassment, or for unlawful discrimination, or for pregnancy discrimination against Donald Trump for President or employees represented there of" unquote. Could you please tell me what claims -- what aforementioned -- I won't have to repeat that mouthful again unless you'd like me to -- the campaign has faced, and please tell me if you're referring to 2016, 2020 and if you're not including 2024?

A. Yes, ma'am. The campaign is **currently aware** if [of] HR complaints regarding the following individuals for the 2016 presidential cycle: Alba Johnson, Jessica Denson, Elizabeth Davidson, A.J. Delgado.

Q. I'm sorry. Could you -- it's complaints against the campaign from these individuals you said?

A. The campaign is **currently aware of** HR complaints regarding the following individuals for the 2016 presidential cycle, and that's: Alba Johnson, Jessica Denson, Elizabeth Davidson, A.J. Delgado.

Q. What was the third name you said, I'm sorry?

A. Elizabeth Davidson.

Q. **And could you tell me about those, please? We can go one by one if you'd like.**

A. **I can tell you what [that] the information that I have is in the public record.**

Ms. Johnson made a claim against Mr. Trump.

Ms. Denson made a complaint against you and one other individual, and I can pull up the other individual's name.

Ms. Davidson made a -- was in Iowa, and since [sic] [she] made a gender discrimination claim.

And Ms. Delgado, yourself, made the complaint that is at issue here.

Q. Who was Ms. Davidson's complaint about?

A. You and one other individual. I can --

MR. BLUMMETTI: Did you hear the question correctly there?

THE WITNESS: Who is Ms. - I'm sorry?

MR. BLUMMETTI: Could you repeat that, Ms. Delgado? I don't think he heard you correctly.

BY MS. DELGADO: Q. Who was -- it's a name I've never heard of so I asked -- who was Ms. Davidson's complaint about?

A. I apologize, I was answering the wrong individual and I heard you incorrectly.

Ms. Davidson's complaint was about gender discrimination. I was not able to locate a particular individual that it was about, but it was -- it had to do with allegations of gender discrimination I

believe, leading up to the Iowa caucuses in 2016. She later dismissed -- that ended up not filing any lawsuit in that claim. But it had to with, you know, whether males and female were treated alike.

Q. Okay. Were there any HR complaints by any males?

A. **Not that I was able to find.**

Q. Okay. And you mentioned these were for 2016--

A. Yes, ma'am.

Q. -- what about 2020?

A. Ma'am, for the relevant time frame here, **I looked at 2016.**

**Q. Why?**

**A. Because of the rather huge amount of documents that would have to be sifted through in order to go beyond that.** This campaign was about the 2016 cycle and so the 2016 presidential campaign and so that is the search I did for -- to do a reasonable and diligent inquiry.

Q. Why do you think this campaign is tied to a presidential cycle -- this lawsuit is tied to a presidential cycle, I should say?

A. Had to do with allegations regarding the 2016 presidential campaign, **which had a completely different staff from any other campaign.**

Q. **On what do you base that it had a completely different staff?**

**A. Well I should say a different hierarchy.** Like for instance, Mr. Bannon was not the CEO of the 2020 campaign. Ms. Conway was not the campaign manager of the 2020 campaign, et cetera. And so, **because there are so many hundreds of thousands of -- actually I apologize, millions of documents in order to get to do a reasonable search to answer your question, that is what I did.**

Q. Who was the HR director in that 2020 campaign you mentioned?

A. Ma'am, I couldn't tell you off the top of my head.

Q. **Mr. Binnall, couldn't you just call whoever -- call or e-mail whoever the HR director was for 2020 and ask them what the complaints were?**

MR. BLUMMETTI: Objection to form.

THE WITNESS: Ma'am, I don't think that was a designated question. And as far as the reasonableness for what I did to prepare for today's deposition, I took the reasonable steps.

Q. **So just to be clear, you did not inquire or research and you cannot answer today as to any complaints made in the 2020 cycle of the campaign; is that correct?**

A. **That's correct.**

Q. Jason Miller was part of both campaigns; is that correct?

MR. BLUMMETTI: Object to form.

Q. Was Jason Miller part of both campaigns in 2016 and 2020?

A. Ma'am, what topic are we under right now?

Q. We're still on 4.

A. Ma'am, that's not a question that I looked into to answer Question Number 4 and so I can't answer on behalf of the campaign that question. From my personal recollection, **I believe that he was.** That's my personal recollection, not on behalf of the campaign.

