# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NO.:  19 CIV. 11764 (AT) KHP)

ARLENE DELGADO,

    Plaintiff,

  -vs-

DONALD J. TRUMP FOR PRESIDENT
INC., SEAN SPICER,
Individually, REINCE PRIEBUS,
Individually, STEPHEN BANNON,
Individually,

    Defendants.
_____/

LOCATION:  AUDIO-VISUAL COMMUNICATIONS

DATE:   Thursday, March 21, 2024

TIME:   10:10 a.m. - 1:43 p.m.

**DEPOSITION OF JESSE BINNALL**

Reported By:
Guerlin Kelly Boyd, Court Reporter
Notary Public, State of Florida

ARLENE DELGADO vs. DONALD J. TRUMP FOR PRESIDENT, ET AL.
JESSE BINNALL - March 21, 2024                                    2

APPEARANCES:


      On behalf of the Plaintiff:

      ARLENE DELGADO, PRO-SE


      On behalf of the Defendants:

      JARED E. BLUMETTI, ESQ.
      LAROCCA HORNIK ROSEN GREENBERG & BLAHA
      The Trump Building
      40 Wall Street
      32nd Floor
      New York, NY 10005
      (212) 530-4831
      JBlumetti@LHRGB.com


                              -   -   -

3

EXAMINATIONS

DEPOSITION OF                                                  PAGE

JESSE BINNALL

DIRECT EXAMINATION BY MS. DELGADO                               4
CERTIFICATE OF REPORTER                                       144
CERTIFICATE OF OATH                                           145
READ LETTER                                                   147
ERRATA SHEET                                                  148

PLAINTIFF'S EXHIBITS

EXHIBIT                        DESCRIPTION                    PAGE

Plaintiff's Exhibit        Spreadsheet                    137
No. 1

DEFENDANT'S EXHIBITS

Exhibit                        Description                    Page
                               NONE

ARLENE DELGADO vs. DONALD J. TRUMP FOR PRESIDENT, ET AL.
JESSE BINNALL - March 21, 2024                                    4

Deposition taken before Guerlin Kelly Boyd, Florida

Professional Reporter and Notary Public in and for

the State of Florida at Large, in the above cause.

- - -

Thereupon,

JESSE BINNALL,

having been first duly sworn or affirmed, was

examined and testified as follows:

THE WITNESS:  I do.

BY MS. DELGADO:

**Q.**    Good morning, Mr. Binnall.

**A.**    Good morning, Ms. Delgado.

**Q.**    Did I pronounce it correctly?  I was wondering.

**A.**    You did.

**Q.**    Okay.  Great.  Okay.  I believe you're an attorney so I'm sure you're familiar with the ground rules for depositions, but nonetheless let me just lay out a couple of the standard ones.

Obviously answer clearly if you can. Use yes or no instead of "uh-huh" or "uh-uh."  If we interrupt each other, let's try not to so that the court reporter is able to type out correctly what it is we're saying.

If I do interrupt you, as you know

with Zoom sometimes there can be a delay, please let me know if you're not finished answering a question, it's not deliberate.

And I need to -- if you need to take a break, please, let me know for any reason. Just don't confer with Mr. Blummetti during that break. I do need to take a break in about 90 minutes to order my son's lunch for school, so hopefully you will hear an alarm go off in about 90 minutes. So we'll definitely have a break planned in 90 minutes, but if you need one earlier, just let me know.

And I will also be taking notes and typing out notes, some handwritten, some on my screen, looking at some notes on my screen so if I'm not looking at the screen directly at you, please don't take offense. It's just the way I'm working this. Okay?

A.    Yes, ma'am.

Q.    Does that all make sense?

A.    I understand the instructions, ma'am.

Q.    Oh, okay. Great. Thank you.

All right. So please state your name for the record?

A.    Jesse Binnall.

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

ARLENE DELGADO vs. DONALD J. TRUMP FOR PRESIDENT, ET AL.
JESSE BINNALL - March 21, 2024                                    6

Q.    And where do you reside?

A.    I reside in Alexandria, Virginia.

Q.    Okay.  And you work as an attorney; is that correct?

A.    That's right, ma'am.

Q.    And do you have a law firm you work in or your own law firm?

A.    I do have a law firm that I'm the principal of, that's correct.

Q.    Okay.  And what is the name of that firm, please?

A.    The Binnall Law group.

Q.    Okay.  How long have you been there?

A.    Binnall Law Group was formed on I believe March the 1st of 2021.  I've been there since that point.

Q.    Great.  And prior to that, say just going back five years or so, where did you practice?

A.    The only other place that I've worked in a five-year period was in my previous law firm and that was Harvey & Binnall at which I was a partner.

Q.    Could you spell that, please?

A.    Yeah, Harvey, H-A-R-V-E-Y, & Binnall

B-I-N-N-A-L-L.

Q. Got it. Okay. Thank you. And you were a principal there as well?

A. I was a partner there, yes.

Q. A partner. Okay. And the office for Harvey & Binnall was located where, sir?

A. Same place as my office is now and that's 717 King Street in Alexandria, Virginia.

Q. Okay. Thank you. Have you ever had the Donald J. Trump for President campaign as a client?

A. Yes, ma'am.

Q. Okay. What years -- in what years have you had that entity as a client?

A. Donald J. Trump President, Inc. was a client in 2016 and then again in 2020 and then from 2021 forward till today.

Q. So in 2016, in 2020, and then I'm sorry you said in --

A. 2021 forward.

Q. 2021 onwards. Got it. Okay.

MS. DELGADO: Kelly, I have an exhibit I wanted to show. Is it easier if I e-mail it to you or because I'm -- versus logging in from a different device to upload that to the screen, what

do you prefer?

(Thereupon, an off-the-record discussion was had.)

MS. DELGADO:  Okay.  Okay.  Let me circle back to that then because I'm going to need to log in from the device on which I have the exhibits.  So I will circle back to that.

Sure.  Let's do that to not go out of order.  Just give me 30 seconds to log in from this device.

BY MS. DELGADO:

Q.    In the meantime can you describe to me what the work you did in 2016 for the Donald J. Trump for President Campaign?

MR. BLUMMETTI:  Objection.

THE WITNESS:  Yes, in 2016 I worked on the delegate team.  And so most of the work that I did was in the spring of 2016 and then again in the summer at the Republican National Convention.

BY MS. DELGADO:

Q.    And to be clear, that work was in a legal capacity as an attorney?

A.    So it actually was as a professional parliamentarian.  And -- so I was not -- I was not

giving legal advice.  I don't think there's any point in 2016 where the Trump Campaign was a client of my law firm.  I believe it was as a -- as -- I served them as a professional parliamentarian only.

Q.   Could you describe what a parliamentarian does?

A.   Absolutely.  A parliamentarian advises people on internal rules.  It advises them on whether it's bylaws, standing rules, special rules of order, party rules.  And so during the delegate selection process for delegates to go to the convention I advise the campaign on various party rules, and then again, at the Republican National Convention I advise the campaign.

Q.   So would it be accurate to say that wasn't strictly in a legal capacity you were advising the Donald J. Trump Campaign?

A.   It wasn't in a legal capacity.  It was as a professional parliamentarian on internal rules as opposed to on the law.

Q.   Understood.  Okay.  And in 2020 what part of -- was it after the election in 2020?

A.   So I was engaged in 2020 to help with election integrity efforts and I -- my engagement ran around the beginning of October in that

capacity through the middle of December.  And then I also begin representing the campaign in a litigation matter in December of 2020 as well and that representation continues.

Q.    What matter -- what lawsuit or matter was that?

A.    It was Michigan Welfare Rights Organization versus Trump.

Q.    And that is still ongoing you said?

A.    Yes, ma'am.

Q.    Okay.  And what about the work that you said in 2021 onwards?

A.    I represented -- I represented the campaign and a number of lawsuits.  I probably wouldn't even be able to remember them all sitting here today.  I can certainly remember some of them; Smith versus Trump which is ongoing; Swalwell versus Trump; Blassingame versus Trump; Lee versus Trump, and -- well, let me amend that.

I represent the campaign in the cases of Smith versus Trump.  The Swalwell and Lee cases I do not believe the campaign is a party to so I represent the president in those cases.

Q.    So you represent the campaign as its attorney in certain present cases; is that correct?

A.    Yes, ma'am.

Q.    And in other cases such as Swalwell you represent not the campaign but perhaps Mr. Trump; is that correct?

A.    That's correct.

Q.    Okay.  Understood.  Let me bring up right now -- that is me sorry.  Let me mute myself.

A.    I'm not going to be able to understand you.

Q.    Is this better?

A.    So far.

Q.    Okay.  Still an echo?

A.    I've had to deal with this before.  If you turn the sound off on your laptop I think you'll be home free.  It's back.

Q.    How about now?

A.    No.

Q.    Still there.  Yep.  Can you see the screen?

A.    Yes.

Q.    Would the best way be for me to e-mail this document to the court reporter and she can now show it on her screen so I can turn this off?

And Mr. Binnall, also if you're able to open it in the chat maybe you can scroll --

I certainly don't want to cause delay with the exhibit.  We'll come back to it at the end then.

Mr. Binnall, regarding the cases you've worked on or are working on, let me ask you about some of those.  You stated you worked on current present cases in which the Trump Campaign is a defendant and also some in which other individuals from Trump world such as Mr. Trump are defendants or plaintiffs; is that accurate?

A.    The first part of your question is accurate.  The second part of your question as to the campaign being a party to my litigation, the litigation to which I'm a counsel on.

The second part I represent the president in -- have since 2020 represented him not personally.  As far as other people in quote unquote "Trump world" you'd have to be more specific.

Q.    Okay.  Do you represent Donald Trump, Junior in lawsuit?

A.    I do not represent him.  Well, I only represent him as in regards to a third party subpoena.

Q.    Okay.  So you do represent him in

regards to information sought from him; is that correct?

A.    Correct, that's correct.

Q.    And you represent Donald Trump in, would it be accurate to say, in at least three separate lawsuits?

A.    At least, yes.

Q.    Okay.  Do you represent various former Trump administration officials in various lawsuits?

A.    Yes.

MR. BLUMMETTI:  Form.  If you could be more specific.

MS. DELGADO:  Of course.

BY MS. DELGADO:

Q.    Do you represent Richard Rick Grenell, a former Trump administration official in a lawsuit?

A.    We have represented him in a lawsuit before.

Q.    It is currently no longer pending?

A.    Correct.

Q.    What about former Trump Administration Official Lieutenant General Michael Flynn?

A.    Yes.

Q.    Is that one currently pending?

A.    Yes.

Q.    What about former Trump Administration Official Kash, and that is his nickname, K-A-S-H Patel P-A-T-E-L?

A.    Yes.

Q.    That one is currently pending?

A.    Yes.

Q.    And the one where you represent former president Donald Trump in which you referenced that my description of at least three separate lawsuits would be accurate, are those all currently pending?

A.    Not all the lawsuits I've represented him in are currently pending, but some of them are.

Q.    How many are currently pending?

A.    I would have to check my records.  I don't know off the top of my head.

Q.    Is it more than two?

A.    Yes.

Q.    Okay.  Do you represent former President Donald Trump in any appeals currently?

A.    Yes.

Q.    More than one?

A.    Not actively on appeal, no.

Q.    Okay.  Is the one you represent him Trump versus Clinton?

A.     Yes, ma'am.

Q.     And please don't take offense to this question, it's not personal, but were there sanctions issued in that matter against --

A.     Not against me.

Q.     Okay.  Not against you.  Those sanctions were against Ms. Alina Habba; is that correct?

A.     Yes, ma'am, and others.  We're appellate counsel in that case.

Q.     Okay.  Understood.  So the sanctions were against the lower court counsel?

A.     That's correct.

Q.     Okay.  Understood.  Thank you.

Are you a colleague -- let me not use it in the loose sense of the word.

Have you worked alongside Sidney Powell on any efforts be it in a legally official format or otherwise?

A.     Can I ask you to be a little bit more specific?

Q.     That was poorly phrased.

Have you worked alongside Sidney Powell on any matters not limited to legal matters?

A.     I have worked alongside her on legal

matters.

Q.    On what legal matters?

A.    United States versus Michael Flynn.

Q.    United States versus Michael Flynn?

A.    Correct.

Q.    Okay.  Did you start a pact with Ms. Powell?

A.    Very, very briefly and although the pact we ended up dissolving that pact before it did any business.  And I was not actively involved in that pact other than being the one to file the paperwork, but it never did anything.

Q.    And what was the purpose of the pact?

A.    I honestly don't remember.

Q.    Okay.  Have you been involved in any efforts regarding questioning the integrity or the outcome of the 2020 election?

MR. BLUMMETTI:  Objection to form.

Objection to relevance.

BY MS. DELGADO:

Q.    I'll rephrase it.

Have you been involved in any efforts to question the out -- question the outcome of the 2020 election?

MR. BLUMMETTI:  Same objections.

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

THE WITNESS:  I have been counsel in an election contest, yeah.

BY MS. DELGADO:

Q.   An election, can you tell me more about that?  Is it an election contest you said?

A.   I did say that.

Q.   Okay.  Can you tell me a bit about that?

MR. BLUMMETTI:  Objection to form.

BY MS. DELGADO:

Q.   If you could, please, elaborate on what you -- I'll rephrase it.

Could you please elaborate on what you mean by an election contest?

A.   It was a lawsuit filed in the state of Nevada pursuant to Nevada state law regarding the outcome of the 2020 Nevada election.  I think the case was Law versus Whitmer.  I do not know how to spell Whitmer, sorry.

Q.   Sorry, go ahead.

A.   No, that's my answer.

Q.   That's it.  Okay.

When you say the 2020 Nevada election do you mean the presidential election in Nevada?

A.   In Nevada, yes.

Q.   Are you familiar with the term quote "stop the steal" unquote?

MR. BLUMMETTI:   Objection to form.

THE WITNESS:   I've heard it.

BY MS. DELGADO:

Q.   Okay.   Would you agree that that is a description of a general idea of questioning the integrity of the 2020 election outcome or questioning the results?

A.   I have no idea.

MR. BLUMMETTI:   Objection.   Calls for speculation.

BY MS. DELGADO:

Q.   Have you been involved in any efforts that would be described by anyone as part of the "stop the steal" efforts?

MR. BLUMMETTI:   Objection to form.   Objection to relevance.

THE WITNESS:   I wouldn't know how to answer that.   Certainly not the way that I would see it, no.

BY MS. DELGADO:

Q.   Okay.   Do you believe Donald J. Trump won the 2020 election?

MR. BLUMMETTI:   Objection to the form.

ARLENE DELGADO vs. DONALD J. TRUMP FOR PRESIDENT, ET AL.
JESSE BINNALL - March 21, 2024

19

THE WITNESS:  My mental impressions about litigation, litigation that I've been a part of are protected by the attorney work product attorney doctrine so I'm not going to be able to answer that question.

BY MS. DELGADO:

Q.    I don't mean the impressions you have from a legal angle.  I mean do you personally as a US citizen and voter, I assume you're a vote, do you personally believe that Donald J. Trump won the 2020 election?  Dont' give me any of your --

A.    Ma'am, I can't answer that without sharing the -- it's impossible to divorce that knowledge from the information I have as a lawyer.  That's attorney work product.  I'm afraid I can't answer you on that.

Q.    So you're claiming attorney work product privilege over your own belief as to whether Donald Trump won the election in 2020?

A.    I've said the information you sought is protected by attorney work product.  I cannot answer that question.

Q.    Right.  If I could just clarify again, so I'm just seeking to clarify what your position is.

So are you -- is it correct that you are asserting attorney-client privilege with yourself over your own opinion as to whether Donald Trump won the presidential election in 2020?

