Page 1

1           UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF NEW YORK
2    - - - - - - - - - - - - - - - - - - -
     ARLENE DELGADO,
3
          Plaintiff,
4                                No. 19-cv-11764
     - against -
5
     DONALD J. TRUMP FOR PRESIDENT,
6    INC., SEAN SPICER, individually,
     REINCE PRIEBUS, individually,
7    and STEPHEN BANNON, individually,
8         Defendants.
     - - - - - - - - - - - - - - - - - -/
9
10
           VIDEOTAPED DEPOSITION OF SEAN M. SPICER
11            (Conducted via videoconference)
12
     DATE:                 JULY 17, 2023
13
     TIME:                 9:03 a.m. - 12:05 p.m.
14
     PURSUANT TO:          Notice by counsel for
15                         Plaintiff for purposes of
                           discovery, use at trial or
16                         such other purposes as are
                           permitted under the Florida
17                         Rules of Civil Procedure
18   REPORTED BY:          Lee Ann Reid, Registered
                           Professional Reporter,
19                         Notary Public, State of
                           Florida
20
21                   Pages 1 - 103
22
23
24
25

Page 2

```
 1   APPEARANCES:
 2   JOHN M. PHILLIPS, ESQUIRE
     Phillips, Hunt, Walker & Hanna
 3   212 North Laura Street
     Jacksonville, Florida 32202
 4      Attorney for the Plaintiff
 5   JARED E. BLUMETTI, ESQUIRE
     LaRocca, Hornik, Rosen & Greenberg LLP
 6   The Trump Building
     40 Wall Street, 32nd Floor
 7   New York, New York 10005
        Attorney for the Defendants
 8
     ALSO PRESENT:     Arlene Delgado
 9                     Catherine Halsema, Paralegal,
                       Phillips, Hunt, Walker & Hanna
10                     Alan Pokotilow, Videographer
11                     I N D E X
12   DIRECT EXAMINATION BY MR. PHILLIPS        Page 4
13   CERTIFICATE OF OATH                       Page 100
14   REPORTER'S CERTIFICATE                    Page 101
15   ERRATA PAGE                               Page 102
16   READ AND SIGN LETTER                      Page 103
17              E X H I B I T S
                   (None)
18
19
20
21
22
23
24
25
```

Page 3

1          THE VIDEOGRAPHER:  Good morning.  We are

2     going on the record at 9:03 a.m.  Today is Monday

3     July 17 of 2023.  We are here today in Middletown,

4     Rhode Island for the video recorded deposition of

5     Sean Spicer in the matter of Arlene Delgado versus

6     Donald J. Trump For President, Incorporated, Sean

7     Spicer individually, Reince Priebus, individually,

8     and Stephen Bannon individually.  Civil case

9     No. 19-cv-11764, to be heard before the United

10    States District Court, Southern District of New

11    York.

12          My name is Alan Pokotilow and I'm a forensic

13    videographer today here on behalf of Veritext

14    Legal Solutions.  Our court reporter today is Lee

15    Ann Reid, also here today on behalf of Veritext

16    Legal Solutions.

17          Please note that this deposition is being

18    conducted virtually.  Quality of recording depends

19    upon the quality of camera and internet connection

20    of participants.  What is observed from the

21    witness and audible on screen is what will be

22    recorded.  Audio and video recording will continue

23    to take place until all parties have agreed to go

24    off the record.

25          Will counsel please state your name and

1    affiliations for the record, after which our court

2    reporter will swear the witness and we can

3    proceed.

4        MR. PHILLIPS:  John Phillips, attorney for

5    Ms. Delgado.

6        MR. BLUMETTI:  Jared Blumetti of LaRocca,

7    Hornik, Rosen & Greenberg on behalf of Mr. Spicer.

8        (At this juncture, the witness was sworn.)

9                SEAN M. SPICER,

10   the witness herein, being first duly sworn on oath, was

11   examined and deposed as follows:

12               DIRECT EXAMINATION

13   BY MR. PHILLIPS:

14       Q.   Good morning, Mr. Spicer.

15       A.   Good morning.

16       Q.   So you have had a lot of questions asked of

17   you over your career.  Have you ever given a deposition

18   before?

19       A.   So I faced a bunch of questions before the

20   Mueller probe.  I don't know legally, I'll leave that

21   up to you whether that was a deposition or an

22   investigation, but that was the extent of my

23   interaction with having any kind of legal questioning.

24       Q.   Okay.  Fair enough.  So a deposition is a

25   little different than a press conference or a normal

1   conversation.  And maybe your attorney has explained

2   this to you, maybe not, but I want to have it on the

3   record.

4           What we're dealing with is a court reporter

5   sitting in a room typing down everything you and I say,

6   and a judge or jury is going to review that at some

7   point or the relevant portions thereof.  Therefore,

8   I've got to ask comprehensible, full questions and then

9   give you a chance to answer or explain to me why my

10  question was terrible and you didn't understand it.

11          My job is to get through this without any

12  crazy screaming and shouting and bluster, ask you the

13  questions we've got to ask you, do my job, and ask you

14  questions that you understand and can respond to.  Is

15  that fair?

16      A.   That's very fair.  Much better than a press

17  conference.

18      Q.   It is, sir.  And my role here today is to,

19  like I said, ask you questions, and will you agree with

20  me that if you don't understand a question, you will

21  let me know?

22      A.   Fair.

23      Q.   Okay.  And if you answer a question, I'm fair

24  to assume that you understood it?

25      A.   Fair.

1    Q.   Okay.  Yeses and noes are better than uh-huhs

2  and uh-uhs or head nods for purposes of the written

3  record.  Certainly we can go back and look at the Zoom

4  feed, but yeses and noes are preferred by a court.

5         It's not a test of duration.  If you need to

6  take a break, you know, let me know.  I don't quite

7  know the length of today.  Kind of depends on what you

8  know and what you were involved in, because I know you

9  kind of came in relatively later in the process and had

10  a limited duration in, you know, the scheme of things,

11  but we'll -- you know, we'll get through it.

12         That said, I always start with please state

13  your full name for the record.

14    A.   Sean Michael Spicer.

15    Q.   Mr. Spicer, where are you currently employed?

16    A.   I currently own an LLC called RigWil.

17    Q.   What is RigWil?

18    A.   It's a consulting firm.

19    Q.   Okay.  Is the Trump campaign or the Trump

20  family a client of yours?

21    A.   No.

22    Q.   Okay.  Have they been?

23    A.   No.

24    Q.   Okay.  You know, kind of short answer, what

25  does RigWil do?  What type of services does it offer?

Page 7

1      A.   We offer consulting services to companies and

2  C-Suite executives.  It's also a holding company for

3  production and marketing that is done on my behalf

4  whether it's -- so if there's a deal that -- like my

5  most recent book deal ran through RigWil, so any of my

6  personal business dealings runs through the LLC.

7      Q.   Sure.  Got it.  What was your last employment

8  before RigWil?

9      A.   Well, to be clear, RigWil has been in

10  business since 2018.  I last received a W-2, which is

11  what I believe you're getting at, from Newsmax Media.

12      Q.   Okay.  How long were you with Newsmax Media?

13      A.   Approximately three years.

14      Q.   And what did you do for Newsmax Media?

15      A.   I hosted an evening television show called

16  Spicer & Co.

17      Q.   Okay.  And what did you do before Newsmax

18  Media?

19      A.   As I stated earlier, RigWil has been set up

20  since 2018 and has had various clients and

21  opportunities that have gone through them.

22      Q.   Okay.  Fair enough.  I'm just going to assume

23  a concurrent employment or concurrent business

24  situation with RigWil.  But I just kind of want to

25  chronologically, in reverse order, go back through your

1   career.

2       A.   Okay.

3       Q.   Eventually, we're going to get to Trump world

4   and that's -- you know, or the White House.  And that's

5   where I think we're headed next.  So where did you

6   work -- besides the concurrent RigWil work, I guess,

7   where did you work prior to Newsmax?

8       A.   Again, I think I have answered the question.

9   I have had a concurrent consulting firm since 20 -- I

10  would have to check the records.  It was either late

11  2017 or early 2018, and that's where all business

12  flowed through.

13          I also -- I'm sorry.  One other thing is that

14  I am a partner in a firm called Point 1, which is a

15  mail firm, but, again, those funds actually flow

16  through RigWil as well.

17      Q.   Okay.  At some point you were employed by the

18  United States of America, were you not?

19      A.   Correct.

20      Q.   Okay.  I guess I'm not being clear that I'm

21  just trying to reverse chronologically obtain your

22  employment.  And besides RigWil and Newsmax, where else

23  have you been employed in the last five or six years?

24      A.   The United States Navy.  I'm in the Reserves.

25  So I continue to get a check for services rendered for

1  the last 24 years.

2      Q.   Okay.  Very good.  Thank you for your

3  service.  When did you work for the United States?

4      A.   As I said, first I have been in the United

5  States Navy for 24 years.  That is the United States.

6  I worked for the Executive Office of the President,

7  which I think is what you're getting at, from January

8  21st until the 1st of September of 2017.

9      Q.   Okay.  Any other employment that we haven't

10 discussed from September 1, 2017 to date?

11     A.   To the best of my knowledge, all of my income

12 has flown through the consulting firm.  I would have to

13 check tax records to -- it is possible that somebody

14 issued a W-2, but the way things have been structured

15 since 2017, all deals have run through the consulting

16 firm to the best of my recollection.

17     Q.   Fair enough.  And I'm not trying to really

18 get into any of that, you know.  My goal is to kind of

19 stick with 2017, 2018, and kind of hit this Trump

20 period, right?  So let me go the other direction.  When

21 did you first meet Donald Trump?

22     A.   I believe Mr. Trump was a guest at an event

23 that the RNC did in Boca Raton in probably -- I would

24 have to look at a calendar -- 2014, 2015, he showed up.

25 It was a donor reception.

1      Q.   And when did you first have business dealings

2    with Mr. Trump?

3           MR. BLUMETTI:  Objection to form.  You can

4         answer.

5           THE WITNESS:  Sometime in the May time period

6         of 2015 when it became apparent -- well, so let me

7         back up one second.  I ran all of the debates in

8         the 2015, 2016 cycle.  There were plenty of times

9         when Mr. Trump and/or his senior associates would

10        reach out to me regarding an issue or concern they

11        had with a debate.  I don't know that that gets to

12        what you're asking, but that's when the

13        relationship sort of became more than just shaking

14        somebody's hand and asking for a picture, and more

15        of a, you know -- but again, it was him calling

16        about concerns with the debate.

17          Then in about May of 2015 when it became

18        obvious that he was the presumptive nominee, I

19        would travel to New York from time to time to help

20        coordinate activities between the Republican

21        National Committee, where I was employed, and the

22        Trump campaign in their role as the leader of the

23        ticket.

24   BY MR. PHILLIPS:

25        Q.   Okay.  There's going to be a lot of questions

1    today that I'm going to ask simply for background.  The

2    answer is going to be obvious, but I'm just trying

3    to -- I'm also the newest one on this case.  I'm trying

4    to get an understanding of the people, places, and

5    things involved.  And you just happen to be my first

6    deposition, so I'm going to ask you some questions that

7    other people might not wind up having to answer just so

8    that I have it all straight in my head.

9            And then there are going to be some questions

10   that I ask that are very specific to you and your

11   situation.  And right now this section in my mental

12   outline is just kind of understanding background and

13   relationships between you, the campaign, Mr. Trump, Ms.

14   Delgado, and to some extent continuing the chronology

15   back, I guess, to the GOP.

16           So I guess my next question is, you know, if

17   you began work for the Executive Office of the

18   President on January 21st, where did you work before

19   that?

20       A.    The Republican National Committee.

21       Q.    Okay.  What was your role with the Republican

22   National Committee?

23       A.    I worked for the Republican National

24   Committee for three cycles; each one is two years.  For

25   the first two cycles, I was the Communications

Page 12

1    Director.  For the last cycle, which encompasses the
2    2016 election, I was the Chief Strategist and
3    Communications Director.
4       Q.   Okay.  One of those obvious questions:  Did
5    you ever work directly for or as an employee of the
6    Trump campaign?
7       A.   No.
8       Q.   Did you ever work for or directly as an
9    employee of the Trump transition team?
10      A.   On or about December 22nd, I was named --
11   after I was named White House Press Secretary, I was
12   named a senior adviser to the transition team as is
13   required by law.
14      Q.   When did you first become aware of or know
15   about AJ Delgado?
16      A.   To the best of my recollection, it would be
17   somewhere July, August maybe, of 2016, but it's
18   possible that there was an interaction prior to that.
19      Q.   Okay.  How?  How did you become aware of her,
20   as best as you --
21      A.   I believe she did some surrogate work for the
22   campaign, meaning that she would appear on television.
23   So I either saw her on television, read a quote, or
24   something of that nature.
25      Q.   Okay.  And was -- was Ms. Delgado ever, for

1  lack of a better way to put it, in your chain of
2  command?  Was she ever --
3      A.   No.
4      Q.   Are you aware if you signed a nondisclosure
5  agreement with either the Trump campaign, Trump
6  transition team, or Trump White House?
7      A.   I am not.  I can't recall.
8      Q.   Okay.  Are you aware if you signed any NDA
9  whatsoever that included a non-disparage provision
10 covering Donald Trump?
11     A.   With respect to the White House, I would have
12 to review those records.  I can't remember -- there is
13 a lot of paperwork, as you can imagine.
14     Q.   Okay.  What have you reviewed in preparation
15 for today?
16     A.   A few e-mails, some texts.  I believe that
17 might be it.
18     Q.   What e-mails and texts did you review?
19     A.   I'm not sure which is which.  I don't know
20 that it matters, but there was some correspondence
21 around the last week of December that was intended to
22 make sure that I remembered -- kind of had a better
23 handle on the timeline.
24     Q.   December of 2016?
25     A.   Yes.  Yes.

Page 14

1        Q.    Okay.

2        A.    Sorry.  So to your previous question, I

3   think -- I just want to make sure I'm keeping the years

4   correct.  You asked about my interaction with her.  I

5   hope I said 2016 and not 2015, but I meant --

6        Q.    July, August of 2016.

7        A.    Okay.  Good.

8        Q.    And what was your role in any way related to

9   the campaign, the candidacy, or the administration of

10   Donald Trump in July or August of 2016?

11            MR. BLUMETTI:  Objection to form.  You can

12        answer.

13            THE WITNESS:  I didn't -- I mean, as I

14        stated, I was the Communications Director and

15        Chief Strategist for the committee.  I helped

16        coordinate activities and messaging from the top

17        of the ticket, which would have been the President

18        of the United States, who in August of that year

19        became the nominee.  But I didn't have any -- I

20        forgot how you phrased the question.  I didn't

21        have any direct responsibility.  It was a

22        coordination role.

23   BY MR. PHILLIPS:

24        Q.    Does the RNC assist in -- or I guess

25   specifically did the RNC assist with helping staff

```
 1   either the Trump campaign, transition team, or White
 2   House?
 3            MR. BLUMETTI:  Objection to form.
 4            THE WITNESS:  Jared, am I --
 5            MR. BLUMETTI:  Yes, Sean.  You answer
 6       everything unless I tell you not to answer.
 7            THE WITNESS:  Okay.
 8            MR. BLUMETTI:  I'm just preserving an
 9       objection for the record.
10            THE WITNESS:  Okay.  Counsel, can you repeat
11       the way you phrased that?
12   BY MR. PHILLIPS:
13       Q.   Certainly.  What I'm trying to understand --
14   I'm going to ask generally and then specifically.  But
15   what I want to understand is what role, if any, does
16   the RNC have with staffing a campaign at that -- at
17   that juncture, right?
18       A.   So the RNC doesn't have a role in staffing.
19   The RNC supports the nominee.  So that being said,
20   there are times in which the nominee may look at a
21   staffer who happens to be employed by the RNC and say
22   we would like to put them on our payroll for a variety
23   of reasons that change from cycle to cycle, candidate
24   to candidate.  The RNC doesn't have a role.  It
25   supports the nominee.  So it will do things, as you can
```

1    imagine, in the same way as any field.  When you

2    interact with folks, you may say we would love them on

3    our team.

4            That clearly happens, but it's not the RNC's

5    doing.  It's the candidate, over history -- and I have

6    been there two cycles -- that will often want a

7    particular individual to be on their payroll for a

8    variety of reasons.

9        Q.    Did you make any recommendations to Mr. Trump

10   or his campaign related to placement of employees?

11       A.    At what time period?

12       Q.    July -- mid-to-late 2016.

13       A.    Just so we're clear on the role, I would

14   never have wanted to lose staff.  So I was never in the

15   ballpark of, that I can recall, of offering people.

16   There were times when I would be asked my opinion, we'd

17   like this person.  Do you think they're good, or do you

18   recommend them?  And I would offer my recommendation.

19   So to that extent, yes.

20           But generally speaking, I didn't offer

21   people.  Again, remember there is a big difference

22   between offering people for employment and providing

23   the historical role that RNC plays in terms of

24   coordination support.

25       Q.    Right.  But I assume -- and again, I haven't

1   been there, you know.  I worked for Sonny Callahan on

2   the Hill for a summer and that's about the extent of my

3   experience.  Rest in peace, Sonny.  But I don't know

4   how it goes.  I know eventually there's an election

5   day, and I imagine upon election day there's a lot of

6   people that want jobs in the White House.  Am I wrong

7   about that?

8            MR. BLUMETTI:  Objection to form.  You can

9        answer.

10           THE WITNESS:  Well, if you win, yes.

11  BY MR. PHILLIPS:

12       Q.   Okay.  If the party -- if the RNC is

13  successful, you have placed a Republican candidate, and

14  there's going to be, certainly, an expanse in staff

15  from what a campaign would have.

16           MR. BLUMETTI:  Objection to form.

17           THE WITNESS:  So again, there's two parts to

18       your question.  The RNC doesn't win.  The

19       candidate wins.

20  BY MR. PHILLIPS:

21       Q.   Certainly.

22       A.   When -- there's actually -- and then, again,

23  with respect to jobs, there's two pots of jobs:

24  There's White House jobs and presidential appointed,

25  which are often called Schedule C jobs.  The RNC

1  doesn't have much input at all.  It's the individual

2  who would assume that job after they're sworn into

3  office on January 21st.  So it doesn't matter

4  necessarily where they come from.  I'm sure that there

5  are recommendations, but the campaign would drive the

6  train on that.

7      Q.    Okay.  Did you -- I guess, were you involved

8  with any aspect of the hiring and firing of White House

9  staff or appointments before January 21, 2017?

10     A.    I was asked to make recommendations --

11     Q.    Okay.

12     A.    -- for one particular office.

13     Q.    And what was that?

14     A.    The press office.

15     Q.    Okay.  Tell me about that.

16     A.    Prior to being named White House Press

17 Secretary, I was asked to help create a list of names

18 to fulfill potential jobs and submit that up the chain,

19 if you will.  I did that.  And then after being sworn

20 in on January 21st, once I became an employee, then I

21 began to execute some of that list.

22     Q.    Going back to some general questions that

23 you're going to be, like, of course you know the answer

24 to this.  But it's one of those dumb questions that I'm

25 going to ask and then take down a path.  What is Comms?

Page 19

1      A.    Shorthand for communications.

2      Q.    Okay.  And what does Comms do, to the extent

3  you know, in a campaign?

4      A.    In a traditional campaign, communications

5  executes the messaging and various means of

6  communications to various audiences.

7      Q.    What does Comms do in a successful campaign?

8  I know it as transition.  I know, you know, if that's

9  not what it's called, then let me know; but that period

10  before, you know, where you have a campaign that won in

11  November, but hasn't taken office yet.  What does Comms

12  do in that interim for a successful candidate?

13      A.    It would communicate the policy, the people,

14  and events of the transition to the media and the

15  American public.

16      Q.    Okay.  And then what does Comms do for -- you

17  know, once somebody's elected, what is the role of

18  Comms?

19      A.    Well, just to be clear, I think there's a big

20  difference between a regular elected official and the

21  White House.  The White House delineates the

22  Communications Office from the Press Office.  The

23  Communications Office in the White House deals much

24  more with what I would say long-term issues.  Anything

25  outside basically the 24-hour window, the Press Office

Page 20

 1    is dealing with.  It's dealing in the moment.  There's

 2    obviously exceptions to this.  A lot of it has to do

 3    with the relationships and the personnel and how they

 4    divvy up some things, but generally speaking, the Press

 5    Office is living in the moment of incoming and

 6    immediately outgoing media inquiries.

 7        Q.   Okay.  And that's what I want to understand

 8    for purposes of this -- kind of this little few minutes

 9    of questions.  You were Press Secretary.  And how

10    does -- I guess, how does the Press Secretary side and

11    Comms -- are they different departments?  Is one over

12    another?  Help me understand the structure there,

13    please.

14        A.   So I think, again, a little of it varies over

15    time in terms of how various White Houses have

16    structured it.  A lot of it is personality driven and

17    relationship driven, meaning that on paper they might

18    appear the same.  Both positions have historically been

19    assistance to the President; Communications Director

20    and the Press Secretary.  But again, you can go back

21    through history, various parties, just the

22    relationships that exist between the press secretary

23    and the communications director and some of what they

24    divvy up.

25            But generally speaking, as I said, the press

1    secretary is dealing with events and issues that happen

2    in the moment; briefings, media inquiries.  The

3    communications staff and specifically the

4    communications director is looking long term, beyond 24

5    hours.  Trips, events, policy rollouts, pronouncements,

6    et cetera.

7        Q.    Do you know how AJ Delgado came to be a

8    surrogate of or employed by the campaign?

9        A.    No.

10       Q.    Do you know how AJ Delgado became, to the

11   extent she was, a surrogate or employee of the

12   transition team?

13       A.    No.

14       Q.    Okay.  Did you consider -- so what was

15   your -- I guess, let me back it up.  We have got this

16   division that you have explained to some extent between

17   communications and press.  Who were you responsible --

18   as of January 21, 2017, who were you responsible for

19   hiring and firing?

20       A.    Everybody in both of those categories.

21       Q.    Okay.  Who is Jason --

22       A.    Just can I step back, sir?

23       Q.    Yes, sir.

24       A.    Just to be clear, hiring is a very

25   interesting word.  I know why you used it just in terms

1    of -- I get it.  But the way it works in the White

2    House isn't the way it would work in a campaign or even

3    on Capitol Hill, for example, meaning that people go

4    through, when you recommend them for employment, more,

5    or you push them up for employment, they get vetted

6    both on a security clearance, and then there's an

7    internal White House.  So you don't hire somebody the

8    way that you would in any other entity that I have been

9    affiliated with in the sense that -- except maybe the

10   military where you have to go through a series of

11   requirements before a formal offer is made to you.

12        Q.   And did that apply to everybody in the Trump

13   White House?

14        A.   I can't speak to that.

15        Q.   Okay.  Who is Jason Miller?

16        A.   Jason Miller is a communications and

17   political operative.

18        Q.   When did you first meet Jason Miller?

19        A.   To the best of my recollection, the late

20   1990s.  I believe we came across each other working on

21   Capitol Hill, but I can't say for certain.

22        Q.   Have you ever had any personal business

23   relationships or co-owned or operated any businesses

24   with Mr. Miller?

25        A.   No.

1    Q.    Okay.  Has he ever been an employee or

2    independent contractor of yours --

3    A.    No.

4    Q.    -- for your business?  Okay.  What is your

5    understanding -- so when you were at the RNC, I guess,

6    how would you have interacted?  What would have been

7    your contact with Mr. Miller?

8         MR. BLUMETTI:  Objection to form.

9         THE WITNESS:  Mr. Miller was basically my

10        counterpart at the campaign.

11   BY MR. PHILLIPS:

12   Q.    Okay.  How often would you guys meet and

13   discuss issues as -- I guess, leading up to the 2016

14   election?

15   A.    Potentially several times a day.

16   Q.    Okay.  And what was, to the extent you're

17   aware, Mr. Miller's role in hiring and firing of

18   communications employees in the campaign?

19   A.    Mr. Miller was the top communications

20   official for campaign.

21   Q.    Okay.  When did you first become aware that

22   Mr. Miller and Ms. Delgado had a personal relationship?

23   A.    There was a tweet that Ms. Delgado sent out

24   on or about December 21st, 22nd, that mentioned

25   something to the extent of my baby daddy has been named

1   White House Communications Director, at which time we

2   started getting a rather large influx of media

3   asking -- and in many cases supposing what that meant,

4   and which required me to discuss with Mr. Miller, who

5   had just been named White House Communications

6   Director, what exactly was going on.

7        Q.   Tell me about that, those discussions.

8        A.   Well, like I said, a tweet was sent out.  It

9   said -- again, I don't have the particulars in front of

10  me.  It said something to the extent of something my

11  baby daddy, can't believe he got named White House

12  Communications Director.  Well, Jason was the only one

13  named White House Communications Director.  I'm not hip

14  on every term, but I think I know what baby daddy

15  means.  And I began asking him what the heck was going

16  on.

17        As I said, it was, you know, I don't know

18  what percentage.  We had a number of folks in the media

19  seeking clarification, then some just outright

20  declaring that they knew what that meant, and they were

21  going to run with it.  And so we had to get to the

22  bottom of it.

