UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARLENE J. DELGADO,

                    Plaintiff,

            -against-

DONALD J. TRUMP FOR PRESIDENT, INC.,
SEAN SPICER, individually, REINCE PRIEBUS,
individually, and STEPHEN BANNON, individually,

                    Defendants.

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  9/11/2025_____
```

19 Civ. 11764 (AT)

**<u>ORDER</u>**

ANALISA TORRES, District Judge:

      Plaintiff *pro se*, Arlene Delgado, brings this action against Defendants, Donald J. Trump for President, Inc., Sean Spicer, Reince Priebus, and Stephen Bannon,[1] alleging that Defendants engaged in gender- and pregnancy-based discrimination against Delgado and then retaliated against her when she spoke out in opposition. *See generally* Am. Compl., ECF No. 94. Defendants Donald J. Trump for President, Inc., Sean Spicer, and Reince Priebus ("Defendants") jointly move for summary judgment, ECF No. 434, and Delgado moves for partial summary judgment, ECF Nos. 501, 503. Defendants also seek permission to file under seal certain documents submitted in connection with their summary judgment motion, ECF No. 435, and Delgado moves to strike a non-party declaration, ECF No. 471. Additionally, Delgado moves for reconsideration of the Court's order denying her leave to amend the complaint. ECF No. 525. For the reasons stated below, Delgado's motions for partial summary judgment, for the Court to strike a non-party declaration, and for reconsideration are DENIED, and Defendants' motions for summary judgment and for permission to file under seal certain documents

---

[1] Although Delgado names Stephen Bannon as a defendant, there is no evidence that Bannon was served with the amended complaint, which Delgado filed over three years ago, and Bannon has not appeared in this action. *See* ECF No. 312 at 10 n.1.

submitted in connection with their summary judgment motion are GRANTED IN PART and
DENIED IN PART.

## BACKGROUND[2]

### I.    Campaign and Transition

Delgado is a political commentator, writer, and attorney.  Am. Compl. ¶¶ 12–15; *see also*
Def. 56.1 ¶¶ 21–25, ECF No. 499.  In mid-2014, she became the general counsel for the
nonprofit Association of Latino Professionals for America.  Def. 56.1 ¶ 26.  In March 2016,
Delgado began volunteering for Donald J. Trump for President, Inc. (the "Campaign"), Donald
Trump's presidential campaign.  *Id.* ¶ 27.  Half a year later, in September 2016, the Campaign,
pursuant to a consulting agreement (the "Consulting Agreement"), retained Delgado to provide
policy advice, engage in "Hispanic outreach efforts," and conduct media appearances.  *Id.* ¶¶ 27,
29; Def. Ex. 10.[3]  Additionally, Delgado executed a non-disclosure agreement (the "NDA") that
forbade her from using confidential information "in any way detrimental to the [Campaign], Mr.
Trump, any [Trump] Family Member, any Trump Company or any [Trump] Family Member
Company."  Pl. Ex. 12 at 6.[4]

The Consulting Agreement specified that Delgado's work would end on November 10,
2016.  Def. Ex. 10 ¶ 3.  However, Delgado continued to work on behalf of President-elect
Trump's team, including for the Campaign and for Trump's transition team, Trump for America,
Inc. (the "Transition"), until he was inaugurated on January 20, 2017.  Def. 56.1 ¶¶ 30–31; *see*

---

[2] These facts are taken from the parties' Rule 56.1 statements and their declarations and accompanying exhibits, unless otherwise noted.  Citations to a paragraph of a party's Rule 56.1 statement also include the opposing party's response.

[3] Citations to "Def. Ex." are to the exhibits attached to the declaration of Jeffrey Gavenman at ECF No. 440; *see also* ECF No. 442.

[4] Citations to "Pl. Ex." are to the set of exhibits emailed by Delgado to Defendants and the Court, which, as described below, shall be filed on the public docket.

Def. Ex. 11; Def. Ex. 13 at DEF-1685; Def. Ex. 1 at 152:13–153:9, 153:16–155:6, 156:22–158:3. Also on the Transition were Sean Spicer, a senior communications advisor and the incoming White House Press Secretary, Def. Ex. 8 at 12:8–13; Pl. Ex. 10 ¶ 1, and Reince Priebus, a member of the Transition's executive committee and the incoming White House Chief of Staff, Def. Ex. 4 at 14:4–9; Pl. Ex. 74 at 8.

Throughout her tenure with the Campaign and the Transition, Delgado was supervised by Jason Miller, the Campaign's head communications official.  *See* Def. Ex. 8 at 23:19–20, 48:9–11; Pl. Ex. 45.  Between October and December 2016, Delgado and Miller engaged in a sexual relationship.  Def. 56.1 ¶¶ 47–48.  In late November, Delgado learned that she was pregnant and informed Miller.  *Id.* ¶¶ 56–57; Pl. 56.1 ¶¶ 21–22, ECF No. 515.  Miller stated that she "could not be seen waddling around the White House pregnant" and asked her to get an abortion.  Def. Ex. 1 at 176:20–22; Def. Ex. 19 at P-1.  On December 20, Delgado emailed Stephen Bannon, the head of the Campaign, informing him that reporters were asking about an affair between her and Miller, and blaming the leak on two Transition staffers.  Def. Ex. 22; *see* Pl. Ex. 74 at 2.  The next day, Bannon and Kellyanne Conway, another top Campaign official, learned that Delgado was two months pregnant.  Def. 56.1 ¶ 59; Def. Ex. 15 at DEF-840; *see* Def. Ex. 3 at 10:8–11.

On December 22, President-elect Trump announced that he was naming Miller to serve as White House Director of Communications.  Def. 56.1 ¶ 62; Def. Ex. 16.  Within a few hours of the announcement,[5] Delgado posted several tweets implying that she was pregnant and that Miller had fathered her child during an affair, including a tweet "congratulating" the "baby-daddy on being named WH Comms Director" and another calling Miller the "2016 version of

---

[5] Without citing evidence, Defendants state that Delgado's tweets identified Miller as the incoming White House Communications Director prior to the release of President-elect Trump's official announcement.  Def. 56.1 ¶ 63. Defendants are mistaken; Delgado posted her tweets after the announcement was published.  *See id.*; Pl. Ex. 10 ¶ 3; Pl. Ex. 12 ¶ 10; Pl. Ex. 13 at 4–6.

John Edwards." Def. 56.1 ¶ 69; Pl. 56.1 ¶¶ 32–34; Def. Ex. 1 at 217:18–219:6; Def. Ex. 17.

Delgado also called Bannon, confirming her pregnancy and asking whether she still had a job in

the White House. Def. 56.1 ¶ 67; Def. Ex. 1 at 199:15–200:14. According to Delgado, Bannon

"reassured" her, but he did not confirm whether she had a job. Def. 56.1 ¶ 68; Def. Ex. 1

200:20–25, 202:8–15.

The next morning, by email dated December 23, 2016, Delgado informed Priebus,

Bannon, and Spicer that she and Miller were expecting a child. Def. 56.1 ¶ 82; Pl. 56.1 ¶ 36;

Def. Ex. 19 at P-1–2. Delgado claimed that Miller told her that he had spoken with Bannon and

Priebus and that Priebus told him "no one will care" about the affair or pregnancy. Def. Ex. 19

at P-1. Delgado questioned whether any of these conversations between Miller, Bannon, and

Priebus had taken place and described how, in the last few days, she had been removed from the

planned White House organization chart, despite having been promised by Miller and

President-elect Trump that she would have a position there. *Id.* Delgado wrote that she was

being punished for being pregnant and for having an affair with a male supervisor, and urged that

Miller be removed from his role as White House Communications Director. *Id.* Having

received no satisfying reply to her email, on December 24, Delgado posted a series of tweets

calling on Miller to resign. Def. 56.1 ¶ 72; Def. Ex. 18. Later that day, Miller's appointment as

Communications Director was withdrawn. Def. 56.1 ¶ 77; Def. Ex. 20.

Over the next week, Delgado reached out to Spicer multiple times to complain about the

online bullying she was experiencing. Def. Ex. 19 at P-3–5; Def. Ex. 23 at P-273–80. She

believed that Miller's continued use of his personal social media was encouraging online users to

focus on the story about her and Miller, and she asked Spicer why the Transition had not directed

Miller to refrain from posting online. Def. Ex. 19 at P-3–5. She also thought that other

Transition staff members were feeding information to the media. Def. Ex. 23 at P-273–75, 278, 280–81. Spicer repeatedly stated that he was working to contain the news stories. *Id.* at P-272–79. According to Delgado, Spicer discouraged her from pursuing a job in the White House, telling her during at least one phone call that "the White House is no place for a new mom." Def. Ex. 1 at 239:19–241:23. On December 29, Delgado emailed Priebus, Spicer, and other Transition leadership, accusing Miller of trying to discredit her in the media, insisting that she wanted "an answer from the Trump team as to why this kind of harassment of a pregnant team member is allowed." Def. Ex. 21 at DEF-1542. The next day, Spicer texted Delgado informing her that the Campaign had retained an employment attorney to "help with [her] concerns and wrap this up promptly." Def. Ex. 23 at P-301–02; *see also* Def. 56.1 ¶¶ 86–88.