Q. Right. The reason I bring that up is because you, yourself, mentioned that the staff was quote "completely different" in 2016 and 2020. So I'm trying to work through that, but you stated Jason Miller was on both. Was Brad Parscale on both 2016 and 2020?

A. Ma'am, again, that wasn't a designated topic so I can't speak on behalf of the campaign. But for my personal recollection **the answer is yes.** And **I should have been more clear in that original answer that there were individuals that were on both campaigns.** I was speaking more as the campaign hierarchy.

ATTACHMENT A-2, Deposition, p. 62-70

Q. Okay. So back on the record. I believe we were on Number 4, Mr. Binnall.

A. Yes.

Q. Okay. So were there any claims of sexual harassment that you found in the 2016 campaign?

A. I'm not sure how Ms. Johnson designated her complaint, and I think she characterizes it as an unwanted physical advance. And then -- yeah.

Q. Okay.

A. That and it -- depending how you would designate your complaint, those were the two I was able to identify.

Q. And when you searched for these, did you limit it to formal complaints, or did you include any type of, for instance, e-mail expressing concern about something?

A. Ma'am, there's no way for me to limit it as far as e-mails expressing concerns because there was millions and millions of e-mails so I was not able to do that. But I – those were the complaints that were made to HR **that I'm aware of.**

Q. Did you perhaps consider conducting a keyword search or --

A. I did conduct a keyword search in a number of ways, and even myself, and **so those are what I was able to find.**

Q. What key words did you use?

**A. Well, I did run searches, such as -- and ask that searches be run for things such as harassment and sexual harassment, but the problem is in presidential campaign those phrases were used a lot, you know. It was used for instance in discussing the issues with Hilary Clinton and allegations, you know, made about what she did or didn't do regarding her husband's time in The White House. So it -- just a simple keyword search, wasn't able to limit it so I was able to identify those four. I was not able to identify anything else beyond the four.**

Q. When you do the keyword search and you say millions would come up, rightly so[,] for the term [']sexual harassment['] --

A. No, ma'am. No, ma'am. I didn't say millions would come up on
that.

Q. Oh, you're right. Let -- let me you're correct. There are a
millions of documents—

A. Millions of documents, that's -- that's correct.

Q. Right. **Did you consider limiting the keyword search to e-mails
sent to Lucia Castellano for instance?**

A. I did **look through a number of her e-mails. I don't know if I
did a word search based on hers,** but again, that's usually when --
when somebody goes directly to human resources on that, that was -
- that's what I was looking for. **Those are the four that came up.**
I did not find any – anything else other than those four that I
believe was responsive to the question and it -- specifically as
to claims if sexual harassment or for unlawful discrimination or
for pregnancy discrimination. So I was looking specifically for
claims and those were the claims I was able to identify.

Q. How do you define claims?

A. I probably would use a dictionary definition for claims. And so
I can pull that up, but I mean, when I'm looking for claims, I'm
looking for someone saying, you know, that -- that somebody, that
they -- that they were a victim of some sort of harassment, as you
identified in your question, and what actions the campaign then
took at that point. Those were the four I was able to identify.

Q. Fair enough. And I just wanted to clarify that you weren't
taking the term -- you weren't interpreting the term claims to
mean a legal claim was made. It sounds like you used the broader -
-

A. Right. I didn't require that a lawsuit be filed or a Title 7
would have to be filed.

Q. Okay. Great. That's what I was looking to clarify. So to be
clear, now working through the answer you gave, did you read
through the e-mail, all e-mail -- obviously, not all e-mails sent
to Lucia, but **you did run a keyword search in all e-mails to and
from Lucia Castellano?**

**A. No, ma'am, I didn't** -- I didn't do a keyword search for
everything regarding her. I looked specifically for claims and
worked with our vendor to do just that, and went through a number

of relevant e-mails, and **that's what my search was able to -- to discover.**

Q. Right. But I'm trying to find out what the search was that you executed because you stated that using the term sexual harassment would bring up too many results, rightly so. But you also did not read through all e-mails sent to and from Lucia. **So what search did you run exactly?**

**A. Ma'am, I actually couldn't tell you the exact searches that I did.** But what I was able to do, and I wouldn't even be on this campaign e-mails, **I researched publicly available sources** on this as well, is identified the particular, you know, the particular individuals that people make claims. **Those were the only four claims I was able to find.**

Q. But -- and so your position -- your testimony today is you can't recall the keyword search, if you ran any keyword search, that --

A. **I can tell you I ran a number of keyword searches. And I can't tell you off the top of my head exactly what keyword searches,** that of course was not a designated topic here. But I believe these were -- **my understanding is that this is all information that was turned over in discovery as well.** So I tried to go through that documentation as efficiently and effectively as I could, and that's what I was able to determine.