MR. BLUMMETTI:  Objection. Mischaracterizes the testimony.  He said work product.

BY MS. DELGADO:

Q.   Right.  Well, he's saying work product and I'm asking him to explain what the work product --

A.   Ma'am, any mental impressions that I form as part of litigation is protected by the attorney work product doctrine and I cannot answer as to my mental impressions.  You're asking me for my mental impressions, I cannot answer that question.

Q.   I'm asking you for your opinion as an American --

MR. BLUMMETTI:  Objection.  Asked and answered.

MS. DELGADO:  -- what -- I'm clarifying, he's under the impression I'm asking him for his mental impressions.

BY MS. DELGADO:

Q.   I'm not asking you for your mental impressions based on your legal work.  I'm asking for your opinion whether --

A.   Ma'am, I have no opinion other than what comes from my mental impressions.

Q.   Okay.  Okay.  We'll circle back.

I was trying to bring up a spreadsheet, which I'm sure you saw the title was payments to Mr. Binnall, but perhaps we don't need to worry about the exhibit if we can make some progress here on this question.

There was an article, Mr. Binnall, stating that your firm -- you and/or your firm, of which you are a principle, including your prior Harvey & Binnall Firm as well as your current firm has earned over $4.2 million from the Trump Campaign and/or the Trump Political Action Committee; is that accurate?

A.   I don't know what the total is.  I saw the spreadsheet that you had earlier that appears to be derived from FEC reporting.  I have no reason to think that the FEC reporting is wrong.  It is -- we have done a lot of work in a lot of matters and so I don't doubt it to be true.  I couldn't tell

you an exact number.

Q.   Of course.  And I -- again, it's not personal.  I don't mean to press you on or imply that there's any -- any falsification in terms of your impression.

Does the 4.2 million number, does that same in the ballpark of what's correct?

MR. BLUMMETTI:  Objection.  Asked and answered.

THE WITNESS:  I have no information about an exact number.  There's nothing that seems unreasonable about that number.

I just happen to not know the number.

BY MS. DELGADO:

Q.   We'll put the spreadsheet up later then.  Okay.  We'll come back to that.

And -- oh, to be clear that 4.2 million, assuming as you say that you have no reason to doubt that number, that would be since -- I believe you said you were retained in October 2020 so, that would be from October 2020 to present day.  Does that sound correct to you?

A.   That sounds right.

Q.   Okay.  Thank you.  And have you ever worked for the Trump Campaign, not as an attorney,

but as a staff member or independent contractor of any kind other than as an attorney?

A.    Other than what I already told you about as a professional parliamentarian in the spring and summer of 2020, no.

Q.    Okay.  Why do you believe then you were chosen as a 30(b)(6) witness?

MR. BLUMMETTI:  Objection to form.  Calls for speculation.

BY MS. DELGADO:

Q.    Just your personal opinion, Mr. Binnall.  I don't want you to speculate.

A.    I don't know why I was selected other than, you know, I think it's public information that the campaign no longer has any employees.  It only has I think a single officer at this point.  So that's all the information that I have, so yeah.

Q.    Okay.  Where did you read that the campaign currently has no employees?  Or where did you hear -- I'm sorry.

Where did you hear or read that?

A.    I mean, that's federal election committee disbursements.  I've looked at the disbursements and the disbursements are consistent with the fact that the campaign, as far as I've

been able to see, has -- no longer has any employees and it has not for I think for several years now.

Q.   Do you consider the 2016 campaign election effort to be a different entity from the current campaign?

MR. BLUMMETTI:  Objection to form.

THE WITNESS:  Yes.

BY MS. DELGADO:

Q.   Okay.  Why is that?

A.   Because they're different entities.

Q.   Have you had a chance to review the topics in this 30(b)(6) notice?

A.   Yes, ma'am.

MR. BLUMMETTI:  Objection.

BY MS. DELGADO:

Q.   Have you ever worked on any employment discrimination matter in your legal work?

A.   Yes, ma'am.

Q.   On the plaintiff side or defendant side?

A.   Certainly the plaintiff side.  I believe we have done defense side work as well. You know, a particular matter isn't coming to me, but of course we've represented, you know, many,

many clients over the years.  So it's hard for me to remember every single matter and what we've done, especially on, you know, another topic here in this deposition that hasn't been -- that's not part of a topic that's been designated.

Q.    Has any of that employment work that you've done been for the Trump Campaign as a client or any individual associated with the Trump Administration or Mr. Trump?

MR. BLUMMETTI:  Objection to form.  Compound.

BY MS. DELGADO:

Q.    Yeah, I'll split it up.  I'm trying to keep the train moving.  I'll split it up.

Has any of the employment work that you've done as an attorney involved the Trump Campaign as a client?

MR. BLUMMETTI:  Objection.

THE WITNESS:  I'm not thinking of any off the top of my head, but I -- and this is -- of course me not speaking on behalf of the campaign as this has not been a designated topic, but I -- not that I can think of sitting here today.

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

BY MS. DELGADO:

Q.   Do you know what would help you refresh your recollection if you were to, for instance, check your files, would you be able to give a more definitive answer?

A.   It would take me some time to check the -- to go through all of our matters to see if there are, you know, which are employment matters and, you know, with plaintiff side, defense side, that would take a substantial amount of time.  And it hasn't been designated so --

MR. BLUMMETTI:  I would just like to object for the record as Mr. Binnall knows that this is outside the scope of the noticed topics of Mr. Binnall, and to the best of his ability, which is all he's required to do under the rules.

MS. DELGADO:  I'm allowed to question him on what matters he's worked on for the entity on whose behalf he's appearing today.

MR. BLUMMETTI:  Correct, and he's answered those questions to the best of his ability.

ARLENE DELGADO vs. DONALD J. TRUMP FOR PRESIDENT, ET AL.
JESSE BINNALL - March 21, 2024                                    27

BY MS. DELGADO:

Q.    And I'm allowed to ask -- he opened the door by saying he may have -- I'm allowed to ask what would help refresh his recollection and if he has any documentation.  So I will request that subsequent to this.  Okay?

A.    Ma'am?

Q.    Yes?

A.    I was -- I was briefly retained in another matter related to -- to you to get an extension.  And I did not actually substantively litigate that matter, but we did get an extension on responding to another matter regarding you.  I think that is probably an employment matter.  I don't remember the entity that I represented on that, but it was an entity defendant.

Q.    I want to make sure I understand you. I'm sorry.

You were retained in a matter involving me to obtain an extension on a --

A.    An extension to respond on another lawsuit that was I think more recently filed and served, and I don't remember the entity.  It was -- yeah.

Q.    Would you be able to check your files

especially given that you said it was recent to ascertain what that was exactly?

A.   I suppose it would be in a client file.  I don't know what I can tell you about what was actually in a client's file.  I will tell you that that matter is being represented by Alina Habba's law firm now and that -- it probably would refresh your recollection more than it would mine because it's an ongoing litigation.

Q.   And as -- to be clear I'm not asking you what's in the client's file, simply the name of the matter.  You stated that you were retained to file an extension only; is that correct?

A.   That is, that is the only work that we did.  We did not do any substantive work on it.  As far as anything else as to, you know, what would be -- I'm not going to get into anything else other than what we actually did as to avoid interfering in any privilege or work product.

Q.   Of course.  I'm just trying to find out the name of the matter.  And what --

A.   To my -- I believe it was the campaign as the defendant.  I believe you were the plaintiff.  I believe that it was also named Jason Miller and James Massesage {ph}.

Q.    Okay.  Thank you.  That helps clarify what it was.  Okay.

And that's not an employment discrimination a matter per se.  So on the employment discrimination matter, you -- the matter -- the employment discrimination matter is that you say you may have represented the Trump Campaign on, that's something you could perhaps go back and check what the names of those matters were?

A.    It's -- like I say, it's possible I could refresh my recollection on that.  But yeah, that's -- for information that I have in front of me now, I've exhausted my memory in that.

Q.    Fair enough.  Okay.  And on the topics noticed in the 30(b)(6) notice, you believe you can speak for the Trump Campaign on these --

MR. BLUMMETTI:  Objection to form.

BY MS. DELGADO:

Q.    -- on those topics on the notice?

A.    I've been designated to speak on behalf of the campaign on those and I've reviewed various records in preparation for it.

Q.    Okay.  That's non -- I'm going to have to object to that as nonresponsive.  So let me ask

it again.

Do you believe that you can speak to the topics and answer on these topics that are listed in the 30(b)(6) notice on behalf of the campaign?

MR. BLUMMETTI:  Objection to form.

BY MS. DELGADO:

Q.    Let me rephrase it.

Regarding the topics and the 30(b)(6) notice, do you believe that you have the information necessary to speak and answer on behalf of the campaign?

A.    Yes, as to the information that -- that I was able to review, yes.

Q.    Let me try to understand your answer there.  Yes, you answered yes as to the information you were able to review?

A.    Yes, ma'am.

Q.    So you're qualifying your answer, correct?

MR. BLUMMETTI:  Objection to form.

THE WITNESS:  Ma'am, I'm a 30(b)(6) witness.  In order to find out what kind of information the entity you've noticed for deposition has, I have to go and be able to

review information that that entity does have. That's what I have done in this case and that's what I'm prepared to answer questions as to today.

BY MS. DELGADO:

Q. Sure. But the information that you were able to review, was it sufficient that you were able to answer and speak on behalf of the campaign on all of these topics?

MR. BLUMMETTI: Objection to form to the extent that the topics pertain to the campaign.

THE WITNESS: Ma'am, I've -- I can't answer as to what's sufficient or what's not here. I've only -- I can only answer as to what I've done and what -- what questions that you asked of me. I have no reason to believe anything in there is deficient. As a matter of fact it's been quite exhausting.

BY MS. DELGADO:

Q. Right. So, again, because none of the answers have been responsive to the question. I'll try one more time.

In your belief do you have the

information and knowledge sufficient to answer for and speak on behalf of the campaign on all of the topics listed in the notice?

MR. BLUMMETTI:  Same objection.

THE WITNESS:  The word that I'm getting hung up on a little bit is a belief.  I can tell you what I've done.  And I'm very happy to tell you what I've done.  And I also can say that I have no reason -- that what I've done has been quite exhaustive and I have no reason to think I will not be able to fully answer, you know, appropriate questions about those topics.  But there's no way that I can know that until I'm asked.

BY MS. DELGADO:

Q.   Okay.  I'm going to object to that again as nonresponsive, but we'll leave that for a later date to handle.

Okay.  Let's -- who prepared you for this deposition Mr. Binnall?

A.   Mr. Blummetti.

Q.   Who else?

A.   Me.  At that point I took various reasonable efforts in order to prepare for this

Jeannie Reporting
Your Wish Is Our Job!                www.jeanniereporting.com
                                          305-577-1705

Case 1:19-cv-11764-AT-KHP   Document 256-1   Filed 04/22/24   Page 34 of 149

ARLENE DELGADO vs. DONALD J. TRUMP FOR PRESIDENT, ET AL.
JESSE BINNALL - March 21, 2024                           33

deposition, and including speaking with a vendor that houses much of the documents from the relevant time frame and asked them questions and had them inference run some searches.  But all the other actions that I took were just me, other than talking to Mr. Blummetti.

Q.   Okay.  So who is the vendor you spoke to you said?

A.   2M.

Q.   I'm sorry?

A.   2M.

Q.   2M.  Thank you.

You stated earlier that it's your belief that the 2016 campaign is a different entity from the current campaign; is that correct?

MR. BLUMMETTI:  Objection to form.

THE WITNESS:  I think I said that it is a different entity.

BY MS. DELGADO:

Q.   I'm sorry?

A.   I think I said that it is a different entity.

Q.   Okay.  So could you explain to me how then Mr. Blummetti was the one preparing you if Mr. Blummetti never worked for the 2016 campaign

effort?

A.    My understanding is that Mr. Blummetti is counsel for the campaign in this case.  And when I say the campaign, I mean the entity that was formerly known as Donald J. Trump for President, Inc.

Q.    And your belief is that's that 2016 campaign or the current one given that you thought they're different entities?

MR. BLUMMETTI:  Objection to form.

THE WITNESS:  Donald J. Trump for President, Inc. was the campaign and again 2016 and 2020.

BY MS. DELGADO:

Q.    Sorry, you cut out.  Can you repeat that, sir?

A.    Yes, ma'am.  Donald J. Trump for President, Inc. was the campaign entity in -- during the 2016 campaign and the 2020 campaign. That's my understanding.

Q.    Who did you speak to -- I believe you said it, but I want to be clear -- in preparation was Mr. Blummetti and you spoke to 2M, the vendor. Anyone else you spoke to?

A.    No.

**Q.**   Why not?

**A.**   Because I was able to conduct the relevant research in order to answer the questions in the topics by those discussions.  And like I said, the campaign no longer has employees and only has a single officer.  And the only thing I would have been able to get from the single officer was campaign financials that I was able to get from the Federal Election Commission directly.

**Q.**   Was there anything stopping you from reaching out to former employees?

MR. BLUMMETTI:  Objection to form.

BY MS. DELGADO:

**Q.**   I'll rephrase it --

**A.**   Other than the fact that many of them are represented by counsel --

**Q.**   Mr. Binnall, I'll rephrase.  I'm sorry.  I'll rephrase it, Mr. Binnall.

Did you reach out to former employees?

**A.**   No, I did not.

**Q.**   Why not?

**A.**   Many of them are represented by counsel.  But more importantly, I didn't need in order to answer the -- answer the questions that were designated in this deposition.

Q.   When you say it's because in part many of them are represented by counsel, to whom are you referring?

A.   Oh, I don't know, ma'am.  You'd have to ask the specific people that.  I think -- no, I don't know.

Q.   Well, I'm asking you because you implied you would have reached out to former employees but for their being represented by counsel.  So I'm asking you who you thought of.

A.   Ma'am, if that was the impression, then let me correct that.  There is no reason for me to reach out to anyone else.  I was able to answer all the questions that you designated without reaching out to former campaign employees.

Q.   Mr. Binnall, are you a supporter of Mr. Trump?  Do you support his candidacy for 2024?

A.   Yes.

Q.   Okay.  And you mentioned earlier that you looked at records.

A.   Yes, ma'am.

Q.   Which records if you could specify did you review?

A.   Yes, ma'am.  I reviewed e-mails, a number of e-mails that -- from both the 2016 and in

some cases the 2020 campaign.  I also reviewed e-mails that have been produced in -- in -- I'm sorry, records that have been produced in discovery in this case.

I have reviewed some of the pleadings in this case and some of the depositions.  And I've also seen your personnel files, at least portions of it.

Q.    Why did you review the pleadings?

A.    To understand the full breadth of the information in this case.  And because -- yeah, in order to thoroughly be able to answer your questions.

Q.    What depositions did you review?

A.    Not in full, but I reviewed much of the depositions of Mr.  Priebus and Mr. Spicer.

Q.    Did you review mine?

A.    I reviewed parts of yours.

Q.    Any others?

A.    No, ma'am, not that I can recall.

Q.    Sorry, go ahead.

A.    Yeah.  No, ma'am.

Q.    Okay.  Any other depositions from any other cases?

A.    No, not in anticipation for this.

Q.   When you say not in anticipation for this, you have reviewed depositions?

A.   Ma'am, I've probably reviewed hundreds of thousands of depositions in my career.

Q.   I should have been more specific.

A.   Yes.

Q.   Anything related to the individuals -- let me be even more specific.

Anything related to me, any other depositions from any other matter?