23        I think it was a series of -- when I say a

24  series, it was, hey, we need to talk about this, what's

25  going on?  And then him -- it was a rather quick

Page 25

1   evolution; meaning that I think within a short term he
2   said, hey, I'm going to step down or something of that,
3   but I don't have the exact timeline.  But it was a
4   rather hectic 24/36 hours.
5       Q.   Again, it's me trying to understand how the
6   umbrellas work, how they all work together.  As of
7   December 21st or 22nd, you were still with the RNC;
8   correct?
9       A.   I maintained employment with the RNC up until
10  Inauguration Day.
11      Q.   When did you know you were going into the
12  White House?
13      A.   At approximately 1:00 on December 22nd,
14  President Trump called and told me to put out a
15  statement naming myself White House Press Secretary,
16  Jason Miller Communications Director, Dan Scavino
17  Director of Social Media, I believe the title was, and
18  Hope Hicks Director of Strategic Communications.
19  That's when I knew.
20      Q.   Okay.  And did you do that?
21      A.   I did.
22      Q.   Okay.  And as of that time, you were aware of
23  the tweet, correct?
24      A.   No.
25      Q.   Okay.  So it's your --

1    A.   Again, Counselor, I apologize.  I don't have

2  documentation.  I would have to look, but it was, you

3  know, at least 24 hours.  So maybe it was the 20th.

4  The date of which the President announced our hiring is

5  public, but that was when I knew I was being hired.

6  And then, like I said, it was at least 24 hours before.

7  And then, again, I think the tweet is public so you can

8  figure -- do the timeline, but my best guess is it was

9  a minimum of 24 hours.

10    Q.   Okay.  And you said you got that call from

11  Mr. Trump, President Trump, at 1 p.m.?

12    A.   Approximately.

13    Q.   On the 21st or 22nd?

14    A.   Again, it's -- I don't have it.  I wasn't

15  prepared, but I believe it was either the 20th or the

16  21st.  The release went out within an hour, so --

17    Q.   Whatever that is.

18    A.   Yeah.  If you pause for one second I can -- I

19  will -- because I have a screenshot of it.

20    Q.   Sure.

21    A.   It's December 22nd.

22    Q.   Which I would expect you to remember.  That's

23  a big call to get.  December 22nd.

24        Did this -- did this announcement come

25  completely by surprise, or did you have a vetting

1   process?  Was there discussions that you being selected

2   was on the table?

3       A.   We had had what I would say are several

4   informal conversations about the job.  I knew he was

5   interviewing other people.  I would -- it wasn't

6   completely by surprise, but it was never certain.  And

7   there was a lot of scuttle about potential other

8   candidates.

9       Q.   Okay.  When -- did you ever ask Mr. Trump or

10  somebody in the campaign or transition to be considered

11  as press secretary?

12      A.   Yes.

13      Q.   And about when was that?

14      A.   I mean, I can't tell you the first time.  It

15  was sometime clearly after the election and before the

16  22nd.  I don't recall specifically -- you know, I'm

17  sure I had several conversations with different folks

18  saying I would love to do this, but there was no --

19  there was no, like, formal request I had of anybody.

20  It was more of just in conversation.

21      Q.   Okay.  Did you defer to Jason Miller about

22  his selection of Comms employees for the White House?

23      A.   Yes.

24      Q.   Okay.  What happened, I guess -- so we have

25  this announcement that goes out 12/22.  And then you

1   believe there was a tweet or a series of tweets after

2   that.

3        A.    Again, Counselor, I don't have the timeline

4   in front of me.

5        Q.    Okay.  And then some phone calls or text

6   messages with Mr. Miller?

7        A.    I believe so, yeah.

8        Q.    Okay.  Do you still have those text messages?

9        A.    With who, sir?

10       Q.    With Mr. Miller.

11       A.    Again, I don't know that -- I believe I said

12  they were calls.  So if there were, I assume I would,

13  but I don't know.  It was -- as you can imagine, this

14  kind of stuff is nothing you do over text.

15       Q.    Right.  Right.  True.  But I guess let me ask

16  a more general question for discovery purposes:  Do you

17  maintain the same phone that you would have had in

18  2017?

19       A.    Yes.

20       Q.    And do you essentially delete your archives?

21  Do you delete texts as they come in, or do you just

22  kind of let them scroll in?

23       A.    I mean, I would say 99 percent of the time I

24  let them flow in.

25       Q.    I'm going to ask you just to save any

Page 29

1   messages you have from that period of time,

2   particularly with Mr. Miller, and we'll address it.

3   After the depo you can certainly go look back and see

4   if there were texts, but just please don't delete

5   anything.

6           Okay.  It's my understanding that Ms. Delgado

7   was planning on being a White House employee.  Is that

8   incorrect?

9       A.   I can't speak to what she believes.

10      Q.   Okay.  What is your understanding as of

11  January 22nd, 2022 as to whether Ms. Delgado would be a

12  White House employee?

13          MR. BLUMETTI:  Objection to form.

14          THE WITNESS:  So as I mentioned, until

15      Inauguration Day there is no White House employee.

16      No one could offer employment that wasn't a White

17      House employee.  So you could want to, you could

18      intend to, but there is no way you could be or be

19      offered something until such time as there was

20      somebody who was an employee of the White House to

21      make that offer.

22  BY MR. PHILLIPS:

23      Q.   Okay.  Do you know whether Mr. Trump or

24  Mr. Miller had made her offers to be in the White

25  House?

1      A.    I have never asked either.

2      Q.    Okay.  Fair enough.  At what point and for

3   what reason did you decide not to employ Ms. Delgado?

4           MR. BLUMETTI:  Objection to form.

5           THE WITNESS:  Just to be clear, again, the

6      incident -- well, I would just say first and

7      foremost, I wouldn't have considered anybody who

8      exhibited the behavior that Ms. Delgado did

9      publicly with the tweets.  It's hardly acceptable

10     behavior for anybody who wants to work in the

11     White House, never mind a communications job.

12          Number two, you know, I question whether she

13     would have passed the vetting based on some issues

14     that she had had in the past.

15          Number three, I was never impressed with her

16     performance on the campaign.

17          Number four, I don't think she ever had the

18     experience that is required for the specific and

19     limited number of jobs that exist in the White

20     House.

21          And I think number five, as I said, I wasn't

22     in a position until January 21st to do that.

23   BY MR. PHILLIPS:

24     Q.    Okay.  As of January 21st when you were able

25   to do that, did you have communications with Ms.

1    Delgado about employment at the White House at or after

2    the 21st?

3        A.   I don't believe so. I would have to check

4    what the timeline was, but I believe by the time that I

5    had assumed the duties of White House Press Secretary,

6    that -- I don't know.  There may have been some texts

7    sent to me.  I don't know that I responded to anything.

8        Q.   Okay.  Did you help her get a job at a PAC or

9    think tank or some other organization, politically

10   oriented organization?

11       A.   I did not help her with a PAC.  I think there

12   may have been some discussion about maintaining

13   something on the campaign.

14       Q.   Okay.  Tell me about that.

15       A.   Ms. Delgado asked at some point about

16   potential options in the interim, and I had suggested

17   that she touch base with -- the campaign needed to

18   maintain itself in some entity and suggested that that

19   might be an option that she discuss with them.

20       Q.   Okay.  And do you know how that proceeded?

21       A.   I don't.

22       Q.   Okay.  What is America First policies?

23       A.   I don't know.

24       Q.   Who is Brian Walsh?

25       A.   Brian Walsh is a political operative that has

1    run campaigns, campaign committees, and Super PACS.

2         Q.    Are you aware if you had any role in

3    connecting Mr. Walsh and Ms. Delgado?

4         A.    By the way, I'm trying to remember, just to

5    your first question, America First Super PAC, I

6    believe, had a policy arm.  I don't know that that's

7    the proper name, but I can't -- I would have to -- I

8    would have to check with -- so I just want to revise my

9    comment on the first one.  I don't know that that's the

10   actual name, but there was a policy component to the

11   Super PAC.  It has to do with federal law and the IRS.

12   But I just want to be clear I'm not trying to be

13   evasive.  I just don't know that that's the name.

14        Q.    Okay.  And I can just go by what's on the

15   letterhead.  I'm trying not to overzealously throw

16   exhibits at you that you don't really need, but I have,

17   essentially, an offer of employment from November 28,

18   2017 from Brian Walsh to Ms. Delgado at what is listed

19   as America First Policies.  And I'm trying to

20   understand if you had any involvement or

21   recommendations related to that.

22        A.    No.

23        Q.    Okay.  I think I asked this in a different

24   way, but I want to clarify that for purposes of White

25   House Comms, who would have been the one that would

1   have decided whether Ms. Delgado was a candidate for

2   employment?

3       A.   At what period?

4       Q.   Going into the White House as of January

5   21st.

6       A.   That would be me.

7       Q.   Okay.  Did you retain Omarosa Manigault

8   Newman?

9       A.   No.

10      Q.   Who did?

11      A.   I'm not entirely -- the Deputy Chief of

12  Staff, Katie Walsh, I believe was involved in that.  I

13  don't -- I didn't have anything to do with her hiring.

14      Q.   Do you know what her status was with regard

15  to passing background investigations?

16      A.   I do not.

17      Q.   Okay.  Are you aware of whether -- you're

18  aware of her recordings, I assume?

19      A.   Yes.

20      Q.   The fact that she recorded?

21      A.   Correct.

22      Q.   Are you aware of whether or not you were

23  recorded by her?

24      A.   I'm not.

25      Q.   Okay.  What communications did you have with

Jason Miller about Ms. Delgado?

A. None.

Q. None whatsoever?

A. I don't believe so. Once Mr. Miller stepped down on the advice of counsel, we did not discuss the matter.

Q. Okay. I guess leading up to that, before he stepped down, what's your understanding from Jason Miller's perspective of his relationship with Ms. Delgado?

A. I wasn't aware of anything beyond a -- to be blunt, I'm not entirely sure what her status was during the campaign. In terms of what he had -- again, all of the hiring and all of the management was from the campaign side. So what interaction they had, what discussions about roles and responsibility were all between the two of them or -- I don't know. I actually had nothing to do with hiring, so I don't know. Maybe that had to do with HR or something. I just would have no visibility on that.

Q. When you spoke to Mr. Miller on the 22nd or 23rd, around that time, after you read the Delgado tweet, did you address with him the substance of those tweets? Did you say, hey, is this true?

A. I can't recall. I'm sure I did, but I can't

1    recall.

2         Q.    Okay.  Do you have any recollection of

3    anything Mr. Miller relayed to you about his personal

4    relationship with Ms. Delgado?

5         A.    At this point, this was a media firestorm.  I

6    mean, that's what we were dealing with and how to quell

7    that.  It was right before Christmas.  This was right

8    after, as I mentioned, a series of announcements in

9    terms of staff.  So the nature of our conversations

10   almost entirely -- or surrounded the media response to

11   this.  How are we responding, who else is asking, how

12   we can put out fires.  This was a five alarm fire for a

13   campaign that had just won.

14        Q.    Why was it a five alarm fire?

15        A.    Well, the first thing any campaign is getting

16   asked is who are you surrounding yourself -- what's

17   going on?  Jason had just been named White House

18   Communications Director and here he is embroiled in a

19   personal scandal.  And that's all the media wanted to

20   talk about.  This was sort of coming right out of the

21   gate after a win.  You know, this was not -- this did

22   not reflect well on the campaign or the candidate.

23        Q.    What was the personal scandal?  What was the

24   scandal?

25        A.    Well, again, I'll leave that up to employment

1   counsel, but when you have employer -- two people of --
2   in a similar department, one person is the boss, the
3   other one is Mr. Miller who was currently married and
4   expecting a child with his wife, I don't think that's a
5   particularly great story for -- on the Republican side.
6       Q.   It's adultery?
7       A.   It is.
8       Q.   And it's sexual harassment?
9            MR. BLUMETTI:  Objection.
10           THE WITNESS:  I'll let you -- that's your
11      words, not mine.
12  BY MR. PHILLIPS:
13      Q.   Okay.  At your company, do you have female
14  employees?
15      A.   I do.
16      Q.   Do you have a policy related to male/female
17  interactions in the workplace?
18      A.   We do not have anything written, no.
19      Q.   Do you have a sexual harassment policy?
20      A.   We do not.
21      Q.   Okay.  In any of the situations where you
22  have been the executive in charge of others, have you
23  had a policy where supervisors are not supposed to have
24  sexual relationships with their inferiors?
25           MR. BLUMETTI:  Objection to form.

1           THE WITNESS:  In my company, I'm the --

2      everyone is a direct report to me, so that would

3      be me.

4  BY MR. PHILLIPS:

5      Q.   Okay.  Would you engage in a relationship

6  with somebody inferior to you?

7           MR. BLUMETTI:  Objection to form.

8           THE WITNESS:  Well, I'm married.  I wouldn't

9      engage in an appropriate relationship with

10     anybody.

11  BY MR. PHILLIPS:

12     Q.   Okay.  Fair enough.  Are you aware if Jason

13  Miller was ever employed by the Executive Office of the

14  President or the Trump White House?

15     A.   No, he was not.

16     Q.   Where was he, I guess, reemployed?

17          MR. BLUMETTI:  Objection to form.

18          THE WITNESS:  Mr. Miller was -- I don't know

19     his exact title -- either Communications Director

20     or Senior Communications Official with the

21     transition team.  And my understanding is up until

22     January 21st, maybe beyond that -- I can't

23     remember the date -- that he maintained that

24     position.

25  BY MR. PHILLIPS:

1      Q.    I'm trying to get familiar with some of the

2   names of people here in this case, so you're going to

3   be kind of, unfortunately, my identifier.  Who is Rob

4   Porter?  Some of these you might not know.

5      A.    Rob Porter served as the Staff Secretary in

6   the White House and had previously been a Capitol Hill

7   staffer as well.

8      Q.    Okay.  Are you aware of, I guess,

9   Mr. Porter's -- did you do a background check on

10  Mr. Porter?

11     A.    I didn't do a background check on anybody.

12  That's not my job.

13     Q.    So help me understand.  I think I get it.  I

14  think -- you're taking over as Press Secretary.  You

15  have issued a press release where Jason Miller is to be

16  Director of Comms.  Was AJ Delgado mentioned in that

17  press release you drafted?

18     A.    No.  There were only four senior aides;

19  myself, Jason Miller, as I mentioned, Hope Hicks, the

20  Director of Strategic Communications, and Dan Scavino,

21  the Director of Social Media.

22     Q.    Okay.  And who does -- my understanding is,

23  and correct me if you have a different understanding,

24  but that Mr. Miller was recommending Ms. Delgado for

25  White House employment.  How would she be run through a

Page 39

1    background check to the extent you're even aware?  Like

2    what's the process for the White House to then

3    determine whether that person qualifies?

4        A.    My understanding is there is two steps.

5    There's a general application that the White House

6    counsel would look at internally, so if there are

7    issues that are more of a political nature, meaning

8    somebody's character, somebody's bearing, their

9    affiliations; in other words, there's a political

10   vetting that goes more to character and suitability for

11   the job.

12            And then there's what they call an SF86,

13   which is a standard form in which you fill out, that

14   is, in this case for the White House, adjudicated by

15   the FBI where you are looking at somebody's criminal

16   behavior, their known associates, potential past

17   lifestyle choices in terms of drugs, potential for

18   blackmail.  So personal relationships, alcohol and drug

19   use.

20            And so what would happen is the most senior

21   aides would have those rushed through so that they can

22   begin employment on January 21st.  And then employment

23   of others would kind of come through on a sliding scale

24   if you wish.

25        Q.    Okay.  I guess what I'm trying to understand

800-726-7007                                          305-376-8800

```
 1   is where the process stopped for Ms. Delgado.  Once
 2   Jason Miller resigned, did you -- we talked about
 3   earlier that you would have deferred to his
 4   recommendations.
 5       A.   Uh-huh.
 6       Q.   It seems to me you didn't defer to the
 7   recommendation of Ms. Delgado or somehow that changed
 8   by the tweet?
 9       A.   Correct.
10       Q.   Help me understand that.
11       A.   We both maintained lists of potential
12   employees that could fill -- remember there is a
13   limited number of jobs at the White House.  I think the
14   White House Press Office was 12.  And so they're very
15   specific.  There's X number of assistant press
16   secretaries.  There's a couple very junior people.
17   There's three deputies.  And then a couple assistants,
18   and that's it.
19           So we would put together, you know, lists of
20   people that we thought would be qualified as well as
21   options, this person and this person.  And I know Jason
22   had done the same.  And then when he stepped down, I
23   was told that I would accept the responsibility of all
24   of -- the roles and responsibilities that came with
25   that position as well.  So as those positions came up,
```

1    I reviewed the names that he had suggested as well as

2    names that I also thought would be good and fulfilled

3    them.

4        Q.   And thus Ms. Delgado, I guess, hit the

5    cutting room floor?

6            MR. BLUMETTI:  Objection to form.

7            THE WITNESS:  Yeah.  I think I have answered

8        this question before.  I think there were several

9        reasons why I wouldn't have considered her.

10   BY MR. PHILLIPS:

11       Q.   Do you recall having conversations with Ms.

12   Delgado around that time?

13       A.   The conversations that I had with Ms. Delgado

14   I believe were somewhere in the timeframe of Christmas

15   week.  And I don't know that we -- so there was a

16   timeframe, yes.

17       Q.   Okay.  Do you recall a conversation about her

18   pregnancy and, I guess, pending having an infant?

19       A.   I mean, I guess I remember having

20   conversations with her regarding what she had been

21   promised or thought she was promised by Mr. Miller.

22       Q.   Okay.  Tell me about what you recall about

23   that.

24       A.   He had told her at one point that she would

25   be able to work from Miami, that she was going to need

Page 42

1   the support of her family and friends to raise this
2   child, and that Mr. Miller told her there would be no
3   problem to work from Miami to do the job.
4       Q.   Okay.  And what conversations did you have
5   with Ms. Delgado about that?
6       A.   Well, I explained to her that White House
7   jobs worked in the White House and that would be
8   like -- and, also, I don't know that there was much of
9   a sense of specificity with the role that Mr. Miller
10  had discussed with her.  I was very clear about what
11  the requirements for working in the White House and the
12  role and responsibility of the most basic jobs
13  entailed.
14      Q.   Did you tell her that you didn't think she
15  could do the job or that this wasn't a suitable job for
16  her because she would have a baby?
17      A.   No.
18      Q.   Did you discuss the need of needing a nanny
19  or the struggle of a single mother trying to keep up
20  with this job?
21      A.   I explained to Ms. Delgado the complex and
22  demanding nature of the job, and when she asked me how
23  I was able to do it, I explained to her the support
24  mechanism that I maintain to do something of that
25  nature.

1      Q.    Are single mothers disqualified in your

2   hiring protocol from working, I guess, in positions at

3   the White House that are highly demanding?

4      A.    Absolutely not.

5      Q.    Why not?  Help me understand.

6      A.    Why are they not excluded?

7      Q.    Yes.

8      A.    I have always hired the best and most

9   qualified individual for every job that I had the

10  responsibility of overseeing.  And I don't -- if

11  somebody can do a job, and there's constraints on it,

12  we can make accommodations.

13     Q.    Okay.  Did you offer Ms. Delgado any

14  accommodations?

15     A.    I think, Counselor, as I explained, Ms.

16  Delgado wasn't qualified by her behavior.  And I don't

17  believe she had the necessary requisite communication

18  skills to handle the job that was necessary.  So it

19  wasn't a question of ever -- her family situation as

20  much as it is qualification for the job; temperament,

21  judgment, and they all lacked.

22     Q.    Did Omarosa Manigault Newman have temperament

23  for the job?

24     A.    I don't believe so, but I didn't hire her.

25     Q.    Okay.  Then kind of help me understand.

```
 1   Wouldn't that -- wouldn't that position -- was
 2   Omarosa's position within Comms at the White House?
 3       A.   So she was technically under the Office of
 4   Public Liaison, but because it was a communications
 5   job, they wanted to create what they call a dotted line
 6   to communications so that she wasn't supposed to be
 7   able to act as a free agent, if you will.  But I had no
 8   oversight over her.  I didn't hire her.  So the
 9   qualifications that she maintained or didn't were not
10   something that I had any input in terms of the
11   employment process or the recommendation process for
12   that matter.
13       Q.   Do you know who was hired kind of instead of
14   Ms. Delgado?
15           MR. BLUMETTI:  Objection to form.
16           THE WITNESS:  There was no instead of.
17   BY MR. PHILLIPS:
18       Q.   Do you know who was -- so was there somebody
19   that assumed a role related to Hispanic outreach in the
20   White House?
21       A.   Yes.
22       Q.   Who was that?
23       A.   There were two individuals.  One was Helen
24   Ferre.  The other one was a woman by the name of Sofia
25   Boza.
```

1    Q.   Okay.  Sofia.  And how did they come to your

2    attention?  How did -- I guess, did you -- strike that

3    question.  Did you retain them?

4         MR. BLUMETTI:  Object to form.

5         THE WITNESS:  I don't know where they were on

6         an org chart prior to that.  Both were in the

7         pipeline for employment.  It was a question of

8         where.  I had worked with both of them and highly

9         recommended them.

10   BY MR. PHILLIPS:

11   Q.   Do you have any specific criticism of work

12   that Ms. Delgado did in the media related to the Trump

13   campaign?

14   A.   I wasn't her -- I wasn't really aware of much

15   work that she did.

16   Q.   Okay.  You didn't review it to determine

17   whether or not she was qualified?

18   A.   I had interactions with her enough that her

19   judgment was something that I questioned alone.  I

20   didn't believe that she had the requisite -- doing

21   media hits, which is what largely her job had been, is

22   not a qualification for any of the jobs that are

23   currently at the White House.

24   Q.   Okay.  My paralegal just handed me an article

25   that said Helen Aguirre, A-G-U-I-R-R-E, Ferre,

1   F-E-R-R-E, deletes anti-Trump tweets after taking RNC

2   job of selling Trump to Hispanics.  Do you recall her

3   sending tweets that were derogatory to Trump?

4       A.   I do not.

5       Q.   Was it your decision to not retain or keep

6   Jason Miller -- strike that.

7            Were you involved with the decision to --

8   sorry.  Were you involved with the decision for Jason

9   Miller to resign?

10      A.   No.

11      Q.   You go through enough jobs either as an

12  employee or employer and understand sometimes

13  resignations aren't actually resignations.  An employee

14  is given the option to resign in lieu of termination.

15  Do you know what -- related to Jason Miller, whether

16  his resignation was a resignation or something else?

17      A.    To the best of my knowledge, Mr. Miller

18  proactively resigned.  But there was no indication that

19  I have that he faced any immediate pressure to do so.

20  It was -- I mean, there was no gap.  It was when he

21  realized the incoming media scrutiny, he said, "I have

22  already made a decision."  It wasn't -- there wasn't

23  enough time to even have a discussion as far as I

24  recall.  It was, I'm doing this.  So I don't --

25      Q.    Okay.  Do you know if Jason's resignation had

1  anything to do with the e-mail Ms. Delgado sent to you

2  January 4, requesting that he resign?

3      A.   I don't know, no.  I do not.  Just to be

4  clear, are you asking if I know that, or do I believe

5  that that factored in?

6      Q.   Either.

7      A.   As I said previously, I believe Mr. Miller

8  proactively offered up his resignation.

9      Q.   Who was Eric Drieband, D-R-I-E-B-A-N-D?

10     A.    Mr. Drieband is an attorney.  During that

11 period of time, he was an employment attorney.  I

12 assume he still is, but I don't know.

13     Q.   Do you know who contacted him about Ms.

14 Delgado's situation or claims?

15          MR. BLUMETTI:  Objection to form.

16          THE WITNESS:  I would have imagined that it

17     would have been Don McGahn, who was the general

18     counsel of the campaign, who I believe had a --

19     who knew who he was.

20 BY MR. PHILLIPS:

21     Q.   Okay.  Do you have your text messages in

22 front of you that you sent and received with Ms.

23 Delgado?

24     A.   I don't, but I can -- no, I don't have them.

25 I have my phone.  I don't have them printed out.

1      Q.    And when we take a break, I can put them up

2    on the screen if need be.  But I have a December 30,

3    2016 text message, Plaintiff Bates Stamp 281, that

4    says:  "I'm going to have Eric Drieband call you.  He

5    is an employment attorney that we brought on because of

6    how serious we are taking this."

7           What did you mean -- what were you taking

8    seriously?

9      A.    Ms. Delgado had communicated that there was

10    this relationship that she described between her and

11    Mr. Miller, him being her boss.  And again, since none

12    of that happened within my purview, it had been

13    recommended that we get an employment lawyer to

14    interact with her, to make sure that we addressed or

15    acknowledged her concerns and figure out how -- what

16    were the options moving forward depending on -- again,

17    a lot of it was this is not my wheelhouse.  I'm not a

18    lawyer.  I don't have any background in HR.  And she

19    made some serious concerns known in these e-mails.  And

20    the idea was, how do we best handle them.

21           And it was told to me by Don McGahn and

22    Reince Priebus that we needed to retain counsel to

23    address the concerns that she had.  They told me who

24    that was, Mr. Drieband.  And I was told to communicate

25    that to her so that it was handled in a professional,

Page 49

1  legal way.

2      Q.  Were you involved in that investigation at

3  all?

4      A.  No.

5      Q.  Do you know what the results of --

6      A.  Investigation into what?  I'm sorry.

7      Q.  I guess into the relationship between -- or

8  the accusations between or by Ms. Delgado about her

9  relationship with Mr. Miller.