Although Delgado continued to work for the Campaign and Transition until President Trump was inaugurated on January 20, 2017, she testified that she stopped receiving new assignments by the end of December 2016, and she was not invited to the inauguration. Def. Ex. 1 at 263:22–268:23. She was not offered a position at the White House. *See* Def. 56.1 ¶ 131.

## II.    Mediation, Arbitration, and Lawsuit

On March 29, 2017, Delgado, through an attorney, sent the Campaign's lawyer a draft complaint before the New York City Commission on Human Rights ("NYCCHR") alleging pregnancy-, sex-, and race-based discrimination claims against the Campaign, the Transition, Spicer, Priebus, and Bannon. Pl. 56.1 ¶ 42; Pl. Ex. 21. In May 2017, the parties attended a mediation session (the "Mediation") where, according to Delgado, the parties agreed to settle the matter for $1.2 million. Pl. 56.1 ¶¶ 45, 47. Defendants, however, state that an agreement was discussed but not finalized. *Id.* The record reflects that, between May 19 and mid-July, the

parties' attorneys emailed back and forth to "confirm [their] clients' agreement" and work on "getting a written agreement done, signed[,] and dusted." Def. Ex. 44 at P-153; *see also* Def. Exs. 45–46.

On July 19, Defendants' lawyer emailed Delgado's lawyer stating that his firm would no longer be representing Defendants. Def. Ex. 46 at P-211. Two weeks later, Delgado's counsel received a letter from new counsel for Defendants. Pl. 56.1 ¶ 49; Pl. Ex. 28. Without referencing the arbitration, Defendant's new counsel claimed, for the first time, that Delgado's December 22 and 24, 2016 tweets about Miller violated the confidentiality and non-disparagement provisions of Delgado's NDA and warned that any public filing with the NYCCHR would further violate the NDA. Pl. 56.1 ¶ 50; Pl. Ex. 28. The same day, the Campaign filed an arbitration demand against Delgado with the American Arbitration Association ("AAA") for $1.5 million, alleging that her December 2016 tweets and her suggestion that she would file a complaint with the NYCCHR violated the NDA (the "Arbitration"). Pl. 56.1 ¶ 51; Pl. Ex. 22. About a month later, after Delgado agreed to file her NYCCHR complaint under seal, the Campaign amended its arbitration demand by removing the reference to Delgado's threatened NYCCHR action but maintained that the Campaign was still entitled to $1.5 million. Pl. 56.1 ¶ 56; Pl. Ex. 23; ECF No. 512-1. Delgado ultimately did not pursue her claims further before the NYCCHR, and in 2018, the Campaign told the AAA that it no longer intended to pursue the Arbitration. Pl. 56.1 ¶ 59; Pl. Ex. 83 at 3.

More than a year later, on December 23, 2019, Delgado, through counsel, filed this action against the Transition, the Campaign, Spicer, Priebus, and Bannon, alleging breach of contract, promissory estoppel, tortious interference with prospective business relations, and discrimination

and retaliation under New York law.[6]  *See generally* Compl., ECF No. 1.  Later that day, the Campaign sought to reopen the Arbitration.  Pl. 56.1 ¶¶ 60–61; Pl. Ex. 25.

In March 2020, Delgado moved in this action to compel enforcement of the purported settlement the parties reached in the Mediation, ECF No. 29, and in April, Defendants moved to compel arbitration of certain claims and to dismiss others, ECF No. 35.  While those motions were pending, the AAA arbitrator issued a decision in favor of Delgado, holding that the NDA applies only to private information concerning President Trump's political affairs, that any other reading "would result in an overly broad, vague and unenforceable restriction," and that Delgado's December 2016 tweets "were strictly personal in nature" and "were directed only at an individual colleague," not the Campaign itself.  ECF No. 61 at 4–5.  In March 2021, the Court granted Defendants' motion to dismiss Delgado's tortious interference claim and denied Defendants' motion to compel arbitration, both without prejudice.  ECF No. 63 at 8.  A month later, Defendants again moved to compel arbitration, ECF No. 67, and the Court again denied the motion without prejudice, ECF No. 93 at 14.

In March 2022, Delgado filed her amended complaint.  Am. Compl.  For over two years, the parties engaged in contentious discovery before the Honorable Katharine H. Parker.  *See* ECF No. 99.  During that time, Delgado's counsel withdrew from the case, and Delgado now proceeds *pro se*.  ECF Nos. 140, 157, 174.  After the close of discovery, in August 2024, Delgado moved to amend her complaint to name three new defendants.  ECF No. 403.  The Court adopted Judge Parker's report recommending that the motion be denied.  ECF Nos. 411, 520.

---

[6] In December 2021, Delgado voluntarily dismissed her claims against the Transition.  ECF No. 91.

Before the Court are Defendants' motion for summary judgment, ECF No. 434, Delgado's cross-motion for partial summary judgment, ECF Nos. 501, 503, Defendants' motion to file certain documents under seal, ECF No. 435, Delgado's motion to strike the declaration of non-party Michael Glassner, ECF No. 471, and Delgado's motion for reconsideration of the Court's order denying her leave to amend the complaint, ECF No. 525.

## DISCUSSION

I. <u>Motion to Strike</u>

Delgado moves to strike the declaration of Michael Glassner, ECF No. 438, filed in connection with Defendants' summary judgment motion, ECF No. 471; *see also* ECF Nos. 489, 506. Because the Court's ruling on this motion may affect whether Delgado is able to prevail on summary judgment, the Court addresses the motion first. *See Vista Food Exch., Inc. v. Comercial de Alimentos Sanchez S de R L de C.V.*, 627 F. Supp. 3d 408, 415 (S.D.N.Y. 2022).

Delgado asks the Court to strike Glassner's declaration, arguing that there are inconsistencies between his declaration and deposition testimony. ECF No. 471 at 2–5. For example, Glassner's declaration states that in March 2017, he learned that Delgado "intended to file a lawsuit against the Campaign that threatened to reveal confidential information" and had "previously revealed confidential information in a series of tweets that she published in or around December 2016 concerning one of the Campaign's former employees, Jason Miller." ECF No. 438 ¶¶ 10–11. At his deposition, however, Glassner testified that he "d[id]n't recall the filing of the arbitration," could not recollect what "confidential information" was contained in Delgado's tweets, and did not remember the tweets themselves. Pl. Ex. 2 at 47:15–48:14, 55:17–56:8. Delgado contends that this deposition testimony establishes that Glassner's declaration is an "improper sham" that "cannot be considered by the Court." ECF No. 471 at 4.

Delgado is correct that Glassner's deposition testimony casts doubt on the credibility of his declaration, and *vice versa*. But "[t]he mere fact that testimony is inconsistent is insufficient to justify striking an entire document." *Trinidad v. Pret A Manger (USA) Ltd.*, 962 F. Supp. 2d 545, 553 (S.D.N.Y. 2013); *see also Vista Food*, 627 F. Supp. 3d at 416 (explaining that striking evidence in connection with summary judgment is a "'harsh remedy' that 'should be imposed only in rare situations.'" (alteration adopted) (quoting *Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988))). "Where there are alleged discrepancies between affidavits and depositions," those inconsistencies ordinarily "go to the credibility of the declarant—and therefore to the weight to be given his or her testimony—rather than the admissibility of the testimony." *Trinidad*, 962 F. Supp. 2d at 553 (citing *Lujan v. Cabana Mgmt., Inc.*, 284 F.R.D. 50, 67 (E.D.N.Y. 2012)). Because the Court does not weigh the evidence or make credibility determinations at summary judgment, *see Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005), any discrepancies in Glassner's statements do not justify striking his declaration.

Delgado next argues that the Court should strike all references in Glassner's testimony to the Campaign's reliance on the "advice of counsel" or, in the alternative, that she be permitted to obtain otherwise privileged communications between Defendants and counsel related to the Arbitration. ECF No. 471 at 5–19. Typically, a party may raise an advice-of-counsel defense only if it waives attorney-client privilege over the evidence at issue, *see SEC v. Honig*, No. 18 Civ. 8175, 2021 WL 5630804, at *7 (S.D.N.Y. Nov. 30, 2021). But Defendants do not assert an advice-of-counsel defense in their summary judgment briefing, and in response to Delgado's motion to strike, Defendants disclaim that they are using that defense or that they intend to do so in the future, *see* ECF No. 489 at 12–13. Such a disclaimer of reliance is sufficient to preserve

attorney-client privilege and obviates the need to strike Glassner's deposition testimony.  *See Honig*, 2021 WL 5630804, at *9–10.