Q. On what do you base that the keyword search is not responsive or part of Topic Number 4?

A. It didn't ask me to run specific keyword searches. And so what I did is, I tried to -- **tried to think best I could the best way to come up with information that would be responsive, and I did that for those four individuals.** I did that and it turned out for those four individuals. Both documents that I found in the -- in the -- in the e-mails at issue and on publicly available sources.

Q. You're saying Number 4 would have to specifically ask you to run a keyword search for you to --

A. Ma'am -- go ahead.

Q. You're saying that Topic Number 4 would have to, specifically, ask you to run a keyword search for you to testify here today what the keyword search was that you ran to inform yourself as to Number 4?

A. No, ma'am. I'm saying Number 4 doesn't require a keyword search
or not. to use my best efforts to try to come up and be able to
answer your questions, and that is exactly what I did. And I was
able -- I was able to identify four specific examples. And those
were the -- and that's -- yeah, and so that's what I was able to
find **using my best efforts.** It didn't, you know, for instance,
Number 4 doesn't say, or nor do the instructions say, to use
specific keywords in order to do searches in order to find those.
So what I did is, as I've explained, is I've gone through e-mails.
**I went through the document production and I looked at publicly
available searches in order to come up with that. And that's what
I was able to come up with.**

Q. And you correctly say it doesn't require you to run a keyword
search, but you also say you understand that your best efforts are
required.

A. Yes, ma'am.

**Q. Yet you don't believe that efforts would entail speaking to the
HR who is still alive as far as I know and somewhere?**

MR. BLUMMETTI: Objection.

THE WITNESS: **Ma'am, in order to answer your question, I didn't
need to do that.**

BY MS. DELGADO:
Q. Right. This is a new question. When you referenced your
expectation that you used your best efforts to educate yourself on
these topics, you -- **is your belief is that the best efforts do
not include speaking to the HR director?**

A. Ma'am, as I think I have already testified to, **I -- in order to
answer the questions that you put in your designated topics, I did
not have to do that. And it was -- it just wasn't necessary for me
to be able to answer -- to find the answer to the designated
topic.** That's what I did, didn't require going and talking to
individual people.

Q. **Even though you mentioned yourself that these are millions of
e-mails to go through, including millions of e-mails, which will
give false positive results on terms like sexual harassment. Even
still, you don't think best practice would be to speak to the HR
director?**

A. **Based on the designated topic, no.**

ATTACHMENT A-3, Deposition, p. 70-71

Q. Oh, and I'm sorry, just to clarify. For Number 4, I presume, but just to clarify, your answer would be that you also, same as Number 3, did not look at the 2020 campaign, correct, 2020 campaign effort?

A. Correct. As a matter of fact, I think that question regarding 2016 and 2020, I think I've already answered, I think that was in regards to Question 4.

Q. Right. So to speed things up, for all of the topics, the answers you're giving are strictly about the 2016 campaign effort and not 2020?

A. Not necessarily. **There may have been at least one question where a reasonable [search] could and was done on 2020. And so if a reasonable search could be done then at that point it was specifically asking for that information that [then] I did it.**

ATTACHMENT A-4, Deposition, p. 131-133:

Q. Who would know, Mr. Binnall, if not you, not in this 30(b)(6), Lucia -- was Lucia -- did you even ask who the HR director was in 2020?

A. That was -- **no, I did not ask who the HR director was in 2020.**

**Q. You're the campaign here today. I'm asking --**

**A. Right. No, I did not ask that question.**

Q. Okay. Who -- if you -- regardless of whether you asked it or didn't ask it, **who was the HR director in 2020?**

**A. I have no personal recollection.**

**Q. But I'm asking the campaign, you're the campaign, who was it?** I don't know about your recollection, you don't know, you can't tell me here today who the campaign's HR director was in 2020?

**A. Ma'am, I don't have that -- I don't have that information, no, on behalf of the campaign or personal.**

Q. Was there an HR director in the 2020 campaign election effort?

A. As I have stated, I limited my review of those the way that I had previously testified so I did not look into that matter. It needed to be bound by time. And in order to do a reasonable search and so I did not look at that.