A.   No, ma'am.

Q.   Okay.  And you've reviewed records produced in discovery in this matter you said?

A.   Yes, ma'am.

Q.   Both plaintiff and defendants?

A.   I believe so, yes.  I think I have certainly focused my review of documents produced by the campaign.  Those are the ones I reviewed in the most detail.  And I certainly didn't review every single document, but I was able to conduct a number of searches in order to review documents that would be likely to be responsive to this deposition.

Q.   You said you reviewed e-mails from the 2016 and 2020 campaign, but not the 2024 campaign,

correct?

A.    Correct.

Q.    Why is that?

A.    I don't have access to those.

Q.    Okay.  And on what do you base -- you stated earlier the 2016 campaign was a different entity and then said 2016 and 2020 were the same entity.  Could you clarify that for me?

A.    What would you like clarified?

Q.    Did you mean the 2016 campaign was distinct from 2020 or that 2016 and 2020 are distinct from 2024?

A.    Ma'am, the 2016 and 2020 campaigns were known during the time as Donald J. Trump for President, Inc.  That entity is now known as "Make America Great Again Act".  The 2024 entity is completely different.

Q.    Okay.  Sorry.  I'm very -- my handwriting is slow these days.  We don't handwrite nearly as much anymore as we used to.

A.    I can understand.

Q.    So bear with me.  Okay.  So let's get into some of the topics then, please.  I'm sure you've probably -- if you have -- let's see we're at 11:00 a.m. so if you -- we're good.  If you

don't need to take a break -- or do you want to take a break before we start topics?

A.    No, ma'am.

Q.    Okay.  Great.  Okay.  So for -- and to speed things up for each of these, I don't need to ask you I presume to whom you spoke to because I gather from your earlier question that for each of these the individual you spoke to would only be Mr. Blummetti, correct?  And the vendor?

A.    And the vendor, correct.

Q.    Correct.  Okay.  So that will speed things up.

Okay.  So Number 1, Mr. Binnall, it reads:  Defendant's document retention policies generally and as applied to records.

Okay.  Could you speak to me or tell me about how the 2016 campaign stored documents, particularly e-mails?

MR. BLUMMETTI:  Objection to form.

You can answer.

BY MS. DELGADO:

Q.    Okay.  I'll rephrase.  I'll rephrase it.

What was the process for the 2016 campaign's storage and retention of e-mails?

ARLENE DELGADO vs. DONALD J. TRUMP FOR PRESIDENT, ET AL.
JESSE BINNALL - March 21, 2024                                    41

A.   Ma'am, the campaign did not have a written policy, but reasonable steps were taken to preserve documents once there was notice of dispute.  This includes retaining documents that were on the campaign server, most of which consisted of e-mails.

Q.   And were all those e-mails stored with 2M?

A.   All those e-mails are now housed with 2M.  They may have initially been imaged by -- by someone else, but 2M is the one who now houses those e-mails.

Q.   Okay.  And you spoke to 2M about their document retention of the Trump Campaign e-mails?

MR. BLUMMETTI:  Objection.

THE WITNESS:  I -- sorry.

MR. BLUMMETTI:  That's okay.  Go ahead.

THE WITNESS:  I did talk to them about their -- their storage of those e-mails, correct.

BY MS. DELGADO:

Q.   Okay.  Were any reservations expressed by 2M regarding failures in the retention process?

A.   No, ma'am.

Q.    Any reservations expressed of any kind?

MR. BLUMMETTI:  Objection to form.

BY MS. DELGADO:

Q.    By 2M?

A.    Can you be more specific?

Q.    Yeah.  Did 2M express any reservations to you about the custodial chain for instance or any other concerns regarding the documents provided to them?

A.    No, ma'am.

Q.    Okay.  Could you tell me about the campaign's policies and procedures for receiving, investigating and resolving complaints of sexual harassment or any kind of discrimination?

MR. BLUMMETTI:  Objection to form.  If you can clarify the time period.

BY MS. DELGADO:

Q.    Sure.  Let's do 2015 and 2016.

A.    There are no written procedures for investigations.  The campaign did engage human resources staff to investigate specific matters however, that department was led by human resources Lucia Castellano.

Q.    When you say the campaign did engage

of HR staff to investigate those matters, is -- do you mean specifically to investigate such matters?

A. No. I mean that the campaign had a human resources staff and human resources staff would investigate matters of allegations of discrimination for instance or harassment.

Q. Okay. Thank you for clarifying that.

And you say there were no written procedures in place; is that correct? Did I hear you correctly?

A. That's correct.

Q. Okay. Were there any -- procedures is often synonymous with policies, but nonetheless, were there any policies in place?

A. Ma'am, I did search to see if there were any procedures or policies. I was not able to find any. So I believe the answer to that question is, no. There is no written policies and procedures. It was --

Q. So -- so no one working on the Trump Campaign, to your knowledge -- so let me rephrase?

Did anyone working on the Trump Campaign to your knowledge receive any policy or guidelines against sexual

harassment or discrimination?

A.     Not that I was able to locate, ma'am.

Q.     Okay.  And you mentioned the campaign had an HR group -- I don't want to put words in your mouth -- an HR staff or a group you said?

A.     I believe there was a staff -- or, I mean, there certainly was a human resources director.  It's my understanding that she had at least some staff.  I don't know the extent to her staff.

Q.     Do you know if she had any staff at all?

A.     You know what, I don't know for sure.

Q.     Okay.  And did you -- you said earlier you didn't speak to anyone but, anyone else beside Mr. Blummetti until now, why did you not reach out to Ms. Castellano?

A.     Ma'am, to answer your question; there I've answered the question that was asked during the reasonable time frame and there was no need for me to speak to Ms. Castellano.

Q.     What -- wouldn't you want to speak to her though to find out if there were any policies you couldn't find regarding such?

MR. BLUMMETTI:  Objection to form.

BY MS. DELGADO:

Q.   Well, I'll rephrase.  Would you not want to not speak to the HR director regarding this topic?

A.  Ma'am, I took the steps necessary to find out what information the entity that I have -- that I've been designated for has, and that's what I did.  Did not think that any other such conversations was necessary to find out what information the entity has.

Q.   And the topic called for your -- and I'll quote here for quote "identification of the person responsible for oversight of all such matters at all relevant times here to" unquote?

A.   Yes, ma'am.

"Q. Your position is, if I understand you correctly, that would be Lucia Castellano?

A. Yes, ma'am.

Q.  Okay."

MS. DELGADO:  And the spelling of her name, for Ms. Boyd's purposes, I believe is C-A-S-T-E-L-L-A-N-O and first name is, Lucia, Ms. Boyd, L-U-C-I-A.

BY MS. DELGADO:

Q.   Is that correct, Mr. Binnall?  Did I

ARLENE DELGADO vs. DONALD J. TRUMP FOR PRESIDENT, ET AL.
JESSE BINNALL - March 21, 2024
46

get that right?

A.    I'll take your word on spelling.

Q.    Okay.  Thank you.  So Mr. Binnall, an employee who is facing discrimination, it's your understanding based on your research that there would be no policy or procedure in place to guide that employee?

A.    Other than the best practices of human resources professionals, which is what was filed, was best practices, is my understanding.

Q.    Q. I'm sorry.  Can you say that again?

A.    Yeah.  It's my understanding that they followed best practices rather than relying on a policies and procedures manual as some entities do.

Q.    And what are best practices, when you use that term?

A.    They're commonly used procedures and principles in the human resources world.  And so that is, from my understanding, what was -- what was done and the limits of the policies and procedures in this case -- in this matter.

Q.    So to be clear and understand your point of view, there were no policies and procedures -- no written policies and procedures in place; is that accurate?

A.     That's my understanding.

Q.     Okay.  So an employee -- to circle back to my earlier question -- an employee facing pregnancy discrimination or other kind of discrimination had no written policy or procedure to go by, correct?

MR. BLUMMETTI:  Objection to form.

THE WITNESS:  As far as I've been able to find, ma'am, that's correct.

BY MS. DELGADO:

Q.     So that takes us into Number 3, the policies and procedures used respond to plaintiff's claim of pregnancy discrimination and applicable decision makers.  Don't want to waste time today, so is it correct to say that there were no policies and procedures used to respond to my claim?

A.     There were procedures.  And once the campaign was aware of the plaintiff's grievance, it hired an outside firm, Jones Day, to conduct an internal investigation.  The firm interviewed witnesses and reviewed documents and communications.

Q.     When was that firm hired?

A.     I believe it was hired either in late in December in 2021 or -- I'm sorry, in 2016 or

ARLENE DELGADO vs. DONALD J. TRUMP FOR PRESIDENT, ET AL.
JESSE BINNALL - March 21, 2024
48

early in 2017.

Q.   You also said quote "once the campaign was aware" unquote.  When was that?

A.   I believe that was December 21st of 2016.

Q.   Why do you say it was December 21st?

A.   Because I believe that's the day that an e-mail was sent to us by you.  And I think it was at that point that the campaign became aware.

Q.   And it's your understanding that at that point is when an outside law firm was retained?

A.   It was after that point, but I believe shortly after that.

Q.   Do you have it?

A.   That was December 21st, I can -- right before the holidays.  I cannot tell you definitively if it was late '21 -- I'm sorry, late '16 or early '17.

Q.   So the topic of the policies and procedures used to respond to my claim, so it's your position that the policy and procedure was to hire an outside firm?

A.   Yes, ma'am, to do an investigation.

Q.   No other policies and procedures?

MR. BLUMMETTI:  Objection to form.

BY MS. DELGADO:

Q.    Were there -- I'll rephrase?

Were there other policies and procedures?

A.    At that point especially since this was at such a time that the campaign was then operating on a skeleton staff and had limited people available at all to do anything.

Q.    Regarding procedures, did anyone reach out to me once the campaign became aware of my pregnancy?

A.    I -- to be clear, which topic are we into right now?

Q.    3.

A.    So as far as procedures used under Number 3, I did not see any that would require the campaign to reach out to you and I -- for whatever steps Jones Day took to investigate, I do not have access to that.

Q.    Right.  I'm not asking about Jones Day.  I'm asking about the campaign.  You're saying you didn't see --

A.    I did not see any e-mails to you regarding your complaint after that date.  And at

least not to my recollection for, you know, I've reviewed many, many e-mails over a great deal of time frame.  I don't recall any e-mails to you after that date to seek information from you on behalf of the campaign.

However, at that point it would likely have been up to Jones Day as being engaged to conduct the internal investigation to do so rather than the skeleton crew left late on the campaign in late December 2016.

Q.   But you don't recall when Jones Day was retained, correct?

MR. BLUMMETTI:   Objection.

BY MS. DELGADO:

Q.   Do you -- you stated earlier, you don't recall when exactly Jones Day was retained. You said it could have been as late as January of 2017; is that correct?

A.   It could have been in January, and specifically I bring that up because the 21st of December going into the holidays it would not be unusual at that point for it to be after the holidays were over.

Q.   But what procedures were there in the interim?

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

MR. BLUMMETTI:  Objection to form.

BY MS. DELGADO:

Q.    Was there any procedures in the interim?

A.    The procedure was to hire an outside firm to conduct an internal investigation.  That was the procedure that was used there.

Q.    That was the only procedure; is that correct?

A.    As far as -- I had seen that.  I mean, going and outsourcing that was the procedure that the campaign used.  Especially, again, like I said, the campaign no longer had a full staff, had a very limited skeleton staff.

Q.    And you stated earlier that you did not see any procedure that reflected any outreach to me; is that correct?

A.    I did not see such procedure.

Q.    Why did you not speak to Steve Bannon?

A.    I did not need to in order to answer the questions that were designated for this deposition.

Q.    Did you not see that Steve Bannon was one of two individuals I informed of my pregnancy?  You referenced the e-mail earlier.

A.   Correct, yes I did.

Q.   So would it not have been appropriate to contact Mr. Bannon to ask, in terms of the procedures taken and the actions taken, why -- whether there was any outreach to me?

MR. BLUMMETTI:  Objection to form.

THE WITNESS:  Oh, sorry, go ahead.

MR. BLUMMETTI:  You can answer.

BY MS. DELGADO:

Q.   I'll rephrase it.

You -- given that you mentioned earlier my e-mail to Steve Bannon and Kellyanne Conway, why did you not contact Mr. Bannon to ascertain what procedures followed my -- disclosing my pregnancy?

A.   Because, ma'am, I did not need to in order to answer the question on the designated topic.

BY MS. DELGADO:

Q.   But Mr. Binnall, you're relying simply on, well, I didn't see any procedure other than involving Jones Day; isn't that correct?  You're just going off of what's --

A.   I was going off the communications and documents that I reviewed, yes, ma'am.  And to

ARLENE DELGADO vs. DONALD J. TRUMP FOR PRESIDENT, ET AL.
JESSE BINNALL - March 21, 2024                    53

answer the question again, policies and procedures, that's all I needed to answer your question.

Q.    But procedures include reaching out to a pregnant employee, do they not?

MR. BLUMMETTI:  Objection to form. Argumentative.

THE WITNESS:  I can't answer that.

BY MS. DELGADO:

Q.    Okay.  I'll rephrase it.

Would you agree that procedures can include reaching out to a pregnant employee who has reached out to you?

A.    Ma'am, procedures could include any number of different things.  I can't talk as to what every procedure could possibly be.

Q.    Of course not, but you referenced an e-mail, a specific e-mail, in which two top level campaign officials were notified an employee was pregnant by her supervisor.

So my question is:  In terms of your duties, to inform yourself on what policies or procedures were used to respond to that disclosure, why did you not reach out to Steven Bannon and/or Kellyanne Conway?

MR. BLUMMETTI:  Objection to form.

ARLENE DELGADO vs. DONALD J. TRUMP FOR PRESIDENT, ET AL.
JESSE BINNALL - March 21, 2024                                    54

THE WITNESS:  Ma'am, I didn't need to in order to answer the questions.

BY MS. DELGADO:

Q.   Yet you take the position that the only procedures and policies you know of are those in the documents; is that correct?

MR. BLUMMETTI:  Objection to form.

THE WITNESS:  As I testified, I was not able to find any -- any formal written policies and procedures.  I can tell you what was done.

BY MS. DELGADO

Q.   Given that you state you couldn't find written policies and procedures, why not ask what unwritten procedures were undertaken?

A.   Ma'am, because I was able to determine what they did, and what they did was hire an outside firm.

Q.   How do you know that's all they did?

A.   Ma'am, in my research in order to answer the question, that's what my research showed that was done in this case.  And I have -- the campaign has no knowledge of anything else that was done.

Q.   So very simple question:  So you did not -- is it correct that you did not reach out to

Steve Bannon?

        A.    Yes.

        Q.    Is it correct that you did not reach out to Kellyanne Conway?

        A.    Yes.

        Q.    Okay.  The topic also asked for quote, "applicable decision maker" on that issue.  Who was the decision maker in terms of -- in terms of policies and procedures regarding my claim?

            MR. BLUMMETTI:  Objection to form.  On behalf of the campaign?

            THE WITNESS:  Mr. Bannon was I believe the CEO of the campaign.  Ms. Conway was the campaign manager.  At the end of the day any decision makers, again, of course was the campaign general counsel, and so as far as decision makers go probably would rest with those people.

BY MS. DELGADO:

        Q.    I'm sorry, that last that you cut out.  Probably what?

        A.    It would probably rest with those people as far as decision makers go.

        Q.    Okay.

        A.    Obviously, we've talked about Lucia Castellano was the human resources director.  She

certainly has decision making authority in a number of matters as well as the human resources director.