10      A.  No.

11      Q.  Okay.  What's your understanding of -- I

12  guess I'll put it in common speak.  What happened with

13  Mr. Drieband?  How did that resolve?  What happened?

14          MR. BLUMETTI:  Objection to form.

15          THE WITNESS:  I don't -- I mean, again, as I

16      stated, it was told to me for a variety of, like,

17      HR/legal reasons we needed to retain counsel.

18      Mr. Drieband would become the interlocutor to Ms.

19      Delgado and they would move forward, but that

20      clearly someone like me was not professionally

21      equipped to deal with the concerns that she

22      raised.

23  BY MR. PHILLIPS:

24      Q.  And do you recall when in correlation to that

25  Ms. Delgado was essentially recommended that she could

Page 50

```
 1   return to the campaign?

 2        A.   I do not.

 3        Q.   Okay.  Would that have been Sean Dollman's

 4   decision as to whether to retain her?

 5        A.   Who -- I don't know who Sean Dollman is.

 6        Q.   Okay.  Did you ever tell Ms. Delgado that the

 7   team was going to take care of her?

 8        A.   I can't recall.

 9        Q.   Do you know what role, if any, Eric Trump had

10   in the -- related to the employment of AJ Delgado?

11        A.   I do not.

12        Q.   We have gone about an hour and a half.  If we

13   can take like a ten minute break, then we can reset,

14   clean up, and try to get this thing moving along and

15   done.  Is that okay?

16        A.   When you say moving along and done, like what

17   are you talking?

18        Q.   I hope to finish by lunchtime.  I'm going to

19   take a break to kind of speed through some of my notes.

20             THE WITNESS:  Jared, are we okay with that?

21             MR. BLUMETTI:  Yes.  That's fine with us.

22             MR. PHILLIPS:  Go off the record.

23             THE VIDEOGRAPHER:  The time is now 10:24 a.m.

24        We are going off the record.  This is the end of

25        Media Unit 1.
```

1          (A recess was taken.)

2          THE VIDEOGRAPHER:  The time is now 10:36 a.m.

3     We're back on the record.  This is the beginning

4     of Media Unit 2.  Please continue.

5          MR. PHILLIPS:  Thank you for that.

6  BY MR. PHILLIPS:

7     Q.   Mr. Spicer, how many times -- and I know

8  there is going to be a little bit of a guess component

9  to this, but how many times have you physically been in

10  the same room as Ms. Delgado?

11     A.   15.

12     Q.   Okay.  Okay.  When you were in her physical

13  presence, did anything stand out as inappropriate that

14  she did that you recall?

15     A.   There were comments here and there that she

16  would make that I didn't think always were

17  professionally appropriate.  I just -- if you were

18  going to ask me to name one, I don't know that I can.

19  I just remember coming away as an impression of

20  somebody who was a little professionally inappropriate

21  might be the word.

22     Q.   We're also talking about Donald Trump here,

23  aren't we?

24          MR. BLUMETTI:  Object to form.

25

1    BY MR. PHILLIPS:

2       Q.   Was he professionally appropriate in all of

3    his communications?

4       A.   Oh, absolutely not.  No, I think Mr. Trump

5    has a very unique style.

6       Q.   So is there any recollection whatsoever you

7    have of anything inappropriate she's ever done or said

8    specifically?

9       A.   I mean, I think the tweets that were sent out

10   around the December thing were highly unprofessional.

11      Q.   Have you ever tried to look at this from the

12   perspective of her blowing the whistle or being a

13   victim of sexual harassment and letting people know?

14          MR. BLUMETTI:  Objection to form.

15          THE WITNESS:  I'm not -- I think that was why

16      we engaged employment counsel.

17   BY MR. PHILLIPS:

18      Q.   Okay.  Did you have -- do you know when you

19   and Ms. Delgado exchanged numbers?

20      A.   I do not.

21      Q.   Okay.  Do you know whether you had her cell

22   number when the tweets hit?

23      A.   I don't.

24      Q.   Okay.  Did you try to call her and get her

25   side of the story or ask her about the tweets?

1     A.    No.

2     Q.    Why not?

3     A.    Because she didn't work for me.

4     Q.    Did Mr. Miller ever express an opinion about

5   whether he was withdrawing her recommendation or don't

6   hire Ms. Delgado, anything like that?

7     A.    He never commented.

8     Q.    Okay.  We talked a little bit earlier about

9   whether or not Ms. Delgado could work for the White

10  House from Miami.  Do you recall that?  Was it your

11  understanding that Mr. Miller had said that she could?

12    A.    It was.

13    Q.    Okay.  Do you know if he had an ongoing

14  sexual relationship with her when he was making those

15  promises?

16    A.    I don't.

17    Q.    Do you know whether he had an ongoing sexual

18  relationship with her when he told her she could get a

19  spot in the White House?

20          MR. BLUMETTI:  Objection to form.

21          THE WITNESS:  I don't.

22  BY MR. PHILLIPS:

23    Q.    Who is Stephanie Grisham?

24    A.    Stephanie Grisham was a communications

25  staffer that was employed by the Trump campaign,

Page 54

1    subsequently went on to be Deputy Press Secretary and

2    Chief of Staff to the First Lady.

3        Q.   What was your role in offering her employment

4    or hiring her?

5        A.   I had been impressed with Ms. Grisham during

6    the campaign and her interactions with the media.  She

7    was what's known sort of colloquially as a wrangler.

8    She travelled with the press that was assigned to then

9    candidate Trump.  The press thought very highly of her,

10   her skill set, her demeanor.

11       And she had asked me to -- there's a separate

12   advance department or whatever in the White House.

13   Those are the folks that travel ahead of the President.

14   Within that division there are, they call them, press

15   leads because they're moving with the media into those

16   events.  Ms. Grisham had been in talks with the person

17   that was going to lead that, that they wanted her to

18   come work for her.  And I had discussions with her

19   saying that, you know, I would be equally interested in

20   bringing her into a position in the press office

21   itself.

22       Q.   When you vet somebody for a position like

23   that, what do you take into consideration?

24       A.   Their experience working with -- again, I

25   would say that it depends -- every position is unique,

1  right?  But 90 percent of the jobs have to go to

2  experience of putting -- you know, in Ms. Grisham's

3  position, it was the relationship --

4          MR. BLUMETTI:  Is that on his side?

5          MR. PHILLIPS:  It has to be.

6          THE VIDEOGRAPHER:  We can go off the record.

7          MR. PHILLIPS:  Sure.

8          THE VIDEOGRAPHER:  The time is now 10:43 a.m.

9      We are going off the record.

10          (A discussion was held off the record.)

11          THE VIDEOGRAPHER:  The time is now 10:44 a.m.

12      We are back on the record.  Please continue.

13  BY MR. PHILLIPS:

14      Q.    In the brand new world of Zoom, we

15  sometimes -- we've got tech issues.  So you were mid

16  answer of a question I don't even remember at this

17  point.

18      A.    I do.

19      Q.    You do?  Okay.  My question --

20      A.    Your question was:  What do you consider for

21  a certain position, what qualifications?  I would just

22  say first of all, remember that every one of the

23  positions, for the most part, is unique in the sense

24  that this isn't a large bureaucracy.  As I think I

25  previously mentioned, in the White House press office I

1    think there's 12 jobs, right?  They all have specific

2    responsibilities.  Communications office is really not

3    that much different.

4           But in the case of Grisham, who you were

5    asking about, she had developed very strong

6    relationships with many of the reporters that would be

7    covering us.  They appreciated how she was able to work

8    with them logistically.  Every trip that the President

9    or then candidate takes requires tremendous planning,

10   and there's a give and take.

11          The campaign, or in this case, in the future,

12   the White House, there are only so many press folks

13   that can get in.  The cameras want to be closer, but

14   they can't be this close.  They need to plug in.  She

15   understood the needs and how to sort of, for lack of a

16   better word, play referee in a very effective way.  Get

17   a little bit more of what they needed while

18   understanding that the campaign and eventually the

19   White House didn't -- isn't going to give you full

20   access to the President of the United States.  You are

21   not going to get 40 people in, but here's how maybe we

22   can have an overflow or whatever.

23          She was very creative.  Had a very calm

24   demeanor in terms of handling stressful situations.

25   And as I said, was liked by all parties.  The Trump

1   family liked her.  The press staff enjoyed working with

2   her.  The media reporters, I felt like her previous

3   experience both in Arizona politics, what she had done

4   in a previous presidential campaign, were all assets

5   that would be helpful to us.

6       Q.   Okay.  Did you review AJ Delgado's

7   relationships with Hispanic media prior to making the

8   decision not to retain her?

9       A.   No.

10      Q.   Did you review her relationship with and

11  encounters with Mr. Trump?

12      A.   No.

13      Q.   Did you ask --

14      A.   As I said earlier, no, I didn't ask Mr. Trump

15  about any hires outside of the Deputy Press Secretary.

16  Those don't rise to the level of the President or the

17  candidate.  I would just tell you if anybody sent -- I

18  don't know that -- the actions that she took publicly

19  around December 22nd, 23rd, whatever it was, to me are

20  disqualifying on itself, regardless of anything else.

21          The idea that you put out something publicly

22  that was intended to be damaging, that created damage

23  and reflected poorly on the President of the United

24  States, the transition, the campaign, I mean

25  everything.  I literally spent my Christmas dinner

1    dealing with reporters sitting outside in the cold on

2    the porch to get this story tamped down, and in most

3    cases shut out, because we didn't want to deal with it.

4            I mean, I did nothing for 72 hours but use my

5    personal relationships and chips that I had built up

6    over decades to get -- to try to make reporters

7    understand, especially during Christmastime, that you

8    had two individuals that engaged in a relationship and

9    this was not worthy of public consumption to the extent

10   that I could, and in several cases very successfully.

11   But for at least 72 hours, if not 96 and more, this was

12   the only thing that we dealt with.  And I cannot tell

13   you how much political capital I spent to change the

14   tone, stop stories from occurring.

15           And in my opinion, an action like that -- and

16   like that, meaning it wasn't just a tweet.  There was

17   several calls to other reporters.  Her discussion with

18   other reporters to explain to them what was going on

19   was something that I was also dealing with, meaning

20   that that was it.  That view, in my opinion, is

21   something that we would never ever consider taking

22   somebody into the White House.

23       Q.   And it sounds like there's some resentment of

24   her?

25           MR. BLUMETTI:  Objection to form.

1          THE WITNESS:  Resentment?  I'm sorry.  Why --

2     BY MR. PHILLIPS:

3          Q.    I mean, I guess you have made it abundantly

4     clear that, you know, AJ's tweet ruined Christmas

5     dinner.

6          A.    No.  I explained to you the actions that I

7     took, Counselor.  I want you -- and what I'm hoping to

8     do is make sure you understand that, in a world where

9     we have to deal with a media that is going to report

10    things.  I mean, frankly, part of the reason I resigned

11    as White House Press Secretary, as I said in a book

12    that I wrote, is that, you know, I became the story too

13    often.

14          The job of a spokesman and a communication

15    staffer is to further the message of the principal.  If

16    you are becoming the story, then you need to get out of

17    the way, which is why, frankly, I ultimately resigned.

18    I felt as though I had become the story too often.  So

19    I don't resent anything.  I just want you to understand

20    what the job is about and why you need people that you

21    have confidence in their judgment, their experiences,

22    their demeanor.  And those are things that I don't

23    think that Ms. Delgado possessed.

24          Q.    Okay.

25          A.    And again, just to go back, I think this is

1    important to just note.  You know, this isn't -- these

2    are very specific jobs where you have to hire people

3    that you feel confident that have the experience in

4    doing them.  Her job on the campaign largely would be a

5    general surrogate.  There's a lot more that goes along

6    with these jobs.  As I mentioned, you were asking about

7    qualifications in terms of planning, event rollouts,

8    things like that.  That was not the role of a

9    surrogate.  There was nothing that led me to believe,

10   based on what I witnessed, you know, from my position

11   at the RNC that this was somebody who was qualified to

12   do that.

13       Q.   Okay.  She had, and how she got it is a

14   separate question, but she had Jason Miller's

15   unqualified endorsement?

16       A.   I don't know that that's true.

17       Q.   Okay.  Did she have -- are you aware if she

18   had Donald Trump's endorsement?

19       A.   He never expressed it to me.

20       Q.   Did you ask?

21       A.   I didn't ask him about any employees.

22       Q.   And you didn't review her interviews or look

23   at her body of work while she was, you know, a

24   surrogate or part of the campaign?

25       A.   No.  That's not what I said.  You didn't ask

1    me about that.  I have seen some of the interviews that

2    she had done, yes.

3        Q.    Okay.

4        A.    When you -- again, with all due respect, and

5    I mentioned this a moment ago, doing interviews is not

6    the job of what a White House staffer does with the

7    exception of the White House Press Secretary and other

8    senior policy makers.  The press staff is not on

9    camera.  That's not their job.  I think that there is

10   this misunderstanding largely that that's the role of

11   press people.  And, frankly, it's not even the role of

12   the press secretary for the most part.  During a

13   campaign, you do a lot more surrogate work.  In the

14   White House, that is not a role.  That's not a job.

15       Q.    Did you review her e-mail history with Bannon

16   or Miller or others in Comms to see where she helped

17   tamp down issues and clarify positions related to Cuba?

18   Did you review her body of work?

19       A.    I didn't review -- no.  I wasn't made privy

20   to that.

21       Q.    Okay.

22       A.    I guess just so we're clear, though, when it

23   came time to put together -- again, you're asking me --

24   we discussed the timeline of my interaction with her.

25   The only real interaction I had with her was this

1    incident that occurred.  So the only time I would have

2    had to review it would have been after that, when it

3    became my responsibility.  And after the actions that

4    she took, both privately in backgrounding with folks in

5    the media, and then publicly with tweeting excessively,

6    why would I -- I, frankly, beg to differ.  I don't know

7    that anybody -- if someone had found out that I was

8    spending a ton of time interviewing someone that had

9    committed the actions that she did, I would have fired

10   that person too.

11        Q.   What do you mean "committed the actions"?

12        A.   In other words, she was actively talking to

13   the press and backgrounding them about the incident

14   that occurred, presenting her side, talking about

15   what's going on, she had sent out tweets.  My point is

16   is that I don't know anyone in their right mind that

17   would at that point deem somebody qualified.

18        Q.   What evidence do you have that she did

19   anything other than send the tweets?

20        A.   Reporters calling me and saying that they had

21   spoken to her.

22        Q.   Her or an unnamed source?

23        A.   I'm sorry?

24        Q.   Her or an unnamed source?

25        A.   Her.

1      Q.    Who said they spoke to her?

2      A.    One of them was a reporter by the name of

3  Mark Caputo.

4      Q.    Okay.  Do you know whether Jason Miller

5  received any discipline from his employer related to

6  this?

7      A.    I do not.

8      Q.    Okay.  Are you aware at all of

9  Mr. Miller's -- well, let me ask this in a way that's

10  not going to get myself in trouble.  Are you aware of

11  whether Mr. Miller had had these issues in the past

12  related to allegations of workplace harassment or

13  sexual misconduct?

14      A.    I am not.

15      Q.    Okay.  Are you aware of whether Mr. Miller,

16  before Ms. Delgado, had impregnated anyone other than

17  his wife?

18      A.    No.

19      Q.    Okay.  Was it -- as of January 21st, could

20  you hire or fire Mr. Miller?

21      A.    No.

22      Q.    Okay.  Bear with me.  Do you know whether Ms.

23  Grisham had -- what her educational background was?

24      A.    I mean, I knew that -- I think in passing we

25  probably discussed where we went to school, went to

1   college, but I can't say that I know much about her

2   specific education background.

3        Q.   Did she have a college degree?

4        A.   I don't know.  I still don't know.

5        Q.   Do you know if she had a criminal history?

6        A.   I don't know.  I believe Ms. Grisham has

7   written a book in which she said that we had a

8   discussion during the transition where she made me

9   aware of a DWI.  Her recollection of the account is

10  that I told her that it was -- it would be adjudicated.

11  Whether -- I don't recall that conversation, but I just

12  want to make you aware that there is a public record of

13  her side saying that I don't recall ever having that.

14  I have expressed that to her, that I don't recall

15  saying it.  But she said that I did, so I want you to

16  be aware of it, which, you know, she had said something

17  to the effect of a DWI, to which I told her, you know,

18  this will be up to the SF86 and others to determine if

19  that's a disqualifying incident.  You know, I don't get

20  to make those decisions.  But that's it.

21       Q.   Okay.  I was waiting for you to be done with

22  your answer because you still had your lips pursed.

23            Who is Max Miller?

24       A.   Max Miller is a member of Congress from Ohio.

25       Q.   Okay.  Congress.  Did he serve in the White

Page 65

1    House after serving on the campaign?

2        A.    I don't believe during my tenure.

3        Q.    You don't know whether or not Ms. Delgado

4    would have made a -- gotten her security clearance as

5    we sit here today; correct?

6        A.    That's not my job, no; but I will say I have

7    a sense of the issues -- well, I cannot -- I hope you

8    respect the fact that I cannot discuss why people were

9    denied clearances.  Frankly, it wasn't always made

10   crystal clear to me.

11           For obvious media reasons, there were times

12   in which we had to dismiss a staffer or ask them to go,

13   in which the counsel's office would generally explain

14   the rationale behind that.  Also, I have had a

15   clearance for 25 years.  I'm aware of general offenses

16   that would preclude somebody, but I do not obviously

17   conduct those.

18       Q.    Okay.  It seems that this is all boiling back

19   to the tweet being disqualifying, so I don't know that

20   you would have ever even gotten to that analysis; am I

21   correct?

22       A.    Yes.  But I want to make one thing clear.  A

23   tweet isn't disqualifying.  Judgment is disqualifying.

24   I think the judgment as far as sending the tweet, how

25   the tweet was handled, how it was reacted to, the

Page 66

1   subsequent tweets.  So I think there is a -- it would

2   be very simplistic to lay it as a tweet was sent.  It

3   was the judgment to send it, the judgment to

4   subsequently send others, other behavior that was

5   surrounding that.  Erratic behavior that existed.

6          There was an incident down in Miami on

7   Mr. Trump's plane that had been communicated back about

8   an outburst, an interaction that was highly

9   inappropriate.  So I just want to be clear that it is

10  not a single tweet.  It is the culmination of a series

11  of actions, of which that is important to note, that go

12  to the heart of judgment that is important for any job,

13  especially in communications, but nonetheless the White

14  House.

15       Q.   Okay.  Help me understand any of these other

16  series of actions that affected her ability to serve in

17  the White House.

18       A.   Can you be more specific?

19       Q.   You just referenced a series of actions.

20       A.   Right.  Well, I think, again, there was an

21  incident on Mr. Trump's plane in Miami that I was not

22  present for, it was communicated back, that she began a

23  verbal assault on several staffers on the plane in

24  front of Mr. Trump that got communicated back to me

25  that was -- he took note of it as well.  Again, he

Page 67

1   didn't communicate that to me; others did.

2        There was a series of just, as I said, I

3   think, interactions and judgment calls that I didn't

4   feel as those were appropriate.

5        Q.   Okay.  Did Mr. Miller communicate that to you

6   about the outburst?

7        A.   No.

8        Q.   Who did?

9        A.   I believe Ms. Hicks.

10       Q.   Okay.  Is the campaign -- I don't want to

11  know of any communications between you and your

12  attorney --

13       A.   One more point.  I'm sorry.  One more thing.

14  I think, obviously, it's now -- it's come out in

15  public, but Ms. Delgado had a restraining order placed

16  against her that was still in effect.  That would have

17  -- I don't see any scenario where anybody with a

18  retraining order that was currently violating -- she

19  was travelling to New York in violation of that, that

20  would have -- I don't see any way in which, at least in

21  my experience, something like that would have allowed a

22  security clearance to be issued.

23       But again, it's more than a security

24  clearance.  Remember, as I mentioned, there is a

25  counsel vetting aspect of this as well, which goes to

1    suitability for the job and judgment, etc.

2         Q.   When did you find out about the alleged

3    restraining order?

4         A.   I don't recall.

5         Q.   Okay.  Do you know whether it was after 2018?

6         A.   I can't be certain of the exact timeframe.

7         Q.   Do you know whether you knew of that while

8    you were still at the White House?

9         A.   I did not.

10        Q.   Okay.  Were you involved in any way in a

11   decision of employment -- well, back that up.  Do you

12   know who Jessica Denson is?

13        A.   No.

14        Q.   Makes that question a lot easier.  I don't

15   want to know of any communications between you and your

16   attorney in the response to this.  I'm trying to think

17   how to best ask it.  Do you know if your legal

18   representation is being paid for by the campaign?

19             THE WITNESS:  Jared, can you --

20             MR. BLUMETTI:  Just to the extent you know,

21        Sean.

22             THE WITNESS:  Honestly, I -- the truth is,

23        I'm not trying to hide -- I can't remember who's

24        -- I believe it's the campaign.

25             MR. PHILLIPS:  Okay.  Jared, I'm not asking

1    to pick on you.  I just didn't hear what you said.

2         MR. BLUMETTI:  I said to the extent he knows,

3    he can answer.

4         MR. PHILLIPS:  Fair enough.

5    BY MR. PHILLIPS:

6    Q.   Okay.  Have you read any of Ms. Delgado's

7    prior depositions?

8    A.   With respect to this case?

9    Q.   Any case.

10   A.   Yes.

11   Q.   Which ones?

12   A.   There was one involving a paternity case with

13   her and Mr. Miller.

14   Q.   Why did you read it?

15   A.   I believe he shared it.

16   Q.   Okay.  In what context did he share it?

17   A.   It was very -- something of the effect of,

18   just giving you an update on what I'm dealing with.

19   Q.   Okay.  When did that happen?

20   A.   A year ago?

21   Q.   Okay.  How did he communicate that deposition

22   to you?

23   A.   I'm not really -- I can't remember the

24   platform, if it was -- it was something that

25   disappeared, but -- you know what I mean?  I don't

1    remember -- this isn't -- so it could have been an app,

2    but I can't remember which one.  But it was something

3    that you had X hours to read and then it disappeared.

4        Q.   I can't remember whether it was in Fire and

5    Fury or Fear, which I'm sure you love both, but in one

6    of those books there's a discussion about you being

7    critical of the use of those apps.  Tell me about that.

8        A.   Well, I'm critical of them in the -- again, I

9    can't remember the reference in either book, but I will

10   tell you that my concern at the time was the White

11   House Records Act.  It was very clear that

12   communications within the White House must be

13   discoverable.  You could not do things, conduct

14   official U.S. business, on platforms or any mechanism

15   that shielded them from being captured by the

16   Presidential Records Act.  And my concern was that many

17   people were acting outside of the guidelines of the

18   Records Act and subjecting us to potential violations.

19       Q.   Okay.

20       A.   To be clear to your statement, I don't -- in

21   fact, I would encourage people.  I believe that whether

22   it's WhatsApp or Signal, they should use things to

23   better encrypt their information.  I don't think that

24   you should do that in violation of U.S. government

25   policies and law.

1    Q.   But to the extent that I wanted to obtain the

2    communications related to Ms. Delgado between you and

3    Mr. Miller, how are you going to respond to that?

4    A.   I don't know.  This is -- I'm not a tech

5    person.  So I don't know what I'm -- again, that's

6    more -- with all due respect, that's sort of -- I don't

7    know the answer to the question you're asking because

8    I'm not -- I am not a purveyor -- like, I don't -- I

9    don't know much about how these things operate.

10   Q.   Okay.  Obviously, there's phone calls, right?

11   We're about the same age.  We got by with corded

12   phones, okay.  And so now we've got the ability to call

13   people, the ability to text on standard phone lines,

14   phone numbers.  And then there's a series of apps that

15   allow DMs, and then there's encryption apps.

16        I guess my question is, in what manners do

17   you communicate or have you communicated with Jason

18   Miller about Ms. Delgado?  On what platforms?

19   A.   Well, the phone, which we previously

20   discussed.  Again, I'm not sure what app this was.  So

21   I don't know -- as I said, I'm not a purveyor of them.

22   I mean, I have, so I don't know.  I don't believe we

23   have communicated via e-mail about her ever,

24   although -- and then I don't know about text.  I mean,

25   yeah.  So I can't -- yeah.  That's probably -- I think

Page 72

1    I'm answering your question.

2         Q.   Are you aware of whether the deposition was a

3    PDF, like a whole deposition, or was it like a screen

4    grab JPEG of a page of a deposition or multiple pages

5    of a deposition?  Do you recall how you reviewed it?

6         A.   I don't.  No, I don't.

7         Q.   Do you recall how you responded to his

8    message, something to the effect of, look what I'm

9    still dealing with?

10        A.   I probably didn't, knowing this case.  I have

11   tried not to respond to anything to do with her just so

12   that -- for obvious reasons.

13        Q.   You remain friends with Jason Miller?

14        A.   Yes.

15        Q.   Do you remain friends with AJ Delgado?

16        A.   I never was friends with AJ Delgado.

17        Q.   What is Mr. Miller's current employment?

18        A.   From my understanding, he works for the Trump

19   2024 campaign, but I'm hardly an expert on Mr. Miller's

20   employment.

21        Q.   That's fair.  The good news is, I tell people

22   when I'm quiet and turning pages, those are questions

23   I'm not asking.  When I'm quiet, so that's good.

24             Do you know whether -- I'll wait for you to

25   drink.  Do you know whether Jared Kushner or Ivanka

1  Trump had any role in the decision to retain or not

2  retain Ms. Delgado?