Delgado's motion to strike Glassner's declaration is, therefore, denied.

II.    <u>Summary Judgment</u>

A.  Legal Standard

A party is entitled to summary judgment if it can establish that there "is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–26 (1986).  A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of informing the Court of the absence of a genuine dispute of material fact by citing particular evidence in the record.  Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323–24; *Koch v. Town of Brattleboro*, 287 F.3d 162, 165 (2d Cir. 2002).  In making this showing, the party may rely on "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  If the moving party meets its initial burden, the burden shifts to the opposing party to establish a genuine dispute of material fact.  *Beard v. Banks*, 548 U.S. 521, 529 (2006).  The Court views all facts "in the light most favorable to the non-movant, resolving all ambiguities in her favor."  *Borley v. United States*, 22 F.4th 75, 78 (2d Cir. 2021).

Because Delgado is proceeding *pro se*, the Court construes her submissions "liberally" and interprets them "to raise the strongest arguments that they suggest."  *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (emphasis omitted) (citation omitted).

B. Discrimination

Delgado alleges that Defendants discriminated against her based on her status as a pregnant woman, in violation of the New York State Human Rights Law (the "NYSHRL"), N.Y. Exec. Law § 296 *et seq.*, and the New York City Human Rights Law (the "NYCHRL"), N.Y.C. Admin. Code § 8-107 *et seq.* Am. Compl. ¶¶ 102–08, 112–15, 119–21, 125–27. Defendants move for summary judgment on each claim.

1. The NYSHRL

a. Legal Standard

The NYSHRL makes it unlawful for an employer, "because of an individual's . . . gender identity or expression, . . . sex, . . . [or] familial status, . . . to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions[,] or privileges of employment." N.Y. Exec. Law § 296(1)(a). Individuals may also be held liable for "aid[ing], abet[ting], incit[ing], compel[ling], or coerc[ing]" an employer's discrimination. *Id.* § 296(6). "The aider and abettor need not have had an employer-employee or supervisory relationship with the plaintiff." *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 68 (S.D.N.Y. 2020) ("A co-worker who actually participates in the conduct giving rise to a discrimination claim can be held liable . . . even though that co-worker lacked authority to either hire or fire the plaintiff." (alteration adopted) (citation omitted)). All that is required is that the defendant "actually participated in the conduct giving rise to a discrimination claim," *Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 337 (S.D.N.Y. 2020) (alteration adopted) (citation omitted), and that he "share[d] the intent or purpose of the principal actor," *Nezaj v. PS450 Bar & Rest.*, 719 F. Supp. 3d 318, 333 (S.D.N.Y. 2024) (citation omitted).

Claims under the NYSHRL are analyzed using the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). At the first step, if a plaintiff can establish a *prima facie* case of discrimination by showing "(1) that she is a member of a protected class; (2) that she was qualified for employment in the position; (3) that she suffered an adverse employment action; and, in addition, has (4) some minimal evidence suggesting an inference that the employer acted with discriminatory motivation," she is entitled to a "temporary presumption" that the defendant acted with a "discriminatory motivation." *Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015) (citations omitted); *see also Davis v. Winston Preparatory School*, No. 21 Civ. 8209, 2025 WL 1795350 at *18 (S.D.N.Y. June 30, 2025) ("[W]hile a Section 1981 claim requires plausible pleading of 'but for' causation, claims under the NYSHRL are properly pled so long as the plaintiff plausibly pleads discrimination as a 'motivating factor.'" (citations omitted)). The burden then shifts to the defendant to articulate a legitimate, non-retaliatory reason for the allegedly discriminatory action. *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013). If the defendant puts forth sufficient evidence to support its articulated reason, the presumption of discrimination disappears, and the plaintiff must adduce evidence that the proffered non-retaliatory reason was "not the true reason (or . . . not the sole reason) for the employment decision, which merges with the plaintiff's ultimate burden of showing that the defendant intentionally discriminated against her." *Littlejohn*, 737 F.3d at 307–08.

### b. Spicer and Preibus

Defendants argue that Delgado's claims against Spicer and Priebus should be dismissed because there is no evidence that these Defendants worked for the Campaign or played any role in the Campaign's decisionmaking with regard to Delgado's employment. Def. Mem. at 7–8,

ECF No. 436.  Delgado claims that, although Spicer and Priebus were not technically Campaign

employees, they served as Transition officials and exercised significant decisionmaking

authority.  Pl. Opp. at 3–4, ECF No. 498.

The Court rejects the artificial distinction that Defendants draw between the Campaign

and the Transition and their respective leadership.  As Delgado testified at her deposition, "[n]o

one [was] quite sure what the Transition team was." Def. Ex. 1 at 154:24–25.  "The Transition

was some sort of nebulous thing nobody could really identify."  *Id.* at 157:17–18.  Delgado

apparently worked for both entities, as she signed the Consulting Agreement with the Campaign,

Def. Ex. 10, a "consultant contract" with the Transition, Def. Ex. 13 at DEF-1685; Def. Ex. 1 at

157:19–20, and she received paychecks from both the Campaign and the Transition, *see* Def. Ex.

13 at DEF-1685; Def. Ex. 1 at 154:14–155:6; Pl. Ex. 51 at P-437 (email discussing the

"campaign portion" of Delgado's pay in December 2016); Pl. Ex. 74 at 4–6 (November 2016

press release listing Delgado as a member of the Transition's "leadership staff"); Pl. Ex. 34 at

DEF-2440 (master staff list designating Delgado as a contract employee of the Transition).  Press

releases from that period likewise show significant overlap between Campaign and Transition

staff and leadership.  *See* Pl. Ex. 74 at 2 (November 13, 2026 press release announcing that

Bannon and Priebus "are highly qualified leaders who worked well together on our campaign

and led us to a historic victory . . . [and] will also work together . . . to help lead the transition

process in the run-up to Inauguration Day"); *id.* at 10 (December 22, 2016 press release

announcing appointment of Spicer as incoming White House Press Secretary and stating that

Spicer was a "key member[] of [Trump's] team during the campaign and transition").

Moreover, the record reflects that Spicer and Priebus exercised authority over the hiring

decisions of the Campaign, Transition, and eventually, the White House.  Spicer served as a

senior communications advisor for the Transition.  Pl. Ex. 10 ¶ 1; Pl. Ex. 74 at 6; Def. Ex. 4 at 60:7–10.  Despite Defendants' claim that Spicer had no role in Campaign staffing decisions, Def. Mem. at 7, the evidence suggests otherwise.  For example, a series of late-2016 emails between Spicer, Miller, and other Campaign and Transition staff containing various proposed White House organization charts suggests that Spicer had a role in selecting or approving which Transition staffers would ultimately go to the White House's press and communications units.  *See* Pl. Ex. 60 at DEF-678, 691–93, 2315; Pl. Ex. 65 at DEF-1092.  In January 2017, after President Trump took office, Spicer emailed Delgado to tell her that "[w]e discussed at length [Delgado] staying on the campaign payroll."  Pl. Ex. 32 at DEF-1997.  It is also reasonable to infer that Priebus, who served on the Transition's executive committee and was the incoming White House Chief of Staff, Pl. Ex. 74 at 8, was involved in hiring decisions, *see* Pl. Ex. 58 at P-41 (email stating that Priebus "would like to sit down" with Miller and "give [him] an update on W[hite] H[ouse] structure"); Pl. Ex. 65 at DEF-1092.

Together, this evidence raises a factual dispute as to whether Spicer and Priebus were sufficiently involved in employment-related decisionmaking at the Campaign, including the decision to terminate Delgado's employment and deny her a place in the White House, to establish liability under the NYSHRL.  Even if they were not the ultimate decisionmakers, there is a triable issue as to whether they aided and abetted the discriminatory conduct alleged by Delgado.  *See McHenry*, 510 F. Supp. 3d at 68 ("A co-worker who actually participates in the conduct giving rise to a discrimination claim can be held liable . . . even though that co-worker lacked authority to either hire or fire the plaintiff." (alteration adopted) (citation omitted)).

### c.  The Merits of Delgado's NYSHRL Claim

Defendants argue that summary judgment is warranted because Delgado cannot establish

a *prima facie* case of discrimination, and even if she could, Defendants have demonstrated that

they had legitimate, non-discriminatory reasons for any adverse actions taken against her, and

these reasons were not pretextual.[7]  Def. Mem. at 8–14.  They are wrong.