Q. Did you ask whether there was an HR director in 2020?

A. Ma'am, I think I've already answered that question.

Q. It's a different question. I asked if you had inquired whether there was?

A. Are you saying inquired and asked are different?

**Q. Did you inquire from Mr. Blumetti or anyone in preparation for this deposition whether there was an HR director --**

A. I've already answered that question, ma'am.

Q. I don't believe I asked you that already.

A. I already answered that question. You can rely on the record for that.

Q. I've asked you whether you inquired if there was an HR director? Can the court reporter read back the question if I did?

**THE WITNESS: Ma'am, I'll just -- I'll save the time. No, I did not. For 2020 I did not.**

ATTACHMENT A-5, Deposition, p. 73-77

Q. Mr. Binnall, I'm taking you back to Number 2, which is the campaign's quote "policies and procedures for receiving/investigating a resulting complaint." Focusing particularly on the receiving, were the staff members of the 2016 campaign informed -- **did you see any point where they were informed there is an HR director, her name is Lucia Castellano?**

A. Ma'am, I'm not aware of any procedure require that. And I'm not aware of that of the procedures at all. And that's that would being part what I researched, and I did not find that procedure.

Q. Okay. Before I have to object to that as nonresponsive, let me try again. I'm not asking if you're aware of whether the procedures require that. I'm saying as far as your knowledge regarding policies for receiving complaints, were the staff members informed where complaints could be received or through whom?

A. I am not aware of any policy regarding how employees were to make complaints and to whom they were making them.

Q. Again, not asking you about if there was a policy regarding informing them. Were they informed? It's **part of the policy**, there isn't a separate policy on that, it would be **part of** the policy for receiving complaints.

A. Ma'am, I looked at what the policies and procedures were, that's what the topic asked me to look at, and that's what I looked at. I'm not aware of any such policies and/or procedures.

Q. Right. So for the policies and procedures of the campaign, was there anything in there therein stating, informing the staff there is an HR director?

A. Ma'am, as I've testified to you already, **I'm not aware of any such polices and procedures. And I did look for such. I was unable to find it.**

Q. Maybe you misheard my question. I'm not asking if there was a policy and procedure. Did you see an e-mail notification or any type of notification informing the staff that there is an HR director and her contact information?

A. Ma'am, that was not part of the designated topic. I did not look for it.

Q. It's part of policies and procedure in Number 2.

A. Ma'am, for policies and procedures I looked for policies and procedures. I did not look for every communication with an HR director, for instance, or every director, every communication from all employees regarding HR directors. I looked for policies and procedures. That's what the topic asked for, that's what I did.

Q. **Mr. Binnall, are you saying an HR policy and HR procedure does not entail notifying staff that the HR department exists; is that your testimony today?**

A. **It could be a policy or procedure. I'm just saying that I was unable to find that as a policy or procedure. And --**

Q. **I'm not asking if you found it as a policy or procedure. I'm asking if you found such a notification, which would be part of the policy or procedure.**

A. Ma'am, that is not what -- part of what I looked for in this case. And I do not believe it was part of the designated topics.

Q. I'm not asking if that's part of what you looked for or if you believe it's part of the designated topics. I'm asking did you see any such notification regarding there being an HR director and her contact information?

A. Object to what I said, that's not something that I looked for based on the designated topics, the answer to your question is no.

Q. Okay. I'll object to that as nonresponsive.
You stated earlier that --

MS. DELGADO: Sorry Mr. Blumetti, did you say -- I thought I heard something. Was there an --

MR. BLUMMETTI: You objected as nonresponsive. I said, I believe that the record speaks for itself, including Mr. Binnall's answers.

ATTACHMENT A-6, Deposition, p. 33-34; 38-39:

Q. You stated earlier that it's your belief that the 2016 campaign is a different entity from the current [2024] campaign; is that correct?

MR. BLUMMETTI: Objection to form.

A. I think I said that it is a different entity.

Q. Okay. So could you explain to me how then Mr. Blumetti was the one preparing you if Mr. Blumetti never worked for the 2016 campaign effort?

A. My understanding is that Mr. Blumetti is counsel for the campaign in this case. **And when I say the campaign, I mean the entity that was formerly known as Donald J. Trump for President, Inc.**

Q. And your belief is that's that 2016 campaign or the current one given that you thought they're different entities?

MR. BLUMMETTI: Objection to form.