Q.    Did you reach out to her?

A.    No, ma'am.

Q.    Okay.    Topic Number 4 is quote "any and all claims of sexual harassment, or for unlawful discrimination, or for pregnancy discrimination against Donald Trump for President or employees represented there of" unquote.

Could you please tell me what claims -- what aforementioned -- I won't have to repeat that mouthful again unless you'd like me to -- the campaign has faced, and please tell me if you're referring to 2016, 2020 and if you're not including 2024?

A.    Yes, ma'am.    The campaign is currently aware if HR complaints regarding the following individuals for the 2016 presidential cycle:  Alba Johnson, Jessica Denson, Elizabeth Davidson, A.J. Delgado.

Q.    I'm sorry.    Could you -- it's complaints against the campaign from these individuals you said?

A.    The campaign is currently aware of HR complaints regarding the following individuals for

the 2016 presidential cycle, and that's:  Alba Johnson, Jessica Denson, Elizabeth Davidson, A.J. Delgado.

Q.    What was the third name you said, I'm sorry?

A.    Elizabeth Davidson.

Q.    And could you tell me about those, please?  We can go one by one if you'd like.

A.    I can tell you what the information that I have is in the public record.

Ms. Johnson made a claim against Mr. Trump.

Ms. Denson made a complaint against you and one other individual, and I can pull up the other individual's name.

Ms. Davidson made a -- was in Iowa, and since made a gender discrimination claim.

And Ms. Delgado, yourself, made the complaint that is at issue here.

Q.    Who was Ms. Davidson's complaint about?

A.    You and one other individual.  I can --

MR. BLUMMETTI:  Did you hear the question correctly there?

ARLENE DELGADO vs. DONALD J. TRUMP FOR PRESIDENT, ET AL.
JESSE BINNALL - March 21, 2024                                    58

THE WITNESS:  Who is Ms. -- I'm sorry?

MR. BLUMMETTI:  Could you repeat that, Ms. Delgado?  I don't think he heard you correctly.

BY MS. DELGADO:

Q.    Who was -- it's a name I've never heard of so I asked -- who was Ms. Davidson's complaint about?

A.    I apologize, I was answering the wrong individual and I heard you incorrectly.

Ms. Davidson's complaint was about gender discrimination.  I was not able to locate a particular individual that it was about, but it was -- it had to do with allegations of gender discrimination I believe, leading up to the Iowa caucuses in 2016.  She later dismissed -- that ended up not filing any lawsuit in that claim.  But it had to do with, you know, whether males and females were treated alike.

Q.    Okay.  Were there any HR complaints by any males?

A.    Not that I was able to find.

Q.    Okay.  And you mentioned these were for 2016 --

A.    Yes, ma'am.

Q.    -- what about 2020?

A.    Ma'am, for the relevant time frame here, I looked at 2016.

Q.    Why?

A.    Because of the rather huge amount of documents that would have to be sifted through in order to go beyond that.  This campaign was about the 2016 cycle and so the 2016 presidential campaign and so that is the search I did for -- to do a reasonable and diligent inquiry.

Q.    Why do you think this campaign is tied to a presidential cycle -- this lawsuit is tied to a presidential cycle, I should say?

A.    Had to do with allegations regarding the 2016 presidential campaign, which had a completely different staff from any other campaign.

Q.    On what do you base that it had a completely different staff?

A.    Well I should say a different hierarchy.  Like for instance, Mr. Bannon was not the CEO of the 2020 campaign.  Ms. Conway was not the campaign manager of the 2020 campaign, et cetera.  And so, because there are so many hundreds of thousands of -- actually I apologize, millions of documents in order to get to do a reasonable search to answer your question, that is what I did.

Q.    Who was the HR director in that 2020 campaign you mentioned?

A.    Ma'am, I couldn't tell you off the top of my head.

Q.    Mr. Binnall, couldn't you just call whoever -- call or e-mail whoever the HR director was for 2020 and ask them what the complaints were?

MR. BLUMMETTI:  Objection to form.

THE WITNESS:  Ma'am, I don't think that was a designated question.  And as far as the reasonableness for what I did to prepare for today's deposition, I took the reasonable steps.

BY MS. DELGADO:

Q.    So just to be clear, you did not inquire or research and you cannot answer today as to any complaints made in the 2020 cycle of the campaign; is that correct?

A.    That's correct.

Q.    Jason Miller was part of both campaigns; is that correct?

MR. BLUMMETTI:  Object to form.

BY MS. DELGADO:

Q.    Was Jason Miller part of both campaigns in 2016 and 2020?

A.    Ma'am, what topic are we under right

now?

Q.    We're still on 4.

A.    Ma'am, that's not a question that I looked into to answer Question Number 4 and so I can't answer on behalf of the campaign that question.

From my personal recollection, I believe that he was.  That's my personal recollection, not on behalf of the campaign.

Q.    Right.  The reason I bring that up is because you, yourself, mentioned that the staff was quote "completely different" in 2016 and 2020.  So I'm trying to work through that, but you stated Jason Miller was on both.  Was Brad Parscale on both 2016 and 2020?

A.    Ma'am, again, that wasn't a designated topic so I can't speak on behalf of the campaign. But for my personal recollection the answer is yes.

And I should have been more clear in that original answer that there were individuals that were on both campaigns.  I was speaking more as the campaign hierarchy.

Q.    Was Kellyanne Conway on both campaigns?

A.    Wasn't a designated question, and I do

not believe that she had an official position in the 2020 campaign.  I believe she was still in The White House at the time, that's my personal recollection.

MS. DELGADO:  My alarm went off, it's time for the Door Dash.  So if now would be a good time for a five-minute break, get some water, whatever you'd like to do, if that's okay with everybody -- ten minutes?

MR. BLUMMETTI:  That's fine.

MS. DELGADO:  Okay.  Thank you.

(Thereupon, a break was taken from 11:46 to 11:57 a.m.)

BY MS. DELGADO:

Q.   Okay.  So back on the record.  I believe we were on Number 4, Mr. Binnall.

A.   Yes.

Q.   Okay.  So were there any claims of sexual harassment that you found in the 2016 campaign?

A.   I'm not sure how Ms. Johnson designated her complaint, and I think she characterizes it as an unwanted physical advance. And then -- yeah.

Q.   Okay.

A.    That and it -- depending how you would designate your complaint, those were the two I was able to identify.

Q.    And when you searched for these, did you limit it to formal complaints, or did you include any type of, for instance, e-mail expressing concern about something?

A.    Ma'am, there's no way for me to limit it as far as e-mails expressing concerns because there was millions and millions of e-mails so I was not able to do that.  But I -- those were the complaints that were made to HR that I'm aware of.

Q.    Did you perhaps consider conducting a keyword search or --

A.    I did conduct a keyword search in a number of ways, and even myself, and so those are what I was able to find.

Q.    What key words did you use?

A.    Well, I did run searches, such as -- and ask that searches be run for things such as harassment and sexual harassment, but the problem is in presidential campaign those phrases were used a lot, you know.  It was used for instance in discussing the issues with Hilary Clinton and allegations, you know, made about what she did or

ARLENE DELGADO vs. DONALD J. TRUMP FOR PRESIDENT, ET AL.
JESSE BINNALL - March 21, 2024                                    64

didn't do regarding her husband's time in The White House.

So it -- just a simple keyword search, wasn't able to limit it so I was able to identify those four.  I was not able to identify anything else beyond the four.

Q.   When you do the keyword search and you say millions would come up, rightly so for the term sexual harassment --

A.   No, ma'am.  No, ma'am.  I didn't say millions would come up on that.

Q.   Oh, you're right.  Let -- let me rephrase it, you're correct.  There are a millions of documents --

A.   Millions of documents, that's -- that's correct.

Q.   Right.  Did you consider limiting the keyword search to e-mails sent to Lucia Castellano for instance?

A.   I did look through a number of her e-mails.  I don't know if I did a word search based on hers, but again, that's usually when -- when somebody goes directly to human resources on that, that was -- that's what I was looking for.  Those are the four that came up.  I did not find any --

anything else other than those four that I believe was responsive to the question and it -- specifically as to claims if sexual harassment or for unlawful discrimination or for pregnancy discrimination.  So I was looking specifically for claims and those were the claims I was able to identify.

Q.    How do you define claims?

A.    I probably would use a dictionary definition for claims.  And so I can pull that up, but I mean, when I'm looking for claims, I'm looking for someone saying, you know, that -- that somebody, that they -- that they were a victim of some sort of harassment, as you identified in your question, and what actions the campaign then took at that point.  Those were the four I was able to identify.

Q.    Fair enough.  And I just wanted to clarify that you weren't taking the term -- you weren't interpreting the term claims to mean a legal claim was made.  It sounds like you used the broader --

A.    Right.  I didn't require that a lawsuit be filed or a Title 7 would have to be filed.

Q.   Okay.  Great.  That's what I was looking to clarify.

So to be clear, now working through the answer you gave, did you read through the e-mail, all e-mail -- obviously, not all e-mails sent to Lucia, but you did run a keyword search in all e-mails to and from Lucia Castellano?

A.   No, ma'am, I didn't -- I didn't do a keyword search for everything regarding her.  I looked specifically for claims and worked with our vendor to do just that, and went through a number of relevant e-mails, and that's what my search was able to -- to discover.

Q.   Right.  But I'm trying to find out what the search was that you executed because you stated that using the term sexual harassment would bring up too many results, rightly so.  But you also did not read through all e-mails sent to and from Lucia.  So what search did you run exactly?

A.   Ma'am, I actually couldn't tell you the exact searches that I did.  But what I was able to do, and I wouldn't even be on this campaign e-mails, I researched publicly available sources on this as well, is identified the particular, you know, the particular individuals that people make

claims.  Those were the only four claims I was able to find.

Q.   But -- and so your position -- your testimony today is you can't recall the keyword search, if you ran any keyword search, that --

A.   I can tell you I ran a number of keyword searches.  And I can't tell you off the top of my head exactly what keyword searches, that of course was not a designated topic here.  But I believe these were -- my understanding is that this is all information that was turned over in discovery as well.

So I tried to go through that documentation as efficiently and effectively as I could, and that's what I was able to determine.

Q.   On what do you base that the keyword search is not responsive or part of Topic Number 4?

A.   It didn't ask me to run specific keyword searches.  And so what I did is, I tried to -- tried to think best I could the best way to come up with information that would be responsive, and I did that for those four individuals.  I did that and it turned out for those four individuals.  Both documents that I found in the -- in the -- in the e-mails at issue and on publicly available

sources.

Q.   You're saying Number 4 would have to specifically ask you to run a keyword search for you to --

A.   Ma'am -- go ahead.

Q.   You're saying that Topic Number 4 would have to, specifically, ask you to run a keyword search for you to testify here today what the keyword search was that you ran to inform yourself as to Number 4?

A.   No, ma'am.  I'm saying Number 4 doesn't require me to do a keyword search or not.  You know, I was required to use my best efforts to try to come up and be able to answer your questions, and that is exactly what I did.  And I was able -- I was able to identify four specific examples.  And those were the -- and that's -- yeah, and so that's what I was able to find using my best efforts.

It didn't, you know, for instance, Number 4 doesn't say, or nor do the instructions say, to use specific keywords in order to do searches in order to find those.  So what I did is, as I've explained, is I've gone through e-mails.  I went through the document production and I looked

ARLENE DELGADO vs. DONALD J. TRUMP FOR PRESIDENT, ET AL.
JESSE BINNALL - March 21, 2024                                      69

at publicly available searches in order to come up with that.  And that's what I was able to come up with.

Q.    And you correctly say it doesn't require you to run a keyword search, but you also say you understand that your best efforts are required.

A.    Yes, ma'am.

Q.    Yet you don't believe that best efforts would entail speaking to the HR director, who is still alive as far as I know and available somewhere?

MR. BLUMMETTI:  Objection.

THE WITNESS:  Ma'am, in order to answer your question, I didn't need to do that.

BY MS. DELGADO:

Q.    Right.  This is a new question.

When you referenced your expectation that you used your best efforts to educate yourself on these topics, you -- is your belief is that the best efforts do not include speaking to the HR director?

A.    Ma'am, as I think I have already testified to, I -- in order to answer the questions that you put in your designated topics, I did not

have to do that.  And it was -- it just wasn't necessary for me to be able to answer -- to find the answer to the designated topic.  That's what I did, didn't require going and talking to individual people.

Q.    Even though you mentioned yourself that these are millions of e-mails to go through, including millions of e-mails, which will give false positive results on terms like sexual harassment.  Even still, you don't think best practice would be to speak to the HR director?

A.    Based on the designated topic, no.

Q.    Okay.  Let's move onto Number 5.

A.    Okay.

Q.    Oh, and I'm sorry, just to clarify.  For Number 4, I presume, but just to clarify, your answer would be that you also, same as Number 3, did not look at the 2020 campaign, correct, 2020 campaign effort?

A.    Correct.  As a matter of fact, I think that question regarding 2016 and 2020, I think I've already answered, I think that was in regards to Question 4.

Q.    Right.  So to speed things up, for all of the topics, the answers you're giving are

strictly about the 2016 campaign effort and not 2020?

A.   Not necessarily.  There may have been at least one question that where a reasonable search could and was done on 2020.  And so if a reasonable search could be done then at that point it was specifically asking for that information that I did it.

Q.   Okay.  So for Number 5, it was -- that was 2016 and 2020 that you looked at or 2016 only?

A.   Correct.  That was the 2016 campaign. So for Question Number 5, I can tell you that the campaign structure was often fluid and it changed over time.  From August 2016 to until November 2016 the campaign hierarchy was as follows:  Steven Bannon was the chief executive officer.  Jeffrey DeWit was the chief operating officer and chief financial officer.  Kellyanne Conway was the campaign manager.  David Bostein was executive campaign manager.  Lucia Castellano was the director of human resources.

Q.   And when you say Lucia Castellano was the director of human resources, can you identify when and via what medium staff members were informed this is the HR director and we have an HR

director?

A.    Ma'am, under what question are you asking me to answer that question?

Q.    Regarding the organizational structure, I'm asking you, it's part of that, if employees, staffers, team members were aware of this organizational structure?

A.    Ma'am, I -- because that question was not -- was not part of a designated question, I did not research that particular topic.  And so I'm not able to answer that question on behalf of the campaign, and I don't have any personal knowledge of that.

Q.    Okay.  So then I'll ask it in regards to Questions Number 2 -- Topics 2, 3 and 4.  It falls under all and each and every one of 2, 3 and 4, its policies and procedures.

What --

A.    Ma'am, my answer would not change. I'm not aware of any policy or procedure that included telling individual employees about the human resources director.  And so because there's no policy or procedure on that, I did not see any information that would be relevant to that.

MR. BLUMMETTI:  Objection to the

extent the question calls for any information beyond those topics noticed, but I believe Mr. Binnall answered.

MS. DELGADO:  Well, we're talking about the policies and procedures for receiving, investigating or resolving complaints.  I'm quoting from Number 2 for instance, part of any such policy and procedure would be informing the staff that there is an HR director.

MR. BLUMMETTI:  That's where the objection comes.  We --

MS. DELGADO:  Mr. Blummetti, your objection is what?  I'm sorry, can you clarify?

MR. BLUMMETTI:  The extent that the question you asked Mr. Binnall, I believe one question ago, falls outside of the scope of the noticed topics, that's it.  I'm asking him not to answer the question.  I'm just preserving the objection for the record.

MS. DELGADO:  Okay.  Thank you.