3      A.   No, I do not.

4      Q.   Were they involved in other White House

5  personnel decisions?

6      A.   Oh, I'm sure.  None that -- the only one that

7  I ever dealt with with Jared, there was a staffer that

8  he was hiring that had some communications aspect to

9  his role.  And that was the only time Jared and I ever

10  discussed employment.  I have never discussed

11  employment of anybody with Ivanka.

12      Q.   Do you know whether Jared successfully

13  completed his background check at the White House?

14      A.   No.  I have read media reports, but that's

15  not -- obviously, again, the adjudication of a security

16  clearance is not something I'm involved in.

17      Q.   Catherine Frazier.  Does that name ring a

18  bell?  Obviously, there could be multiple.

19      A.   Not from the White House, no.

20      Q.   Are you aware of whether Mr. Miller and you

21  ever had a conversation about allegations of him having

22  a workplace affair with Catherine Frazier?

23      A.   Oh.  Now I know who -- I believe she used to

24  work for Ted Cruz.  But I've only -- yeah.  No.  I'm

25  aware of that, now that you connect the two dots, from

1   a media story, but I've never discussed that with

2   anybody.

3       Q.   C-A-T-H-E-R-I-N-E, F-R-A-Z-I-E-R.

4       A.   Yeah.  On her own, but that's why I thought

5   you were -- it was a White House employee.  No.  I know

6   where you're going now.  No.  I have never had any

7   discussions.

8       Q.   Okay.  I was spelling it for the court

9   reporter too.

10           While you were working for the Executive

11  Office of the President, were you aware of any new hire

12  that was pregnant at the time of hire?

13      A.   No.  But that would be -- no.  But I would

14  never -- that would never be something that would be

15  brought up.

16      Q.   Are you aware that Mrs. Delgado was on the

17  list of people retained by the transition team?

18      A.   As I said, I wasn't named to the transition

19  team, I think, until it would have been whatever the

20  day after I was named White House Press Secretary.  So

21  I was not aware of who was on and who was off, or how

22  they were named.

23      Q.   Is there an equivalent list of people that

24  are being considered for these few Comms job in the

25  White House you were talking about?  Is there actually

1    a list?

2         A.   I'm sorry.  So are you saying did we like

3    maintain a list?

4         Q.   Yes.

5         A.   For the transition?

6         Q.   For the White House Comms jobs.

7         A.   I think, yeah, Mr. Miller had a list.

8         Q.   Okay.  Do you know whether Ms. Delgado was on

9    it?

10        A.   I believe she was.

11        Q.   I think I asked this.  Do you know who was

12   hired instead of her, or who else was on the list that

13   --

14        A.   No.  As I said, there was no instead of.  The

15   role that he apparently had discussed with her doesn't

16   exist, so I had to hire for actual jobs that existed

17   with actual qualifications and responsibilities.

18        Q.   Okay.  Do you recall having a conversation

19   with Ms. Delgado where she told you she would, in fact,

20   love to work in Washington, D.C., and was able to move

21   to Washington, D.C.?

22        A.   I do not.

23        Q.   Okay.  Do you recall having a conversation

24   with Ms. Delgado about raising a small child in

25   Washington, D.C. in which she brought up a nanny?

1    A.   I think we discussed this during the first

2    hour.  Would you like me to repeat my answer?

3    Q.   Please.

4    A.   Ms. Delgado had been informed by Mr. Miller

5    that she could work in Miami, and as she expressed to

6    me, it was something that she needed to do because she

7    had family that would be able to care for this.  And

8    when I explained to her that these few White House jobs

9    needed to work in the White House, get security

10   clearances, there was materials, there was meetings,

11   the hours such that -- there were not -- it was, at

12   that time, preCOVID.  There was no such thing as remote

13   work, especially in the Comms shop.

14        And she inquired how I was able to do

15   something like this, and I explained to her my family

16   situation.  I too had two young kids.  I know what it's

17   like, so I was very well aware of the demands that

18   existed.  And she inquired of me how I could, you know,

19   take on this role in the family situation that I had.

20   And I explained to her how I was able to do that.

21   Q.   You also have a supportive spouse?

22   A.   Yes, I do.

23   Q.   Did she have a supportive spouse?

24   A.   I don't know Ms. Delgado's situation.

25   Q.   From reading her deposition, was there

1    discussion about whether Jason Miller has been

2    supportive of that child?

3        A.    That's not for me to pass judgment on.

4        Q.    Has he had conversations with you about child

5    support at all?

6        A.    Not like a dollar amount or where things

7    stood.  There have been check-in periods where I have

8    just -- same thing:  How's everything going?  Oh, we're

9    still battling it out, or we're still making it --

10   there's never been a discussion about a number or a

11   payment or -- so does that answer your question?

12       Q.    It certainly gives me another one.  Why are

13   you having any conversations about Ms. Delgado and

14   Mr. Miller's custody and ongoing issues?

15       A.    As I said, I'm not.  There are times when

16   he'll just bring up -- I don't quiz him on this.  This

17   is -- for obvious legal reasons that we're addressing

18   right now, I don't initiate these conversations.  There

19   are times just in the course of a social situation,

20   I'll ask how are things going, which is a very natural

21   conversation to have with somebody.  How are you doing?

22   What's going on in your world?  And he'll say, well --

23   I mean, we went through that period of time together.

24   As I explained to you, it was an interesting five days

25   around Christmastime of 2016.  And I think naturally he

Page 78

1    defaults to things that we share, our experiences on

2    the campaign.  Sometimes that's the nature from time to

3    time.  And I would leave that as number twice, three

4    times he may have said, man, it's -- still dealing with

5    this or something like that.

6        Q.    What was your -- I guess we talked about

7    that, the number of hours, the number of days, ranging

8    from 2 to 5 days that you worked on kind of quashing

9    this five alarm fire, I think is how you put it.

10        What was your priority there?  What were you

11    trying to do?

12        A.    I think there were probably two things:  The

13    first and foremost was to preserve the integrity of the

14    campaign; meaning, we were talking about the

15    president-elect's policies and priorities, what he was

16    going to do, and this was clearly a massive distraction

17    from that.  So that was first and foremost the number

18    one priority is to ensure the messaging and the image

19    of the campaign, the president-elect.

20        And then I think on a second, more human

21    level is to make sure that I shielded both Mr. Miller

22    and Ms. Delgado from reporters that wanted to write

23    about their personal lives.  And just on a personal,

24    human level, I wasn't here to pass judgment as much as

25    just to preserve their lives and to make sure that they

1  didn't -- this was Christmas.  You know, I wanted to

2  make sure that they could go -- have some degree of

3  privacy.  And so by quashing this story, that I think

4  was -- you know, that I was hoping that I was shielding

5  them to some degree.

6      Q.   I mean, if Ms. Delgado is sending the tweet,

7  doesn't that mean she didn't want that shield?

8          MR. BLUMETTI:  Objection to form.

9          THE WITNESS:  Again, I don't know her.

10 BY MR. PHILLIPS:

11     Q.   Did she ask you to shield her?

12     A.   No.

13     Q.   So you were shielding Jason?

14     A.   No.  I think on a human level there was times

15 in which you realize that somebody is in a position

16 where -- I have been doing this 30 years.  There are

17 times when people say things or utter things in the

18 moment which they're frustrated or upset.  I recognized

19 that this might be one of those moments.  I don't know

20 -- I didn't see any positive that could come out of

21 this for -- so, yeah.

22          Look, you can be critical.  She didn't ask

23 for it, but I -- as a human being, do I think it's ever

24 in someone's best interest to have their personal life

25 spread across Page Six?  No, I don't.  And so if that's

1    what I'm -- is a concern, then I'll take the hit.

2           But as I said, my number one priority was

3    protecting the campaign and the image of the

4    president-elect and the integrity of what we were

5    putting forward in terms of announcing the President,

6    his positions, his priorities, the rollouts and the

7    events that we were having.  But on a personal, human

8    level, yeah, I wanted to, as a byproduct, help maintain

9    some of the privacy of those two individuals.

10   Q.   Wouldn't the integrity of the campaign

11   already have been exposed when you have a very senior

12   official who's married with children impregnate, in an

13   adulterous affair, his inferior?  Isn't that a lack of

14   integrity in a campaign official, namely Jason Miller,

15   within and of itself?

16           MR. BLUMETTI:  Objection to form.

17           THE WITNESS:  Sure.  But there's a big

18       difference between something occurring within a

19       workplace that is inappropriate that is maintained

20       within the confines of that institution, and

21       having something spread out to both national and

22       international news within, what, a month before an

23       inauguration.  There's a big difference, yes.

24           Does that distract from the pronouncements,

25       the policy rollouts, all of the other issues that

Page 81

1      a president-elect is trying to do?  100 percent.

2      There is -- undeniably, that is the case.

3  BY MR. PHILLIPS:

4      Q.   I'm pretty sure you wrote a book on this

5  question, but I'm going to ask it anyway.  Why did you

6  leave the White House?

7      A.   I did write a book.  It's called The

8  Briefing.  It's available on Amazon and at

9  SeanSpicer.com.

10     Q.   I may have an extra copy in my office.

11     A.   Thank you.  I appreciate it.  I left for two

12  reasons:  As previously stated, I fundamentally believe

13  that if you're a member of the press or Comms team and

14  you become the story, that you need to get out of the

15  way.  And I fundamentally believe through some of my

16  own mistakes as well as some of the actions that the

17  administration had taken that the current situation was

18  untenable.

19         Secondly, as I wrote in the book, I had been

20  performing off and on at various times the positions of

21  Press Secretary and Communications Director.  I have

22  noted the difference in responsibilities and roles in

23  both of those positions.  And so we had looked for some

24  individuals to take over one or either of the

25  positions.  Ultimately, the President decided on the

```
1    recommendation of some other people to bring in a
2    gentleman by the name of Anthony Scaramucci.  I believe
3    that Anthony Scaramucci, while very successful in the
4    world of finance and making media appearances as a
5    surrogate, was highly unqualified to do the job.  He
6    had no experience in government.  He didn't know the
7    various agencies.  He didn't have a background in
8    creating rollout plans.  The communications director is
9    the one who coordinates through the various 13
10   departments and their subagencies, independent
11   agencies, to roll out policy pronouncements and
12   coordinate messaging.  And if you couldn't name those
13   departments, I'm not sure that you're qualified to lead
14   that position.
15           And so knowing that Mr. Scaramucci's tenure
16   would reflect on me, meaning that the President would
17   look at some of the media attention and lack thereof,
18   and as he's not being qualified for the job, it would
19   have probably fallen to me, I chose to step out of the
20   way.
21       Q.   Okay.  I guess to that end, you would
22   disagree with Mr. Wolff or Mr. Woodward about how you
23   came to leave the White House?
24       A.   Can you enlighten me?
25       Q.   Yes.  About Trump wanting you out.
```

Page 83

1      A.   No, no.  Just to be clear, Mr. Trump, I

2   think, he -- I'm pretty open with this in my book.  I

3   think he had not liked some of the press briefings and

4   some of the interactions.  That's true.

5          As I said in answering your questions, I had

6   become the story too often.  But even the day I left,

7   Mr. Trump asked me to stay on board.  And I write in

8   very -- in detail in that book that you mentioned that

9   I should have taken more of a communications role and

10   less of a public facing role.  I think Mr. Trump had a

11   problem with the job I was doing as Press Secretary.  I

12   understood that, but I think -- I can't recall how Mr.

13   Wolff or Mr. Woodward ended their book, but Mr. -- I

14   left on great terms with him.

15          I think that the nature of the job, and this

16   is kind of what this all stems on, is I think there

17   was -- probably I should have had more of a

18   communications director role and less of a press

19   secretary role.

20      Q.   Okay.  In one passage -- I think it's Wolff,

21   W-O-L-F-F, for the court reporter -- asked the

22   question, probably rhetorical, "Or in Jared and

23   Ivanka's view, in his family's defense, what does

24   Spicer's 40-member comm staff actually do was a

25   persistent First Family question."

Page 84

```
 1          And the reason I wrote down to ask that about
 2    that was because it says 40 member comm crew or 40
 3    member comm staff.  How big was the Comms staff?
 4         A.   So as I mentioned, the press staff was 12,
 5    I'd say the Comms staff was probably 25.  I think if
 6    you add those two together, you get 37-38.  I think
 7    that's -- again, this goes back to a fundamental lack
 8    of understanding of how government worked by a lot of
 9    people who didn't fully understand some of the
10    machinations that -- and then, frankly, as I mentioned
11    in describing the roles of the two offices, the Comms
12    shop isn't a forward-facing -- it's a lot of planning,
13    it's a lot of rollouts, it's a lot of coordination.
14          And I think for a lot of people who haven't
15    been involved in government, they would look at some of
16    these folks and say, well, what does so and so do?  Not
17    realizing that rolling out a revision to the Tax Code
18    doesn't just happen with one person, calling one
19    reporter.  And so that would be my answer to that.
20         Q.   Yeah.
21         A.   And I would just say for the record, Mr.
22    Wolff's book in particular has been highly, highly
23    debunked in several areas for misleading and false
24    statements.
25         Q.   And nor am I trying to bolster.  Okay.
```

1     A.    You did very well.

2     Q.    Thanks.  It's -- you and I in another life

3  can have beers and talk about the craziness of all of

4  this.  It's not for today.  But I think it's pretty

5  common knowledge that I represented Omarosa in her case

6  against the campaign.  It's been interesting.

7          But the craziness about Wolff's and

8  Woodward's books, and I think it was probably

9  intentional, is they put a word index in the back so

10 when you've got books on shelves and you can just look

11 up Spicer and pull up the passages, it makes life a lot

12 easier on a busy attorney.

13         But as I was looking through the passages

14 trying to get a foundational knowledge and picture,

15 while not being naive, a 40 member Comms staff, right,

16 it's kind of why I highlighted that.  Where did the 40

17 people fit?  Do they all work in Washington, D.C.?

18    A.    Every one of them, yeah.  They work in the

19 old executive office building.  In fact, I would argue

20 if you look historically, the Trump Comms shop, at

21 least during my tenure, was smaller than Obama, Bush.

22         I think you can go back -- I don't know where

23 we ended up, but we got squeezed.  We lost bodies,

24 historically speaking.  And again, as I mentioned, I

25 don't have an org chart in front of me, but when you

1   think of the prep that it takes communication-wise, as

2   I mentioned, you're talking about 12 departments.  The

3   Department of Defense, the Department of Agriculture,

4   the Department of Health & Human Services, independent

5   agencies like the Security Exchange Commission, all who

6   have announcements or activities, travel that has to be

7   coordinated.  Sometimes it's just with the White House,

8   sometimes it's interagency.  There are big decisions

9   that boil up that deal with massive pronouncements of

10  U.S. policies and actions.

11          I would argue my staff at the White House --

12  excuse me, at the RNC in Washington was 90.  If you

13  talk about Comms shops, you are talking about 25

14  people.  Just the internal deliberations within the

15  White House, never mind the outside, they are a very

16  nimble shop.  There is no meat on the bone there.

17      Q.   To the extent Wolff's talking about Jared and

18  Ivanka, for lack of a better way to enunciate it, being

19  critical of the Comms shop, was that something you

20  experienced?

21      A.   I experienced it through rumor, never

22  directly.

23      Q.   Okay.  Did it affect how you operated?

24      A.   Not really.  I mean, obviously, when you hear

25  criticism, I don't think that many people are not

1    immune to it, but I did my job every day to the best of

2    my capabilities, and I had, for the most part, an

3    extremely dedicated staff that was very talented and

4    experienced.

5        Q.    Okay.  There's a tab in my binder called

6    Scaramucci.  I'm afraid to even look at it.  I think we

7    have covered it.

8            Let me do this:  It's 11:37.  Let me do one

9    more ten-minute break, and it will certainly be my

10   last.  I'm still trying to get us out around lunch.

11       A.    What time do you eat lunch, sir?

12       Q.    It usually starts with a 12.  My plan is to

13   get you out of here by 1:30, and I think it might be

14   substantially shorter.

15       A.    Okay.  I thought we had agreed to 12:30 prior

16   to this.

17       Q.    I think 12:30 should work, but I need -- give

18   me five minutes to get through it and my plan is to get

19   you out maybe even by 12:15.

20       A.    Okay.  Deal.

21           THE VIDEOGRAPHER:  The time is now 11:38 a.m.

22       We're going off the record.  This is the end of

23       Media Unit 2.  We're off the record.

24           (A recess was taken.)

25           THE VIDEOGRAPHER:  The time is now 11:46 a.m.

1      We are back on the record.  This is the beginning

2      of Media Unit 3.  Please continue.

3  BY MR. PHILLIPS:

4      Q.   Do you recall having any conversations with

5  Donald Trump about Ms. Delgado?

6      A.   Never.

7      Q.   Do you recall ever seeing them -- anything

8  about seeing them interact stand out to you?

9           MR. BLUMETTI:  Object to the form.

10          THE WITNESS:  No.

11 BY MR. PHILLIPS:

12     Q.   Have you had any conversations with Sean

13 Hannity about Ms. Delgado?

14     A.   Never.

15     Q.   Chris Hayes?

16     A.   Who?

17     Q.   Chris Hayes.

18     A.   I've never spoken to --

19     Q.   Yeah.

20     A.   Actually, that's not true.  No, I have not

21 ever had a conversation.

22     Q.   I should just keep going left.

23     A.   Sure.

24     Q.   Did you ever tell or communicate to Ms.

25 Delgado in any way that her tweets disqualified her

Page 89

1    from White House employment?

2        A.   Yes.  There was a conversation and I can't --

3    I'm trying to remember the full nature of where -- she

4    had threatened to send more tweets or go -- and I had

5    sort of said the best way to deal with this is that we

6    had retained counsel and that to express concerns

7    through counsel, but -- so I made it clear to her that

8    public pronouncements over this were not helpful going

9    forward.

10       Q.   Well, and saying something is the best way is

11   kind of offering them advice and a way out, isn't it?

12           MR. BLUMETTI:  Object to the form.

13           THE WITNESS:  I'm unclear.  A way out to

14       what, sir?

15   BY MR. PHILLIPS:

16       Q.   You said the best approach or the best way --

17       A.   Yes, because Ms. Delgado, in the e-mails that

18   you referenced earlier, had expressed concern over how

19   this was being handled.  We had retained counsel to

20   make sure that her concerns were addressed.  And my

21   point to her was if you have concerns, you know, you

22   have asked us to -- it was on her.  She had asked us to

23   deal with it, meaning, collectively, senior members of

24   the team.  We had addressed those concerns by retaining

25   counsel and advised her to express concerns with

1    counsel.  But when she had expressed to me a desire to

2    tweet or publicly vent further, I relayed to her that I

3    thought the better approach was to go through the

4    proper channels that had been established, that she had

5    requested, by the way.

6        Q.    The counsel that was retained was not for

7    her, correct?  It wasn't for -- it wasn't an attorney

8    for her?

9        A.    Well, in the same way that when you go to

10   your company's HR, that HR isn't for you.  I mean, I

11   don't know.  I'm not a lawyer.  I'm not an HR expert.

12   I mean, my assumption is that they're there to address

13   the concerns.  That was what Mr. Drieband was brought

14   on board to do.

15            Obviously, a transition adviser, which was

16   what I was, is not capable of handling legal employment

17   concerns nor HR issues that had been expressed by Ms.

18   Delgado.  So what I want to be clear on is that whether

19   it was a campaign or an office, we were ensuring that

20   she was speaking to the appropriate person to deal with

21   her concerns.

22       Q.    To what end?  Like, I guess what was -- and

23   it may be the same answer that I think is appropriate.

24   That's the legal side.  I don't know.  But I guess my

25   question is:  From Mr. Drieband's role in this, what

Page 91

1    changed?  What findings did he have or conclusions?

2         A.    Again, that's not -- I don't know that that's

3    his to share with me, or I mean -- I want to be clear.

4    Ms. Delgado, through e-mails and other communications,

5    expressed concerns about how her situation was being

6    addressed and asked us to treat it in a serious manner.

7    We retained somebody who was properly equipped to

8    address and understand that scenario from an HR

9    employment standpoint.  That's frankly where, from my

10   end, it ended; meaning that I'm not equipped to handle

11   HR concerns.  I'm not an HR professional or an

12   attorney.

13        And so as she would continue to communicate

14   with me, on the advice of counsel I steered her back to

15   where she had asked to go, i.e., she wanted somebody

16   to -- she wanted a mechanism to address concerns.  Me

17   not being in a situation to do that, I was doing

18   everything in my power to get it back to somebody who

19   was appropriately able to do that.

20        Q.    Are you aware of any White House policy

21   changes as a result of her complaints?

22        A.    She didn't work for the White House.

23        Q.    Okay.  Are you aware of any campaign,

24   transition, or White House policy changes that occurred

25   as a result of this?

1          MR. BLUMETTI:  Objection to form.

2          THE WITNESS:  No, I'm not.  But as I

3     mentioned, I was not an employee of the campaign,

4     and I was brought on late as an adviser to the

5     transition.

6  BY MR. PHILLIPS:

7     Q.   I guess what I'm trying to understand is as

8  to what could be achieved from her speaking to this

9  lawyer from the standpoint of what was intended by you

10 or whoever tasked this lawyer to talk to her.

11         MR. BLUMETTI:  Object to form.

12         THE WITNESS:  Again, I'm sorry if we're

13    talking past each other on this.  The e-mails that

14    were sent by Ms. Delgado expressed concerns about

15    her employment situation and issues that she

16    raised.  I'll speak for myself, as I have, and

17    said I was not in a position either of authority,

18    because I was an adviser, nor professionally to

19    address those concerns.  And so we retained

20    somebody who was.

21         It was not -- I just -- I'm almost finding

22    the question a little backwards, which is she's

23    the one asking for somebody to address the

24    concerns.  Knowing that I'm not equipped, we bring

25    somebody in, and you're asking what that person

1      can do.  Again, I think that's either a question

2      for him or for someone else in another field, but

3      not for me.

4  BY MR. PHILLIPS:

5      Q.   And I guess I was trying to see what -- Jason

6  resigns.  There was no way to terminate Jason.  What

7  else --

8      A.   I don't know.  That's again a question for

9  Ms. Delgado.  Not for me.

10     Q.   Okay.  And this all started because of me

11  asking whether you ever communicated to her that she

12  was disqualified as an employee of the Executive Office

13  of the President or White House.

14     A.   Again, I've stated over and over again, I

15  don't think that she was qualified from the get-go, so

16  there was no disqualifying.  It was, I would have never

17  recommended her for a position to begin with.

18     Q.   There were a lot of people, including, I

19  think, you've discussed Mr. Scaramucci, who were

20  retained by the White House, who didn't meet your

21  standards or qualifications.

22     A.   Correct.  Some I had -- I mean, there were

23  plenty of people recommended to me during my tenure to

24  be hired that I chose not to hire or recommend.  There

25  were people that didn't get hired.  And then there were

1    people that got brought in like Mr. Scaramucci who

2    because I couldn't make a difference, I chose to step

3    down.

4        Q.   Okay.  You talked about an incident on a

5    plane reported to you by Hope Hicks.  Do you recall an

6    incident between Corey Lewandowski and Hope Hicks where

7    there was like a screaming argument between the two?

8            MR. BLUMETTI:  Objection to form.

9            THE WITNESS:  I do not.

10   BY MR. PHILLIPS:

11       Q.   Did you inform Ms. Delgado that -- strike

12   that.

13           At any point in your communications,

14   particularly text communications with Ms. Delgado, did

15   you ever explain to her that she in any way did not

16   qualify for White House employment?

17           MR. BLUMETTI:  Objection to form.

18           THE WITNESS:  I don't believe over text that

19       would have been a discussion.

20   BY MR. PHILLIPS:

21       Q.   Or e-mail?

22       A.   If you have something that sheds light on

23   this, but I don't recall anything in any -- any of

24   those communications.

25       Q.   Okay.  I mean, my review of the e-mail, and I

1    don't know that I have everything, but my review of the

2    e-mail shows that you're actually trying to assist Ms.

3    Delgado with finding employment even if it's not in the

4    White House.  Do you disagree with that?

5            MR. BLUMETTI:  Objection to form.

6        Mr. Phillips, can you show the witness the e-mail

7        if you're going to give him your interpretation of

8        it?

9    BY MR. PHILLIPS:

10       Q.    The Politico story, do you know who brought

11   this, this whole affair thing to Politico's attention?

12       A.    Could you enlighten me what Politico -- which

13   story are you referring to and --

14       Q.    Yeah.  Do you know who brought -- so before

15   Delgado's tweet, did you have any media requests

16   related to a potential affair or issue involving

17   somebody in the campaign at a high level?

18       A.    Not that I'm aware of.  What story are you

19   referring to?  What's the date and the reporter?

20       Q.    So Plaintiff's 91, which I don't have

21   scanned, is an e-mail from AJ to Steve Bannon and Jason

22   Miller.  It states:  "I just received a call from Jason

23   that five to six reporters were e-mailing saying he and

24   I are having an affair.  Politico's Alex just called

25   and Jason believes this is Corey and Hope's doing.

Page 96

1  E-mail to reporters even said this is why staff rollout

2  announcements (Jason's) are delayed."  It's Plaintiff

3  91.