First, as a pregnant woman, Delgado was a member of a protected class.  *See* N.Y. Exec.

Law § 296(1)(a).  Second, the record supports that she was qualified for a job with the

Campaign, the Transition, and the White House.  *See, e.g.*, Pl. Ex. 32 at DEF-486, 494–95, 576,

1978 (November 2016 emails from high-level Campaign and Transition leaders praising

Delgado's work).  Third, Delgado suffered adverse employment actions.  Beyond her testimony

that she was ostracized and constructively terminated from her role on the Campaign and

Transition, she has also adduced evidence that her name was removed from a list of Campaign

and Transition employees destined for roles in the White House.  *See* Def. Ex. 1 at 263:22–

268:23 (Delgado's testimony that, after her pregnancy became public, she stopped receiving

communications from the Campaign and Transition and was excluded from opportunities to

make media appearances).  *Compare* Pl. Ex. 60 at DEF-299–302 (December 21, 2016 email

from Spicer with a proposed list of White House press employees that includes Delgado as

---

[7] Defendants argue that Delgado's NYSHRL claim also fails because she was an independent contractor, not a Campaign employee.  Def. Mem. at 9; *see Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 113 (2d Cir. 2000).  Although the Consulting Agreement labeled her an independent contractor, *see* Def. Ex. 10, that fact is not determinative.  "[A] decision on whether a worker is an 'employee'—or whether he or she is merely an independent contractor—requires the application of the common law of agency," which "depends largely on the thirteen factors articulated by the Supreme Court in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989)."  *Eisenberg*, 237 F.3d at 114.  These factors include "the hiring party's right to control the manner and means by which the product is accomplished," "the skill required," "the duration of the relationship between the parties," "the method of payment," and "whether the work is part of the regular business of the hiring party."  *Reid*, 490 U.S. at 752.  Because questions of fact remain as to these factors and others, the Court denies summary judgment on this ground.

"Director of Hispanic Media"), *with id.* at TFA-DG-7514–15 (January 11, 2017 email from Spicer with a proposed list that does not include Delgado).

Fourth, Delgado proffers evidence suggesting that Defendants acted with a discriminatory motive.  She details how, mere days after she told Spicer, Priebus, and other Campaign and Transition workers that she was pregnant, she stopped being included on certain communications, received fewer opportunities for media appearances, and was taken off a list of potential White House employees.  *See* Pl. Mem. at 18–19, ECF No. 501; Def. Ex. 1 at 264:11–266:5; Pl. Ex. 60 at DEF-691–92, DEF-2315–19, DEF-2394 (December 6, 21, and 27, 2016 draft White House organization charts listing Delgado as "Director of Hispanic Media"); *id.* at TFA-DG-7514–15 (January 11, 2017 White House staff list omitting Delgado).  She also recalls a conversation in which Spicer told her that "the White House is no place for a new mom" and that he would not be able to work there but for the fact that he relies on his wife and others to care for his children.  Def. Ex. 1 at 239:19–241:23.  The timing of these adverse actions combined with Spicer's alleged comments suffice to establish *prima facie* discrimination.  *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (explaining that "[c]ircumstances contributing to a permissible inference of discriminatory intent may include . . . invidious comments about others in the employee's protected group, . . . or the more favorable treatment of employees not in the protected group . . . or the timing of the [plaintiff's] discharge" (citations omitted)).

Defendants contend that they had legitimate, non-discriminatory reasons for terminating Delgado's employment.  *See* Def. Mem. at 9–14.  They point out that the Consulting Agreement specified that her work for the Campaign would continue only through November 10, 2016, right after the presidential election, and they claim that, after that date, "[t]here simply was no job

available for Plaintiff with the Campaign." *Id.* at 9–10; *see* Def. Ex. 10 at P-451. But Delgado continued working after November 10, as evidenced by email records and deposition testimony showing that she worked on behalf of President-elect Trump through at least the end of December 2016. *See, e.g.*, Def. Ex. 1 at 152:18–155:21; Pl. Ex. 51 at P-437 (discussing "campaign salary-payments" for Delgado's work in December 2016 and January 2017). It was only after Spicer, Priebus, and other Campaign and Transition staff learned of her pregnancy that Delgado's work dried up, raising a question of fact as to the ultimate reason for her termination. *See Chambers*, 43 F.3d at 37. Likewise, Defendants' claims that after she announced her pregnancy, Delgado was not denied the opportunity to make television appearances, and that Delgado made the decision not to make such appearances, conflict with other evidence in the record. *See* Def. Mem. at 9–10; Def. Ex. 1 at 263:22–268:23 (Delgado testifying that work was taken away from her against her wishes). Moreover, Defendants' argument that they cannot be held responsible for gender-based discrimination because Delgado did not face such discrimination when she first started working for the Campaign, *see* Def. Mem. at 10–11, is barely worth addressing; a plaintiff need not have faced discrimination for the entirety of her time with an employer for her to make out a viable claim. *See LaGrassa v. Autoone Ins. Co.*, No. 07 Civ. 1072, 2008 WL 3887606, at *8 (E.D.N.Y. Aug. 20, 2008).

The Court also rejects Defendants' argument that Delgado's claims fail because she "cannot demonstrate that the Campaign treated any similarly-situated employees more favorably than it did [Delgado]." Def. Mem. at 11. A plaintiff can succeed on a discrimination claim without identifying the existence of similarly situated employees who were treated more favorably. *See Chambers*, 43 F.3d 29 (describing such evidence as only one of many circumstances that may "contribut[e] to a permissible inference of discriminatory intent");

17

*Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001); *Minto v. Molloy Univ.*, 715 F. Supp. 3d 422, 431 (E.D.N.Y. 2024). Delgado has adduced sufficient evidence to support a finding of pretext and discriminatory intent, including but not limited to the "sequence of events" leading to Delgado's termination, Spicer and Priebus' apparent involvement in that termination, and "degrading" comments about the capacity of pregnant women. *Chambers*, 43 F.3d at 37.

Accordingly, Defendants' motion for summary judgment on Delgado's pregnancy discrimination claim under NYSHRL is denied.

### 2. The NYCHRL

The standard for discriminatory conduct under the NYCHRL is generous, offering employees "broader protection than its NYSHRL counterpart." *Bilitch v. N.Y.C. Health & Hosps. Corp.*, 194 A.D.3d 999, 1004 (N.Y. App. Div. 2021). A plaintiff need only show "by a preponderance of the evidence that she has been treated less well than other employees because of her gender [or sexual and reproductive health decisions]."[8] *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) (citation omitted); *see also McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 72 (S.D.N.Y. 2020) ("Under the NYCHRL, a plaintiff is not required to show but-for causation.") Because a genuine dispute of material fact

---

[8] Unlike its state-law counterpart, the NYCHRL directly prohibits employers *and* employees from "refus[ing] to hire or employ," "discharg[ing] from employment," or "discriminat[ing] against . . . in compensation or in terms, conditions or privileges of employment" any person because of their "actual or perceived . . . gender," "caregiver status," and "sexual and reproductive health decisions." N.Y.C. Admin. Code § 8-107(1)(a). Aiding and abetting such discrimination is similarly forbidden. *Id.* § 8-107(6); *see Lee v. Riverbay Corp.*, 751 F. Supp. 3d 259, 291 (S.D.N.Y. 2024) ("The same standards of analysis used to evaluate aiding and abetting claims under the NYSHRL apply to such claims under the NYCHRL."). The NYCHRL also imposes supervisory liability on employers for the unlawful discriminatory practices of their employees or agents where the employee or agent "exercised managerial or supervisory responsibility," the employer knew of the employee or agent's discriminatory conduct and "acquiesced" in such conduct or "failed to take immediate and appropriate corrective action," or the employer should have known of the discriminatory conduct and "failed to exercise reasonable diligence to prevent" it. N.Y.C. Admin. Code § 8-107(13).

precludes the Court from granting summary judgment to Spicer, Priebus, and the Campaign under the NYSHRL on Delgado's pregnancy discrimination claim, the Court also denies their motion for summary judgment under the NYCHRL's "more relaxed standards for liability."[9] *McHenry*, 510 F. Supp. 3d at 74.

### C.  Retaliation

#### 1.  Legal Standard

The NYSHRL and NYCHRL both prohibit retaliation against an employee who has engaged in protected activity.  N.Y. Exec. Law § 296(7); N.Y.C. Admin. Code § 8-107(7).  Protected activity includes opposing any forbidden discriminatory practice by, for example, bringing legal claims alleging unlawful discrimination.  N.Y. Exec. Law § 296(7); N.Y.C. Admin. Code § 8-107(7).