THE WITNESS: **Donald J. Trump for President, Inc. was the campaign and again 2016 and 2020.**

BY MS. DELGADO:

Q. Sorry, you cut out. Can you repeat that, sir?

A. Yes, ma'am. Donald J. Trump for Inc. was the campaign entity in -- 2016 campaign and the 2020 campaign. That's my understanding.

....

Q. You said you reviewed e-mails from the 2016 and 2020 campaign, but not the 2024 campaign, correct?

A. Correct.

Q. Why is that?

A. I don't have access to those.

Q. Okay. And on what do you base -- you stated earlier the 2016 campaign was a different entity and then said 2016 and 2020 were the same entity. Could you clarify that for me?

A. What would you like clarified?

Q. Did you mean the 2016 campaign was distinct from 2020 or that 2016 and 2020 are distinct from 2024?

A. **Ma'am, the 2016 and 2020 campaigns were known during the time as Donald J. Trump for President, Inc. That entity is now known as "Make America Great Again Act". The 2024 entity is completely different.**

ATTACHMENT A-7, Deposition, p. 99-102

Q. **When you speak of a campaign's financial obligations, how does it pay for its legal counsel?**

A. There are – and I'm sorry, which topic are we under for this question?

Q. Number 11, campaign's financial obligations.

A. So the Question Number 11 looks specifically as to current final [financial] status. It doesn't ask how particular payments are made. And so in answering Question Number 11 I did not look into how payments were made.

Q. **I'm sorry, Mr. Binnall, but I do believe it requires you to answer. It's clearly asked for the campaign's financial obligations, obligations to vendors, attorneys currently working for the campaign clearly falls under that.** So I'm asking how does the campaign --

A. Ma'am, I -- I might be wrong here. The version I have says current financial status of DTP including total available assets, debts and the winding of the campaign's financial obligations. Is that the question for Number 11?

Q. Yep, that's it.

A. Okay. As to Question Number 11 I looked to determine the status including the assets, debts and the winding up.

Q. Okay. Same question?

A. So same answer.


MR. BLUMMETTI: And objection to the extent it falls outside the scope of the notice filed.

Q. So your answer, Mr. Binnall, is that you have no -- you can't answer 11 because you didn't look into that?

A. That wasn't exactly my answer. My answer is as I previously said and the record shows.

Q. You what?

A. My answer is as I previously said and the record shows.

MS. DELGADO: Can the court reporter repeat the answer?

(Thereupon, the requested portion was read back by the court reporter.)

BY MS. DELGADO:
Q. Okay. Mr. Binnall, if that's the answer, perhaps I need to ask the question again. It's not responsive. **Are you able to answer regarding how the campaign pays its current financial obligations to its attorneys?**

MR. BLUMMETTI: Objection to the extent the question falls under the noticed topic. You can answer.

THE WITNESS: As to Question Number 11 **that is not something that I looked at in preparing for today's deposition** because that was not within the topic designated.

BY MS. DELGADO:
Q. We'll have to go to the judge on that one. Okay.

ATTACHMENT A-8, Deposition, p. 97-99

Q. If we could look at the Number 11, the **current financial status of campaign.**

A. Yes, ma'am.


Q. Could you speak to me about that topic, please?


A. Yes, ma'am.

Q. Including the available assets, debts and the winding up of the campaign financial obligations?

A. **As of December 31st, 2023,** the entity formerly known as Donald J. Trump for President Inc. has $518,249.18 in assets. It has $17,142.43 in debt. The name of the entity is now Make America Great Again PAC as the former campaign continues through its wind down.

Q. I'm sorry, your last question as it continues through what?

A. Through its wind down.

Q. And when you say wind down, what do you mean?

A. I was responding -- you said winding up the campaign financial obligations, and simply talking about the campaigns going after they're done continuing through a wind down process. That takes some time usually for a presidential campaign.

Q. And this is the MAGA, Make America Great Again PAC entity, which you believe is what the 2016 and the 2020 campaign became?

MR. BLUMMETTI: Objection to form.

THE WITNESS: Let me be very specific because there are pacs that have similar names.

BY MS. DELGADO: Q. Yes.