BY MS. DELGADO:

Q.    Mr. Binnall, I'm taking you back to Number 2, which is the campaign's quote "policies and procedures for receiving/investigating a resulting complaint."  Focusing particularly on the

ARLENE DELGADO vs. DONALD J. TRUMP FOR PRESIDENT, ET AL.
JESSE BINNALL - March 21, 2024                          74

receiving, were the staff members of the 2016 campaign informed -- did you see any point where they were informed there is an HR director, her name is Lucia Castellano?

     A.   Ma'am, I'm not aware of any procedure that would require that.  And I'm not aware of that being part of the procedures at all.  And that's what I researched, and I did not find that procedure.

     Q.   Okay.  Before I have to object to that as nonresponsive, let me try again.

          I'm not asking if you're aware of whether the procedures require that.  I'm saying as far as your knowledge regarding policies for receiving complaints, were the staff members informed where complaints could be received or through whom?

     A.   I am not aware of any policy regarding how employees were to make complaints and to whom they were making them.

     Q.   Again, not asking you about if there was a policy regarding informing them.  Were they informed?  It's part of the policy, there isn't a separate policy on that, it would be part of the policy for receiving complaints.

A.    Ma'am, I looked at what the policies and procedures were, that's what the topic asked me to look at, and that's what I looked at.  I'm not aware of any such policies and/or procedures.

Q.    Right.  So for the policies and procedures of the campaign, was there anything in there therein stating, informing the staff there is an HR director?

A.    Ma'am, as I've testified to you already, I'm not aware of any such policies and procedures.  And I did look for such.  I was unable to find it.

Q.    Maybe you misheard my question.  I'm not asking if there was a policy and procedure.

Did you see an e-mail notification or any type of notification informing the staff that there is an HR director and her contact information?

A.    Ma'am, that was not part of the designated topic.  I did not look for it.

Q.    It's part of policies and procedure in Number 2.

A.    Ma'am, for policies and procedures I looked for policies and procedures.  I did not look for every communication with an HR director, for

instance, or every director, every communication from all employees regarding HR directors.

I looked for policies and procedures. That's what the topic asked for, that's what I did.

Q.    Mr. Binnall, are you saying an HR policy and HR procedure does not entail notifying staff that the HR department exists; is that your testimony today?

A.    It could be a policy or procedure. I'm just saying that I was unable to find that as a policy or procedure.  And --

Q.    I'm not asking if you found it as a policy or procedure.  I'm asking if you found such a notification, which would be part of the policy or procedure?

A.    Ma'am, that is not what -- part of what I looked for in this case.  And I do not believe it was part of the designated topics.

Q.    I'm not asking if that's part of what you looked for or if you believe it's part of the designated topics.

I'm asking did you see any such notification regarding there being an HR director and her contact information?

A.    Object to what I said, that's not

something that I looked for based on the designated topics, the answer to your question is no.

Q.    Okay.  I'll object to that as nonresponsive.

You stated earlier that --

MS. DELGADO:  Sorry Mr. Blummetti, did you say -- I thought I heard something.  Was there an --

MR. BLUMMETTI:  You objected as nonresponsive.  I said, I believe that the record speaks for itself, including Mr. Binnall's answers.

MS. DELGADO:  Oh, okay.  I couldn't hear you.

BY MS. DELGADO:

Q.    I'm sorry, there's a note here I'm trying to find.

Number 5, Mr. Binnall, wasn't in general the organizational structure, it was for reporting complaints or allegation for sexual discrimination; correct?

A.    Correct -- yes.

Q.    Okay.  And I believe you gave me your organizational structure in general of the campaign.  So would you like me to ask it again?

A.    Well, so I think there might be some

confusion here about these -- the conjunction here. I see the organizational structure of DTP, which I'm taking that particularly is Donald Trump for President, administration and chain of reporting.

So for the chain of -- so for the administration, that's -- best I could answer was, that hierarchy for the chain of reporting. As far as I've been able to determine, like I said, there are no policies and procedures per se. There was a human resources director. And I believe all such complaints would go to the human resources director, Lucia Castellano. She was certainly subject to the campaign manager and the chief executive officer.

Q.    So the chain of reporting for a complaint, your answer would be Lucia Castellano?

A.    Yes, ma'am. And then where she -- certainly there was nothing prohibiting people from going to another campaign official, but there was no policy or procedure talking about going up the ladder, if you will.

Q.    Sure. So when we speak of a chain, was her contact information disclosed or shared with staff at any point?

A.    Sorry, go ahead.

Q.    I'm waiting.

A.    I do not know what question that would be subject to, what particular topic that would be questioned -- that would be subject to.  Can you point me to it?

Q.    The chain of reporting, Mr. Binnall?

A.    Ma'am, I did not look for chain of reporting as to know what her phone number was or who her phone number was -- was distributed to by.  I do not have that information.

Q.    I don't believe I said phone number.

A.    I'm sorry.

Q.    I can re-ask it.

A.    Please do.

Q.    When you speak of, quote "the chain of reporting" in Number 5, we speak of a chain, were the staff members ever informed as to Lucia Castellano's existence of being HR director?

A.    Oh.  Again, that's not a question that I -- that I researched specifically, but it was not something that was specifically designated.  So the campaign does not have -- is not able to answer that question.  And I have no personal knowledge.

Q.    Okay.  I'm objecting because it's not really responsive, Mr. Binnall, what you

researched.  You're here because you have taken a position of the campaign that you can speak to these issues.  So when you say, well, I didn't look into them, I'm going to object to that as nonresponsive.

Let me ask again:  The chain of reporting, what -- when we speak of a chain, when were -- was the staff in what format notified that there is an HR director in that chain?

MR. BLUMMETTI:  Objection.  Asked and answered.

THE WITNESS:  Ma'am, I believe as I have already testified to, there is not a policy and procedure that would require that.  And nor do I have any information as to any whether such a policy or procedure about notifying staff of that chain -- chain of reporting happened.

There -- like I said, as far as what I've testified to, there was no such policy or procedure about giving the staff a chain of reporting.

BY MS. DELGADO:

Q.    Okay.  So your answer is no?

A.    My answer is is that there was no policy or procedure that required the -- the

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

disclosure of a chain of reporting.  And because there wasn't such a policy or procedure, I did not look into whether there was disclosure of a chain of reporting to specific employees because it was not a designated topic.

Q.    You're not going to answer whether employees were informed as to Lucia Castellano?

A.    The reason that you don't like my answer is because -- and I'm trying to be as absolutely straight and clear as I possibly can be. I can only answer questions that were designated, information that was designated.  I looked as -- to see whether there were policies and/or procedures.

Whether other actions were taken outside of the policies and procedures in this case that did not exist, is not something that was designated.  And so it's not something that I looked into.  For instance, was there a communication sent out regarding what the chain of reporting is for an HR issue.  I've told you what the policies and procedures were and I've told you what the administration was and who was in charge of HR complaints.

Q.    Mr. Binnall, there's no reference to policies and procedures in Question -- in Topic 5

which is what I'm asking you about.

A.    So for Question Number 5 -- Question Number 5 does not include whether campaign staff were given that information.

It was -- Question Number 5 says:  The organizational structure of DTP's administration and chain of reporting for complaints or allegations of sexual discrimination as it existed each year, 2016 to the present.

That's the information that I researched and looked at and that's what I've answered my question as to.

Q.    So your chain, your definition of chain, begins at the receiving end; is that correct?

A.    I'm not sure what you mean.

Q.    I'm going to strike all of that as nonresponsive.  It's clear you don't want to answer the question about -- which it falls under Number 2, Number 3, Number 4, and Number 5.  But we'll move on because we're pressed for time, but I'll just label all of that as nonresponsive to the question posed repeatedly.

MR. BLUMMETTI:  I believe Mr. Binnall answered the question repeatedly.

MS. DELGADO:  Sorry, Mr. Blummetti. Go ahead.

MR. BLUMMETTI:  I would just like the record to reflect that Mr. Binnall's testimony speaks for itself and we believe that he's answered the question.

BY MS. DELGADO:

Q.    Number 6, Mr. Binnall, is plaintiff's employment and performance evaluations and any deficiencies relating to the same or other forms of other random evaluation.

Did I have any performance evaluations?

A.    No, ma'am.  As far as I was able to find there was no performance reviews.  There was a complaint of harassment by Jessica Denson against you.

Q.    And you stated that you've looked at public filings including Ms. Denson; correct?

A.    Yes, ma'am.

Q.    So you're aware of the campaign's position on Ms. Denson; correct?

A.    I'm aware of public reporting on it, but I did not look in detail as to what the campaign's position as to what Ms. Denson was and I

have no personal knowledge of it.

Q.    Number 7 is the process for reviewing campaign staff and recommending current or former staff for White House positions, including identification of those individuals with the decision-making authority in such matters and those individuals made hiring decisions.

Did Steve Bannon recommend anyone for a White House role?

MR. BLUMMETTI:  Objection to form.

THE WITNESS:  Ma'am, based on the question designated, I did look not as to whether specifically Steve Bannon recommended people for positions.  What I was able to determine is that there was no such procedure.  All staffing was decided by the presidential transition and not the campaign.  Presidential transitions are governed by federal law.  The campaign has no independent knowledge of the efforts of the official transition committee.

BY MS. DELGADO:

Q.    Mr. Binnall, how do you know all staffing was decided by the presidential transition?

A.    Because that's what's required by

federal law.

Q.   That's -- okay.  That's your basis.
Okay.

Were you aware that the campaign was still paying half of our salaries during that transition period?

MR. BLUMMETTI:  Objection to form.

THE WITNESS:  Can you point me to the topic?

BY MS. DELGADO:

Q.   Okay.  Let me rephrase it.  Why was the campaign paying half our salaries during the transition period?

A.   Can you, please, point me to the topic under which that question falls?

Q.   I believe it falls under 7.

A.   So I have -- based on Number 7, that's not something that we definitely looked into.  I do have knowledge that in many instances, although not all, campaign staffers were paid, for instance, till the end of the year.  And that was a campaign individual by individual decision.

But I have no information about -- my information is that all transition activities were handled by the official presidential transition.

Q.   What federal law is it that you believe required the transition team solely to recommend for The White House?

A.   I don't remember the name of the statute.  I do know it was passed I think in the mid 1960's and then revised in, I think, 2015.  And that law has a structure, and that structure is -- and, by the way, I don't think this is -- I'm speaking on my own personal capacity here -- I'm not sure that this --

Q.   Don't, please don't.  Let me stop you there then, please, don't because you're here as a 30(b)(6) witness.  So we shouldn't mix the two.

A.   I'll take that as an instruction not to answer on my own personal knowledge.

Q.   No.  Of your -- the way you mentioned, you, specifically, said, I'm going into my own personal knowledge here as an attorney and you're here as a 30(b)(6) witness on behalf of the campaign --

A.   That's not exactly what I said.

Q.   Okay.  Go ahead.

A.   Yeah.  So what I can tell you is that you asked for the process of reviewing campaign staff -- process for reviewing campaign staff,

recommending current or former staff for White House positions, including identification of those individuals with decision-making authority in such matters, and those individuals who made hiring decisions.

And our response to that is that the campaign had no position, there was no such procedure.  All staffing was decided by the presidential transition and not the campaign.  And as I pointed out, presidential transitions are governed by federal law.  Campaign has no independent knowledge of the efforts of the official transition.

Q.   I understand your answer is that it didn't happen because it's contrary to federal law, correct?

A.   My position is there was certainly no such procedure.  And that -- yeah, as I said, there's no such procedure.  All staffing was decided by the presidential transition, not the campaign.

Q.   So you have no documentation to support that other than because it's against the law?

A.   Well, I also did review documents and

that is what happened.  It was presidential transition officials in my review of the relevant documents that were making decisions.  And it was -- it was the transition that was hiring people for The White House.  There's a procedure for doing that and that procedure was followed.

Q.   But how could you possibly review such documents if you reviewed the campaign's documents?

A.   Because there were people that did use campaign e-mail addresses.  And so those -- there were documents with -- that had to do with the presidential transition, and that that was -- that that was very clearly being done.  In regards to the transition, there was no action on behalf of the campaign that was being conducted at that point.

Q.   So you're aware, as you just said, that campaign e-mails were still being used during the transition period to conduct White House discussions?

A.   Yes, ma'am.

Q.   Okay.  Fair enough.  That's in the documents.  And you're aware that during the transition period the campaign was paying in part the salaries of the transition staff?

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

A.   As I've already testified to, I have no knowledge on behalf of the campaign.

Q.   And did the campaign ever issue a termination letter when the transition period began?

A.   Under what topic are we?

Q.   I think it would fall under what you just -- you opened the door to it really with what you just said about the campaign not being involved in transition issue.  So I asked of you --

A.   There's nothing designated that I'm aware of about termination letters.  I did not look for any.

Q.   You didn't see any?

A.   No, ma'am.

Q.   Okay.  Fair enough.  Did the campaign -- did you ever see any notice for where the campaign is informing its staff to stop using the campaign e-mails immediately?

A.   Ma'am, that wasn't a designated topic as far as I know so I didn't look for it.

Q.   Okay.  Again, just going off of what you opened the door to.

Did the Trump campaign NDA remain in effect during the transition period?

A.     Ma'am, that was not a designated topic and I did not look for it.

Q.     Okay.  In the lawsuits that you said you reviewed, did you notice that the Trump Campaign NDA was still in effect during this transition period?

A.     Ma'am, it wasn't a designated topic. I didn't look for it.  And I have no personal knowledge on that.

Q.     You don't recall the lawsuit against me for 1.5 million for allegedly breaching my Trump Campaign NDA during the transition period?

A.     Ma'am, that wasn't a designated topic. I didn't look for that and I don't have any specific recollection of -- of that.

Q.     Sure.  And it isn't a topic.  I was wondering based on your -- doing your reading of these lawsuits that have been filed, including mine.  But if your answer is you don't recall then that's fine by me.

A.     I didn't see that, no.

Q.     Okay.  Would you agree -- and we're still under Number 7 -- that campaign performance was a big driver for obtaining a White House role?

MR. BLUMMETTI:  Object to form.

BY MS. DELGADO:

Q.   Is it to work on the drive -- let me ask -- okay.

Would you -- was campaign performance a large factor in obtaining a White House job?

A.   Ma'am, I have no ability to testify what the transition looked at as far as for what they -- what decisions they used in order to make personnel decisions for the White House.  That's something you would have to ask the transition.

Q.   Why didn't the campaign wrap up?

MR. BLUMMETTI:  Object to the form.

THE WITNESS:  Yeah, ma'am, what topic are we under here?

BY MS. DELGADO:

Q.   Still going to reviewing of campaign staff and recommending former staff and White House positions?

A.   Ma'am, I did not look into why the campaign didn't wrap up as -- in researching that topic.

Q.   We'll come back to 7.

Did you look into 8, my qualifications for a position with the campaign?

MR. BLUMMETTI:  I object to the form.

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

You can obviously answer.

BY MS. DELGADO:

Q.   No, sorry, I didn't mean that to be flippant.

A.   Ma'am, I have reviewed the plaintiff's personnel file.  It did not contain a resume or a CV, but I did look.

Q.   I have not seen this personnel file that you're referring to.  So are -- are you saying there is a personnel file of mine that you reviewed?

A.   Ma'am, what I'm saying is I've seen documents regarding your -- yeah, and correspondence regarding your -- your employment.  It's not what I would probably generally call personnel file, but I -- for instance, I've seen records of the complaint against you.  I've seen other e-mail correspondence regarding you.  I have not seen and nor was able to locate a CV or a resume.