4          You weren't listed on this e-mail, so I don't

5  even know what showing it to you would do, but were you

6  aware before the tweet --

7     A.   No.

8     Q.   -- that this was all churning up?

9     A.   I was not.

10    Q.   I think we talked about your book and the

11 mentioning about whether you knew about a DUI.  Do you

12 know whether it was one or more than one DUI?

13    A.   Just to be clear, you weren't talking -- my

14 book is -- my first book is The Briefing.

15    Q.   Her book.

16    A.   Correct.  You're referring to Ms. Grisham's

17 book?

18    Q.   Yes.  In Ms. Grisham's book, do you know

19 whether it was one DUI or more than one DUI that she

20 had?

21    A.   I believe according to her account, she had,

22 I think, two.  But again, I only was made aware of this

23 in the publication of her book.

24    Q.   One thing about me is I get hangry, so I'm

25 trying to get done in ten minutes and getting a little

Page 97

1    hungry, so I apologize if I'm --
2         A.   Don't worry.
3         Q.   I'm trying to get you out as promised.  Text
4    messages, we have covered that.  Will you agree with me
5    that as late as January 2017 you were trying to assist
6    Ms. Delgado with employment in a campaign?
7              MR. BLUMETTI:  Objection, form.
8              THE WITNESS:  I think I had given her some
9         options.  As I stated earlier, staying on the
10        campaign payroll was an option.  But just to be
11        clear, I had also advised her I was not in a
12        position -- I didn't work for the campaign.  I
13        didn't have the authority to offer her a job or
14        help her.  I said that I could be helpful, which I
15        could be.
16   BY MR. PHILLIPS:
17        Q.   Okay.  Is there any text or e-mail that you
18   can point to whatsoever where you tell Ms. Delgado she
19   does not have a White House job?
20        A.   No.  All of the conversations that we had
21   pertaining to employment were verbal.  And again, it
22   was more she telling me what Mr. Miller had promised
23   her, specifically the location where she would work
24   from, and me explaining why that wasn't going to --
25   that there was no scenario where that would happen.

1    Q.   Isn't that exactly why sexual harassment in
2    the workplace is inappropriate because people make
3    promises that they may not intend to keep, but they're
4    making promises for their own sexual gratification?
5    A.   I have never engaged in sexual harassment, so
6    I don't know why people do.
7            MR. PHILLIPS:  Okay.  That's all the
8        questions I have.  Thank you, Mr. Spicer.  I
9        appreciate it.
10           THE WITNESS:  Thank you.  Pleasure.  Thank
11       you, guys.
12           THE VIDEOGRAPHER:  The time is now 12:05 p.m.
13       This concludes the videotape deposition of
14       Mr. Spicer.  The total number of media units used
15       was three and will be retained by Veritext Legal
16       Solutions.  Again, the time is 12:05 p.m., and we
17       are off the record.
18           (The following colloquy took place off the
19       video record.)
20           THE COURT REPORTER:  Okay.  Read or waive?
21           MR. PHILLIPS:  You have the right to read
22       this transcript for any inaccuracies or errors.
23       If you make a substantial change, I'll get to
24       redepose you of the change, or you can waive that
25       right.  Usually your counsel kind of helps you

```
 1      with that decision.

 2             THE WITNESS:  Okay.

 3             MR. PHILLIPS:  Or not.  Do you want to read

 4      or waive?

 5             THE WITNESS:  Oh.  Jared, unless you have a

 6      -- we have a video.

 7             MR. BLUMETTI:  We're going to review.  We're

 8      going to request a paper copy of the transcript,

 9      and we don't need the videotape portion of it to

10      the extent it's being recorded.  Just the

11      transcript, which we'll review and send to

12      Mr. Spicer and we'll respond.

13             THE COURT REPORTER:  Okay.  Mr. Phillips,

14      would you like to order?

15             MR. PHILLIPS:  Yes.

16             THE VIDEOGRAPHER:  Mr. Phillips, are you

17      ordering the video at this time?

18             MR. PHILLIPS:  No video at this time.

19             THE COURT REPORTER:  Mr. Blumetti, would you

20      like a copy as well?

21             MR. BLUMETTI:  A copy of the transcript,

22      please.

23             (Deposition concluded at 12:05 p.m.)

24

25
```

Page 100

1                    CERTIFICATE OF OATH

2

3     STATE OF FLORIDA

4     COUNTY OF ORANGE

5

6        I, the undersigned authority, certify that SEAN M.

7     SPICER personally appeared before me and was duly

8     sworn.

9

10       WITNESS my hand and official seal this 27th day of

11    July, 2023.

12

13

14

15

16                    Lee Ann Reid, Registered

                      Professional Reporter

17                    Notary Public - State of Florida

                      My Commission Expires:  7/16/2027

18                    Commission No.:  HH 387767

19

20

21

22

23

24

25

Page 101

1                          REPORTER'S CERTIFICATE
2
3       STATE OF FLORIDA              :
4       COUNTY OF ORANGE              :
5
6
            I, Lee Ann Reid, Registered Professional
7       Reporter, certify that I was authorized to and did
        stenographically report the deposition of SEAN M.
8       SPICER; that a review of the transcript was requested
        and that the transcript is a true and complete record
9       of my stenographic notes.
10            I further certify that I am not a relative,
        employee, attorney, or counsel of any of the parties,
11      nor am I a relative or employee of any of the parties'
        attorneys or counsel connected with the action, nor am
12      I financially interested in the outcome of the
        foregoing action.
13
            Dated this 27th day of July, 2023, IN THE CITY
14      OF ORLANDO, COUNTY OF ORANGE, STATE OF FLORIDA.
15
16              _Lee Ann Reid_
17              _____
                Lee Ann Reid, Registered Professional
18              Reporter
19
20
21
22
23
24
25

```
1                          ERRATA SHEET
2    PLEASE ATTACH TO THE DEPOSITION OF SEAN M. SPICER TAKEN
     ON JULY 17, 2023 IN THE CASE OF ARLENE DELGADO V.
3    DONALD J. TRUMP FOR PRESIDENT, INC., SEAN SPICER,
     individually, REINCE PRIEBUS, individually, and STEPHEN
4    BANNON, individually.
5
     PAGE     LINE      CORRECTION AND REASON THEREFOR
6
7
8
9
10
11
12
13
14
15
16
17
18
19
     I HAVE READ THE FOREGOING PAGES AND, EXCEPT FOR ANY
20   CORRECTIONS OR AMENDMENTS INDICATED ABOVE, I HEREBY
     SUBSCRIBE TO THE ACCURACY OF THIS TRANSCRIPT.
21
22
23   SEAN M. SPICER                    DATE
24
25   WITNESS TO SIGNATURE              DATE
```

```
 1   JULY 27, 2023
 2   SEAN M. SPICER
     C/O JARED E. BLUMETTI, ESQUIRE
 3   LaRocca, Hornik, Rosen & Greenberg LLP
     The Trump Building
 4   40 Wall Street, 32nd Floor
     New York, New York 10005
 5   Re:  JULY 17, 2023 DEPOSITION OF SEAN M. SPICER
              ARLENE DELGADO V. DONALD J. TRUMP FOR
 6            PRESIDENT, INC., SEAN SPICER, individually,
              REINCE PRIEBUS, individually, and STEPHEN BANNON,
 7            individually.
 8   Dear Sir:
 9      This letter is to advise that the transcript of
     the above-referenced deposition has been completed
10   and is available for review.  Please contact our
     office at (800)275-7991 to make arrangements to read
11   and sign or sign below to waive review of this
     transcript.
12
        It is suggested that the review of this
13   transcript be completed within 30 days of your
     receipt of this letter, as considered reasonable
14   under Federal Rules*; however, there is no Florida
     Statute to this regard.
15
        The original of this transcript has been
16   forwarded to the ordering party and your errata, once
     received, will be forwarded to all ordering parties.
17
                              Sincerely,
18
                              Lee Ann Reid, RPR
19                            Veritext Legal Solutions
20   cc:  John M. Phillips, Esquire
21   WAIVER:
     I, _____ hereby waive the reading &
22   signing of my deposition transcript.
23   _____      _____
     Deponent Signature          Date
24
     *Federal Civil Procedure Rule 30(e)/Florida Civil
25   Procedure Rule 1.310(e)
```

**[& - acceptable]**

**&**

**&**   2:2,5,9 4:7
  7:16 86:4 103:3
  103:21

**1**

**1**   1:21 8:14 9:10
  26:11 50:25
**1.310**   103:25
**100**   2:13 81:1
**10005**   2:7 103:4
**101**   2:14
**102**   2:15
**103**   1:21 2:16
**10:24**   50:23
**10:36**   51:2
**10:43**   55:8
**10:44**   55:11
**11764**   1:4 3:9
**11:37**   87:8
**11:38**   87:21
**11:46**   87:25
**12**   40:14 56:1
  84:4 86:2 87:12
**12/22**   27:25
**12:05**   1:13
  98:12,16 99:23
**12:15**   87:19
**12:30**   87:15,17
**13**   82:9
**15**   51:11
**17**   1:12 3:3
  102:2 103:5
**19**   1:4 3:9
**1990s**   22:20

**1:00**   25:13
**1:30**   87:13
**1st**   9:8

**2**

**2**   7:10 9:14 51:4
  78:8 87:23
**20**   8:9
**2014**   9:24
**2015**   9:24 10:6,8
  10:17 14:5
**2016**   10:8 12:2
  12:17 13:24
  14:5,6,10 16:12
  23:13 48:3
  77:25
**2017**   8:11 9:8,10
  9:15,19 18:9
  21:18 28:18
  32:18 97:5
**2018**   7:10,20
  8:11 9:19 68:5
**2022**   29:11
**2023**   1:12 3:3
  100:11 101:13
  102:2 103:1,5
**2024**   72:19
**20th**   26:3,15
**21**   18:9 21:18
**212**   2:3
**21st**   9:8 11:18
  18:3,20 23:24
  25:7 26:13,16
  30:22,24 31:2
  33:5 37:22
  39:22 63:19

**22nd**   12:10
  23:24 25:7,13
  26:13,21,23
  27:16 29:11
  34:21 57:19
**23rd**   34:22
  57:19
**24**   9:1,5 19:25
  21:4 26:3,6,9
**24/36**   25:4
**25**   65:15 84:5
  86:13
**25004**   100:15
  101:17
**27**   103:1
**275-7991**
  103:10
**27th**   100:10
  101:13
**28**   32:17
**281**   48:3

**3**

**3**   88:2
**30**   48:2 79:16
  103:13,24
**32202**   2:3
**32nd**   2:6 103:4
**37-38**   84:6
**387767**   100:18

**4**

**4**   2:12 47:2
**40**   2:6 56:21
  83:24 84:2,2
  85:15,16 103:4

**5**

**5**   78:8

**7**

**7/16/2027**
  100:17
**72**   58:4,11

**8**

**800**   103:10

**9**

**90**   55:1 86:12
**91**   95:20 96:3
**96**   58:11
**99**   28:23
**9:03**   1:13 3:2

**a**

**a.m.**   1:13 3:2
  50:23 51:2 55:8
  55:11 87:21,25
**ability**   66:16
  71:12,13
**able**   30:24 41:25
  42:23 44:7 56:7
  75:20 76:7,14
  76:20 91:19
**above**   102:20
  103:9
**absolutely**   43:4
  52:4
**abundantly**
  59:3
**accept**   40:23
**acceptable**   30:9

access 56:20
accommodati...
  43:12,14
account 64:9
  96:21
accuracy 102:20
accusations
  49:8
achieved 92:8
acknowledged
  48:15
act 44:7 70:11
  70:16,18
acting 70:17
action 58:15
  101:11,12
actions 57:18
  59:6 62:3,9,11
  66:11,16,19
  81:16 86:10
actively 62:12
activities 10:20
  14:16 86:6
actual 32:10
  75:16,17
actually 8:15
  17:22 34:17
  46:13 74:25
  83:24 88:20
  95:2
add 84:6
address 29:2
  34:23 48:23
  90:12 91:8,16
  92:19,23

addressed 48:14
  89:20,24 91:6
addressing
  77:17
adjudicated
  39:14 64:10
adjudication
  73:15
administration
  14:9 81:17
adulterous
  80:13
adultery 36:6
advance 54:12
advice 34:5
  89:11 91:14
advise 103:9
advised 89:25
  97:11
adviser 12:12
  90:15 92:4,18
affair 73:22
  80:13 95:11,16
  95:24
affect 86:23
affected 66:16
affiliated 22:9
affiliations 4:1
  39:9
afraid 87:6
age 71:11
agencies 82:7,11
  86:5
agent 44:7

ago 61:5 69:20
agree 5:19 97:4
agreed 3:23
  87:15
agreement 13:5
agriculture 86:3
aguirre 45:25
ahead 54:13
aides 38:18
  39:21
aj 12:15 21:7,10
  38:16 50:10
  57:6 72:15,16
  95:21
aj's 59:4
alan 2:10 3:12
alarm 35:12,14
  78:9
alcohol 39:18
alex 95:24
allegations
  63:12 73:21
alleged 68:2
allow 71:15
allowed 67:21
amazon 81:8
amendments
  102:20
america 8:18
  31:22 32:5,19
american 19:15
amount 77:6
analysis 65:20
ann 1:18 3:15
  100:16 101:6,17

103:18
announced 26:4
announcement
  26:24 27:25
announcements
  35:8 86:6 96:2
announcing
  80:5
answer 5:9,23
  6:24 10:4 11:2,7
  14:12 15:5,6
  17:9 18:23
  55:16 64:22
  69:3 71:7 76:2
  77:11 84:19
  90:23
answered 8:8
  41:7
answering 72:1
  83:5
anthony 82:2,3
anti 46:1
anybody 27:19
  30:7,10 37:10
  38:11 57:17
  62:7 67:17
  73:11 74:2
anyway 81:5
apologize 26:1
  97:1
app 70:1 71:20
apparent 10:6
apparently
  75:15

appear  12:22
  20:18
appearances  2:1
  82:4
appeared  100:7
application  39:5
apply  22:12
appointed  17:24
appointments
  18:9
appreciate
  81:11 98:9
appreciated
  56:7
approach  89:16
  90:3
appropriate
  37:9 51:17 52:2
  67:4 90:20,23
appropriately
  91:19
approximately
  7:13 25:13
  26:12
apps  70:7 71:14
  71:15
archives  28:20
areas  84:23
argue  85:19
  86:11
argument  94:7
arizona  57:3
arlene  1:2 2:8
  3:5 102:2 103:5

arm  32:6
arrangements
  103:10
article  45:24
asked  4:16 14:4
  16:16 18:10,17
  30:1 31:15
  32:23 35:16
  42:22 54:11
  75:11 83:7,21
  89:22,22 91:6
  91:15
asking  10:12,14
  24:3,15 35:11
  47:4 56:5 60:6
  61:23 68:25
  71:7 72:23
  92:23,25 93:11
aspect  18:8
  67:25 73:8
assault  66:23
assets  57:4
assigned  54:8
assist  14:24,25
  95:2 97:5
assistance  20:19
assistant  40:15
assistants  40:17
associates  10:9
  39:16
assume  5:24
  7:22 16:25 18:2
  28:12 33:18
  47:12

assumed  31:5
  44:19
assumption
  90:12
attach  102:2
attention  45:2
  82:17 95:11
attorney  2:4,7
  4:4 5:1 47:10,11
  48:5 67:12
  68:16 85:12
  90:7 91:12
  101:10
attorneys
  101:11
audible  3:21
audiences  19:6
audio  3:22
august  12:17
  14:6,10,18
authority  92:17
  97:13 100:6
authorized
  101:7
available  81:8
  103:10
aware  12:14,19
  13:4,8 23:17,21
  25:22 32:2
  33:17,18,22
  34:11 37:12
  38:8 39:1 45:14
  60:17 63:8,10
  63:15 64:9,12
  64:16 65:15

72:2 73:20,25
74:11,16,21
76:17 91:20,23
95:18 96:6,22

**b**

b  2:17 47:9
baby  23:25
  24:11,14 42:16
back  6:3 7:25
  10:7 11:15
  18:22 20:20
  21:15,22 29:3
  51:3 55:12
  59:25 65:18
  66:7,22,24
  68:11 84:7 85:9
  85:22 88:1
  91:14,18
background
  11:1,12 33:15
  38:9,11 39:1
  48:18 63:23
  64:2 73:13 82:7
backgrounding
  62:4,13
backwards
  92:22
ballpark  16:15
bannon  1:7 3:8
  61:15 95:21
  102:4 103:6
base  31:17
based  30:13
  60:10

**basic** 42:12
**basically** 19:25
  23:9
**bates** 48:3
**battling** 77:9
**bear** 63:22
**bearing** 39:8
**becoming** 59:16
**beers** 85:3
**beg** 62:6
**began** 11:17
  18:21 24:15
  66:22
**beginning** 51:3
  88:1
**behalf** 3:13,15
  4:7 7:3
**behavior** 30:8
  30:10 39:16
  43:16 66:4,5
**believe** 7:11
  9:22 12:21
  13:16 22:20
  24:11 25:17
  26:15 28:1,7,11
  31:3,4 32:6
  33:12 34:4
  41:14 43:17,24
  45:20 47:4,7,18
  60:9 64:6 65:2
  67:9 68:24
  69:15 70:21
  71:22 73:23
  75:10 81:12,15
  82:2 94:18

96:21
**believes** 29:9
  95:25
**bell** 73:18
**best** 9:11,16
  12:16,20 22:19
  26:8 43:8 46:17
  48:20 68:17
  79:24 87:1 89:5
  89:10,16,16
**better** 5:16 6:1
  13:1,22 56:16
  70:23 86:18
  90:3
**beyond** 21:4
  34:11 37:22
**big** 16:21 19:19
  26:23 80:17,23
  84:3 86:8
**binder** 87:5
**bit** 51:8 53:8
  56:17
**blackmail** 39:18
**blowing** 52:12
**blumetti** 2:5 4:6
  4:6 10:3 14:11
  15:3,5,8 17:8,16
  23:8 29:13 30:4
  36:9,25 37:7,17
  41:6 44:15 45:4
  47:15 49:14
  50:21 51:24
  52:14 53:20
  55:4 58:25
  68:20 69:2 79:8

80:16 88:9
  89:12 92:1,11
  94:8,17 95:5
  97:7 99:7,19,21
  103:2
**blunt** 34:12
**bluster** 5:12
**board** 83:7
  90:14
**boca** 9:23
**bodies** 85:23
**body** 60:23
  61:18
**boil** 86:9
**boiling** 65:18
**bolster** 84:25
**bone** 86:16
**book** 7:5 59:11
  64:7 70:9 81:4,7
  81:19 83:2,8,13
  84:22 96:10,14
  96:14,15,17,18
  96:23
**books** 70:6 85:8
  85:10
**boss** 36:2 48:11
**bottom** 24:22
**boza** 44:25
**brand** 55:14
**break** 6:6 48:1
  50:13,19 87:9
**brian** 31:24,25
  32:18
**briefing** 81:8
  96:14

**briefings** 21:2
  83:3
**bring** 77:16
  82:1 92:24
**bringing** 54:20
**brought** 48:5
  74:15 75:25
  90:13 92:4 94:1
  95:10,14
**building** 2:6
  85:19 103:3
**built** 58:5
**bunch** 4:19
**bureaucracy**
  55:24
**bush** 85:21
**business** 7:6,10
  7:23 8:11 10:1
  22:22 23:4
  70:14
**businesses**
  22:23
**busy** 85:12
**byproduct** 80:8

**c**

**c** 7:2 17:25 74:3
  103:2
**calendar** 9:24
**call** 26:10,23
  39:12 44:5 48:4
  52:24 54:14
  71:12 95:22
**callahan** 17:1
**called** 6:16 7:15
  8:14 17:25 19:9

25:14 81:7 87:5
95:24
**calling** 10:15
62:20 84:18
**calls** 28:5,12
58:17 67:3
71:10
**calm** 56:23
**camera** 3:19
61:9
**cameras** 56:13
**campaign** 6:19
10:22 11:13
12:6,22 13:5
14:9 15:1,16
16:10 17:15
18:5 19:3,4,7,10
21:8 22:2 23:10
23:18,20 27:10
30:16 31:13,17
32:1 34:13,15
35:13,15,22
45:13 47:18
50:1 53:25 54:6
56:11,18 57:4
57:24 60:4,24
61:13 65:1
67:10 68:18,24
72:19 78:2,14
78:19 80:3,10
80:14 85:6
90:19 91:23
92:3 95:17 97:6
97:10,12

**campaigns** 32:1
**candidacy** 14:9
**candidate** 15:23
15:24 16:5
17:13,19 19:12
33:1 35:22 54:9
56:9 57:17
**candidates** 27:8
**capabilities**
87:2
**capable** 90:16
**capital** 58:13
**capitol** 22:3,21
38:6
**captured** 70:15
**caputo** 63:3
**care** 50:7 76:7
**career** 4:17 8:1
**case** 3:8 11:3
38:2 39:14 56:4
56:11 69:8,9,12
72:10 81:2 85:5
102:2
**cases** 24:3 58:3
58:10
**categories** 21:20
**catherine** 2:9
73:17,22
**cc** 103:20
**cell** 52:21
**certain** 22:21
27:6 55:21 68:6
**certainly** 6:3
15:13 17:14,21
29:3 77:12 87:9

**certificate** 2:13
2:14 100:1
101:1
**certify** 100:6
101:7,10
**cetera** 21:6
**chain** 13:1
18:18
**chance** 5:9
**change** 15:23
58:13 98:23,24
**changed** 40:7
91:1
**changes** 91:21
91:24
**channels** 90:4
**character** 39:8
39:10
**charge** 36:22
**chart** 45:6 85:25
**check** 8:10,25
9:13 31:3 32:8
38:9,11 39:1
73:13 77:7
**chief** 12:2 14:15
33:11 54:2
**child** 36:4 42:2
75:24 77:2,4
**children** 80:12
**chips** 58:5
**choices** 39:17
**chose** 82:19
93:24 94:2
**chris** 88:15,17

**christmas** 35:7
41:14 57:25
59:4 79:1
**christmastime**
58:7 77:25
**chronologically**
7:25 8:21
**chronology**
11:14
**churning** 96:8
**city** 101:13
**civil** 1:17 3:8
103:24,24
**claims** 47:14
**clarification**
24:19
**clarify** 32:24
61:17
**clean** 50:14
**clear** 7:9 8:20
16:13 19:19
21:24 30:5
32:12 42:10
47:4 59:4 61:22
65:10,22 66:9
70:11,20 83:1
89:7 90:18 91:3
96:13 97:11
**clearance** 22:6
65:4,15 67:22
67:24 73:16
**clearances** 65:9
76:10
**clearly** 16:4
27:15 49:20

78:16
**client** 6:20
**clients** 7:20
**close** 56:14
**closer** 56:13
**code** 84:17
**cold** 58:1
**collectively**
89:23
**college** 64:1,3
**colloquially**
54:7
**colloquy** 98:18
**come** 18:4 26:24
28:21 39:23
45:1 54:18
67:14 79:20
**coming** 35:20
51:19
**comm** 83:24
84:2,3
**command** 13:2
**comment** 32:9
**commented**
53:7
**comments** 51:15
**commission**
86:5 100:17,18
**committed** 62:9
62:11
**committee**
10:21 11:20,22
11:24 14:15
**committees** 32:1

**common** 49:12
85:5
**comms** 18:25
19:2,7,11,16,18
20:11 27:22
32:25 38:16
44:2 61:16
74:24 75:6
76:13 81:13
84:3,5,11 85:15
85:20 86:13,19
**communicate**
19:13 48:24
67:1,5 69:21
71:17 88:24
91:13
**communicated**
48:9 66:7,22,24
71:17,23 93:11
**communication**
43:17 59:14
86:1
**communicatio...**
11:25 12:3
14:14 19:1,4,6
19:22,23 20:19
20:23 21:3,4,17
22:16 23:18,19
24:1,5,12,13
25:16,18 30:11
30:25 33:25
35:18 37:19,20
38:20 44:4,6
52:3 53:24 56:2
66:13 67:11

68:15 70:12
71:2 73:8 81:21
82:8 83:9,18
91:4 94:13,14
94:24
**companies** 7:1
**company** 7:2
36:13 37:1
**company's**
90:10
**complaints**
91:21
**complete** 101:8
**completed**
73:13 103:9,13
**completely**
26:25 27:6
**complex** 42:21
**component**
32:10 51:8
**comprehensible**
5:8
**concern** 10:10
70:10,16 80:1
89:18
**concerns** 10:16
48:15,19,23
49:21 89:6,20
89:21,24,25
90:13,17,21
91:5,11,16
92:14,19,24
**concluded**
99:23

**concludes** 98:13
**conclusions**
91:1
**concurrent** 7:23
7:23 8:6,9
**conduct** 65:17
70:13
**conducted** 1:11
3:18
**conference** 4:25
5:17
**confidence**
59:21
**confident** 60:3
**confines** 80:20
**congress** 64:24
64:25
**connect** 73:25
**connected**
101:11
**connecting** 32:3
**connection** 3:19
**consider** 21:14
55:20 58:21
**consideration**
54:23
**considered**
27:10 30:7 41:9
74:24 103:13
**constraints**
43:11
**consulting** 6:18
7:1 8:9 9:12,15
**consumption**
58:9