"A plaintiff alleging retaliation in violation of the NYSHRL must show that (1) he or she was engaged in a protected activity by opposing conduct prohibited [by the NYSHRL]; (2) the defendant was aware of that activity; (3) he or she suffered an adverse action based upon his or her activity; and (4) there was a causal connection between the protected activity and the adverse action."  *Bilitch*, 194 A.D.3d at 1004.  To demonstrate an adverse action, a plaintiff must show that "the challenged action [was] materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Robinson v. De Niro*, 739 F. Supp. 3d 33, 112 (S.D.N.Y. 2023) (quotation omitted).  That

---

[9] Delgado also purports to bring a "hostile work environment" claim under the NYCHLR, citing Miller's conduct and the actions of a female Campaign staffer who allegedly threatened her and called her a "slut."  *See* Pl. Opp. at 28–33.  Delgado does not allege a hostile work environment as an independent cause of action, but rather includes it as a theory of liability in her general discrimination claim under the NYCHLR, as is appropriate for her to do.  Am. Compl. ¶ 114; *see Mehta v. City of New York*, No. 19 Civ. 3857, 2022 WL 280460, at *12 (E.D.N.Y. Jan. 31, 2022).  Because the Court denies Defendants' motion for summary judgment as to Delgado's NYCHRL claim based on her theory of discrimination described above, the Court need not separately analyze her NYCHRL claim under a hostile work environment theory.  *See Mehta*, 2022 WL 280460, at *12.

analysis "depend[s] upon the particular circumstances" of each case and it need not be confined to actions that have a direct and concrete "impact [on] [the plaintiff's] current or future employment." *Id.* at 112–13 (quotation omitted).   Retaliation claims under the NYCHRL are analyzed in a similar manner, but as with claims of discrimination, the standard is more generous than under the NYSHRL. *Bilitch*, 194 A.D.3d at 1004.  Under the NYCHRL, a plaintiff need only show that the "employer engaged in conduct which was reasonably likely to deter a person from engaging in that protected activity." *Id.*; *Robinson*, 739 F. Supp. 3d at 113 ("Under the NYCHRL . . . an adverse action need not even be material, but only nontrivial." (quotation omitted)).

If the plaintiff makes out a *prima facie* case of retaliation under either the NYSHRL or NYCHRL standard set forth above, the burden shifts to the defendant to provide evidence of legitimate, non-retaliatory reasons for the challenged action.  *See Robinson*, 739 F. Supp. 3d at 102.  If the defendant proffers such evidence, the burden shifts back to the plaintiff to demonstrate that a reasonable jury could find that the defendant's reasons are pretextual, or that "unlawful discrimination was one of the motivating factors" for the adverse action, "even if it was not the sole motivating factor." *Id.* (quotation omitted); *see also id.* ("[S]ummary judgment is appropriate only if the plaintiff cannot show that retaliation played *any* part in the employer's decision." (emphasis added) (quotation omitted)).

### 2.  Application

Both Delgado and Defendants seek summary judgment on Delgado's retaliation claims. Delgado argues that she engaged in protected activity when she emailed Campaign and Transition leadership in December 2016 complaining of pregnancy discrimination and harassment, *see* Def. Ex. 19; indicated that she may file an NYCCHR complaint against

Defendants in March 2017, *see* Pl. Ex. 21; and initiated the instant action, Pl. Mem. at 15–16. Delgado contends that, in response to these protected activities, Defendants ostracized her, constructively discharged her, prevented her from getting a job in the White House, and then prosecuted an arbitration action against her—all materially adverse employment actions or actions that would reasonably deter a person from engaging in protected activity. *See* Pl. Mem. at 17–18. Delgado argues that the timing of the adverse actions in relation to her activity, as well as comments like those made by Spicer, including that the White House is no place for a pregnant woman and that he could not work there but for the fact that he relies on his wife and others to care for his children, establish a *prima facie* case of retaliation and demonstrate that retaliating against her was at least a motivating factor if not the sole factor that influenced Defendants' decisionmaking. *See id.* at 18–24.

Defendants contend that Spicer and Priebus had no role in any of the Campaign's employment-related decisionmaking or the discrimination that Delgado complains of; that there is no evidence that Delgado lost out on any Campaign work assignments; that Delgado was denied a role in the White House for legitimate, non-discriminatory reasons; and that Delgado's termination from the Campaign did not reflect retaliatory animus, but simply the natural end of the election cycle and the Consulting Agreement. *See* Def. Mem. at 14–16; Def. Opp. at 17–22, ECF No. 518. For the reasons discussed above, the Court finds that these are all disputed issues of fact not appropriate for resolution at summary judgment. *See, e.g.*, *Bilitch*, 194 A.D.3d at 1005 (finding that the same evidence that precludes summary judgment for an employer on NYSHRL and NYCHRL discrimination claims can preclude summary judgment for an employer on a retaliation claim).

Defendants argue that summary judgment on at least a portion of Delgado's retaliation claim is warranted because "there is no evidence to demonstrate that the [specific] decision to institute the Arbitration was motivated by retaliatory animus." Def. Opp. at 22; *see also* Def. Mem. at 16 n.4. Delgado cross-moves for summary judgment on this issue. Pl. Mem. at 24. According to Defendants, the four months between when Delgado's presentation of her draft NYCCHR complaint and the Campaign's filing of the Arbitration against her is too long a time period from which to infer a retaliatory connection.[10] Def. Opp. at 22–23. However, there is no "bright line . . . defin[ing] the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a . . . right and an allegedly retaliatory action." *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001); *see also id.* at 555 (finding, with "particular[] confiden[ce]," that five months could support a causal connection between protected activity and allegedly retaliatory action); *Suggs v. Port Auth. of N.Y. & N.J.*, No. 97 Civ. 4026, 1999 WL 269905, at *6 (S.D.N.Y. May 4, 1999) (6 months). Although temporal proximity, standing alone, may not be sufficient under the NYSHRL or NYCHRL to demonstrate a retaliatory motive, *see Robinson*, 739 F. Supp. 3d at 114, the record suggests that the Arbitration was merely one action in a broader sequence of retaliatory steps taken by the Campaign against her and it should, therefore, not be viewed in isolation, *see Tepperwien v. Entergy Nuclear Operations*, 663 F.3d 556, 568 (2d Cir. 2011)

---

[10] Although the Campaign filed the Arbitration after the conclusion of Delgado's employment, the Arbitration and the Campaign's decision to reinstate the Arbitration in December 2019 fall within the ambit of the NYSHRL and NYCHRL because they constitute allegedly retaliatory activity that might "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Robinson*, 739 F. Supp. 3d at 112 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)); *see also Jian Zhong Li v. Oliver King Enters., Inc.*, No. 14 Civ. 9293, 2015 WL 4643145, at *3 (S.D.N.Y. Aug. 4, 2015) (explaining that "[c]ourts have held that . . . instituting bad faith litigation against [an] employee constitutes actionable retaliation" and listing cases). Defendants' argument that the Court may not consider Delgado's claim about the Campaign's reopening of the Arbitration in 2019 because Delgado did not raise the issue in her amended complaint is not supported by the record. Def. Opp. at 16. That claim *does* appear in the amended complaint. *See* Am. Compl. ¶ 71.

("Alleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct."); *Giordano-Forkan v. N.Y.C. Dep't of Educ.*, No. 13 Civ. 6950, 2014 WL 5369426, at *3 (S.D.N.Y. Oct. 17, 2014) ("Even if the U-Rating and its immediate consequences could not sustain the present claim, the sum of the alleged retaliatory actions taken by the school administration could amount to an adverse employment action.").

The Court, however, cannot grant summary judgment to Delgado on this issue; as Defendants note, the Campaign may have had non-retaliatory reasons for bringing claims against Delgado, including a belief that Delgado actually violated or was about to violate the NDA, *see* Def. Opp. at 24–26, and, for the reasons set forth above, it is genuinely disputed whether Defendants' reasons were pretextual or at least partially motivated by retaliatory animus. Accordingly, neither party is entitled to summary judgment on Delgado's retaliation claims.[11]

### D. Interference with Protected Rights

Delgado alleges that Defendants also interfered with her protected rights, in violation of the NYCHRL. Am. Compl. ¶¶ 122–23. The law states, in relevant part, that "[i]t shall be an unlawful discriminatory practice for any person to coerce, intimidate, threaten or interfere with, or attempt to coerce, intimidate, threaten or interfere with, any person in the exercise or enjoyment of . . . any right granted or protected pursuant to the [NYCHRL]." N.Y.C. Admin. Code § 8-107(19). To make out an interference claim under the NYCHRL, a plaintiff must show that a defendant actually threatened, intimidated, or coerced her, or attempted to do so, and the

---

[11] The Court agrees with Defendants that "there is no evidence that []Priebus or []Spicer had any role in the decision to institute [the Arbitration] against Plaintiff" and, therefore, partial summary judgment should be granted to Priebus and Spicer on this discrete issue. Def. Mem. at 16 n.4. Priebus and Spicer are not entitled to summary judgment on Delgado's retaliation claim to the extent the claim encompasses her constructive termination from the Campaign and denial of a role in the White House for the reasons set forth above.