A. This is the Make America Great Again PAC. Make America Great Again PAC is, you know, has the same FEC identifier, for instance, and is the same entity as the entity that was once Donald J. Trump for President Inc. Its -- and its financials are **all reported on the FEC website publicly.**

Q. So it's your understanding the 2016 and 2020 campaign became a PAC?

A. It did become a PAC in the spring of 2021, or maybe still winter of 2020, but in 2021 it became Make America Great Again PAC.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARLENE DELGADO

Plaintiff,                                              **19 Civ. 11764 (AT) KHP)**

v.                                                      **REVISED NOTICE of RULE
                                                        30(b)(6) DEPOSTION DUCES
                                                        TECUM**

DONALD J. TRUMP FOR PRESIDENT INC.,
SEAN SPICER, Individually, REINCE PRIEBUS,
Individually, STEPHEN BANNON, Individually
Defendants.


**SECOND AMENDED[1] NOTICE OF RULE 30(b)(6) DEPOSITION**

PLEASE TAKE NOTICE that, pursuant to Fed. R. Civ. P. 30(b)(6), the Plaintiff, Arlene

Delgado, shall take the deposition upon oral examination of Defendant Donald J. Trump for

President, Inc. ("DTP" or "Defendant") through one or more officers, directors, agents, or other

representatives who shall be designated to testify on its behalf regarding all information known or

reasonably available to DTP with respect to the subject matters set forth below, on **February 27,**

**2024 at 10 am**. The deposition will take place via ZOOM, before a certified court reporter

authorized to administer oaths, will be recorded stenographically, and may be videotaped.  The

deposition will continue from day to day until completed.

Said individual(s) shall consent to testify to the following:

---

[1] Plaintiff provided an Amended Notice to Defendants' counsel on February 6, 2024 (pursuant to
Magistrate Judge Parker's January 31, 2024 Order, stating Plaintiff may issue a revised notice, by
February 6th, revising the November 2023 Notice provided by Plaintiff's prior counsel). On
February 8, 2024, Defendants' counsel identified the 30(b)(6) witness and, on February 12, 2024,
Defendants' counsel selected the date of February 27, 2024. As such, **the Notice is hereby
amended and filed to now reflect the date and time of the deposition.**

1.      Defendant's document retention policies generally and as applied to records which remain in the custody and control of DTP, including current custodian, as well as the method and format for retaining such documents.

2.      DTP's policies and procedures for receiving, investigating and resolving complaints of sexual harassment and of any kind of discrimination, including identification of person[s] responsible for oversight of all such matters at all relevant times hereto.

3.      The policies and procedures used to respond to Plaintiff's claim of pregnancy discrimination and applicable decision-maker[s].

4.      Any and all claims of sexual harassment or for unlawful discrimination or for pregnancy discrimination against DTP or employees/representatives thereof.

5.      The organizational structure of DTP's administration and chain of reporting for complaints or allegations of sexual discrimination as it existed each year from 2016 to the present.

6.      Plaintiff's employment and performance evaluations and any deficiencies relating to the same, or other forms of written evaluation.

7.      The process for reviewing campaign staff and recommending current or former staff for White House positions, including identification of those individuals with decision making authority in such matters and those individuals who made hiring decisions.

8.      Plaintiff's qualifications for her position with DTP.

9.      The qualifications of Plaintiff and all campaign staff or contract employees who received offers to work on the Trump transition team or in White House positions.

10.     The organization of the Comms staff, chain of reporting and identification of persons considered for White House positions.

11.  The current financial status of DTP, including total available assets, debts and the winding up of the campaign's financial obligations.

12.  Public statements made by or on behalf of DTP concerning or relating to Plaintiff, her claims in this lawsuit and her professional qualifications.

13.  Complaints, or any concerns, raised by anyone (whether within the Campaign or exterior to the Campaign, such as networks or makeup artists), regarding Boris Epshteyn or Omarosa Manigault.

14.  Communications (email, text messages, letters, memos, and the like), whether internally or with third parties, about any potential or actual offer of employment or contractual offer to Plaintiff, from December 2016 onward, for any and all campaign cycles, including but not limited to the offer made in February/March 2017 and any discussions of potential employment/contract with Plaintiff during the 2020 election cycle.

15.  Communications (email, text messages, letters, memos, and the like) with Eric Trump about Plaintiff.

16.  Communications (email, text messages, letters, memos, and the like) regarding Plaintiff's employment and termination from the America First Policies/America First Action PAC, in late 2017 and in 2018.

17.  Any funding of legal fees or legal costs in any action, in any state, in which Plaintiff was a party.

18.  Processes, lists, and communications (email, text messages, letters, memos, and the like), as to White House job placements, from November 2016 – January 2017.

Respectfully Submitted,

s/Arlene Delgado
Arlene Delgado
Plaintiff, pro-se