Q.   Notwithstanding that you didn't have a CV or a resume to review, did you conduct your own research into my qualifications for a position even via Google?

A.   You know, I didn't Google you.  I did

see a number of references to that you had a past in politics and communication and -- and so that I did see.  But I didn't see, you know, anything that would need like a CV or a resume in order to answer the question about, you know, whether you were -- your qualifications for your position with Donald Trump for President.

Q.    So are you able to speak to Number 8? I think you're telling me you're not.

A.    No, ma'am, I'm telling you what I looked for and I didn't see any specific resume or CV, which is what I would normally look at in order to determine whether somebody is qualified for a position.  I didn't see that.

As I've told you, you were clearly involved in politics.  I have -- there's nothing that I have seen to say that you didn't have the qualifications to be in your current position.  But affirmatively being able to say that you were is something that I would -- I would need information that I wasn't able to find in our documents such as a resume or CV.

Q.    Well, what about in the complaint, which you stated you looked at which has a biographical section, did you find anything there

that would be a qualification?

A.   I mean, I -- of course in the complaint in these allegations, and, you know, as to what you alleged in the biographical data, I have, again, no reason to question your qualifications for the position that you had.

Q.   Okay.  Number 9 I assume you're going to have the same answer.  Let me ask it anyway. The qualifications of the plaintiff and all campaign staff, et cetera, ultimately, did receive White House positions, what were their qualifications?

MR. BLUMMETTI:  Object to form.

THE WITNESS:  All staffing was decided by the presidential transition and not the campaign.  Presidential transitions are governed by federal law.  The campaign has no independent knowledge of the efforts of the official transitions made.

BY MS. DELGADO:

Q.   So you did -- that's not what Number 9 is about thought, the qualification.  I presume you know who went into the White House.  You worked on the campaign.  The topic is about the qualifications of those individuals.

A.    Ma'am, I have -- no, the campaign does not have any independent knowledge of the decision-making or the qualifications of people that were hired by the transition to go into the White House after the inauguration.

Q.    But you just said a lot of the individuals were still using their campaign e-mails and so you were able to read some of these e-mails on the campaign servers, did you not?

A.    No, I definitely saw e-mails on it, but as far as answering your question regarding the qualifications to the plaintiff and campaign staff or contract employees, that was -- you know, qualifications to go into government service in the White House was something that the transition committee did.  You would have to ask them.

Q.    And again, your basis for the belief that the transition committee did that, is federal law; is that correct?

A.    There is very specific statutory regime for how this is handled and it was handled according to that statutory regime in this case.

Q.    How do you know it was handled according to that statutory law?

A.    Because I did review documents both

publicly available documents showing that.  And the correspondence I saw showed that as well that the decisions that were being made were by -- for personnel were by transition officials.  And so there was a presidential transition from both candidates, both major party candidates for the presidency that goes back to the summer, and actually before, of 2016 and that continues onto the election and past the election up to the inauguration.

Q.    When you say there are quote, "publicly available documents including correspondence showing the decisions were made by transitions officers," would you be able to supply what those documents and correspondence are that you're referring to?

A.    Ma'am, I can certainly refer you to the archive version of the transition that disclose in some detail the way that the transition occurred, but I was not asked, and have not been asked for specific documents to produce.

Q.    Would you be able to subsequently produce -- subsequent to today produce those?  Any reason you wouldn't?

MR. BLUMMETTI:  Objection.  Asked and

answered.

BY MS. DELGADO:

Q.    No, I don't believe he has -- I don't believe I had asked that.

A.    Ma'am, if -- I of course would comply with any subpoena that was given to us on behalf of the campaign.  I think we have complied with all document requests.

Q.    When you say that decisions are made by transition officials, how do you know they were wearing their transition hat versus their campaign hat?

A.    Because they were transition officials acting on behalf of the transition.

Q.    How do you know they were acting on behalf of the transition?

A.    Because staffing of federal government positions in the White House or otherwise is a job of the transition and so that's very clearly the job that they had in the transition.  Those were the duties that they were performing.

Q.    If we could look at the Number 11, the current financial status of campaign.

A.    Yes, ma'am.

Q.    Could you speak to me about that

topic, please?

A.    Yes, ma'am.

Q.    Including the available assets, debts and the winding up of the campaign financial obligations?

A.    As of December 31st, 2023, the entity formerly known as Donald J. Trump for President Inc. has $518,249.18 in assets.  It has $17,142.43 in debt.  The name of the entity is now Make America Great Again PAC as the former campaign continues through its wind down.

Q.    I'm sorry, your last question as it continues through what?

A.    Through it's wind down.

Q.    And when you say wind down, what do you mean?

A.    I was responding -- you said winding up the campaign financial obligations, and simply talking about the campaigns going after they're done continuing through a wind down process.  That takes some time usually for a presidential campaign.

Q.    And this is the MAGA, Make America Great Again PAC entity, which you believe is what the 2016n and the 2020 campaign became?

MR. BLUMMETTI:  Objection to form.

THE WITNESS:  Let me be very specific because there are pacs that have similar names.

BY MS. DELGADO:

Q.    Yes.

A.    This is the Make America Great Again PAC.  Make America Great Again PAC is, you know, has the same FEC identifier, for instance, and is the same entity as the entity that was once Donald J. Trump for President Inc.  Its -- and its financials are all reported on the FEC website publicly.

Q.    So it's your understanding of the 2016 and 2020 campaign became a PAC?

A.    It did become a PAC in the spring of 2021, or maybe still winter of 2020, but in 2021 it became Make America Great Again PAC.

Q.    And what is that $17,000 debt?

A.    We can pull it up publicly.  I didn't actually see what the debt was, but that's what publicly recorded the $17,142.43 in debt.

Q.    When you speak of a campaign's financial obligations, how does it pay for its legal counsel?

A.    There are -- and I'm sorry, which topic are we under for this question?

Q.    Number 11, campaigns financial obligations.

A.    So the Question Number 11 looks specifically as to current final status.  It doesn't ask how particular payments are made.  And so in answering Question Number 11 I did not look into how payments were made.

Q.    I'm sorry, Mr. Binnall, but I do believe it requires you to answer.  It's clearly asked for the campaign's financial obligations, obligations to vendors, attorneys currently working for the campaign clearly falls under that.  So I'm asking how does the campaign --

A.    Ma'am, I -- I might be wrong here. The version I have says current financial status of DTP including total available assets, debts and the winding of the campaign's financial obligations. Is that the question for Number 11?

Q.    Yep, that's it.

A.    Okay.  As to Question Number 11 I looked to determine the status including the assets, debts and the winding up.

Q.    Okay.  Same question?

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

A.    So same answer.

MR. BLUMMETTI:  And objection to the extent it falls outside the scope of the notice filed.

BY MS. DELGADO:

Q.    So your answer, Mr. Binnall, is that you have no -- you can't answer 11 because you didn't look into that?

A.    That wasn't exactly my answer.  My answer is as I previously said and the record shows.

Q.    You what?

A.    My answer is as I previously said and the record shows.

MS. DELGADO:  Can the court reporter repeat the answer?

(Thereupon, the requested portion was read back by the court reporter.)

BY MS. DELGADO:

Q.    Okay.  Mr. Binnall, if that's the answer, perhaps I need to ask the question again. It's not responsive.

Are you able to answer regarding how the campaign pays its current financial obligations to its attorneys?

MR. BLUMMETTI:  Objection to the extent the question falls under the noticed topic.  You can answer.

THE WITNESS:  As to Question Number 11 that is not something that I looked at in preparing for today's deposition because that was not within the topic designated.

BY MS. DELGADO:

Q.    We'll have to go to the judge on that one.  Okay.

Okay.  Number 12, public statements made by or on behalf of the Trump Campaign concerning or regarding plaintiff.  Anything on that?

A.    The campaign is not aware of any such statements.

Q.    13, complaints or any concerns raised by anyone regarding Boris Epshteyn or Omarosa Manigault?

A.    The campaign is not aware of any such specific complaints during the relevant time period.

Q.    What is the relevant time period?

A.    The 2016 campaign, general election campaign.

Q.    Why do you gather that that's the relevant time period for 13?

A.    Because these individuals of course, you know, are -- are discussed a lot and they are included on a number of e-mails and so I was limited as to how I kind of searched for that topic, which was extremely broad.  And so I did my best to go through the e-mails available to me to see if there were any -- any such complaints and I was not able to locate any.

Q.    You searched all e-mails available to you in 2016 and 2020?

A.    Certainly not every -- I did not look at every single e-mail from the 2016 and 2020 campaign, which would have probably taken centuries.  I'm not exaggerating, it probably would take centuries.

I did do my very best in order to see if in that relevant time frame I could locate any complaints about either Mr. Epshteyn or Ms. Manigault and I did not find any.

Q.    Just to be clear, Mr. Binnall, I didn't ask if you read every e-mail.  I agree with you that would take centuries.  I said if you searched every e-mail.

A.    Well, I -- I could not come up with a way to -- that would -- or a search term on that would sufficiently narrow that down.  Certainly there's -- yeah, so for the search that I was able to do, that was -- I was not able to locate any such complaints or concerns.  Concerns is a very broad word.

Q.    Go ahead.

A.    Yeah, I was not able to locate anything that would show an answer to Number 13.

Q.    What was the keyword search that you ran?

A.    Ma'am, I didn't keep a record of the keyword searches that I ran, as I previously disclosed to you.  But they're are a number of e-mails that I went through in order to try to find an answer to your questions.  I spent a decent amount of time doing so, but I was not able to find anything regarding that.

Q.    And even still for this topic you didn't think to call or speak to or reach out to the HR director?

MR. BLUMMETTI:  Objection to form.

THE WITNESS:  Ma'am, I did not believe that was necessary in order to answer your

question.

BY MS. DELGADO:

Q.    I'll rephrase it.  In Number 13, given that you speak of the breadth of the number of e-mails and the difficulty, in your opinion, of the search, did you then at least for this topic consider reaching out to the HR director?

A.    No, ma'am, I did not.

Q.    Why not?

A.    Because as I previously disclosed, I believe that the best way to look at the records especially in the length of time, you know, it's several presidential cycles ago, that the best way to get an answer to that would be to go through records and that is what I did.

Q.    But you found nothing, correct?

A.    Correct, I found nothing.

Q.    So at that point did you not think perhaps I should go to the HR director and ask her?

A.    No, ma'am, I did not.

MR. BLUMMETTI:  Objection to form.

BY MS. DELGADO:

Q.    Okay.  Number 14 is communications about any potential or actual law firm employment, et cetera, you can read it for yourself, to

plaintiff from December 2016 onward, et cetera.

Can you speak to me about what you found there?

A.    Yes.  The campaign was unable to locate any such documents.  We did see that there was a number of communication that some of which was forwarded to us that included you, but there was -- as far as anything about potential employments or contracts during the 2020 election cycle we found nothing.

Q.    And that was purely based on a search you ran in the 2M database?

A.    And the search I had the vendor run as well.

Q.    I'm sorry?

A.    And the search that I had the vendor run as well.

Q.    Did you reach out to anyone about it?

A.    Only the vendor and -- yeah, only the vendor.  Other than that I reviewed documents.

Q.    So if I were to tell you there was an offer communicated to me to remain on the campaign in the spring of 2017, that does not ring a bell to you at all?

A.    I did not see that.

Q.     Did you speak to Jones Day given that you were in this respect part of the campaign regarding what they might have?

A.     No, ma'am, I did not speak to Jones Day.

Q.     Why not?

A.     Because it was not necessary to find -- to do the research to respond to the questions that you designated in your 30(b)(6) notice.

Q.     But you say you found nothing and you also said earlier that Jones Day was essentially put in charge once the campaign became aware of my pregnancy.  So given that, did you think you should reach out to Jones Day?

A.     Well, that's not exactly what I said. However, no, just because they conducted the internal investigation I did not believe it was necessary to reach out to Jones Day in order to discuss that investigation.

Q.     And you found -- go ahead.  I'm sorry.

A.     And I looked at the documents that the campaign had.

Q.     Okay.  And you found nothing -- I presume your answer covered nothing about a

potential employment offer for 2020; is that correct?

A.    Correct.

MR. BLUMMETTI:  Objection to form.

BY MS. DELGADO:

Q.    Sorry?  Sorry?

A.    Correct, I was not able to find anything regarding an offer of employment for the 2020 presidential election.

Q.    What about discussions of potential employment?

A.    No, ma'am.

Q.    Did you speak to anyone from the 2020 leadership?

A.    No, ma'am.

Q.    For 15 do you have any knowledge of communications that you can speak to here today with Eric Trump?

MR. BLUMMETTI:  Objection to form.

BY MS. DELGADO:

Q.    I'm sorry, I'm thinking and reading at the same time.  Let me rephrase.

For Number 15 communications with Eric Trump about the plaintiff, does the campaign have that?

A.    The campaign is aware of no such communications.

Q.    What about from campaign counsel to Eric Trump?

A.    Well --

MR. BLUMMETTI:  Objection to form for attorney-client privilege, but you can answer if you can.

THE WITNESS:  Yeah, obviously I'm not going to disclose anything that's privileged.  That being said, I'm aware of no unprivileged communications.

MS. DELGADO:  Sorry, the objection on the basis of attorney-client privilege is what exactly, Mr. Blummetti?

MR. BLUMMETTI:  Just to the extent it calls for any information protected by the attorney-client privilege for the reasons that we discussed during Mr. Trump's deposition.

MS. DELGADO:  Right.  And for the record Mr. Trump was at the Trump organization during that time.

Mr. Blummetti, your position is there would be attorney-client privilege there

ARLENE DELGADO vs. DONALD J. TRUMP FOR PRESIDENT, ET AL.
JESSE BINNALL - March 21, 2024                                  110

because -- potentially because Mr. Trump,

Eric, acted as an agent of the campaign?

MR. BLUMMETTI:  My objection is sort

of hypothetical at this juncture.  I was

just directing Mr. Binnall not to answer

any questions that go to privilege.  I

don't even know whether he saw any such

documents.

BY MS. DELGADO:

Q.     What about 16, Mr. Binnall?

A.     The campaign is aware of no such

communications.

Q.     When you say the campaign is not aware

of any, why is it you don't say the campaign didn't

have any communications?  It seems you're trying to

buildup offer there, Mr. Binnall.  Am I

misunderstanding your answer?

A.     No, it's simply because, you know,

I've told you that the due diligence that we did

try to find answers to your questions.  And by

doing that we were not able to find any such

communications.  And I wouldn't expect that we

would frankly find and, you know, the campaign

server in a period of late 2017, early 2018

employment and termination records regarding

America First Policies or America First Action PAC. I think you would have to ask them.

Q.    Fair enough.  Going back to 15, you didn't find any record of communications between the campaign or campaign counsel with Eric Trump in say October of 2017?  You found none at all in the search to 2017 as well?

MR. BLUMMETTI:  Objection to the form.

BY MS. DELGADO:

Q.    Let me rephrase it.

Did you search 2017 the year as well?

A.    There were some e-mails from specifically in early 2017.  That being said, and again being very specific not to go into anything that may or may not exist that would be attorney-client privilege, I did not see any communications with Eric Trump about you that would have been using a campaign medium.

Q.    Did you speak to the campaign's counsel at that time which was Larry Rosen?

A.    No, ma'am, I did not.

Q.    Why not?

A.    Ma'am, could I ask for just a brief -- I've got my op par calling me.  Could I ask for a brief two or three-minutes recess.

Q.    Absolutely.

A.    Thank you.

Q.    Five minutes?

A.    Fine.

(Thereupon, a break was had from 12:49 to 12:53 p.m.)