**contact** 23:7
103:10
**contacted** 47:13
**context** 69:16
**continue** 3:22
8:25 51:4 55:12
88:2 91:13
**continuing**
11:14
**contractor** 23:2
**conversation**
5:1 27:20 41:17
64:11 73:21
75:18,23 77:21
88:21 89:2
**conversations**
27:4,17 35:9
41:11,13,20
42:4 77:4,13,18
88:4,12 97:20
**coordinate**
10:20 14:16
82:12
**coordinated**
86:7
**coordinates**
82:9
**coordination**
14:22 16:24
84:13
**copy** 81:10 99:8
99:20,21
**corded** 71:11
**corey** 94:6
95:25

**correct** 8:19
14:4 25:8,23
33:21 38:23
40:9 65:5,21
90:7 93:22
96:16
**correction**
102:5
**corrections**
102:20
**correlation**
49:24
**correspondence**
13:20
**counsel** 1:14
3:25 15:10 34:5
36:1 39:6 47:18
48:22 49:17
52:16 67:25
89:6,7,19,25
90:1,6 91:14
98:25 101:10,11
**counsel's** 65:13
**counselor** 26:1
28:3 43:15 59:7
**counterpart**
23:10
**county** 100:4
101:4,14
**couple** 40:16,17
**course** 18:23
77:19
**court** 1:1 3:10
3:14 4:1 5:4 6:4
74:8 83:21

98:20 99:13,19
**covered** 87:7
97:4
**covering** 13:10
56:7
**craziness** 85:3,7
**crazy** 5:12
**create** 18:17
44:5
**created** 57:22
**creating** 82:8
**creative** 56:23
**crew** 84:2
**criminal** 39:15
64:5
**critical** 70:7,8
79:22 86:19
**criticism** 45:11
86:25
**cruz** 73:24
**crystal** 65:10
**cuba** 61:17
**culmination**
66:10
**current** 72:17
81:17
**currently** 6:15
6:16 36:3 45:23
67:18
**custody** 77:14
**cutting** 41:5
**cv** 1:4 3:9
**cycle** 10:8 12:1
15:23,23

**cycles** 11:24,25
16:6

## d

**d** 2:11 47:9,9
**d.c.** 75:20,21,25
85:17
**daddy** 23:25
24:11,14
**damage** 57:22
**damaging** 57:22
**dan** 25:16 38:20
**date** 1:12 9:10
26:4 37:23
95:19 102:23,25
103:23
**dated** 101:13
**day** 17:5,5
23:15 25:10
29:15 74:20
83:6 87:1
100:10 101:13
**days** 77:24 78:7
78:8 103:13
**deal** 7:4,5 49:21
58:3 59:9 86:9
87:20 89:5,23
90:20
**dealing** 5:4 20:1
20:1 21:1 35:6
58:1,19 69:18
72:9 78:4
**dealings** 7:6
10:1
**deals** 9:15 19:23

**dealt** 58:12 73:7
**dear** 103:8
**debate** 10:11,16
**debates** 10:7
**debunked** 84:23
**decades** 58:6
**december** 12:10
  13:21,24 23:24
  25:7,13 26:21
  26:23 48:2
  52:10 57:19
**decide** 30:3
**decided** 33:1
  81:25
**decision** 46:5,7
  46:8,22 50:4
  57:8 68:11 73:1
  99:1
**decisions** 64:20
  73:5 86:8
**declaring** 24:20
**dedicated** 87:3
**deem** 62:17
**defaults** 78:1
**defendants** 1:8
  2:7
**defense** 83:23
  86:3
**defer** 27:21 40:6
**deferred** 40:3
**degree** 64:3
  79:2,5
**delayed** 96:2
**delete** 28:20,21
  29:4

**deletes** 46:1
**delgado** 1:2 2:8
  3:5 4:5 11:14
  12:15,25 21:7
  21:10 23:22,23
  29:6,11 30:3,8
  31:1,15 32:3,18
  33:1 34:1,10,22
  35:4 38:16,24
  40:1,7 41:4,12
  41:13 42:5,21
  43:13,16 44:14
  45:12 47:1,23
  48:9 49:8,19,25
  50:6,10 51:10
  52:19 53:6,9
  59:23 63:16
  65:3 67:15 71:2
  71:18 72:15,16
  73:2 74:16 75:8
  75:19,24 76:4
  77:13 78:22
  79:6 88:5,13,25
  89:17 90:18
  91:4 92:14 93:9
  94:11,14 95:3
  97:6,18 102:2
  103:5
**delgado's** 47:14
  57:6 69:6 76:24
  95:15
**deliberations**
  86:14
**delineates** 19:21

**demanding**
  42:22 43:3
**demands** 76:17
**demeanor** 54:10
  56:24 59:22
**denied** 65:9
**denson** 68:12
**department**
  36:2 54:12 86:3
  86:3,4
**departments**
  20:11 82:10,13
  86:2
**depending**
  48:16
**depends** 3:18
  6:7 54:25
**depo** 29:3
**deponent**
  103:23
**deposed** 4:11
**deposition** 1:10
  3:4,17 4:17,21
  4:24 11:6 69:21
  72:2,3,4,5 76:25
  98:13 99:23
  101:7 102:2
  103:5,9,22
**depositions** 69:7
**deputies** 40:17
**deputy** 33:11
  54:1 57:15
**derogatory** 46:3
**described** 48:10

**describing**
  84:11
**desire** 90:1
**detail** 83:8
**determine** 39:3
  45:16 64:18
**developed** 56:5
**differ** 62:6
**difference** 16:21
  19:20 80:18,23
  81:22 94:2
**different** 4:25
  20:11 27:17
  32:23 38:23
  56:3
**dinner** 57:25
  59:5
**direct** 2:12 4:12
  14:21 37:2
**direction** 9:20
**directly** 12:5,8
  86:22
**director** 12:1,3
  14:14 20:19,23
  21:4 24:1,6,12
  24:13 25:16,17
  25:18 35:18
  37:19 38:16,20
  38:21 81:21
  82:8 83:18
**disagree** 82:22
  95:4
**disappeared**
  69:25 70:3

**discipline** 63:5
**discoverable**
  70:13
**discovery** 1:15
  28:16
**discuss** 23:13
  24:4 31:19 34:5
  42:18 65:8
**discussed** 9:10
  42:10 61:24
  63:25 71:20
  73:10,10 74:1
  75:15 76:1
  93:19
**discussion**
  31:12 46:23
  55:10 58:17
  64:8 70:6 77:1
  77:10 94:19
**discussions** 24:7
  27:1 34:16
  54:18 74:7
**dismiss** 65:12
**disparage** 13:9
**disqualified**
  43:1 88:25
  93:12
**disqualifying**
  57:20 64:19
  65:19,23,23
  93:16
**distract** 80:24
**distraction**
  78:16

**district** 1:1,1
  3:10,10
**division** 21:16
  54:14
**divvy** 20:4,24
**dms** 71:15
**documentation**
  26:2
**doing** 16:5
  45:20 46:24
  60:4 61:5 77:21
  79:16 83:11
  91:17 95:25
**dollar** 77:6
**dollman** 50:5
**dollman's** 50:3
**don** 47:17 48:21
**donald** 1:5 3:6
  9:21 13:10
  14:10 51:22
  60:18 88:5
  102:3 103:5
**donor** 9:25
**dots** 73:25
**dotted** 44:5
**drafted** 38:17
**drieband** 47:9
  47:10 48:4,24
  49:13,18 90:13
**drieband's**
  90:25
**drink** 72:25
**drive** 18:5
**driven** 20:16,17

**drug** 39:18
**drugs** 39:17
**due** 61:4 71:6
**dui** 96:11,12,19
  96:19
**duly** 4:10 100:7
**dumb** 18:24
**duration** 6:5,10
**duties** 31:5
**dwi** 64:9,17

**e**

**e** 2:5,11,17
  13:16,18 45:25
  46:1,1 47:1,9
  48:19 61:15
  71:23 74:3,3,3
  89:17 91:4
  92:13 94:21,25
  95:2,6,21,23
  96:1,4 97:17
  103:2,24,25
**earlier** 7:19
  40:3 53:8 57:14
  89:18 97:9
**early** 8:11
**easier** 68:14
  85:12
**eat** 87:11
**education** 64:2
**educational**
  63:23
**effect** 64:17
  67:16 69:17
  72:8

**effective** 56:16
**either** 8:10
  12:23 13:5 15:1
  26:15 30:1
  37:19 46:11
  47:6 70:9 81:24
  92:17 93:1
**elect** 78:19 80:4
  81:1
**elect's** 78:15
**elected** 19:17,20
**election** 12:2
  17:4,5 23:14
  27:15
**embroiled** 35:18
**employ** 30:3
**employed** 6:15
  8:17,23 10:21
  15:21 21:8
  37:13 53:25
**employee** 12:5,9
  18:20 21:11
  23:1 29:7,12,15
  29:17,20 46:12
  46:13 74:5 92:3
  93:12 101:10,11
**employees**
  16:10 23:18
  27:22 36:14
  40:12 60:21
**employer** 36:1
  46:12 63:5
**employment** 7:7
  7:23 8:22 9:9
  16:22 22:4,5

25:9 29:16 31:1
32:17 33:2
35:25 38:25
39:22,22 44:11
45:7 47:11 48:5
48:13 50:10
52:16 54:3
68:11 72:17,20
73:10,11 89:1
90:16 91:9
92:15 94:16
95:3 97:6,21
**encompasses**
12:1
**encounters**
57:11
**encourage**
70:21
**encrypt** 70:23
**encryption**
71:15
**ended** 83:13
85:23 91:10
**endorsement**
60:15,18
**engage** 37:5,9
**engaged** 52:16
58:8 98:5
**enjoyed** 57:1
**enlighten** 82:24
95:12
**ensure** 78:18
**ensuring** 90:19
**entailed** 42:13

**entirely** 33:11
34:12 35:10
**entity** 22:8
31:18
**enunciate** 86:18
**equally** 54:19
**equipped** 49:21
91:7,10 92:24
**equivalent**
74:23
**eric** 47:9 48:4
50:9
**errata** 2:15
102:1 103:16
**erratic** 66:5
**errors** 98:22
**especially** 58:7
66:13 76:13
**esquire** 2:2,5
103:2,20
**essentially**
28:20 32:17
49:25
**established** 90:4
**et** 21:6
**evasive** 32:13
**evening** 7:15
**event** 9:22 60:7
**events** 19:14
21:1,5 54:16
80:7
**eventually** 8:3
17:4 56:18
**everybody**
21:20 22:12

**evidence** 62:18
**evolution** 25:1
**exact** 25:3 37:19
68:6
**exactly** 24:6
98:1
**examination**
2:12 4:12
**examined** 4:11
**example** 22:3
**except** 22:9
102:19
**exception** 61:7
**exceptions** 20:2
**excessively** 62:5
**exchange** 86:5
**exchanged**
52:19
**excluded** 43:6
**excuse** 86:12
**execute** 18:21
**executes** 19:5
**executive** 9:6
11:17 36:22
37:13 74:10
85:19 93:12
**executives** 7:2
**exhibited** 30:8
**exhibits** 32:16
**exist** 20:22
30:19 75:16
**existed** 66:5
75:16 76:18
**expanse** 17:14

**expect** 26:22
**expecting** 36:4
**experience** 17:3
30:18 54:24
55:2 57:3 60:3
67:21 82:6
**experienced**
86:20,21 87:4
**experiences**
59:21 78:1
**expert** 72:19
90:11
**expires** 100:17
**explain** 5:9
58:18 65:13
94:15
**explained** 5:1
21:16 42:6,21
42:23 43:15
59:6 76:8,15,20
77:24
**explaining**
97:24
**exposed** 80:11
**express** 53:4
89:6,25
**expressed** 60:19
64:14 76:5
89:18 90:1,17
91:5 92:14
**extent** 4:22
11:14 16:19
17:2 19:2 21:11
21:16 23:16,25
24:10 39:1 58:9

**[extent - fully]**                                                      Page 114

68:20 69:2 71:1
86:17 99:10
**extra** 81:10
**extremely** 87:3

**f**

**f** 46:1 74:3
83:21,21
**faced** 4:19 46:19
**facing** 83:10
84:12
**fact** 33:20 65:8
70:21 75:19
85:19
**factored** 47:5
**fair** 4:24 5:15
5:16,22,23,25
7:22 9:17 30:2
37:12 69:4
72:21
**fallen** 82:19
**false** 84:23
**familiar** 38:1
**family** 6:20 42:1
43:19 57:1 76:7
76:15,19 83:25
**family's** 83:23
**far** 46:23 65:24
**fbi** 39:15
**fear** 70:5
**federal** 32:11
103:14,24
**feed** 6:4
**feel** 60:3 67:4
**felt** 57:2 59:18

**female** 36:13,16
**ferre** 44:24
45:25
**field** 16:1 93:2
**figure** 26:8
48:15
**fill** 39:13 40:12
**finance** 82:4
**financially**
101:12
**find** 68:2
**finding** 92:21
95:3
**findings** 91:1
**fine** 50:21
**finish** 50:18
**fire** 35:12,14
63:20 70:4 78:9
**fired** 62:9
**fires** 35:12
**firestorm** 35:5
**firing** 18:8
21:19 23:17
**firm** 6:18 8:9,14
8:15 9:12,16
**first** 4:10 9:4,21
10:1 11:5,25
12:14 22:18
23:21 27:14
30:6 31:22 32:5
32:5,9,19 35:15
54:2 55:22 76:1
78:13,17 83:25
96:14

**fit** 85:17
**five** 8:23 30:21
35:12,14 77:24
78:9 87:18
95:23
**floor** 2:6 41:5
103:4
**florida** 1:16,19
2:3 100:3,17
101:3,14 103:14
103:24
**flow** 8:15 28:24
**flowed** 8:12
**flown** 9:12
**folks** 16:2 24:18
27:17 54:13
56:12 62:4
84:16
**following** 98:18
**follows** 4:11
**foregoing**
101:12 102:19
**foremost** 30:7
78:13,17
**forensic** 3:12
**forgot** 14:20
**form** 10:3 14:11
15:3 17:8,16
23:8 29:13 30:4
36:25 37:7,17
39:13 41:6
44:15 45:4
47:15 49:14
51:24 52:14
53:20 58:25

79:8 80:16 88:9
89:12 92:1,11
94:8,17 95:5
97:7
**formal** 22:11
27:19
**forward** 48:16
49:19 80:5
84:12 89:9
**forwarded**
103:16,16
**found** 62:7
**foundational**
85:14
**four** 30:17
38:18
**frankly** 59:10
59:17 61:11
62:6 65:9 84:10
91:9
**frazier** 73:17,22
**free** 44:7
**friends** 42:1
72:13,15,16
**front** 24:9 28:4
47:22 66:24
85:25
**frustrated**
79:18
**fulfill** 18:18
**fulfilled** 41:2
**full** 5:8 6:13
56:19 89:3
**fully** 84:9

| | | | h |
|---|---|---|---|

**fundamental**
84:7
**fundamentally**
81:12,15
**funds** 8:15
**further** 59:15
90:2 101:10
**fury** 70:5
**future** 56:11

**g**

**g** 45:25
**gap** 46:20
**gate** 35:21
**general** 18:22
28:16 39:5
47:17 60:5
65:15
**generally** 15:14
16:20 20:4,25
65:13
**gentleman** 82:2
**getting** 7:11 9:7
24:2 35:15
96:25
**give** 5:9 56:10
56:19 87:17
95:7
**given** 4:17 46:14
97:8
**gives** 77:12
**giving** 69:18
**go** 3:23 6:3 7:25
9:20 20:20 22:3
22:10 29:3
32:14 46:11

50:22 55:1,6
59:25 65:12
66:11 79:2
85:22 89:4 90:3
90:9 91:15
93:15
**goal** 9:18
**goes** 17:4 27:25
39:10 60:5
67:25 84:7
**going** 3:2 5:6
7:22 8:3 10:25
11:1,2,6,9 15:14
17:14 18:22,23
18:25 24:6,15
24:21,25 25:2
25:11 28:25
33:4 35:17 38:2
41:25 48:4 50:7
50:18,24 51:8
51:18 54:17
55:9 56:19,21
58:18 59:9
62:15 63:10
71:3 74:6 77:8
77:20,22 78:16
81:5 87:22
88:22 89:8 95:7
97:24 99:7,8
**good** 3:1 4:14
4:15 9:2 14:7
16:17 41:2
72:21,23
**gop** 11:15

**gotten** 65:4,20
**government**
70:24 82:6 84:8
84:15
**grab** 72:4
**gratification**
98:4
**great** 36:5 83:14
**greenberg** 2:5
4:7 103:3
**grisham** 53:23
53:24 54:5,16
56:4 63:23 64:6
**grisham's** 55:2
96:16,18
**guess** 8:6,20
11:15,16 14:24
18:7 20:10
21:15 23:5,13
26:8 27:24
28:15 34:7
37:16 38:8
39:25 41:4,18
41:19 43:2 45:2
49:7,12 51:8
59:3 61:22
71:16 78:6
82:21 90:22,24
92:7 93:5
**guest** 9:22
**guidelines** 70:17
**guys** 23:12
98:11

**h** 2:17 74:3
**half** 50:12
**halsema** 2:9
**hand** 10:14
100:10
**handed** 45:24
**handle** 13:23
43:18 48:20
91:10
**handled** 48:25
65:25 89:19
**handling** 56:24
90:16
**hangry** 96:24
**hanna** 2:2,9
**hannity** 88:13
**happen** 11:5
21:1 39:20
69:19 84:18
97:25
**happened** 27:24
48:12 49:12,13
**happens** 15:21
16:4
**harassment**
36:8,19 52:13
63:12 98:1,5
**hayes** 88:15,17
**he'll** 77:16,22
**head** 6:2 11:8
**headed** 8:5
**health** 86:4
**hear** 69:1 86:24

**heard** 3:9
**heart** 66:12
**heck** 24:15
**hectic** 25:4
**held** 55:10
**helen** 44:23
  45:25
**help** 10:19
  18:17 20:12
  31:8,11 38:13
  40:10 43:5,25
  66:15 80:8
  97:14
**helped** 14:15
  61:16
**helpful** 57:5
  89:8 97:14
**helping** 14:25
**helps** 98:25
**hey** 24:24 25:2
  34:24
**hh** 100:18
**hicks** 25:18
  38:19 67:9 94:5
  94:6
**hide** 68:23
**high** 95:17
**highlighted**
  85:16
**highly** 43:3 45:8
  52:10 54:9 66:8
  82:5 84:22,22
**hill** 17:2 22:3,21
  38:6

**hip** 24:13
**hire** 22:7 43:24
  44:8 53:6 60:2
  63:20 74:11,12
  75:16 93:24
**hired** 26:5 43:8
  44:13 75:12
  93:24,25
**hires** 57:15
**hiring** 18:8
  21:19,24 23:17
  26:4 33:13
  34:14,18 43:2
  54:4 73:8
**hispanic** 44:19
  57:7
**hispanics** 46:2
**historical** 16:23
**historically**
  20:18 85:20,24
**history** 16:5
  20:21 61:15
  64:5
**hit** 9:19 41:4
  52:22 80:1
**hits** 45:21
**holding** 7:2
**honestly** 68:22
**hope** 14:5 25:18
  38:19 50:18
  65:7 94:5,6
**hope's** 95:25
**hoping** 59:7
  79:4

**hornik** 2:5 4:7
  103:3
**hosted** 7:15
**hour** 19:25
  26:16 50:12
  76:2
**hours** 21:5 25:4
  26:3,6,9 58:4,11
  70:3 76:11 78:7
**house** 8:4 12:11
  13:6,11 15:2
  17:6,24 18:8,16
  19:21,21,23
  22:2,7,13 24:1,5
  24:11,13 25:12
  25:15 27:22
  29:7,12,15,17
  29:20,25 30:11
  30:20 31:1,5
  32:25 33:4
  35:17 37:14
  38:6,25 39:2,5
  39:14 40:13,14
  42:6,7,11 43:3
  44:2,20 45:23
  53:10,19 54:12
  55:25 56:12,19
  58:22 59:11
  61:6,7,14 65:1
  66:14,17 68:8
  70:11,12 73:4
  73:13,19 74:5
  74:20,25 75:6
  76:8,9 81:6
  82:23 86:7,11

86:15 89:1
  91:20,22,24
  93:13,20 94:16
  95:4 97:19
**houses** 20:15
**how's** 77:8
**hr** 34:19 48:18
  49:17 90:10,10
  90:11,17 91:8
  91:11,11
**huh** 40:5
**huhs** 6:1
**human** 78:20,24
  79:14,23 80:7
  86:4
**hungry** 97:1
**hunt** 2:2,9

**i**

**i.e.** 91:15
**idea** 48:20 57:21
**identifier** 38:3
**image** 78:18
  80:3
**imagine** 13:13
  16:1 17:5 28:13
**imagined** 47:16
**immediate**
  46:19
**immediately**
  20:6
**immune** 87:1
**important** 60:1
  66:11,12
**impregnate**
  80:12

**impregnated**
63:16
**impressed** 30:15
54:5
**impression**
51:19
**inaccuracies**
98:22
**inappropriate**
51:13,20 52:7
66:9 80:19 98:2
**inauguration**
25:10 29:15
80:23
**incident** 30:6
62:1,13 64:19
66:6,21 94:4,6
**included** 13:9
**including** 93:18
**income** 9:11
**incoming** 20:5
46:21
**incorporated**
3:6
**incorrect** 29:8
**independent**
23:2 82:10 86:4
**index** 85:9
**indicated**
102:20
**indication** 46:18
**individual** 16:7
18:1 43:9
**individually** 1:6
1:6,7 3:7,7,8

102:3,3,4 103:6
103:6,7
**individuals**
44:23 58:8 80:9
81:24
**infant** 41:18
**inferior** 37:6
80:13
**inferiors** 36:24
**influx** 24:2
**inform** 94:11
**informal** 27:4
**information**
70:23
**informed** 76:4
**initiate** 77:18
**input** 18:1 44:10
**inquired** 76:14
76:18
**inquiries** 20:6
21:2
**institution**
80:20
**integrity** 78:13
80:4,10,14
**intend** 29:18
98:3
**intended** 13:21
57:22 92:9
**intentional** 85:9
**interact** 16:2
48:14 88:8
**interacted** 23:6
**interaction** 4:23
12:18 14:4

34:15 61:24,25
66:8
**interactions**
36:17 45:18
54:6 67:3 83:4
**interagency**
86:8
**interest** 79:24
**interested** 54:19
101:12
**interesting**
21:25 77:24
85:6
**interim** 19:12
31:16
**interlocutor**
49:18
**internal** 22:7
86:14
**internally** 39:6
**international**
80:22
**internet** 3:19
**interpretation**
95:7
**interviewing**
27:5 62:8
**interviews**
60:22 61:1,5
**investigation**
4:22 49:2,6
**investigations**
33:15
**involved** 6:8
11:5 18:7 33:12

46:7,8 49:2
68:10 73:4,16
84:15
**involvement**
32:20
**involving** 69:12
95:16
**irs** 32:11
**island** 3:4
**issue** 10:10
95:16
**issued** 9:14
38:15 67:22
**issues** 19:24
21:1 23:13
30:13 39:7
55:15 61:17
63:11 65:7
77:14 80:25
90:17 92:15
**ivanka** 72:25
73:11 86:18
**ivanka's** 83:23

**j**

**j** 1:5 3:6 102:3
103:5
**jacksonville** 2:3
**january** 9:7
11:18 18:3,9,20
21:18 29:11
30:22,24 33:4
37:22 39:22
47:2 63:19 97:5
**jared** 2:5 4:6
15:4 50:20

68:19,25 72:25
73:7,9,12 83:22
86:17 99:5
103:2
**jason** 21:21
22:15,16,18
24:12 25:16
27:21 34:1,8
35:17 37:12
38:15,19 40:2
40:21 46:6,8,15
60:14 63:4
71:17 72:13
77:1 79:13
80:14 93:5,6
95:21,22,25
**jason's** 46:25
96:2
**jessica** 68:12
**job** 5:11,13 18:2
27:4 30:11 31:8
38:12 39:11
42:3,15,15,20
42:22 43:9,11
43:18,20,23
44:5 45:21 46:2
59:14,20 60:4
61:6,9,14 65:6
66:12 68:1
74:24 82:5,18
83:11,15 87:1
97:13,19
**jobs** 17:6,23,23
17:24,25 18:18
30:19 40:13

42:7,12 45:22
46:11 55:1 56:1
60:2,6 75:6,16
76:8
**john** 2:2 4:4
103:20
**jpeg** 72:4
**judge** 5:6
**judgment** 43:21
45:19 59:21
65:23,24 66:3,3
66:12 67:3 68:1
77:3 78:24
**july** 1:12 3:3
12:17 14:6,10
16:12 100:11
101:13 102:2
103:1,5
**juncture** 4:8
15:17
**junior** 40:16
**jury** 5:6

**k**

**katie** 33:12
**keep** 42:19 46:5
88:22 98:3
**keeping** 14:3
**kids** 76:16
**kind** 4:23 6:7,9
6:24 7:24 9:18
9:19 11:12
13:22 20:8
28:14,22 38:3
39:23 43:25
44:13 50:19