threat, intimidation, or coercion must go "beyond the adverse employment action itself." *Cadet v. All. Nursing Staffing of N.Y., Inc.*, 632 F. Supp. 3d 202, 237 (S.D.N.Y. 2022); *Mitura v. Finco Servs., Inc.*, 712 F. Supp. 3d 442, 462 (S.D.N.Y. 2024).

Delgado argues that the Campaign threatened her by commencing the Arbitration in an attempt to discourage her from filing a complaint with the NYCCHR.  Pl. Opp. at 36.  If the Court were to conclude that the Arbitration was itself interference, however, it "would make [Delgado's] retaliation claim and 'interference with protect[ed] rights' claim entirely duplicative." *Cadet*, 632 F. Supp. 3d at 237; *see also Palmer v. eCapital Corp.*, No. 23 Civ. 4080, 2024 WL 3794715, at *12 (S.D.N.Y. Aug. 13, 2024).  For that reason, and because the Court is allowing Delgado's retaliation claim to proceed, Delgado cannot maintain that the Arbitration in and of itself constituted interference.

Delgado's remaining arguments are unavailing.  She contends that Miller, a Campaign employee, interfered with her protected rights when he threatened to withhold a White House job from her if she did not have an abortion.  Pl. Opp. at 36.  Miller, however, is not named as a defendant, and there is no evidence that Spicer, Preibus, or the Campaign knew or should have known about Miller's alleged threat, as required for a cause of action based on a supervisory liability theory.  *See* N.Y.C. Admin. Code. § 8-107(13).  Delgado claims that Spicer's directive that she not make public statements regarding the alleged discrimination amounted to a threat, but the record does not reasonably support such a characterization or inference.  *See* Pl. Opp. at 37 (citing Def. Ex. 8 at 48, 89).  The Court, therefore, grants summary judgment to Defendants on Delgado's interference claim.

### E.  Breach of Contract

Both parties seek summary judgment on Delgado's claim that Defendants breached a settlement agreement purportedly reached during the Mediation in May 2017.  Def. Mem. at 21–22; Pl. Mem. at 9–13.  The issue is one of contract formation.  Delgado argues that the parties agreed to settle their dispute in the Mediation for $1.2 million and Defendants reneged on that agreement.  Pl. Mem. at 9.  Defendants contend that no contract was formed.  Def. Mem. at 21.

#### 1.  Legal Standard

Under New York law,[12] a binding contract "requires a 'meeting of the minds' and 'a manifestation of mutual assent.'"  *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288–89 (2d Cir. 2019) (quoting *Express Indus. & Terminal Corp. v. N.Y. Dep't of Transp.*, 715 N.E.2d 1050, 1053 (N.Y. 1999)).  A court looks to "the basic elements of the offer and the acceptance to determine whether there is an objective meeting of the minds sufficient to give rise to a binding and enforceable contract."  *Express Indus.*, 715 N.E.2d at 1053.  Crucially, for a contract to be binding, "[t]he manifestation of mutual assent must be sufficiently definite to assure that the parties are truly in agreement with respect to all material terms."  *Starke*, 913 F.3d at 289; *Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.*, 578 F. Supp. 3d 467, 491 (S.D.N.Y. 2022) ("Generally, 'a mere agreement to agree, in which a material term is left for future negotiations, is unenforceable.'" (quoting *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 417 N.E.2d 541, 543 (N.Y. 1981))).

Parties are free to contract orally, "even if the parties contemplate a writing to evidence their agreement."  *Winston v. Mediafare Ent. Corp.*, 777 F.2d 78, 80 (2d Cir. 1985).  "In such a case, the mere intention to commit the agreement to writing will not prevent contract formation

---

[12] The parties agree that New York law applies to Delgado's claims.  *See* Def. Mem. at 21; Pl. Mem. at 9.

prior to execution." *Id.* But "if either party communicates an intent not to be bound until he achieves a fully executed document, no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract." *Id.* In determining whether parties intend to be bound in the absence of a finalized, executed contract, a court considers

> (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.

*Attestor Value Master Fund v. Republic of Argentina*, 940 F.3d 825, 830 (2d Cir. 2019) (quoting *Winston* 777 F.2d at 80).

### 2. Application

Delgado argues that the 2017 email chain between the parties' attorneys demonstrates that the Mediation resulted in a binding agreement to settle Delgado's claims for $1.2 million. Pl. Mem. at 9, 11–13; *see* Def. Exs. 44–46. The Court disagrees. In the emails, Andrew G. Celli, Delgado's then-attorney, repeatedly asks Defendants' attorney to "confirm" the agreement. *E.g.*, Def. Ex. 44 at P-153, 169. In one of the emails, Celli expresses frustration about not hearing back from Defendants' lawyer, writing that "[t]he inference [he] draws is that [Defendants] are unwilling to settle this matter." *Id.* at P-149. Defendants' counsel later writes that their agreement is "[c]onfirmed as to amount," *i.e.*, $1.2 million, but he expressly says that he and his client "need to work out payments and other terms and reduce to a formal signed writing." *Id.* at P-160. The parties then circulated redline drafts of a settlement agreement, but

there is no evidence that the parties reached a final agreement on the material terms.  *Id.* at P-162–165; Def. Exs. 45–46.

There is no evidence that Defendants agreed to the consideration they would receive in exchange for the $1.2 million—*i.e.*, the scope of Delgado's release of her claims.  Such a term would be critical to any agreement the parties intended to reach.  *See Forden v. Bristol Myers Squibb*, 63 F. App'x 14, 16 (2d Cir. 2003) (affirming order finding that scope of a release in a settlement agreement is a material term under *Winston*); *cf. Winston*, 777 F.2d at 82–83 (stating that even "minor" or "technical" points that remain to be negotiated weigh against a finding that the parties intended to be bound absent a formal writing).  The remaining *Winston* factors are also undisputed:  There was no partial performance of the alleged contract, and a settlement agreement, negotiated by experienced counsel, is precisely the type of agreement that one would expect to be "committed to writing."  *Attestor Value*, 940 F.3d at 830 (quoting *Winston*, 777 F.2d at 80); *id.* at 832 ("[S]ettlement agreements are the type of contract that is usually put into writing.").

Accordingly, Defendants' motion for summary judgment as to Delgado's claim for breach of contract is granted.

### F.   Promissory Estoppel

Delgado also brings a claim for promissory estoppel, arguing that Defendants made "a clear and unambiguous promise . . . to settle her NYCCHR claims" and that she "reasonably and foreseeably relied upon their promise to her detriment by ceasing to pursue those claims."  Am. Compl. ¶ 99.

"Promissory estoppel is a legal fiction designed to substitute for contractual consideration where one party relied on another's promise without having entered into an enforceable

contract." *Bader v. Wells Fargo Home Mortg. Inc.*, 773 F. Supp. 2d 397, 415 (S.D.N.Y. 2011) (citation omitted). "In New York, promissory estoppel has three elements: a clear and unambiguous promise[,] a reasonable and foreseeable reliance by the party to whom the promise is made, and an injury sustained by the party asserting the estoppel by reason of the reliance." *Cyberchron Corp. v. Calldata Sys. Dev., Inc.*, 47 F.3d 39, 44 (2d Cir. 1995) (citation omitted).

Defendants are entitled to summary judgment on Delgado's promissory estoppel claim. Even assuming Delgado has adduced sufficient evidence that Defendants made her a "clear and unambiguous promise" to settle the matter, and Delgado reasonably relied on that promise, she has not offered any evidence that she was harmed by any reliance. *See* Def. Opp. at 14. Indeed, it is hard to see how she could demonstrate harm, given that she ultimately brought the claims that she purports to have released in the settlement and has, by and large, successfully litigated those claims. Her promissory estoppel cause of action, therefore, may not proceed.

### G. Tort Claims

Delgado also brings a claim for tortious interference with prospective economic advantage and a *prima facie* tort cause of action. Am. Compl. ¶¶ 128–35. Defendants move for summary judgment on both claims.