BY MS. DELGADO:

Q.    So back on the record, I'm not even sure if I said we were going off the record, but nonetheless.

Okay.  So Number 17, Mr. Binnall, I'm sorry, we were on 15.  I was asking you why you hadn't reached out to Larry Rosen who was campaign counsel at the time regarding whether there had been any communications by him on behalf of the campaign with Eric Trump?

A.    Because if there were any documents regarding any such communications, and it specifically of course didn't mention Mr. Rosen specifically, those should be in the campaign documents that I had access to, so I searched that in order to answer your question.  And that, which would have of course included all e-mails and whatnot, showed that there was -- I was aware of no such communications.

Q.   Why would campaign counsel's e-mails be on the campaign's server?

A.   I wouldn't expect that they would, but for Question Number 15 communications, e-mail, which parentheses, e-mails, text messages, letters, memos and the like with Eric Trump about plaintiff, it certainly didn't specify anyone specifically who I would look at.

So my due diligence in answering that question was to look at the documents retained by the campaign in order to determine if there were any such communications and I was unable to find any.

Q.   It didn't occur to you that an attorney might have been the one conducting the communications?

A.   Ma'am, I could have of course thought of a hundred different hypotheticals, but using my best efforts and best resources in order to answer that question, I made it so I looked at the documents that the campaign had.

Q.   So Number 15 you can only speak to it today on the basis of the campaign documents on the server, correct?

A.   And -- yeah, the individuals that, you

know, that I spoke with.  And I was unable using my best efforts to locate any such communications.

Q.    When you say the individuals that you spoke with, that would be Mr. Blummetti and the 2M vendor?

A.    Correct.

Q.    Wouldn't Mr. Blummetti had told you we have something in that regard since it was his firm?

MR. BLUMMETTI:  Objection to form.

BY MS. DELGADO:

Q.    Let me rephrase that.

A.    Yeah, ma'am, without going --

Q.    I'll rephrase it.  Thank you.

You say you spoke to Mr. Blummetti about 15?

A.    Yes.

Q.    Did Mr. Blummetti tell you that there were communications from his firm to Eric Trump about me?

A.    I wouldn't expect that he would have disclosed any -- any -- I think it would have been protected by attorney-client privilege or work product, but no, no such communications were disclosed.

Q.   And you're aware as an attorney yourself that the privilege issue in your 30(b)(6) witness you're treated as the campaign itself, correct?

A.   Yes, ma'am.

Q.   Okay.  Number 17, Mr. Binnall, can you speak to me about the funding of legal fees, which I guess brings us back to what we were arguing about earlier?

A.   Here's what I was able to do because I was unable to, for instance, locate how much was spent by a particular firm on a particular matter.  So what I did is I looked in the publicly available FEC reporting to determine how much money had been paid to Mr. Blummetti's firm over the past number of years.  And that amount for calendar year 2023 was $155,522.01.

Q.   Sorry, Mr. Binnall, you cut out.  I hate to interrupt you.  I just wanted to let you know you cut out.  From what year?

A.   That was 2023.

Q.   2023 was how much?

A.   $155,522.01.

Q.   Okay.

A.   For the years 2021 until 2022, so a

two-year period, it was $1,340,083.19.  And for I believe the years 2019 and 2021 it was 1,340,083 -- you know what, I apologize.  I misspoke.

Q.   Okay.

A.   Let me go back.  For the years 2021 to 2022, it was $614,894.16.

And then for the period of 2019 and 2021 it was $1,343,083.18.

And again, I don't know what matters those were for, but that's the amount that was paid to Mr. Blummetti's firm during that period which is the best way I could find out to answer your question.

Q.   Why does it start at 2019?

A.   I mean, I'd be happy to go back further if you would like and, you know, perhaps -- I mean, that is all publicly available, very easily publicly available information.  But we can pull up that if you'd like and we can go back to -- tell me when you want to start, we can do that.

Q.   Yes, I'd like to go back.  We definitely will.  But I will note when you say I don't know what these are for, what cases these are for, you were specifically asked.  I can find this myself, this information you just gave me.  This is

public as you just said.

The topic was about for those cases in which plaintiff is a party.

A.    Correct, and that -- and this was as much as having the information available to me. This is as much as I was able to narrow it down.

Q.    Again, Mr. Binnall, you're not a member of the public.  You're here as the campaign. I'm asking the campaign --

A.    Correct.

Q.    -- right now how much have you paid in legal fees and costs for matters involving me?

A.    As far as the records of the campaign has, that is the extent of the information.

Q.    So you're telling me the campaign doesn't have records that show we were billed from Jared Lummeti and Larry Rosen -- and/or Larry Rosen's firm a few years ago X amount for the A.J. Delgado matter this month?  You're telling me the campaign gets a blind bill?

A.    Not that I was able to find.  And so that's -- so the information that I have is what I disclosed to you.  And that was the information that after looking that I was able to find.

Q.    So you weren't able to answer for 17,

correct?

A.    I was able to answer to the only extent that I did answer.

Q.    Mr. Binnall, were you able to answer Number 17, which is the legal fees or costs in which plaintiff is a party?

A.    I was only able to answer as to the amount paid to Mr. Blummetti's firm in that relevant time frame.

Q.    So is that a no?

MR. BLUMMETTI:  Objection to form.

THE WITNESS:  I was able to answer the way that I did answer.  I don't know how else to answer your question.

BY MS. DELGADO:

Q.    Are you able to tell me what was spent on my case in particular?

A.    No, ma'am, I'm not available to.

Q.    Okay.  Fair enough.  Thank you.

What other cases -- how many other cases does Mr. Blummetti's firm handle for the campaign?

A.    I don't know.  That wasn't a designated topic so I didn't look at that.

Q.    Sure.  Fair enough.  It's not.  I'm

Jeannie Reporting
Your Wish Is Our Job!      www.jeanniereporting.com
305-577-1705

trying to find the answer I need which was a designated topic by process of elimination, but if we could go back and you said you could go back past 2019.  Certainly I do want to go back to 2016. So could you provide me the numbers for 2016 through 2018?

A.    Can I make a suggestion?

Q.    Sure.

A.    Can I make a suggestion that we get through everything else and then we take a break and I'll pull up the website and I'll give you the answer to that.

Q.    Perfect.  I appreciate the efficiency.

A.    Yep.

Q.    And we still have that one exhibit to go back to at the end.  Okay.

So Number 18 -- oh, I'm sorry going back to Number 17, Mr. Binnall, who paid me, the campaign, the MAGA entity you just mentioned earlier, who paid these bills, these amounts?

A.    So of course the name of the entity has changed once over time, but these were all paid by Make America Great Again Inc.  I'm sorry, no, no, that's wrong.  These were all paid by Make America Great Again PAC.

Q.    Okay.  Have any fees or costs for -- and I'm sticking to 17 -- for my case come out of any other PAC or entity?

A.    Not that I'm aware of.

Q.    Does the Save America PAC ring a bell?  Have they perhaps paid anything in my case that you're aware of?

MR. BLUMMETTI:  Objection to the form.

BY MS. DELGADO:

Q.    Has the Save America PAC paid any legal fees or costs in my case?

A.    So I'm not designated on the behalf of Save American.  You would have to ask them.  I'm aware of what was paid out of the entity that I am here to answer on behalf of.

And yeah, anything as to Save America you can ask them or you could look at the FEC reporting.

Q.    No, but Mr. Binnall, you're here on behalf of the campaign because the --

A.    Correct.

Q.    -- campaign is the defendant.

A.    Correct.

Q.    And I'm asking did anyone else pick up or pay or contribute to any legal fees or costs in

the case of which your entity is a defendant.  I fully realize you don't speak up to Save America.

A.    Right.  And so if Save America paid directly any of the legal fees, that's not something that I have seen.  But I wasn't able to locate the payments that came out of Make America Great Again Inc. -- I'm sorry, Make America Great Again PAC, which -- or its predecessor name Donald J. Trump for President Inc.  Save America disbursements are publicly available.

Q.    Has the campaign paid for any -- let me rephrase that.

Has the campaign funded or contributed even indirectly or directly for any legal fees or costs regarding the Family Law Action in which I am a respondent in Florida?

A.    So I am -- I do not believe so.  I have not seen any payments for that action.  And in frankness, I did not know to look for that exact action and I am very happy if you give me the name of the law firms involved to see if there are any disbursements to those law firms.

Q.    Sure.  They would -- I can -- if you want to jot them down.

A.    Yes, ma'am.  Go ahead.

ARLENE DELGADO vs. DONALD J. TRUMP FOR PRESIDENT, ET AL.
JESSE BINNALL - March 21, 2024                              122

Q.    It's Sandy Fox, PA?

A.    I'm sorry, what?

Q.    Sandy Fox, PA.

A.    Sandy Fox, PA.

Q.    Yes.  Or it would be potentially also to payments directly to Jason Miller that you find that are outside of the compensation structure. And I doubt this was done plainly so I'll save you some time, but it's unlikely you'll find anything because it's always done in plain sight.  But if you'd like to take a look I would appreciate that.

A.    I'll take a look.  I'm sure there will be payments to Jason Miller.  It's not -- if there's anything that is for reimbursement of legal fees or something to Jason Miller, I won't publicly disclose that.

Q.    Okay.  Number 20 I believe I don't want to delay --

A.    Is there a 20?

Q.    I'm sorry, Number 18 I believe your position is that you have no answer on that so I won't waste our time making you repeat your earlier answer.

If you want to take that break now -- well, just to be clear, you did not search the --

the 2020 campaign you did not search that for the HR complaints, correct?

A.   I did not.

Q.   And your reason for that was?

A.   I think as I already discussed and I'll rely on my previous answer for that.

Q.   And I'm sorry, you answered it previously, but I'm afraid if I would ask the court reporter, it's going back so far.  Would you mind answering again?  I won't hold you to it if it's inconsistent with your prior answer.

MR. BLUMMETTI:  Objection.

THE WITNESS:  There's voluminous heavily, heavily voluminous documents and so I used my best efforts in order to narrow down the topics under the relevant time period in order to do my search, in order to do a reasonable search.  Not something where I, you know, I theoretically could look at every single e-mail, although as we've discussed that would literally take centuries.

And so doing a reasonable search I limited it to the time period, a broad time period that was relevant to this case.

BY MS. DELGADO:

Q.    But it wouldn't have taken centuries to speak to the HR director, right, maybe 30 minutes?

MR. BLUMMETTI:  Objection to form.

THE WITNESS:  I think I've already answered that.

BY MS. DELGADO:

Q.    Do you know there were complaints against Jason Miller in 2020?  Is that why you didn't conduct the search?

MR. BLUMMETTI:  Objection to form.

THE WITNESS:  I have no personal knowledge of that.

BY MS. DELGADO:

Q.    Have you heard anything?

A.    As I just said, I have no personal knowledge of that.

Q.    Isn't it true that it wouldn't have taken long to limit your search to Jason Miller complaints in 2020?

MR. BLUMMETTI:  Objection to form.

BY MS. DELGADO:

Q.    Let me rephrase it.

Would it have been highly

time-consuming to at least run a search of complaints against Jason Miller in the 2020 campaign?

A.    Ma'am, I don't know how long it would have taken to do it.  I know for the questions that were designated if I would have done it over the entire existence of Donald J. Trump for President, Inc. and it's Make America Great Again PAC that would have been an extremely onerous task.  And so I did a reasonable search and I limited it to the time frame at issue, the 2016 general election cycle.

Q.    And to be clear, the request, the topic that you were asked to speak on did not limit it to the 2016 election cycle, correct?

A.    I don't know how else to answer your question other than what I've already answered it to on that.

Q.    No, I just mean the literal request, did it say limited to 2016 election?

A.    The original request was extraordinarily broad and there's no way that I reasonably could have done that in the time frame to prepare for a deposition that it also wasn't, you know, unduly burdensome.

So I tried to give you the best answers that I could by doing a thorough search in a reasonable manner that wouldn't have been unduly burdensome and at the same time having prepared time for this deposition.

Q.    It's your testimony that Number 4 which asked for any all claims of sexual harassment or for unlawful discrimination or for pregnant discrimination in the Trump Campaign is extraordinarily broad?

MR. BLUMMETTI:  I object to the question to the extent it pertains to any campaign other than the 2020 campaign as to relevance.

MS. DELGADO:  It's not irrelevant, Mr. Blummetti.  It's the same actors.  In fact, it's the same individual who impregnated me, my supervisor, was once again hired and placed in a supervisory role in the 2020 campaign.  I don't think anyone would consider that irrelevant.  In fact, it'd be the first place I would look.  So just explaining why I find it highly relevant.

BY MS. DELGADO:

Q.    So this question remains, Mr. Binnall,

do you consider asking that you speak to claims of discrimination or sexual harassment in the 2016 and 2020 cycle, should have included 2024, but even if you -- you limited it to 2016 and 2020, you consider that as an extraordinarily broad, your words, request?

A.   So let me unpack that question a little bit.

Regarding 2016 and 2020, it was -- this was unbound by time.  And that in the question for an entity that over two presidential campaign titles employed a large number of people.  And so, yes, it would have been extremely burdensome so look at the entirety there.

And so what I did -- and as far as 2024 goes, unpacking that part of the question, that's not this entity.  And so it's not something that I have access to.  And so you would have to ask that entity anything about what's going on in the 2024 election.

And so, yes, I took and used my best efforts to get you answers to your questions using a -- using reasonable efforts by -- by looking at the relevant time frame, which was the general election campaign in 2016.

ARLENE DELGADO vs. DONALD J. TRUMP FOR PRESIDENT, ET AL.
JESSE BINNALL - March 21, 2024                              128

BY MS. DELGADO:

Q.    You also said it was quote, "unduly burdensome" end quote, the request.  Isn't it true that it wouldn't be unduly burdensome to simply call the HR director for 2016 and the HR director for 2020, assuming they were even different individuals?

MR. BLUMMETTI:  Objection to the form.

THE WITNESS:  I don't know.  You'd have to take that up with somebody that they could give you a legal answer.  I'm just --

BY MS. DELGADO:

Q.    You called it unduly burdensome.  Why do you consider it unduly burdensome, the request, when a reasonable person --

A.    The request was not for me to call any individual person.  What I testified to is, to give you the answer to your question, I did not believe that I needed to call those individuals.  I believe I had access to a voluminous document repository and other publicly available records and other records that are directly involved in this litigation.  That's what I looked at.

Q.    But Mr. Binnall, you just testified

ARLENE DELGADO vs. DONALD J. TRUMP FOR PRESIDENT, ET AL.
JESSE BINNALL - March 21, 2024
129

that the reason you're not able to give me an answer about 2020 here today, which is one of main reasons you're here and one of the top things I needed to get information on, is because there are too many e-mails from 2020 and it's too voluminous.

So I asked you isn't an easy obvious alternative, which takes ten minutes to call or contact the HR director and ask them, hey, what were the complaints you heard of or recall from 2020?

MR. BLUMMETTI:  Object to form.

THE WITNESS:  I did not do that nor did I believe it was necessary or productive to do that in the -- or that -- I'm sorry, let me restate that.

I didn't believe that was a reasonable -- reasonably necessary thing to do in order to answer your questions and I did that as fairly as I could.

BY MS. DELGADO:

Q.    But you're not asking the topic; is that right?  You --

A.    I am.  I just put a -- out of necessity limited to a reasonable time frame.  I think I've been very clear about what I did.  I

don't know how else to answer these questions that you're getting at because I think I've -- we're going to keep going round and round for the same thing, which is this is what I did and I explained to you the exact reasons why I did it that way.  I don't really have anything else to say on this.