78:8 83:16
85:16 89:11
98:25
**knew** 24:20
25:19 26:5 27:4
47:19 63:24
68:7 96:11
**know** 4:20 5:21
6:6,6,7,8,8,10
6:11,24 8:4 9:18
10:11,15 11:16
12:14 13:19
17:1,3,4 18:23
19:3,8,8,8,9,10
19:17 21:7,10
21:25 24:14,17
24:17 25:11
26:3 27:16
28:11,13 29:23
30:12 31:6,7,20
31:23 32:6,9,13
33:14 34:17,18
35:21 37:18
38:4 40:19,21
41:15 42:8
44:13,18 45:5
46:15,25 47:3,4
47:12,13 49:5
50:5,9 51:7,18
52:13,18,21
53:13,17 54:19
55:2 57:18 59:4
59:12 60:1,10
60:16,23 62:6
62:16 63:4,22

64:1,4,4,5,6,16
64:17,19 65:3
65:19 67:11
68:5,7,12,15,17
68:20 69:25
71:4,5,7,9,21,22
71:24 72:24,25
73:12,23 74:5
75:8,11 76:16
76:18,24 79:1,4
79:9,19 82:6
85:22 89:21
90:11,24 91:2
93:8 95:1,10,14
96:5,12,18 98:6
**knowing** 72:10
82:15 92:24
**knowledge** 9:11
46:17 85:5,14
**known** 39:16
48:19 54:7
**knows** 69:2
**kushner** 72:25

**l**

**l** 83:21
**lack** 13:1 56:15
80:13 82:17
84:7 86:18
**lacked** 43:21
**lady** 54:2
**large** 24:2 55:24
**largely** 45:21
60:4 61:10
**larocca** 2:5 4:6
103:3

**late** 8:10 16:12 22:19 92:4 97:5
**laura** 2:3
**law** 12:13 32:11 70:25
**lawyer** 48:13,18 90:11 92:9,10
**lay** 66:2
**lead** 54:17 82:13
**leader** 10:22
**leading** 23:13 34:7
**leads** 54:15
**leave** 4:20 35:25 78:3 81:6 82:23
**led** 60:9
**lee** 1:18 3:14 100:16 101:6,17 103:18
**left** 81:11 83:6 83:14 88:22
**legal** 3:14,16 4:23 49:1,17 68:17 77:17 90:16,24 98:15 103:19
**legally** 4:20
**length** 6:7
**letter** 2:16 103:9 103:13
**letterhead** 32:15
**letting** 52:13
**level** 57:16 78:21,24 79:14 80:8 95:17

**lewandowski** 94:6
**liaison** 44:4
**lieu** 46:14
**life** 79:24 85:2 85:11
**lifestyle** 39:17
**light** 94:22
**liked** 56:25 57:1 83:3
**limited** 6:10 30:19 40:13
**line** 44:5 102:5
**lines** 71:13
**lips** 64:22
**list** 18:17,21 74:17,23 75:1,3 75:7,12
**listed** 32:18 96:4
**lists** 40:11,19
**literally** 57:25
**little** 4:25 20:8 20:14 51:8,20 53:8 56:17 92:22 96:25
**lives** 78:23,25
**living** 20:5
**llc** 6:16 7:6
**llp** 2:5 103:3
**location** 97:23
**logistically** 56:8
**long** 7:12 19:24 21:4
**look** 6:3 9:24 15:20 26:2 29:3

39:6 52:11 60:22 72:8 79:22 82:17 84:15 85:10,20 87:6
**looked** 81:23
**looking** 21:4 39:15 85:13
**lose** 16:14
**lost** 85:23
**lot** 4:16 10:25 13:13 17:5 20:2 20:16 27:7 48:17 60:5 61:13 68:14 84:8,12,13,13 84:14 85:11 93:18
**love** 16:2 27:18 70:5 75:20
**lunch** 87:10,11
**lunchtime** 50:18

### m

**m** 1:10 2:2 4:9 100:6 101:7 102:2,23 103:2 103:5,20
**machinations** 84:10
**made** 22:11 29:24 46:22 48:19 59:3 61:19 64:8 65:4 65:9 89:7 96:22

**mail** 8:15 47:1 61:15 71:23 94:21,25 95:2,6 95:21 96:1,4 97:17
**mailing** 95:23
**mails** 13:16,18 48:19 89:17 91:4 92:13
**maintain** 28:17 31:18 42:24 75:3 80:8
**maintained** 25:9 37:23 40:11 44:9 80:19
**maintaining** 31:12
**make** 13:22 14:3 16:9 18:10 29:21 43:12 48:14 51:16 58:6 59:8 64:12 64:20 65:22 78:21,25 79:2 89:20 94:2 98:2 98:23 103:10
**makers** 61:8
**makes** 68:14 85:11
**making** 53:14 57:7 77:9 82:4 98:4
**male** 36:16
**man** 78:4

management
  34:14
manigault  33:7
  43:22
manner  91:6
manners  71:16
mark  63:3
marketing  7:3
married  36:3
  37:8 80:12
massive  78:16
  86:9
materials  76:10
matter  3:5 18:3
  34:6 44:12
matters  13:20
max  64:23,24
mcgahn  47:17
  48:21
mean  14:13
  27:14 28:23
  35:6 41:19
  46:20 48:7
  49:15 52:9
  57:24 58:4 59:3
  59:10 62:11
  63:24 69:25
  71:22,24 77:23
  79:6,7 86:24
  90:10,12 91:3
  93:22 94:25
meaning  12:22
  20:17 22:3 25:1
  39:7 58:16,19
  78:14 82:16

89:23 91:10
means  19:5
  24:15
meant  14:5 24:3
  24:20
meat  86:16
mechanism
  42:24 70:14
  91:16
media  7:11,12
  7:14,18 19:14
  20:6 21:2 24:2
  24:18 25:17
  35:5,10,19
  38:21 45:12,21
  46:21 50:25
  51:4 54:6,15
  57:2,7 59:9 62:5
  65:11 73:14
  74:1 82:4,17
  87:23 88:2
  95:15 98:14
meet  9:21 22:18
  23:12 93:20
meetings  76:10
member  64:24
  81:13 83:24
  84:2,3 85:15
members  89:23
mental  11:11
mentioned
  23:24 29:14
  35:8 38:16,19
  55:25 60:6 61:5
  67:24 83:8 84:4

84:10 85:24
  86:2 92:3
mentioning
  96:11
message  48:3
  59:15 72:8
messages  28:6,8
  29:1 47:21 97:4
messaging
  14:16 19:5
  78:18 82:12
miami  41:25
  42:3 53:10 66:6
  66:21 76:5
michael  6:14
mid  16:12 55:15
middleton  3:3
military  22:10
miller  22:15,16
  22:18,24 23:7,9
  23:19,22 24:4
  25:16 27:21
  28:6,10 29:2,24
  34:1,4,21 35:3
  36:3 37:13,18
  38:15,19,24
  40:2 41:21 42:2
  42:9 46:6,9,15
  46:17 47:7
  48:11 49:9 53:4
  53:11 61:16
  63:4,11,15,20
  64:23,24 67:5
  69:13 71:3,18
  72:13 73:20

75:7 76:4 77:1
  78:21 80:14
  95:22 97:22
miller's  23:17
  34:9 60:14 63:9
  72:17,19 77:14
mind  30:11
  62:16 86:15
mine  36:11
minimum  26:9
minute  50:13
  87:9
minutes  20:8
  87:18 96:25
misconduct
  63:13
misleading
  84:23
mistakes  81:16
misunderstan...
  61:10
moment  20:1,5
  21:2 61:5 79:18
moments  79:19
monday  3:2
month  80:22
morning  3:1
  4:14,15
mother  42:19
mothers  43:1
move  49:19
  75:20
moving  48:16
  50:14,16 54:15

| | | | |
|---|---|---|---|
| **mueller** 4:20 | **need** 6:5 24:24 | **noes** 6:1,4 | **objection** 10:3 |
| **multiple** 72:4 | 32:16 41:25 | **nominee** 10:18 | 14:11 15:3,9 |
| 73:18 | 42:18 48:2 | 14:19 15:19,20 | 17:8,16 23:8 |
| **n** | 56:14 59:16,20 | 15:25 | 29:13 30:4 36:9 |
| | 81:14 87:17 | **non** 13:9 | 36:25 37:7,17 |
| **n** 2:11 47:9 74:3 | 99:9 | **nondisclosure** | 41:6 44:15 |
| **naive** 85:15 | **needed** 31:17 | 13:4 | 47:15 49:14 |
| **name** 3:12,25 | 48:22 49:17 | **normal** 4:25 | 52:14 53:20 |
| 6:13 32:7,10,13 | 56:17 76:6,9 | **north** 2:3 | 58:25 79:8 |
| 44:24 51:18 | **needing** 42:18 | **notary** 1:19 | 80:16 92:1 94:8 |
| 63:2 73:17 82:2 | **needs** 56:15 | 100:17 | 94:17 95:5 97:7 |
| 82:12 | **never** 16:14,14 | **note** 3:17 60:1 | **observed** 3:20 |
| **named** 12:10,11 | 27:6 30:1,11,15 | 66:11,25 | **obtain** 8:21 71:1 |
| 12:12 18:16 | 53:7 58:21 | **noted** 81:22 | **obvious** 10:18 |
| 23:25 24:5,11 | 60:19 72:16 | **notes** 50:19 | 11:2 12:4 65:11 |
| 24:13 35:17 | 73:10 74:1,6,14 | 101:9 | 72:12 77:17 |
| 74:18,20,22 | 74:14 77:10 | **notice** 1:14 | **obviously** 20:2 |
| **names** 18:17 | 86:15,21 88:6 | **november** 19:11 | 65:16 67:14 |
| 38:2 41:1,2 | 88:14,18 93:16 | 32:17 | 71:10 73:15,18 |
| **naming** 25:15 | 98:5 | **number** 24:18 | 86:24 90:15 |
| **nanny** 42:18 | **new** 1:1 2:7,7 | 30:12,15,17,19 | **occurred** 62:1 |
| 75:25 | 3:10 10:19 | 30:21 40:13,15 | 62:14 91:24 |
| **national** 10:21 | 55:14 67:19 | 52:22 77:10 | **occurring** 58:14 |
| 11:20,22,23 | 74:11 103:4,4 | 78:3,7,7,17 80:2 | 80:18 |
| 80:21 | **newest** 11:3 | 98:14 | **offenses** 65:15 |
| **natural** 77:20 | **newman** 33:8 | **numbers** 52:19 | **offer** 6:25 7:1 |
| **naturally** 77:25 | 43:22 | 71:14 | 16:18,20 22:11 |
| **nature** 12:24 | **news** 72:21 | **o** | 29:16,21 32:17 |
| 35:9 39:7 42:22 | 80:22 | | 43:13 97:13 |
| 42:25 78:2 | **newsmax** 7:11 | **o** 83:21 103:2 | **offered** 29:19 |
| 83:15 89:3 | 7:12,14,17 8:7 | **oath** 2:13 4:10 | 47:8 |
| **navy** 8:24 9:5 | 8:22 | 100:1 | **offering** 16:15 |
| **nda** 13:8 | **nimble** 86:16 | **obama** 85:21 | 16:22 54:3 |
| **necessarily** 18:4 | **nods** 6:2 | **object** 45:4 | 89:11 |
| **necessary** 43:17 | | 51:24 88:9 | |
| 43:18 | | 89:12 92:11 | |

**[offers - paper]**

| | | | |
|---|---|---|---|
| **offers** 29:24 | 29:6,10,23 30:2 | **omarosa's** 44:2 | **orlando** 101:14 |
| **office** 9:6 11:17 | 30:24 31:8,14 | **once** 18:20 | **outburst** 66:8 |
| 18:3,12,14 | 31:20,22 32:14 | 19:17 34:4 40:1 | 67:6 |
| 19:11,22,22,23 | 32:23 33:7,17 | 103:16 | **outcome** 101:12 |
| 19:25 20:5 | 33:25 34:7 35:2 | **ones** 69:11 | **outgoing** 20:6 |
| 37:13 40:14 | 36:13,21 37:5 | **ongoing** 53:13 | **outline** 11:12 |
| 44:3 54:20 | 37:12 38:8,22 | 53:17 77:14 | **outreach** 44:19 |
| 55:25 56:2 | 39:25 41:17,22 | **open** 83:2 | **outright** 24:19 |
| 65:13 74:11 | 42:4 43:13,25 | **operate** 71:9 | **outside** 19:25 |
| 81:10 85:19 | 45:1,16,24 | **operated** 22:23 | 57:15 58:1 |
| 90:19 93:12 | 46:25 47:21 | 86:23 | 70:17 86:15 |
| 103:10 | 49:11 50:3,6,15 | **operative** 22:17 | **overflow** 56:22 |
| **offices** 84:11 | 50:20 51:12,12 | 31:25 | **overseeing** |
| **official** 19:20 | 52:18,21,24 | **opinion** 16:16 | 43:10 |
| 23:20 37:20 | 53:8,13 55:19 | 53:4 58:15,20 | **oversight** 44:8 |
| 70:14 80:12,14 | 57:6 59:24 | **opportunities** | **overzealously** |
| 100:10 | 60:13,17 61:3 | 7:21 | 32:15 |
| **oh** 52:4 73:6,23 | 61:21 63:4,8,15 | **option** 31:19 | **own** 6:16 74:4 |
| 77:8 99:5 | 63:19,22 64:21 | 46:14 97:10 | 81:16 98:4 |
| **ohio** 64:24 | 64:25 65:18 | **options** 31:16 | **owned** 22:23 |
| **okay** 4:24 5:23 | 66:15 67:5,10 | 40:21 48:16 | **p** |
| 6:1,19,22,24 | 68:5,10,25 69:6 | 97:9 | **p.m.** 1:13 26:11 |
| 7:12,17,22 8:2 | 69:16,19,21 | **orange** 100:4 | 98:12,16 99:23 |
| 8:17,20 9:2,9 | 70:19 71:10,12 | 101:4,14 | **pac** 31:8,11 32:5 |
| 10:25 11:21 | 74:8 75:8,18,23 | **order** 7:25 | 32:11 |
| 12:4,19,25 13:8 | 82:21 83:20 | 67:15,18 68:3 | **pacs** 32:1 |
| 13:14 14:1,7 | 84:25 86:23 | 99:14 | **page** 2:12,13,14 |
| 15:7,10 17:12 | 87:5,15,20 | **ordering** 99:17 | 2:15,15,16 72:4 |
| 18:7,11,15 19:2 | 91:23 93:10 | 103:16,16 | 79:25 102:5 |
| 19:16 20:7 | 94:4,25 97:17 | **org** 45:6 85:25 | **pages** 1:21 72:4 |
| 21:14,21 22:15 | 98:7,20 99:2,13 | **organization** | 72:22 102:19 |
| 23:1,4,12,16,21 | **old** 85:19 | 31:9,10 | **paid** 68:18 |
| 25:20,22,25 | **omarosa** 33:7 | **oriented** 31:10 | **paper** 20:17 |
| 26:10 27:9,21 | 43:22 85:5 | **original** 103:15 | 99:8 |
| 27:24 28:5,8 | | | |

**paperwork**
13:13
**paralegal** 2:9
45:24
**part** 55:23
59:10 60:24
61:12 87:2
**participants**
3:20
**particular** 16:7
18:12 84:22
**particularly**
29:2 36:5 94:14
**particulars** 24:9
**parties** 3:23
20:21 56:25
101:10,11
103:16
**partner** 8:14
**parts** 17:17
**party** 17:12
103:16
**pass** 77:3 78:24
**passage** 83:20
**passages** 85:11
85:13
**passed** 30:13
**passing** 33:15
63:24
**past** 30:14 39:16
63:11 92:13
**paternity** 69:12
**path** 18:25
**pause** 26:18

**payment** 77:11
**payroll** 15:22
16:7 97:10
**pdf** 72:3
**peace** 17:3
**pending** 41:18
**people** 11:4,7
16:15,21,22
17:6 19:13 22:3
27:5 36:1 38:2
40:16,20 52:13
56:21 59:20
60:2 61:11 65:8
70:17,21 71:13
72:21 74:17,23
79:17 82:1 84:9
84:14 85:17
86:14,25 93:18
93:23,25 94:1
98:2,6
**percent** 28:23
55:1 81:1
**percentage**
24:18
**performance**
30:16
**performing**
81:20
**period** 9:20 10:5
16:11 19:9 29:1
33:3 47:11
77:23
**periods** 77:7
**permitted** 1:16

**persistent** 83:25
**person** 16:17
36:2 39:3 40:21
40:21 54:16
62:10 71:5
84:18 90:20
92:25
**personal** 7:6
22:22 23:22
35:3,19,23
39:18 58:5
78:23,23 79:24
80:7
**personality**
20:16
**personally**
100:7
**personnel** 20:3
73:5
**perspective** 34:9
52:12
**pertaining**
97:21
**phillips** 2:2,2,9
2:12 4:4,4,13
10:24 14:23
15:12 17:11,20
23:11 29:22
30:23 36:12
37:4,11,25
41:10 44:17
45:10 47:20
49:23 50:22
51:5,6 52:1,17
53:22 55:5,7,13

59:2 68:25 69:4
69:5 79:10 81:3
88:3,11 89:15
92:6 93:4 94:10
94:20 95:6,9
97:16 98:7,21
99:3,13,15,16
99:18 103:20
**phone** 28:5,17
47:25 71:10,13
71:14,19
**phones** 71:12
**phrased** 14:20
15:11
**physical** 51:12
**physically** 51:9
**pick** 69:1
**picture** 10:14
85:14
**pipeline** 45:7
**place** 3:23 98:18
**placed** 17:13
67:15
**placement**
16:10
**places** 11:4
**plaintiff** 1:3,15
2:4 48:3 96:2
**plaintiff's** 95:20
**plan** 87:12,18
**plane** 66:7,21
66:23 94:5
**planning** 29:7
56:9 60:7 84:12

plans 82:8
platform 69:24
platforms 70:14
  71:18
play 56:16
plays 16:23
please 3:17,25
  6:12 20:13 29:4
  51:4 55:12 76:3
  88:2 99:22
  102:2 103:10
pleasure 98:10
plenty 10:8
  93:23
plug 56:14
point 5:7 8:14
  8:17 30:2 31:15
  35:5 41:24
  55:17 62:15,17
  67:13 89:21
  94:13 97:18
pokotilow 2:10
  3:12
policies 31:22
  32:19 70:25
  78:15 86:10
policy 19:13
  21:5 32:6,10
  36:16,19,23
  61:8 80:25
  82:11 91:20,24
political 22:17
  31:25 39:7,9
  58:13

politically 31:9
politico 95:10
  95:12
politico's 95:11
  95:24
politics 57:3
poorly 57:23
porch 58:2
porter 38:4,5,10
porter's 38:9
portion 99:9
portions 5:7
position 30:22
  37:24 40:25
  44:1,2 54:20,22
  54:25 55:3,21
  60:10 79:15
  82:14 92:17
  93:17 97:12
positions 20:18
  40:25 43:2
  55:23 61:17
  80:6 81:20,23
  81:25
positive 79:20
possessed 59:23
possible 9:13
  12:18
potential 18:18
  27:7 31:16
  39:16,17 40:11
  70:18 95:16
potentially
  23:15

pots 17:23
power 91:18
preclude 65:16
precovid 76:12
preferred 6:4
pregnancy
  41:18
pregnant 74:12
prep 86:1
preparation
  13:14
prepared 26:15
presence 51:13
present 2:8
  66:22
presenting
  62:14
preserve 78:13
  78:25
preserving 15:8
president 1:5
  3:6 9:6 11:18
  14:17 20:19
  25:14 26:4,11
  37:14 54:13
  56:8,20 57:16
  57:23 74:11
  78:15,19 80:4,5
  81:1,25 82:16
  93:13 102:3
  103:6
presidential
  17:24 57:4
  70:16

press 4:25 5:16
  12:11 18:14,16
  19:22,25 20:4,9
  20:10,20,22,25
  21:17 25:15
  27:11 31:5
  38:14,15,17
  40:14,15 54:1,8
  54:9,14,20
  55:25 56:12
  57:1,15 59:11
  61:7,8,11,12
  62:13 74:20
  81:13,21 83:3
  83:11,18 84:4
pressure 46:19
presumptive
  10:18
pretty 81:4 83:2
  85:4
previous 14:2
  57:2,4
previously 38:6
  47:7 55:25
  71:19 81:12
priebus 1:6 3:7
  48:22 102:3
  103:6
principal 59:15
printed 47:25
prior 8:7 12:18
  18:16 45:6 57:7
  69:7 87:15
priorities 78:15
  80:6

priority 78:10
78:18 80:2
privacy 79:3
80:9
privately 62:4
privy 61:19
proactively
46:18 47:8
probably 9:23
63:25 71:25
72:10 78:12
82:19 83:17,22
84:5 85:8
probe 4:20
problem 42:3
83:11
procedure 1:17
103:24,25
proceed 4:3
proceeded
31:20
process 6:9 27:1
39:2 40:1 44:11
44:11
production 7:3
professional
1:18 48:25
91:11 100:16
101:6,17
professionally
49:20 51:17,20
52:2 92:18
promised 41:21
41:21 97:3,22

promises 53:15
98:3,4
pronounceme...
21:5 80:24
82:11 86:9 89:8
proper 32:7
90:4
properly 91:7
protecting 80:3
protocol 43:2
providing 16:22
provision 13:9
public 1:19
19:15 26:5,7
44:4 58:9 64:12
67:15 83:10
89:8 100:17
publication
96:23
publicly 30:9
57:18,21 62:5
90:2
pull 85:11
purposes 1:15
1:16 6:2 20:8
28:16 32:24
pursed 64:22
pursuant 1:14
purveyor 71:8
71:21
purview 48:12
push 22:5
put 13:1 15:22
25:14 35:12
40:19 48:1

49:12 57:21
61:23 78:9 85:9
putting 55:2
80:5

**q**

qualification
43:20 45:22
qualifications
44:9 55:21 60:7
75:17 93:21
qualified 40:20
43:9,16 45:17
60:11 62:17
82:13,18 93:15
qualifies 39:3
qualify 94:16
quality 3:18,19
quashing 78:8
79:3
quell 35:6
question 5:10
5:20,23 8:8
11:16 14:2,20
17:18 28:16
30:12 32:5 41:8
43:19 45:3,7
55:16,19,20
60:14 68:14
71:7,16 72:1
77:11 81:5
83:22,25 90:25
92:22 93:1,8
questioned
45:19

questioning
4:23
questions 4:16
4:19 5:8,13,14
5:19 10:25 11:6
11:9 12:4 18:22
18:24 20:9
72:22 83:5 98:8
quick 24:25
quiet 72:22,23
quite 6:6
quiz 77:16
quote 12:23

**r**

r 45:25,25 46:1
46:1 47:9 74:3,3
74:3
raise 42:1
raised 49:22
92:16
raising 75:24
ran 7:5 10:7
ranging 78:7
rather 24:2,25
25:4
rationale 65:14
raton 9:23
reach 10:10
reacted 65:25
read 2:16 12:23
34:22 69:6,14
70:3 73:14
98:20,21 99:3
102:19 103:10

reading  76:25
103:21
real  61:25
realize  79:15
realized  46:21
realizing  84:17
really  9:17
32:16 45:14
56:2 69:23
86:24
reason  30:3
59:10 84:1
102:5
reasonable
103:13
reasons  15:23
16:8 41:9 49:17
65:11 72:12
77:17 81:12
recall  13:7
16:15 27:16
34:25 35:1
41:11,17,22
46:2,24 49:24
50:8 51:14
53:10 64:11,13
64:14 68:4 72:5
72:7 75:18,23
83:12 88:4,7
94:5,23
receipt  103:13
received  7:10
47:22 63:5
95:22 103:16

recent  7:5
reception  9:25
recess  51:1
87:24
recognized
79:18
recollection
9:16 12:16
22:19 35:2 52:6
64:9
recommend
16:18 22:4
93:24
recommendati...
16:18 40:7
44:11 53:5 82:1
recommendati...
16:9 18:5,10
32:21 40:4
recommended
45:9 48:13
49:25 93:17,23
recommending
38:24
record  3:2,24
4:1 5:3 6:3,13
15:9 50:22,24
51:3 55:6,9,10
55:12 64:12
84:21 87:22,23
88:1 98:17,19
101:8
recorded  3:4,22
33:20,23 99:10

recording  3:18
3:22
recordings
33:18
records  8:10
9:13 13:12
70:11,16,18
redepose  98:24
reemployed
37:16
referee  56:16
reference  70:9
referenced
66:19 89:18
103:9
referring  95:13
95:19 96:16
reflect  35:22
82:16
reflected  57:23
regard  33:14
103:14
regarding  10:10
41:20
regardless
57:20
registered  1:18
100:16 101:6,17
regular  19:20
reid  1:18 3:15
100:16 101:6,17
103:18
reince  1:6 3:7
48:22 102:3
103:6

related  14:8
16:10 32:21
36:16 44:19
45:12 46:15
50:10 61:17
63:5,12 71:2
95:16
relationship
10:13 20:17
23:22 34:9 35:4
37:5,9 48:10
49:7,9 53:14,18
55:3 57:10 58:8
relationships
11:13 20:3,22
22:23 36:24
39:18 56:6 57:7
58:5
relative  101:10
101:11
relatively  6:9
relayed  35:3
90:2
release  26:16
38:15,17
relevant  5:7
remain  72:13,15
remember
13:12 16:21
26:22 32:4
37:23 40:12
41:19 51:19
55:16,22 67:24
68:23 69:23
70:1,2,4,9 89:3

remembered 13:22
remote 76:12
rendered 8:25
repeat 15:10 76:2
report 37:2 59:9 101:7
reported 1:18 94:5
reporter 1:18 3:14 4:2 5:4 63:2 74:9 83:21 84:19 95:19 98:20 99:13,19 100:16 101:7,18
reporter's 2:14 101:1
reporters 56:6 57:2 58:1,6,17 58:18 62:20 78:22 95:23 96:1
reports 73:14
representation 68:18
represented 85:5
republican 10:20 11:20,21 11:23 17:13 36:5
request 27:19 99:8

requested 90:5 101:8
requesting 47:2
requests 95:15
required 12:13 24:4 30:18
requirements 22:11 42:11
requires 56:9
requisite 43:17 45:20
resent 59:19
resentment 58:23 59:1
reserves 8:24
reset 50:13
resign 46:9,14 47:2
resignation 46:16,16,25 47:8
resignations 46:13,13
resigned 40:2 46:18 59:10,17
resigns 93:6
resolve 49:13
respect 13:11 17:23 61:4 65:8 69:8 71:6
respond 5:14 71:3 72:11 99:12
responded 31:7 72:7

responding 35:11
response 35:10 68:16
responsibilities 40:24 56:2 75:17 81:22
responsibility 14:21 34:16 40:23 42:12 43:10 62:3
responsible 21:17,18
rest 17:3
restraining 67:15 68:3
result 91:21,25
results 49:5
retain 33:7 45:3 46:5 48:22 49:17 50:4 57:8 73:1,2
retained 74:17 89:6,19 90:6 91:7 92:19 93:20 98:15
retaining 89:24
retraining 67:18
return 50:1
reverse 7:25 8:21
review 5:6 13:12,18 45:16 57:6,10 60:22