#### 1. Tortious Interference with Prospective Economic Advantage

To succeed on a tortious interference with prospective economic advantage claim under New York law, a plaintiff must show that "(1) [she] had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 261 (2d Cir. 2015) (citation omitted). A plaintiff must "specify some particular, existing relationship through which plaintiff

would have done business but for the allegedly tortious behavior." *Krepps v. Reiner*, 588 F. Supp. 2d 471, 484 (S.D.N.Y. 2008) (citation omitted). Tortious interference with prospective economic advantage is actionable when the interference is "effected by unlawful means or, under the theory of *prima facie* tort, by lawful means without justification." *Quail Ridge Assocs. v. Chem. Bank*, 558 N.Y.S.2d 655, 658 (1990).

Defendants argue that they are entitled to summary judgment on Delgado's tortious interference claim because Delgado fails to show that she had been offered a job by the White House or a federal agency, so there existed no "business relationship" sufficient to satisfy the first element of the tort. Def. Mem. at 26–29. But a firm offer is not required, and a plaintiff can succeed by demonstrating that "but for the actions of the defendant, [a] contract would have been formed," *Jones v. City Sch. Dist. of New Rochelle*, 695 F. Supp. 2d 136, 148 (S.D.N.Y. 2010), or a job would have been offered, *see Murphy v. City of New York*, 874 N.Y.S.2d 407, 408 (App. Div. 2009). The evidence suggests that being placed on the draft White House organization chart by a member of the Transition and/or an incoming White House official was nearly tantamount to receiving an official offer, and as described above, Delgado has proffered sufficient evidence to create a genuine issue of material fact as to whether her removal from the organization chart evinced a discriminatory or retaliatory intent. Although, as Defendants point out, there is evidence of other, legitimate reasons why Delgado was not offered a White House position, such as a lack of experience and sound judgment, *see* Def. Mem. at 26–28, the Court cannot resolve the issue of Defendants' true motivation at summary judgment.

### 2. *Prima Facie* Tort

Defendants also move for summary judgment on Delgado's "*prima facie* tort" cause of action. Def. Mem. at 29–30; *see* Am. Compl. ¶¶ 131–35. "Under New York law, there are four

elements to a claim of *prima facie* tort: (1) an intentional infliction of harm; (2) without excuse or justification and motivated solely by malice; (3) resulting in special damages; (4) by an act that would otherwise be lawful." *McKenzie v. Dow Jones & Co.*, 355 F. App'x 533, 536 (2d Cir. 2009) (summary order) (italics added); *see also Curiano v. Suozzi*, 469 N.E.2d 1324, 1327 (N.Y. 1984). Although "*prima facie* tort may be pleaded in the alternative with a traditional tort, once a traditional tort is established[,] the cause of action for prima facie tort disappears." *Curiano*, 469 N.E.2d at 1327 (italics added). To recover for *prima facie* tort, "malevolence" must be "the sole motive for [the] defendant's otherwise lawful act." *Burns Jackson Miller Summit & Spitzer v. Lindner*, 451 N.E.2d 459, 468 (N.Y. 1983) ("[T]he genesis which will make a lawful act unlawful must be a malicious one unmixed with any other and exclusively directed to injury and damage of another." (quotation omitted)). Consequently, the existence of other motives, "such as profit, self-interest, or business advantage" will defeat a claim. *Marcella v. ARP Films, Inc.*, 778 F.2d 112, 119 (2d Cir. 1985).

Delgado contends that Defendants committed a *prima facie* tort when they "intentional[ly] interfere[d] with [her] attempts to obtain a White House position." Am. Compl. ¶ 135. Defendants argue that there is no genuine dispute that they had "had other motives for refusing to hire [Delgado] aside from pure malevolence," Def. Mem. at 29, and that Delgado has produced "not a scintilla of evidence" that she would have received a job in the White House but for Defendants' alleged actions, *id.* at 29–30. As the Court has explained, however, Delgado has proffered sufficient evidence to create a triable issue of Defendants' intent, whether discriminatory or retaliatory. *See also Nat'l Union Fire Ins. Co. of Pittsburgh v. Turtur*, 892 F.2d 199, 205 (2d Cir. 1989) ("Questions of intent . . . are usually inappropriate for disposition on summary judgment."); *Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (2d Cir. 2001) (same).

To the extent Defendants' actions were based on discriminatory or retaliatory intent, however, those actions would not otherwise be lawful under a *prima facie* tort analysis. *See, e.g.*, *Krause v. Kelehan*, No. 617 Civ. 1045, 2018 WL 2021484, at *16 (N.D.N.Y. Apr. 26, 2018) ("Gender discrimination is not an act[] that would otherwise be lawful.") (alternation in original) (citation omitted); *Chen v. United States*, 854 F.2d 622, 629 (2d Cir. 1988) (stating that "[r]acial harassment . . . [does not] constitute[] conduct that is otherwise lawful" under a *prima facie* tort analysis.) Accordingly, Delgado's *prima facie* tort claim cannot survive summary judgment.

III. <u>Order Denying Leave to Amend</u>

Delgado moves for reconsideration of the Court's order denying her leave to amend her complaint to add Miller, Michael Glassner, and Eric Trump as additional defendants. ECF No. 525; *see also* ECF Nos. 520, 534–36.

A. Legal Standard

"Reconsideration of a previous order by the court is an extraordinary remedy to be employed sparingly." *In re Beacon Assocs. Litig.*, 818 F. Supp. 2d 697, 701 (S.D.N.Y. 2011) (quotation omitted). It should be granted "only when the [movant] identifies 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 104 (2d Cir. 2013) (quoting *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)). Only errors that are "direct, obvious, and observable," *Corpac v. Does*, 10 F. Supp. 3d 349, 354 (E.D.N.Y. 2013), or that leave the Court with "with the definite and firm conviction that a mistake has been committed," *Anderson v. Bessemer City*, 470 U.S. 564, 573–74 (1985), are sufficient to warrant reconsideration. "A motion for reconsideration is not 'an occasion for repeating old arguments previously rejected nor an opportunity for making

31

new arguments that could have been previously advanced.'" *Mikhaylova v. Bloomingdale's Inc.*, No. 19 Civ. 8927, 2023 WL 2237541, at *1 (S.D.N.Y. Feb. 27, 2023) (quoting *Assoc. Press v. U.S. Dep't of Def.*, 395 F. Supp. 2d 17, 19 (S.D.N.Y. 2005)).

B. Application

Delgado does not identify any decisions or information that the Court failed to consider in its order denying leave to amend and instead criticizes Judge Parker's handling of discovery. Her criticisms lack merit.

Delgado argues that Judge Parker is responsible for Delgado's delay in seeking to depose Miller and, consequently, for her delay in requesting to add him as a defendant. ECF No. 525 at 5. Specifically, Delgado argues that Judge Parker, when selecting which non-parties she would allow Delgado to depose, did not select Miller from Delgado's list of requested non-parties to depose. *Id.*; *see* ECF No. 202 (Delgado's list of requested depositions); ECF No. 204 at 2 (Judge Parker's order denying leave to depose Miller). The Court addressed Delgado's objections to Judge Parker's handling of the non-party depositions more than a year ago and does not revisit those objections now. *See* ECF Nos. 241, 244; *Mikhaylova*, 2023 WL 2237541, at *1.

Delgado makes similar arguments about Glassner, blaming Judge Parker for not letting her depose Glassner earlier, which ostensibly would have allowed Delgado to move to add him as a defendant earlier. *See* ECF No. 525 at 7–12. But Judge Parker *did* allow Delgado to depose Glassner, and she restricted the subject matter of the deposition to that which Delgado had identified as relevant. *See* ECF No. 202 at 3 (Delgado's list of requested depositions, which identifies Glassner as "part of the discussions of the 2017 settlement" and "relevant to the breach-of-contract issue"); ECF No. 204 at 2 (allowing Delgado to depose Glassner on "information relevant to the breach of contract claim"). Delgado then declined to take

Glassner's deposition.  ECF No. 525 at 9.  This background is relevant to Judge Parker's denial of Delgado's subsequent motion to reopen discovery for the purposes of deposing Glassner based on newly discovered information about Glassner's alleged involvement in the Campaign's decision to bring the Arbitration.  *See generally* ECF No. 281.  Judge Parker did not err in concluding that Delgado's previous failure to depose Glassner, combined with her initial failure to ask Defendants to identify individuals with knowledge of her retaliation claims, did not constitute "good cause" for reopening discovery and adding Glassner as a defendant.  *See* ECF No. 411 & n.2; ECF No. 381 at 2–3.  Accordingly, Delgado's untimely and meritless objections to Judge Parker's discovery rulings do not provide a basis for the Court to reconsider its order denying Delgado leave to amend her complaint after discovery had closed.