Q.    Number 4 was not answered, which you were brought here to answer for on behalf of the campaign speaking as the campaign because 2020 you said was too voluminous to search for.  And you've stated that you therefore have no answer for me at all about any complaint of any kind made in 2020; is that correct?

A.    I do not have any information for you regarding personnel matters of 2020.

Q.    And Jason Miller was in a supervisory position again in the 2020 campaign effort, was he not?

MR. BLUMMETTI:  Object to the form.

THE FOREMAN:  You know, I wasn't designated to look into what his position was in 2020 so I don't have any official answer as to whether it was supervisory or not.  From my personal recollection, my personal recollection is that he was.

BY MS. DELGADO:

Q.   Who would know, Mr. Binnall, if not you, not in this 30(b)(6), Lucia -- was Lucia -- did you even ask who the HR director was in 2020?

A.   That was -- no, I did not ask who the HR director was in 2020.

Q.   You're the campaign here today.  I'm asking --

A.   Right.  No, I did not ask that question.

Q.   Okay.  Who -- if you -- regardless of whether you asked it or didn't ask it, who was the HR director in 2020?

A.   I have no personal recollection.

Q.   But I'm asking the campaign, you're the campaign, who was it?  I don't know about your recollection, you don't know, you can't tell me here today who the campaign's HR director was in 2020?

A.   Ma'am, I don't have that -- I don't have that information, no, on behalf of the campaign or personal.

Q.   Was there an HR director in the 2020 campaign election effort?

A.   As I have stated, I limited my review

of those the way that I had previously testified so I did not look into that matter.  It needed to be bound by time.  And in order to do a reasonable search and so I did not look at that.

Q.    Did you ask whether there was an HR director in 2020?

A.    Ma'am, I think I've already answered that question.

Q.    It's a different question.  I asked if you had inquired whether there was?

A.    Are you saying inquired and asked are different?

Q.    Did you inquire from Mr. Blummetti or anyone in preparation for this deposition whether there was an HR director --

A.    I've already answered that question, ma'am.

Q.    I don't believe I asked you that already.

A.    I already answered that question.  You can rely on the record for that.

Q.    I've asked you whether you inquired if there was an HR director?

MS. DELGADO:  Can the court reporter read back the question if I did?

THE WITNESS:  Ma'am, I'll just -- I'll save the time.  No, I did not.  For 2020 I did not.

BY MS. DELGADO:

Q.    Okay.  Mr. Binnall, were you told not to look into the 2020 complaints?

A.    No, ma'am.

Q.    Was it suggested to you that you leave 2020 complaints alone?

A.    No, ma'am.

Q.    Okay.

A.    Ma'am, it's simply a matter of the question --

Q.    That answered my question.

A.    Okay.

Q.    Okay.  Let's go over that elusive exhibit.  Let's try again.  I'm going to see if I convert it to a PDF if it works better for you in the chart or -- I'm not even sure if --

MS. DELGADO:  I do have to show it on the screen, do I Ms. Boyd?  Am I allowed to e-mail it to the court reporter and to Mr. Binnall?

(Thereupon, a break was taken from 1:22 p.m. to 1:30 p.m.)

BY MS. DELGADO:

Q.    Okay.  Back on the record.

A.    So for the period including the years 2015 and 2016 the Larroco Law Firm was paid $80,999.76 by Donald J. Trump for President, Inc.

And in the 2017/2018 time period that firm was paid $404,774.48.

Q.    Okay.  And you pulled this just from the FEC disclosures?

A.    Correct.

Q.    Okay.  So that's publicly available information, correct?

A.    Yes, ma'am.

Q.    Okay.  So, again, you were not able to -- you're not able to speak to what was paid for my case or cases in which I am a party as listed in Topic 17, correct?

A.    Correct.

Q.    Okay.  Would you be able to obtain that information?

A.    Ma'am, I've told you that the ways that I would have went about trying to find out that information and this was the only information I was able to find.

Q.    But Mr. Blummetti's the person who prepared you for this 30(b)(6) appearance, correct?

A.    He was -- yeah, he was one of the

sources that I went to for information.

Q.   Right.  And it's Mr. Blummetti's firm so how is it you just can't ask Mr. Blummetti to educate on what Mr. Blummetti's firm has been paid for my case, which is --

A.   Miscommunication as my firm, but go ahead.

I'm not -- I'm not sure what records here he does not have on that, but this was the best way that I could think of to get you answers to your question.

Q.   Did you ask him how much have you received for, and I'm quoting, "any action in any state in which plaintiff is a party"?

A.   What I can say is without remembering exact phrasing of our conversation, what I can tell you that is that we discussed the best way to get you an answer to that question and this is the best that I could come up with.

Q.   It's Mr. Blummetti's firm --

MR. BLUMMETTI:  Objection to form.

BY MS. DELGADO:

Q.   Okay.

A.   The firm name is -- what called the records the firm name, it's not my firm.

Q.    Correct.  He is a partner.  So you're saying that Mr. Blummetti had no way that -- that you inquired or asked but Mr. Blummetti had to way to tell you what he has been paid for his work on my case?

A.    No, ma'am, that's not what I said.

Q.    Okay.  Could you, please, clarify if I misunderstood?

A.    Ma'am, I said that we discussed the answer to this question and the best way to try to get you an answer and the way that I came up with is to look at the filings as to how much was paid to his firm and that's what we did.

Q.    But Mr. Binnall, you say you discussed the best way to get me an answer to Topic 17. Clearly you're a smart man, you know full well that the public disclosures are not going to give me an answer to 17.  The public disclosures just tell me how much Mr. Blummetti or the firm that we're speaking of has been paid in total.  It could be for 20 cases, it could be for just my case.  You are aware of that, weren't you?

A.    Ma'am, that was a long question and I'm not exactly sure what you're asking.

Q.    Let me break it down.

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

You said that you discussed what was the best way to get me an answer to Topic 17.  So your testimony is that the best way that you could find to get Topic 17 was to just cite the FEC disclosures of what Mr. Blummetti has been paid in total?

A.    Yes, ma'am.

Q.    Is that correct?

A.    Yes, ma'am.

Q.    Okay.  I'm going to object to that.  I probably need another 30(b)(6) just for the record, as well as on the question of sexual harassment and pregnant discrimination and other types of discrimination complaints not being answered for the 2020 election effort.

Let's try to wrap up then with -- I think the only exhibit I'm going to use --

MS. DELGADO:  Court reporter, I'm going to mark this Exhibit 1.

(Plaintiff's Exhibit No. 1, Spreadsheet, was marked for Identification.)

BY MS. DELGADO:

Q.    And Mr. Binnall, have you had a chance to review what I sent you via e-mail, which was a

copy has also been to Mr. Blummetti and to Ms. Boyd, the court reporter.  Are you able to open that, sir?

          A.    Ma'am, I did not get that e-mail.

          Q.    Oh, okay.  Let's see.

               MS. DELGADO:  Ms. Boyd, did you receive it?  Or Mr. Blummetti?

               THE WITNESS:  Oh, wait.  I've got it. I got it.

               MS. DELGADO:  Maybe check your spam folder, Mr. Binnall.

               THE WITNESS:  Yeah, I found it.  Yes, ma'am, I've been able to review it.

BY MS. DELGADO:

          Q.    Okay.  Thank you.

               This is a spreadsheet reflecting the payments and I'd like for you to tell me if anything -- and feel free of course to take your time in reviewing it -- but please tell me if any of this is incorrect.  This spreadsheet in general totals I believe a little over 4 million in payments made to Binnall Law Group or Harvey & Binnall from either the Trump Campaign or a Trump affiliated PAC such as Make America Great Again PAC or Save America PAC.  If you want to take a look

and let me know if that looks accurate to you.

A.    Ma'am, there's nothing in here that looks inaccurate to me.  As a matter of fact, this looks to me to be pulled directly off of the FEC's websites.

Q.    Okay.

A.    And it's not something that I can recreate because of course this doesn't go directly to invoices, but there is no reason that I would have to question anything.  Only to say that I know at least one of these, and I'm sure a number of these is not for legal fees, it's for expenses.

So for instance, the payment on 2/14/2023 was not for legal fees, that was for expenses.  And there are a number of those other payments, a number of those include expenses rather than legal fees.

Q.    Okay.  But in the disclosures they were described as legal consulting.

A.    Correct.

Q.    So it's fair enough if -- I'm not saying there's anything wrong with the description as legal consult that includes cost.

A.    Yeah, that's right.

Q.    So -- okay.  And so it's roughly about

4 million since 2020; is that accurate?

A.   The document speaks for itself, ma'am.

Q.   Okay.  And do you intend to continue doing work for the Donald J. Trump legal needs for Donald J. Trump Junior's legal needs and/or the campaign's legal needs or former administration officials' legal needs going forward?

A.   Ma'am, I'm an attorney.  I only serve those people as long as I'm hired to do so.  And as of right now I'm engaged.  I can't tell you how long those engagements are going to last.

Q.   Fair enough.  Fair enough.

A.   Yep.

Q.   But would you -- you intend to consider doing work for individuals in the Trump orbit?

A.   I have -- yeah, I have absolutely no objection to continuing to serve the clients who I currently serve.

Q.   And I don't mean this to sound disrespectful in any way, but would you say it would be accurate to describe that working within the Trump orbit and representing them has been lucrative for your firm and for you?

MR. BLUMMETTI:  Object to the form.

THE WITNESS:  I mean, it's -- yeah, I don't think you'd probably dispute that -- that they are a client that has paid me a good deal of money over the past number of years.

BY MS. DELGADO:

Q.    Fair enough.  Okay.  I don't really have anything else, but to the extent Mr. Blummetti has any questions for his own 30(b)(6) witness, I doubt it, but I think that's about it.  Let me just double-check that I covered every topic.  I believe we did.  And sorry if you could hear my dog.  I apologize.

A.    No problem.  That's a good sound.

Q.    One last thing, Mr. Binnall, you mentioned at the very beginning documents you reviewed of which were e-mails, records produced in discovery, pleadings and depositions and the personnel file.  You later clarified that it wasn't a personnel file in the traditional --

A.    That -- that may have been -- that's as much as you can kind of put together, cobble together a personnel file is what I looked at.

Q.    Okay.  And when you say what -- cobbled together, what was in that if you recall?

I'm just trying to make sure I have everything.

A.    I'm talking about largely e-mails and -- yeah, largely e-mails.

Q.    Were you given something that was even if nontraditional described as an A.J. or Arlene Delgado quote unquote "personnel file"?

A.    Not that I saw, no.

Q.    Okay.  And what did you review that you considered to be part of an even informal cobbled together personnel file?

A.    E-mail communications regarding you and including you.

Q.    Just e-mails?  Was it just e-mails?

A.    I'm trying to think.  From my memory it's -- it was all e-mails.  I looked at a good number of things here in the recent past, but yeah, I'm -- it's everything that -- every document that I can recall is e-mails.

Q.    Okay.  And I gather those were also in the records produced in discovery that you say you reviewed?

A.    Yes, ma'am.

Q.    Or -- there was nothing you reviewed that you considered part of what you described as a personnel file that was withheld from discovery to

ARLENE DELGADO vs. DONALD J. TRUMP FOR PRESIDENT, ET AL.
JESSE BINNALL - March 21, 2024                                    143

your knowledge?

      A.    Not to my knowledge.

      Q.    Or labeled in any -- okay.

      A.    Not to my knowledge.

      Q.    I don't think I have anything else. No, I think that's it.  I think that's it.

          Okay.  Well, thank you, Mr. Binnall. I appreciate your time and it was nice to --

          MR. BLUMMETTI:  Read.

          (Thereupon, the deposition concluded at 1:43 p.m. with the reading and signing having been not waived.)

ARLENE DELGADO vs. DONALD J. TRUMP FOR PRESIDENT, ET AL.
JESSE BINNALL - March 21, 2024                                          144

                    CERTIFICATE OF SHORTHAND REPORTER


     STATE OF FLORIDA   )
                        )  SS.
     COUNTY OF DADE     )

                    I, the undersigned authority hereby
     certify that the foregoing transcript, pages 1
     through 143 are a true and correct transcription of
     the deposition of JESSE BINNALL, taken before me at
     the time and place stated in the caption hereof.

                    I further certify that the said
     witness was duly sworn according to law.

                    I further certify that I am not of
     counsel to either of the parties to said cause or
     otherwise interested in the event thereof.

                    IN WITNESS WHEREOF, I hereunto set my
     hand and affix my official seal of office this 21st
     day of March, 2024.


     _____
     GUERLIN KELLY BOYD, Reporter
     Notary Public in and for the State of Florida
     My Commission No. HH 055178
     Expires:  October 20, 2024

ARLENE DELGADO vs. DONALD J. TRUMP FOR PRESIDENT, ET AL.
JESSE BINNALL - March 21, 2024
145

CERTIFICATE OF OATH

STATE OF FLORIDA)

COUNTY OF DADE)


            I, the undersigned authority, certify
that JESSE BINNALL personally appeared remotely
before me and was duly sworn.

            WITNESS my hand and official seal this
21st day of March, 2024.


            _ _ _ _ _ _ _ _ _ _ _
            GUERLIN KELLY BOYD
            Notary Public State of Florida
            My commission Expires:  10-20-24

<u>JURAT PAGE</u>

STATE OF FLORIDA   )
                   )SS.
COUNTY OF DADE     )


            I, hereby certify that I have read the foregoing transcript pages 1 to 142 and find the same to be true and accurate.

            Any corrections made by me are set forth on the errata page attached hereto.


            _____
            (JESSE BINNALL)



Sworn to and subscribed before me on this, _____ day of _____, 2024.


_____
Notary Public in and for the
State of Florida at Large.
My Commission expires:

*Jeannie Reporting*
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

ARLENE DELGADO vs. DONALD J. TRUMP FOR PRESIDENT, ET AL.
JESSE BINNALL - March 21, 2024
147



Jeannie Reporting
Your Wish Is Our Job!
305-577-1705

TO: Jesse Binnall
c/o LAROCCA HORNIK ROSEN GREENBERG & BLAHA
    The Trump Building
    40 Wall Street
    32nd Floor
    New York, NY 10005


April 4, 2024

IN RE: ARLENE DELGADO v. DONALD J. TRUMP FOR PRESIDENT INC., et al
CASE NO: 19 Civ. 11764 (AT) KHP)

Dear Jesse Binnall,

With reference to the examination of YOURSELF, deponent in the above-styled cause, taken on March 21, 2024, under oath, please be advised that the transcript of the Deposition has been transcribed and is awaiting your signature.

Please arrange to conclude this matter at your earliest convenience.  We would suggest that you telephone this office and arrange an appointment suitable for all concerned.

However, if this has not been taken care of by May 4, 2024 we shall conclude the reading and signing of said deposition has been waived, and shall then proceed to file the original of the said transcript with the party who took the deposition, without further notice to any parties.

Sincerely,

_____
Guerlin Kelly Boyd, FPR

cc:  All Counsel of Record.

ERRATA SHEET

F.R.C.P. RULE 1.310 PROVIDES IN PART:
    (e)"...Any changes in form or substance that the witness wants to make shall be entered upon a separate correction page by the officer with a statement of the reasons given by the witness for making them..."


 PAGE/LINE            CHANGE/CORRECTION          REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____


I, _____, do hereby certify that I

have read the foregoing transcript of my

deposition, given on March 21, 2024, and that

together with any additions or corrections made

herein, it is true and correct.


                        _____

                        JESSE BINNALL

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705