61:15,18,19
62:2 94:25 95:1
99:7,11 101:8
103:10,11,12
reviewed 13:14 41:1 72:5
revise 32:8
revision 84:17
rhetorical 83:22
rhode 3:4
right 9:20 11:11 15:17 16:25 28:15,15 35:7,7 35:20 55:1 56:1 62:16 66:20 71:10 77:18 85:15 98:21,25
rigwil 6:16,17 6:25 7:5,8,9,19 7:24 8:6,16,22
ring 73:17
rise 57:16
rnc 9:23 14:24 14:25 15:16,18 15:19,21,24 16:23 17:12,18 17:25 23:5 25:7 25:9 46:1 60:11 86:12
rnc's 16:4
rob 38:3,5
role 5:18 10:22 11:21 14:8,22 15:15,18,24 16:13,23 19:17

23:17 32:2 42:9
42:12 44:19
50:9 54:3 60:8
61:10,11,14
73:1,9 75:15
76:19 83:9,10
83:18,19 90:25
**roles** 34:16
40:24 81:22
84:11
**roll** 82:11
**rolling** 84:17
**rollout** 82:8
96:1
**rollouts** 21:5
60:7 80:6,25
84:13
**room** 5:5 41:5
51:10
**rosen** 2:5 4:7
103:3
**rpr** 103:18
**ruined** 59:4
**rule** 103:24,25
**rules** 1:17
103:14
**rumor** 86:21
**run** 9:15 24:21
32:1 38:25
**runs** 7:6
**rushed** 39:21

**s**

**s** 2:17
**save** 28:25

**saw** 12:23
**saying** 27:18
54:19 62:20
64:13,15 75:2
89:10 95:23
**says** 48:4 84:2
**scale** 39:23
**scandal** 35:19
35:23,24
**scanned** 95:21
**scaramucci** 82:2
82:3 87:6 93:19
94:1
**scaramucci's**
82:15
**scavino** 25:16
38:20
**scenario** 67:17
91:8 97:25
**schedule** 17:25
**scheme** 6:10
**school** 63:25
**screaming** 5:12
94:7
**screen** 3:21 48:2
72:3
**screenshot**
26:19
**scroll** 28:22
**scrutiny** 46:21
**scuttle** 27:7
**seal** 100:10
**sean** 1:6,10 3:5
3:6 4:9 6:14
15:5 50:3,5

68:21 88:12
100:6 101:7
102:2,3,23
103:2,5,6
**seanspicer.com.**
81:9
**second** 10:7
26:18 78:20
**secondly** 81:19
**secretaries**
40:16
**secretary** 12:11
18:17 20:9,10
20:20,22 21:1
25:15 27:11
31:5 38:5,14
54:1 57:15
59:11 61:7,12
74:20 81:21
83:11,19
**section** 11:11
**security** 22:6
65:4 67:22,23
73:15 76:9 86:5
**see** 29:3 61:16
67:17,20 79:20
93:5
**seeing** 88:7,8
**seeking** 24:19
**seems** 40:6
65:18
**seen** 61:1
**selected** 27:1
**selection** 27:22

**selling** 46:2
**send** 62:19 66:3
66:4 89:4 99:11
**sending** 46:3
65:24 79:6
**senior** 10:9
12:12 37:20
38:18 39:20
61:8 80:11
89:23
**sense** 22:9 42:9
55:23 65:7
**sent** 23:23 24:8
31:7 47:1,22
52:9 57:17
62:15 66:2
92:14
**separate** 54:11
60:14
**september** 9:8
9:10
**series** 22:10
24:23,24 28:1
35:8 66:10,16
66:19 67:2
71:14
**serious** 48:6,19
91:6
**seriously** 48:8
**serve** 64:25
66:16
**served** 38:5
**service** 9:3
**services** 6:25
7:1 8:25 86:4

**[serving - spicer's]**

serving  65:1
set  7:19 54:10
several  23:15
  27:3,17 41:8
  58:10,17 66:23
  84:23
sexual  36:8,19
  36:24 52:13
  53:14,17 63:13
  98:1,4,5
sf86  39:12 64:18
shaking  10:13
share  69:16
  78:1 91:3
shared  69:15
sheds  94:22
sheet  102:1
shelves  85:10
shield  79:7,11
shielded  70:15
  78:21
shielding  79:4
  79:13
shop  76:13
  84:12 85:20
  86:16,19
shops  86:13
short  6:24 25:1
shorter  87:14
shorthand  19:1
shouting  5:12
show  7:15 95:6
showed  9:24
showing  96:5

shows  95:2
shut  58:3
side  20:10 34:15
  36:5 52:25 55:4
  62:14 64:13
  90:24
sign  2:16 103:11
  103:11
signal  70:22
signature
  100:15 101:17
  102:25 103:23
signed  13:4,8
signing  103:22
similar  36:2
simplistic  66:2
simply  11:1
sincerely  103:17
single  42:19
  43:1 66:10
sir  5:18 21:22
  21:23 28:9
  87:11 89:14
  103:8
sit  65:5
sitting  5:5 58:1
situation  7:24
  11:11 43:19
  47:14 76:16,19
  76:24 77:19
  81:17 91:5,17
  92:15
situations  36:21
  56:24

six  8:23 79:25
  95:23
skill  54:10
skills  43:18
sliding  39:23
small  75:24
smaller  85:21
social  25:17
  38:21 77:19
sofia  44:24 45:1
solutions  3:14
  3:16 98:16
  103:19
somebody  9:13
  22:7 27:10
  29:20 37:6
  43:11 44:18
  51:20 54:22
  58:22 60:11
  62:17 65:16
  77:21 79:15
  91:7,15,18
  92:20,23,25
  95:17
somebody's
  10:14 19:17
  39:8,8,15
someone's  79:24
sonny  17:1,3
sorry  8:13 14:2
  46:8 49:6 59:1
  62:23 67:13
  75:2 92:12
sort  10:13 35:20
  54:7 56:15 71:6

89:5
sounds  58:23
source  62:22,24
southern  1:1
  3:10
speak  22:14
  29:9 49:12
  92:16
speaking  16:20
  20:4,25 85:24
  90:20 92:8
specific  11:10
  30:18 40:15
  45:11 56:1 60:2
  64:2 66:18
specifically
  14:25 15:14
  21:3 27:16 52:8
  97:23
specificity  42:9
speed  50:19
spelling  74:8
spending  62:8
spent  57:25
  58:13
spicer  1:6,10 3:5
  3:7 4:7,9,14
  6:14,15 7:16
  51:7 85:11 98:8
  98:14 99:12
  100:7 101:8
  102:2,3,23
  103:2,5,6
spicer's  83:24

spoke  34:21
  63:1
spoken  62:21
  88:18
spokesman
  59:14
spot  53:19
spouse  76:21,23
spread  79:25
  80:21
squeezed  85:23
staff  14:25
  16:14 17:14
  18:9 21:3 33:12
  35:9 38:5 54:2
  57:1 61:8 83:24
  84:3,3,4,5 85:15
  86:11 87:3 96:1
staffer  15:21
  38:7 53:25
  59:15 61:6
  65:12 73:7
staffers  66:23
staffing  15:16
  15:18
stamp  48:3
stand  51:13
  88:8
standard  39:13
  71:13
standards  93:21
standpoint  91:9
  92:9
start  6:12

started  24:2
  93:10
starts  87:12
state  1:19 3:25
  6:12 100:3,17
  101:3,14
stated  7:19
  14:14 49:16
  81:12 93:14
  97:9
statement  25:15
  70:20
statements
  84:24
states  1:1 3:10
  8:18,24 9:3,5,5
  14:18 56:20
  57:24 95:22
status  33:14
  34:12
statute  103:14
stay  83:7
staying  97:9
steered  91:14
stems  83:16
stenographic
  101:9
stenographica...
  101:7
step  21:22 25:2
  82:19 94:2
stephanie  53:23
  53:24
stephen  1:7 3:8
  102:3 103:6

stepped  34:4,8
  40:22
steps  39:4
steve  95:21
stick  9:19
stood  77:7
stop  58:14
stopped  40:1
stories  58:14
story  36:5 52:25
  58:2 59:12,16
  59:18 74:1 79:3
  81:14 83:6
  95:10,13,18
straight  11:8
strategic  25:18
  38:20
strategist  12:2
  14:15
street  2:3,6
  103:4
stressful  56:24
strike  45:2 46:6
  94:11
strong  56:5
structure  20:12
structured  9:14
  20:16
struggle  42:19
stuff  28:14
style  52:5
subagencies
  82:10
subjecting
  70:18

submit  18:18
subscribe
  102:20
subsequent  66:1
subsequently
  54:1 66:4
substance  34:23
substantial
  98:23
substantially
  87:14
successful  17:13
  19:7,12 82:3
successfully
  58:10 73:12
suggested  31:16
  31:18 41:1
  103:12
suitability  39:10
  68:1
suitable  42:15
suite  7:2
summer  17:2
super  32:1,5,11
supervisors
  36:23
support  16:24
  42:1,23 77:5
supportive
  76:21,23 77:2
supports  15:19
  15:25
supposed  36:23
  44:6

supposing  24:3
sure  7:7 13:19
    13:22 14:3 18:4
    26:20 27:17
    34:12,25 48:14
    55:7 59:8 70:5
    71:20 73:6
    78:21,25 79:2
    80:17 81:4
    82:13 88:23
    89:20
surprise  26:25
    27:6
surrogate  12:21
    21:8,11 60:5,9
    60:24 61:13
    82:5
surrounded
    35:10
surrounding
    35:16 66:5
swear  4:2
sworn  4:8,10
    18:2,19 100:8

**t**

t  2:17 74:3
tab  87:5
table  27:2
take  3:23 6:6
    18:25 48:1 50:7
    50:13,19 54:23
    56:10 76:19
    80:1 81:24
taken  19:11
    51:1 81:17 83:9

87:24 102:2
takes  56:9 86:1
talented  87:3
talk  24:24 35:20
    85:3 86:13
    92:10
talked  40:2 53:8
    78:6 94:4 96:10
talking  50:17
    51:22 62:12,14
    74:25 78:14
    86:2,13,17
    92:13 96:13
talks  54:16
tamp  61:17
tamped  58:2
tank  31:9
tasked  92:10
tax  9:13 84:17
team  12:9,12
    13:6 15:1 16:3
    21:12 37:21
    50:7 74:17,19
    81:13 89:24
tech  55:15 71:4
technically  44:3
ted  73:24
television  7:15
    12:22,23
tell  15:6 18:15
    24:7 27:14
    31:14 41:22
    42:14 50:6
    57:17 58:12
    70:7,10 72:21

88:24 97:18
telling  97:22
temperament
    43:20,22
ten  50:13 87:9
    96:25
tenure  65:2
    82:15 85:21
    93:23
term  19:24 21:4
    24:14 25:1
terminate  93:6
termination
    46:14
terms  16:23
    20:15 21:25
    34:13 35:9
    39:17 44:10
    56:24 60:7 80:5
    83:14
terrible  5:10
test  6:5
text  28:5,8,14
    47:21 48:3
    71:13,24 94:14
    94:18 97:3,17
texts  13:16,18
    28:21 29:4 31:6
thank  9:2 51:5
    81:11 98:8,10
    98:10
thanks  85:2
therefor  102:5
thereof  5:7
    82:17

thing  8:13 35:15
    50:14 52:10
    58:12 65:22
    67:13 76:12
    77:8 95:11
    96:24
things  6:10 9:14
    11:5 15:25 20:4
    59:10,22 60:8
    70:13,22 71:9
    77:6,20 78:1,12
    79:17,17
think  8:5,8 9:7
    14:3 16:17
    19:19 20:14
    24:14,23 25:1
    26:7 30:17,21
    31:9,11 32:23
    36:4 38:13,14
    40:13 41:7,8
    42:14 43:15
    51:16 52:4,9,15
    55:24 56:1
    59:23,25 61:9
    63:24 65:24
    66:1,20 67:3,14
    68:16 70:23
    71:25 74:19
    75:7,11 76:1
    77:25 78:9,12
    78:20 79:3,14
    79:23 83:2,3,10
    83:12,15,16,20
    84:5,6,14 85:4,8
    85:22 86:1,25

**[think - tweets]**

87:6,13,17
90:23 93:1,15
93:19 96:10,22
97:8
**thought**  40:20
41:2,21 54:9
74:4 87:15 90:3
**threatened**  89:4
**three**  7:13 11:24
30:15 40:17
78:3 98:15
**throw**  32:15
**ticket**  10:23
14:17
**time**  1:13 10:5
10:19,19 16:11
20:15 24:1
25:22 27:14
28:23 29:1,19
31:4 34:22
41:12 46:23
47:11 50:23
51:2 55:8,11
61:23 62:1,8
70:10 73:9
74:12 76:12
77:23 78:2,3
87:11,21,25
98:12,16 99:17
99:18
**timeframe**
41:14,16 68:6
**timeline**  13:23
25:3 26:8 28:3
31:4 61:24

**times**  10:8 15:20
16:16 23:15
51:7,9 65:11
77:15,19 78:4
79:14,17 81:20
**title**  25:17 37:19
**today**  3:2,3,13
3:14,15 5:18 6:7
11:1 13:15 65:5
85:4
**together**  25:6
40:19 61:23
77:23 84:6
**told**  25:14 40:23
41:24 42:2
48:21,23,24
49:16 53:18
64:10,17 75:19
**ton**  62:8
**tone**  58:14
**took**  57:18 59:7
62:4 66:25
98:18
**top**  14:16 23:19
**total**  98:14
**touch**  31:17
**traditional**  19:4
**train**  18:6
**transcript**  98:22
99:8,11,21
101:8,8 102:20
103:9,11,13,15
103:22
**transition**  12:9
12:12 13:6 15:1

19:8,14 21:12
27:10 37:21
57:24 64:8
74:17,18 75:5
90:15 91:24
92:5
**travel**  10:19
54:13 86:6
**travelled**  54:8
**travelling**  67:19
**treat**  91:6
**tremendous**
56:9
**trial**  1:15
**tried**  52:11
72:11
**trip**  56:8
**trips**  21:5
**trouble**  63:10
**true**  28:15 34:24
60:16 83:4
88:20 101:8
**trump**  1:5 2:6
3:6 6:19,19 8:3
9:19,21,22 10:2
10:9,22 11:13
12:6,9 13:5,5,6
13:10 14:10
15:1 16:9 22:12
25:14 26:11,11
27:9 29:23
37:14 45:12
46:1,2,3 50:9
51:22 52:4
53:25 54:9

56:25 57:11,14
66:24 72:18
73:1 82:25 83:1
83:7,10 85:20
88:5 102:3
103:3,5
**trump's**  60:18
66:7,21
**truth**  68:22
**try**  50:14 52:24
58:6
**trying**  8:21 9:17
11:2,3 15:13
25:5 32:4,12,15
32:19 38:1
39:25 42:19
68:16,23 78:11
81:1 84:25
85:14 87:10
89:3 92:7 93:5
95:2 96:25 97:3
97:5
**turning**  72:22
**tweet**  23:23 24:8
25:23 26:7 28:1
34:23 40:8
58:16 59:4
65:19,23,24,25
66:2,10 79:6
90:2 95:15 96:6
**tweeting**  62:5
**tweets**  28:1 30:9
34:24 46:1,3
52:9,22,25
62:15,19 66:1

88:25 89:4
**twice** 78:3
**two** 11:24,25
16:6 17:17,23
30:12 34:17
36:1 39:4 44:23
58:8 73:25
76:16 78:12
80:9 81:11 84:6
84:11 94:7
96:22
**type** 6:25
**typing** 5:5

**u**

**u** 45:25
**u.s.** 70:14,24
86:10
**uh** 6:1,2 40:5
**uhs** 6:2
**ultimately** 59:17
81:25
**umbrellas** 25:6
**unclear** 89:13
**undeniably** 81:2
**under** 1:16 44:3
103:14
**undersigned**
100:6
**understand**
5:10,14,20
15:13,15 20:7
20:12 25:5
32:20 38:13
39:25 40:10
43:5,25 46:12

58:7 59:8,19
66:15 84:9 91:8
92:7
**understanding**
11:4,12 23:5
29:6,10 34:8
37:21 38:22,23
39:4 49:11
53:11 56:18
72:18 84:8
**understood**
5:24 56:15
83:12
**unfortunately**
38:3
**unique** 52:5
54:25 55:23
**unit** 50:25 51:4
87:23 88:2
**united** 1:1 3:9
8:18,24 9:3,4,5
14:18 56:20
57:23
**units** 98:14
**unnamed** 62:22
62:24
**unprofessional**
52:10
**unqualified**
60:15 82:5
**untenable** 81:18
**update** 69:18
**upset** 79:18
**use** 1:15 39:19
58:4 70:7,22

**used** 21:25
73:23 98:14
**usually** 87:12
98:25
**utter** 79:17

**v**

**v** 102:2 103:5
**varies** 20:14
**variety** 15:22
16:8 49:16
**various** 7:20
19:5,6 20:15,21
81:20 82:7,9
**vent** 90:2
**verbal** 66:23
97:21
**veritext** 3:13,15
98:15 103:19
**versus** 3:5
**vet** 54:22
**vetted** 22:5
**vetting** 26:25
30:13 39:10
67:25
**victim** 52:13
**video** 3:4,22
98:19 99:6,17
99:18
**videoconferen...**
1:11
**videographer**
2:10 3:1,13
50:23 51:2 55:6
55:8,11 87:21
87:25 98:12

99:16
**videotape** 98:13
99:9
**videotaped** 1:10
**view** 58:20
83:23
**violating** 67:18
**violation** 67:19
70:24
**violations** 70:18
**virtually** 3:18
**visibility** 34:20

**w**

**w** 7:10 9:14
83:21
**wait** 72:24
**waiting** 64:21
**waive** 98:20,24
99:4 103:11,21
**waiver** 103:21
**walker** 2:2,9
**wall** 2:6 103:4
**walsh** 31:24,25
32:3,18 33:12
**want** 5:2 7:24
14:3 15:15 16:6
17:6 20:7 29:17
32:8,12,24
56:13 58:3 59:7
59:19 64:12,15
65:22 66:9
67:10 68:15
79:7 90:18 91:3
99:3

**wanted** 16:14
  35:19 44:5
  54:17 71:1
  78:22 79:1 80:8
  91:15,16
**wanting** 82:25
**wants** 30:10
**washington**
  75:20,21,25
  85:17 86:12
**way** 9:14 13:1
  14:8 15:11 16:1
  22:1,2,8 29:18
  32:4,24 49:1
  56:16 59:17
  63:9 67:20
  68:10 81:15
  82:20 86:18
  88:25 89:5,10
  89:11,13,16
  90:5,9 93:6
  94:15
**we've** 5:13
  55:15 71:12
**week** 13:21
  41:15
**went** 26:16 54:1
  63:25,25 77:23
**whatsapp** 70:22
**whatsoever**
  13:9 34:3 52:6
  97:18
**wheelhouse**
  48:17

**whistle** 52:12
**white** 8:4 12:11
  13:6,11 15:1
  17:6,24 18:8,16
  19:21,21,23
  20:15 22:1,7,13
  24:1,5,11,13
  25:12,15 27:22
  29:7,12,15,16
  29:20,24 30:11
  30:19 31:1,5
  32:24 33:4
  35:17 37:14
  38:6,25 39:2,5
  39:14 40:13,14
  42:6,7,11 43:3
  44:2,20 45:23
  53:9,19 54:12
  55:25 56:12,19
  58:22 59:11
  61:6,7,14 64:25
  66:13,17 68:8
  70:10,12 73:4
  73:13,19 74:5
  74:20,25 75:6
  76:8,9 81:6
  82:23 86:7,11
  86:15 89:1
  91:20,22,24
  93:13,20 94:16
  95:4 97:19
**wife** 36:4 63:17
**win** 17:10,18
  35:21

**wind** 11:7
**window** 19:25
**wins** 17:19
**wise** 86:1
**wish** 39:24
**withdrawing**
  53:5
**witness** 3:21 4:2
  4:8,10 10:5
  14:13 15:4,7,10
  17:10,17 23:9
  29:14 30:5
  36:10 37:1,8,18
  41:7 44:16 45:5
  47:16 49:15
  50:20 52:15
  53:21 59:1
  68:19,22 79:9
  80:17 88:10
  89:13 92:2,12
  94:9,18 95:6
  97:8 98:10 99:2
  99:5 100:10
  102:25
**witnessed** 60:10
**wolff** 82:22
  83:13,20
**wolff's** 84:22
  85:7 86:17
**woman** 44:24
**won** 19:10
  35:13
**woodward**
  82:22 83:13

**woodward's**
  85:8
**word** 21:25
  51:21 56:16
  85:9
**words** 36:11
  39:9 62:12
**work** 8:6,6,7 9:3
  11:17,18 12:5,8
  12:21 22:2 25:6
  25:6 30:10
  41:25 42:3
  45:11,15 53:3,9
  54:18 56:7
  60:23 61:13,18
  73:24 75:20
  76:5,9,13 85:17
  85:18 87:17
  91:22 97:12,23
**worked** 9:6
  11:23 17:1 42:7
  45:8 78:8 84:8
**working** 22:20
  42:11 43:2
  54:24 57:1
  74:10
**workplace**
  36:17 63:12
  73:22 80:19
  98:2
**works** 22:1
  72:18
**world** 8:3 55:14
  59:8 77:22 82:4

**worry**  97:2
**worthy**  58:9
**wrangler**  54:7
**write**  78:22 81:7
  83:7
**written**  6:2
  36:18 64:7
**wrong**  17:6
**wrote**  59:12
  81:4,19 84:1

**x**

**x**  2:11,17 40:15
  70:3

**y**

**yeah**  26:18 28:7
  41:7 71:25,25
  73:24 74:4 75:7
  79:21 80:8
  84:20 85:18
  88:19 95:14
**year**  14:18
  69:20
**years**  7:13 8:23
  9:1,5 11:24 14:3
  65:15 79:16
**yeses**  6:1,4
**york**  1:1 2:7,7
  3:11 10:19
  67:19 103:4,4
**young**  76:16

**z**

**z**  74:3
**zoom**  6:3 55:14

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is transcribed, the transcript shall be furnished to the witness for examination and shall be read to or by the witness unless the examination and reading are waived by the witness and by the parties. Any changes in form or substance that the witness wants to make shall be listed in writing by the officer with a statement of the reasons given by the witness for making the changes. The changes shall be attached to the transcript. It shall then be signed by the witness unless the parties waived the signing or the witness is ill, cannot be found, or refuses to sign. If the transcript is not signed by the witness within a reasonable time after it is furnished to the witness, the officer shall sign the transcript and state on the transcript the waiver, illness, absence of the witness, or refusal to sign with any reasons given therefor. The deposition may then be used as fully as though signed unless the court holds that the reasons given for the refusal to sign require rejection of

the deposition wholly or partly, on motion under
rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.



TO REUSE: Mark through all previous shipping labels and barcodes.

Align top of FedEx Express® shipping label here.

ORIGIN ID:GVLA        (770) 343-9696          SHIP DATE: 09AUG23
VERITEXT VERITEXT                              ACTWGT: 2.33 LB
VERITEXT                                       CAD: 100994154/WSXI3000
20 MANSELL COURT
SUITE 300
ROSWELL GA 30076                               BILL SENDER
UNITED STATES US

TO   JARED BLUMETTI ESQ
     LAROCCA HORNIK ROSEN GREENBERG LLP
     40 WALL ST.
     FL. 32
     NEW YORK NY 10005
     (212) 530-4822          REF: 6008286 CERT
     INV:
     PO:                              DEPT:



TRK# 7822 8410 6855    THU - 10 AUG 5:00P
0201                   STANDARD OVERNIGHT

XE SXYA                         10005
                    NY-US       EWR

Re                                    Pak