Lastly, Delgado asks the Court to reconsider its order denying her leave to name Eric Trump as a defendant.  ECF No. 525 at 12–16.  Even if the Court were to accept Delgado's argument that she could not have known about Eric Trump's involvement in Defendants' allegedly retaliatory conduct until July 2024, when he turned over his final set of documents, *see id.* at 16; ECF No. 366 at 13 (Judge Parker's order directing Eric Trump to produce certain documents by July 3, 2024), the Court would still not allow Delgado to add him as a party because Delgado again fails to demonstrate how these documents show that Trump was "a key player in the retaliation" against her, *see* ECF No. 520 at 7 (quoting ECF No. 403 at 4).  The documents, which consist of an email chain from the summer and fall of 2017, merely show that counsel for Defendants would update Eric Trump about the status of the Arbitration.  *See* ECF No. 525 at 14, 36–52.  They do not demonstrate anything more than that, and the Court shall not permit Delgado to add Eric Trump as a defendant at this late stage.

The Court has considered the remainder of Delgado's arguments in favor of reconsideration and finds them to be without merit or otherwise duplicative of arguments she has already raised before the Court.  Accordingly, Delgado's motion for reconsideration is denied.

IV.    Motion to Seal

     A.  Legal Standard

The public enjoys a "general right to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978).  This presumption of public access "is based on the need for federal courts . . . to have a measure of accountability and for the public to have confidence in the administration of justice." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006) (quoting *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995)).

Courts conduct a three-step analysis to determine whether sealing is warranted.  First, a court must determine whether the relevant material constitutes a "judicial document," *i.e.*, a document that is "relevant to the performance of the judicial function and useful in the judicial process." *Lugosch*, 435 F.3d at 119 (quoting *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995)).  If material constitutes a "judicial document," the "common law presumption of access attaches," and a court must evaluate the "weight of that presumption." *Id.*  "[T]he presumption of public access is at its highest when the material is relevant to a court's decision on a dispositive motion." *SEC v. Ripple Labs, Inc.*, No. 20 Civ. 10832, 2022 WL 329211, at *1 (S.D.N.Y. Feb. 3, 2022).  The presumption is "weaker where the 'documents play only a negligible role in the performance of Article III duties.'" *Olson v. Major League Baseball*, 29 F.4th 59, 89 (2d Cir. 2022) (quoting *Amodeo*, 71 F.3d at 1050).

A court must then balance the weight of the presumption against "competing considerations," including "the privacy interests of those resisting disclosure," *Lugosch*, 435 F.3d at 120 (quoting *Amodeo*, 71 F.3d at 1050), and "the protection of sensitive, confidential, or proprietary business information," *Ripple*, 2022 WL 329211, at *1. Ultimately, sealing judicial documents "may be justified only with specific, on-the-record findings that sealing is necessary to preserve higher values and only if the sealing order is narrowly tailored to achieve that aim." *Lugosch*, 435 F.3d at 124. The party seeking to file documents under seal "bears the burden of showing that higher values overcome the presumption of public access." *Samsung Elecs. Co., Ltd. v. Microchip Tech. Inc.*, No. 24 Misc. 269, 2024 WL 4169353, at *2 (S.D.N.Y. Sept. 12, 2024) (quoting *Kewazinga Corp. v. Google LLC*, No. 20 Civ. 1106, 2024 WL 3442428, at *1 (S.D.N.Y. July 17, 2024)).

B. Application

Defendants request the sealing of two categories of information from the exhibits they submitted in connection with their motion for summary judgment. ECF No. 435. First, they seek to redact personal email addresses, cellphone numbers, and compensation information. *Id.* at 1. Second, they ask the Court to redact the payment terms from the draft settlement agreement that the parties circulated after the Mediation. *Id.* These documents are all judicial documents because they were submitted in connection with Defendants' summary judgment motion, *see Lugosch*, 435 F.3d at 121, so the questions are the weight of the presumption of public access that attaches and whether Defendants have met their burden to overcome that presumption by showing that the nonpublic filing is narrowly tailored to promote higher interests.

The Court agrees with Defendants that all personal home addresses, email addresses, and cellphone numbers, none of which are relevant to the motions before the Court, may be redacted.

*See Farris v. Avon Prods., Inc.*, No. 23 Civ. 2023, 2024 WL 4441811, at *4 (S.D.N.Y. Oct. 7, 2024) ("Typically, sealing of personal information such as [a person]'s home addresses, personal phone numbers, and email addresses that is not public is warranted unless that information has bearing on issues before the court." (citation omitted)).

However, the Court sees no reason to allow Defendants to redact the details of Delgado's compensation or the payment terms of the parties' draft settlement agreement. The total amount of Delgado's compensation, information that is almost ten years old, is relevant to the issue of which entity paid Delgado during her tenure at the Campaign. And the terms of the draft settlement agreement need not be redacted because the total value of the proposed agreement is already public information. *See* Pl. Mem. at 5; *Chigirinskiy v. Panchenkova*, 319 F. Supp. 3d 718, 739 (S.D.N.Y. 2018) (rejecting motion to seal provisions of a settlement agreement "represent[ing] minor details in a dispute that was otherwise made public in the pleadings"). Moreover, Defendants have not stated why this information should be sealed, preventing the Court from making a specific finding that sealing "is necessary to preserve higher values." *Lugosch*, 435 F.3d at 124. Defendants' motion to redact Delgado's compensation amount and the terms of the parties' draft settlement agreement is denied without prejudice to permit Defendants to submit a renewed motion by the date set forth below to more fully explain their concerns. Should Defendants opt not to renew their sealing motion as to those materials, the materials must be filed on the public docket by the same date.

V.     <u>Remaining Defendant</u>

Under Federal Rule of Civil Procedure 4(m), "[i]f a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff— must dismiss the action without prejudice against that defendant or order that service be made

within a specified time." If the plaintiff shows good cause for the failure to timely serve the defendant, the time for service must be extended. Fed. R. Civ. P. 4(m).

Delgado had 90 days from the time her amended complaint was filed to serve Bannon, in other words, until June 26, 2022. Now, over three years later, Bannon has not appeared in this action, and there is no indication that service was effectuated. *See* ECF No. 312 at 10 n.1. Accordingly, by **September 25, 2025**, Delgado shall either show cause, in writing, why the claim against Bannon should not be dismissed or, alternatively, file a notice voluntarily dismissing Bannon from this action.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment, ECF No. 434, is GRANTED IN PART and DENIED IN PART, and Delgado's motion for partial summary judgment, ECF Nos. 501, 503, is DENIED. Specifically:

1. Defendants' motion for summary judgment on Delgado's discrimination claims under NYSHRL and NYCHRL is DENIED.

2. Defendants' and Delgado's cross-motions for summary judgment on Delgado's retaliation claims under NYSHRL and NYCHRL are DENIED.

3. Defendants' motion for summary judgment on Delgado's interference claim is GRANTED.

4. Defendants' and Delgado's cross-motions for summary judgment on Delgado's breach of contract claim is GRANTED as to Defendants and DENIED as to Delgado.

5. Defendants' motion for summary judgment on Delgado's promissory estoppel claim is GRANTED.

6. Defendants' motion for summary judgment on Delgado's tortious interference with prospective economic advantage cause of action is DENIED.

7. Defendant's motion for summary judgment on Delgado's *prima facie* tort claim is GRANTED.

Delgado's motions to strike the declaration of Michael Glassner, ECF No. 471, and for reconsideration of the Court's order denying her leave to amend her complaint, ECF No. 525, are DENIED.

Defendants' motion to seal, ECF No. 435, is GRANTED IN PART and DENIED IN PART without prejudice to renewal.  Specifically, the motion is GRANTED with respect to all personal home addresses, email addresses, and cellphone numbers, and the motion is DENIED in all other respects.  By **September 25, 2025**, Defendants may file a renewed motion to seal with proposed redactions consistent with this Order.[13]  If they choose not to renew their sealing motion, then, by that same date, Defendants shall file the settlement and compensation materials referenced in the initial sealing motion on the public docket.

By **September 25, 2025**, Delgado shall file copies of her summary judgment exhibits on the public docket.  She is directed to file them with the redactions that the Court has already approved, *i.e.*, with personal home address, email addresses, and cellphone numbers redacted.

Trial on the remaining claims is scheduled for **November 7, 2025**.  The parties are directed to strictly comply with Section V of the undersigned's Individual Practices in Civil Pro Se Cases concerning pretrial filings.

The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 434, 435, 471, 501, 503, and 525.

SO ORDERED.

Dated:  September 11, 2025
       New York, New York

ANALISA TORRES
United States District Judge

---

[13] By that **same date**, Defendants shall also refile an appropriately redacted copy of Defense Exhibit 1, which does not currently appear on the public docket.  *See* ECF No. 440-1.